UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| STEVEN BECK, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **<u>JURY TRIAL DEMANDED</u>** |
| v. | |
| FORD MOTOR COMPANY, a Delaware Limited Liability Company, | |
| Defendant. | |

<u>**CLASS ACTION COMPLAINT**</u>

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................... 1

II.   JURISDICTION ...................................................................................... 6

III.  VENUE ...................................................................................................... 6

IV.   PARTIES .................................................................................................. 7

    A.    Plaintiff ......................................................................................... 7

        1.    Steven Beck ........................................................................ 7

    B.    Defendant ..................................................................................... 8

V.    FACTUAL ALLEGATIONS ............................................................... 9

    A.    Ford marketed the Roof-Crush Defect Vehicles as safe and reliable, and Ford knew that these attributes were material to consumers. ..................................................................................... 9

    B.    Ford's Vehicle Warranties ..................................................... 16

    C.    The Roof-Crush Defect .......................................................... 16

    D.    Ford knew or should have known of the Roof-Crush Defect and never disclosed the defect to Plaintiff and the Class. ................. 21

    E.    All class members could have been made aware of the Roof-Crush Defect at the point of sale. ...................................................... 23

VI.   TOLLING OF THE STATUTE OF LIMITATIONS ................. 24

    A.    Discovery Rule Tolling .......................................................... 24

    B.    Estoppel ...................................................................................... 25

VII.  CLASS ALLEGATIONS ................................................................... 25

VIII. CLAIMS ................................................................................................ 29

000700-00/2020553 V1

A.      Nationwide Claims ................................................................ 29

COUNT I VIOLATION OF THE MAGNUSON-MOSS WARRANTY
    ACT (15 U.S.C. § 2301, *et seq.*)...................................................... 29

COUNT II FRAUDULENT CONCEALMENT (COMMON LAW)
    (Alleged by Plaintiff on behalf of the Nationwide Class) ........................... 34

COUNT III UNJUST ENRICHMENT (COMMON LAW) ................................. 37

B.      State-Specific Claims .......................................................... 39

COUNT IV VIOLATION OF THE CALIFORNIA CONSUMER
    LEGAL REMEDIES ACT (Cal. Civ. Code § 1750, *et seq.*) ...................... 39

COUNT V VIOLATIONS OF THE CALIFORNIA UNFAIR
    COMPETITION LAW (Cal. Bus. & Prof. Code § 17200) ......................... 42

COUNT VI VIOLATIONS OF CALIFORNIA FALSE ADVERTISING
    LAW (Cal. Bus. & Prof. Code § 17500, et seq.) ........................................ 45

COUNT VII VIOLATION OF SONG-BEVERLY CONSUMER
    WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY
    OF MERCHANTABILITY UNDER CALIFORNIA LAW (Cal.
    Civ. Code §§ 1791.1 & 1792) ...................................................... 47

REQUEST FOR RELIEF ...................................................................... 50

DEMAND FOR JURY TRIAL ........................................................... 51

Plaintiff files this lawsuit individually and on behalf of proposed nationwide and statewide classes. Plaintiff alleges the following based on personal knowledge as to his own acts and experiences and, as to all other matters, based on the investigation of counsel:

## I.      INTRODUCTION

1.      The most important duty of a car manufacturer is to provide consumers with a safe car. A second related duty is to promptly warn consumers and fix or replace a car where the manufacturer learns of a defect that implicates serious safety issues. Ford Motor Company ("Ford") breached these fundamental duties by selling Ford Super-Duty pick-up trucks that Ford knew had a dangerously weak roof structure that would collapse in the event of a roll-over accident, gravely injuring or killing vehicle occupants. Though Ford knew of the roof crush risk prior to selling the Super-Duty pick-up trucks at issue, it did nothing to promptly warn owners and lessees, instead entering into secret settlements with crash victims to hide the deadly nature of its roof design defect.

2.      Model year 1999-2016 Ford Super-Duty Pick-Up trucks (the "Roof-Crush Defect Vehicles") contain a defect in the design of their roofs that cause the roofs to be crushed in the event of a rollover accident, resulting in grave and deadly injury to vehicle occupants (the "Roof-Crush Defect").

3.      The Roof-Crush Defect exposes putative class members to an unreasonable risk of injury and death if their vehicle is involved in a rollover accident.

4.      This catastrophic injury and death risk is the direct result of a design defect that was known to Ford and is still unremedied by Ford. Not only did Ford fail to disclose the Roof-Crush Defect to consumers before their purchases of Roof-Crush Defect Vehicles, but it also misrepresented the vehicles' safety, reliability, functionality, and quality by this omission. Ford also omitted the consequences, including the serious safety hazards and monetary harm caused by the Roof-Crush Defect—e.g., damage to a vehicle and injury or death to persons in the vehicle or another vehicle in proximity should the Roof-Crush Defect Vehicle become involved in an accident.

5.      The dangerous and deadly defect in the Roof-Crush Defect Vehicles gained national attention on August 19, 2022, when a jury in Georgia awarded $1.7 billion in punitive damages to the family of Melvin and Voncile Hill, who were killed when the roof of their 2002 F-250 Super-Duty collapsed in a rollover accident.[1]

---

[1] *See* **Exhibit 1**, https://www.wsj.com/articles/ford-faces-1-7-billion-verdict-in-fatal-rollover-of-f-250-pickup-11661033662 (last visited Sept. 1, 2022).

- 2 -

6.      In that case, the lawyers for the plaintiffs argued that the roofs on the 1999-2016 Super Duty trucks were defectively designed and dangerously weak and that Ford allegedly knew of the dangers posed by the roofs. The plaintiffs' attorneys pointed to evidence they said showed the roof on these trucks failed in the company's own internal testing and that Ford engineers developed a stronger roof for its Super Duty pickups in 2004 but that roof wasn't used in trucks sold to customers until the 2017 model year, according to court documents.[2]

7.      The pretrial order in the Hill case states that Ford has identified 162 lawsuits and 83 similar incidents of the roof crush involving the 1999-2016 Super Duty trucks.[3]

8.      A vehicle that is knowingly designed to fail and introduce a grave risk of injury or death in a foreseeable and common type of accident is not fit for its ordinary purpose. When a vehicle manufacturer has the ability to eliminate a grave safety risk on a vehicle model line but chooses not to do so in order to save manufacturing costs, and then fails to warn purchasers of these vehicles of this known and deadly risk, such manufacturer engages in a deadly fraud for which it should be held accountable.

---

[2] *See id.*

[3] *See id.*

9.     Ford knew about the Roof-Crush Defect before the Roof-Crush Defect Vehicles went to market, and certainly knew well before it issued its much stronger redesigned roof which it affirmatively chose not to use on the Roof-Crush Defect Vehicles. Ford's knowledge is evidenced by: (1) its own internal investigations and documents as further described below; (2) the rigorous pre-launch testing of the Roof-Crush Defect Vehicles; (3) the direct and public reports of deadly accidents involving Roof-Crush Defect Vehicles; and (4) Ford's own investigation of accidents in the Roof-Crush Defect Vehicles and its practice of settling lawsuits involving such accidents with secrecy clauses that hid the dangerous nature of the Roof Crush Defect and its knowledge of the defect while it continued to sell Roof-Crush Defect Vehicles.

10.     Ford offers no reimbursement to Roof-Crush Defect Vehicle owners and lessees for out-of-pocket expenses, loss of use, and loss of value. Because a repair to the Roof-Crush Defect Vehicles is not being made, putative class members are left without a safely operable vehicle for an unknown and potentially lengthy period.

11.     Because of Ford's omissions regarding the Roof-Crush Defect and failure to act more quickly in disclosing and providing a remedy, it has violated state consumer protection acts, been unjustly enriched, and breached implied warranties of merchantability. Plaintiff and other owners and lessees of the Roof-

- 4 -

Crush Defect Vehicles have been injured in fact, incurred damages, and suffered ascertainable losses in money and property. Had Plaintiff and the putative class members known of the Roof-Crush Defect, then they would either not have purchased or leased those vehicles or would have paid substantially less for them. Fires in the Roof-Crush Defect Vehicles also necessitate expensive repairs, car rentals, car payments, towing charges, property damage, time off work, loss of use, and other miscellaneous costs.

12.     Ford may argue in response to this complaint that many class members and even Plaintiff have not had a rollover crash where their roof was crushed and as such are uninjured. Ford had a duty to tell the truth at the point of sale and plaintiff and members of the class were injured by overpaying for cars that would have sold for less if the truth had been told, or they would not have paid for them at all. And plaintiffs don't have to wait for the ticking time bomb to explode before they can claim injury.

13.     Plaintiff brings this class action to redress Ford's misconduct. Plaintiff seeks damages and a repair under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 23-1-2312, state consumer protection acts, state implied warranty acts, and unjust enrichment at common law.

- 5 -

## II.   JURISDICTION

14.     This Court has original jurisdiction over this lawsuit under the Class

Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) and (6), because Plaintiff

and Defendant are citizens of different states; there are more than 100 members of

the Nationwide Class and the California Subclass (as defined herein); the aggregate

amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest,

and costs; and class members reside across the United States. The citizenship of

each party is described further below in the "Parties" section.

15.     This Court has personal jurisdiction over the Defendant by virtue of

its transactions and business conducted in this judicial district, and because

Defendant is headquartered in Michigan. Defendant has transacted and done

business, and violated statutory and common law, in the State of Michigan and in

this judicial district.

## III.   VENUE

16.     Venue is proper in this judicial district under 28 U.S.C. § 1391

because Defendant transacts substantial business and is headquartered in this

district.

## IV.   PARTIES

**A.   Plaintiff**

> **1.   Steven Beck**

17.    Plaintiff and proposed class representative Steven Beck ("Plaintiff" for purposes of this Section) is a resident and citizen of Paso Robles, California. On or about June 1, 2015, Plaintiff purchased a new Ford F-350 Super-Duty from South Bay Ford in Hawthorne, California. Plaintiff's Ford F-350 Super-Duty is a Roof-Crush Defect Vehicle that suffers from the Roof-Crush Defect.

18.    Plaintiff purchased his Roof-Crush Defect Vehicle as his primary vehicle for work in his vineyard and occasional personal use.

19.    Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these were the primary reasons Plaintiff purchased the Roof-Crush Defect Vehicle over the other large work trucks available in the marketplace. However, despite touting the safety and reliability aspect of the Roof-Crush Defect Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Defect to Plaintiff before his purchase.

20.    Plaintiff is concerned about driving the Roof-Crush Defect Vehicle because he no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident. This is an especially acute problem

because Plaintiff has also experienced the so-called "death-wobble" in his truck, which he fears could easily result in a rollover incident.[4]

21.    Plaintiff would not have purchased a Roof-Crush Defect Vehicle if he had been aware of the Roof-Crush Defect.

**B.    Defendant**

22.    Defendant Ford Motor Company ("Ford") is a Delaware limited liability company organized and existing under the laws of the State of Delaware. Ford's principal place of business and headquarters is One American Road, Dearborn, Michigan 48126.

23.    Ford is a motor vehicle manufacturer and a licensed distributor of new, previously untitled Ford and Lincoln motor vehicles. The Ford brand is one of the "Big Three" American automobile brands. Lincoln is Ford's luxury automobile brand. Ford engages in commerce by distributing and selling new and used passenger cars and motor vehicles under its Ford and Lincoln brands.

24.    Ford, through its various entities, designs, manufactures, markets, distributes, and sells automobiles throughout the U.S. and worldwide. Ford and its agents designed and manufactured the Roof-Crush Defect Vehicles. Ford also developed and disseminated the owner's manuals and warranty booklets,

---

[4]*See* **Exhibit 2,** *What You Should Know About the Ford Super Duty Death Wobble.* Available at: https://www.motorbiscuit.com/what-you-should-know-about-the-ford-super-duty-death-wobble/ (last visited Sept. 1, 2022).

advertisements, brochures, and other promotional materials relating to the Roof-Crush Defect Vehicles, with the intent that such documents be purposely distributed throughout all fifty states. Ford is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

25.     Ford authorized automobile dealerships sell automobiles under the Ford brand name and disseminate vehicle information provided by Ford to customers. At all relevant times, Ford's dealerships served as its agents for motor vehicle repairs and warranty issues because they performed repairs, replacements, and adjustments covered by Ford's manufacturer warranty under the contracts between Ford and its nearly 10,000 authorized dealerships worldwide.

## V.     FACTUAL ALLEGATIONS

**A.     Ford marketed the Roof-Crush Defect Vehicles as safe and reliable, and Ford knew that these attributes were material to consumers.**

26.     The Ford Roof-Crush Defect Vehicles are marketed to consumers as safe, reliable vehicles, and Ford knew these qualities were material to consumers in marketing them in this manner. These qualities were in fact material to Plaintiff.

27.     For example, in the sales brochure for the 2013 Ford F-350 Super Duty (Plaintiff Beck's truck), Ford touted various safety features "like the driver and right-front-passenger front airbags, front-seat side airbags, and our Safety

- 9 -

Canopy® System with its rollover sensor and side-curtain airbags" in the Roof-

Crush Defect Vehicles.[5]

**LOTS OF WAYS TO MAKE IT YOURS.**








Take comfort in serious safety standards like the driver and right-front-passenger front airbags, front-seat side airbags, and our Safety Canopy® System with its rollover sensor and side-curtain airbags. Add options to help power your electronics, extend your cargo-carrying capabilities, stow your valuables securely out of sight and much more. Build the Super Duty® you want, just the way you want it.

6 airbags standard

Mini-console with front bucket seats¹

Flow-through center console¹ with 110-volt power outlet and two 12-volt powerpoints

Stowable bed extender¹

LARIAT Crew Cab with lockable rear under-seat storage¹ and flow-through center console¹

---

[5] *See* **Exhibit 3**, MY 2013 Ford SuperDuty brochure, at 16.

- 10 -

28.     On the final page of the brochure, knowing safety is material to Plaintiff and putative class members, Ford emphasized the key points of its SuperDuty advertising: "Quality, Green, Safe and Smart".[6]



29.     Ford also emphasizes the SuperDuty's overall reliability, noting the truck "has endured more torture testing than any previous generation of Ford Truck" and that "A world-class team put this truck through a groundbreaking battery of computer simulations, lab and real-world test, running it for thousands of hours on end in extreme conditions."[7]

---

[6] **Exhibit 3**, at 29.

[7] *Id.* at 3.



# OUTWORKS ALL THE REST.

This Super Duty® has endured more torture testing than any previous generation of Ford Truck — including over 10 million cumulative miles on the most tested Power Stroke® diesel engine ever. A world-class team put this truck through a groundbreaking battery of computer simulations, lab and real-world tests, running it for thousands of hours on end in extreme conditions. Scorching heat. Bitter cold. Loaded to the max. Up the steepest grades. All to confirm that it is far more than the sum of its parts.

Super Duty is built to be the best, most capable truck in its class,[1] bringing you the best diesel and gas fuel economy,[2] plus max. capabilities and lots of other features only Ford can deliver. With the most configurations of any truck in its class, there's a Super Duty just right for you and your work.

### Best in Class

- Max. Horsepower and Torque: Diesel and Gas
- Max. Conventional Towing: 18,500 lbs.[3]
- Max. 5th-Wheel Towing: 24,700 lbs.[3]
- Max. GCWR: 33,000 lbs.[3]
- Max. Payload: 7,260 lbs.[3]
- Fuel Economy: Diesel and Gas

### Class Exclusive

- 5th-Wheel/Gooseneck Trailer Tow Prep Package[4]
- Standard Trailer Sway Control on both SRW and DRW
- Hill Descent Control™[4]
- Tailgate Step[4]
- Cable Lock by Master Lock®[4][5]
- LCD Productivity Screen[4]
- Standard MyKey®
- Standard Safety Canopy® System
- Live-Drive Power Take-Off (PTO)[4]

[1]Class is Full-Size Pickups over 8,500 lbs. GVWR vs. 2012/2013 competitors. [2]Based on Ford drive-cycle tests of comparably equipped 2011/2012 Ford and 2011/2012 competitive models. [3]When properly equipped. [4]Available feature. [5]Ford Licensed Accessory. See your dealer for limited warranty details.

2013 **SUPER DUTY**®
ford.com

BUILT Ford TOUGH

- 12 -

30.     Ford repeatedly emphasized the capability and structural strength of the SuperDuty, proclaiming it "The most capable Pickup in North America. Its muscular sheet metal wraps around an incredibly strong structure and its stance clues you in to the huge capabilities on tap."[8]



31.     Ford also repeatedly stressed the safety of its SuperDuty line, emphasizing "Safe Trucks" as one of the four pillars of the product line.[9]

---

[8] **Exhibit 4**, MY 2009 SuperDuty brochure, at 2.

[9] *See id.*, at 22.



32.    And throughout its brochures, Ford stresses "Built Ford Tough" and "Durability: Super Duty is built to the extremely high standards of durability and reliability you'd expect in a full-size pickup that's Built Ford Tough."[10]

---

[10] *See, e.g.,* **Exhibit 5**, 2011 SuperDuty brochure, at 2.

Thank you for your interest in the **2011 Ford Super Duty**. Included in this brochure you'll find information about:

**POWER:** 6.2L gas and 6.7L Power Stroke™ turbo diesel engine with greater displacement and impressive fuel economy are all-new Super Duty powerplants.

**DURABILITY:** Super Duty is built to the extremely high standards of durability and reliability you'd expect in a full-size pickup that's Built Ford Tough.

**CAPABILITY:** Tons of great features, like new Anti-Sway Control, that make working those tough jobs a lot easier. And best-in-class payload and towing? You bet.

**PRODUCTIVITY:** Available Ford Work Solutions™ and new 4.2-inch LCD Productivity Screen are two big Super duty features that'll favorably impact your bottom line.

33.     Plaintiff and putative class members, believing in the safety and durability of the Roof-Crush Defect Vehicles as touted by Ford, paid many thousands of dollars for the vehicles. The Manufacturer's Suggested Retail Price ("MSRP") for Plaintiff's Roof Crush Defect Vehicle, the 2013 Ford F-350 SuperDuty, starts at $30,770 for the base-level trim and goes up to $55,540 for the SuperDuty Platinum 4WD DRW Crew Cab.[11] The Manufacturer's Suggested Retail Price ("MSRP") for the most recent Roof Crush Defect Vehicle, the 2016 Ford F-350 SuperDuty, starts at $33,280 for the base-level trim and goes up to $59,340 for the SuperDuty Platinum 4WD DRW Crew Cab.[12]

34.     Plaintiff and putative class members would not have paid these prices for Roof-Crush Defect Vehicles if they had known that the vehicles were not, in fact, safe and durable.

---

[11] **Exhibit 6**, *2013 Ford F-350*, MOTORTREND.COM, https://www.motor trend.com/cars/ford/f-350/2013/ (last visited Sept. 1, 2022).

[12] **Exhibit 7**, *2016 Ford F-350*, MOTORTREND.COM, https://www.motor trend.com/cars/ford/f-350/2016/ (last visited Sept. 1, 2022).

- 15 -

**B.     Ford's Vehicle Warranties**

35.     Ford's New Vehicle Limited Warranty for SuperDuty model years 1998-2016 provides "bumper-to-bumper" coverage for 3 years/36,000 miles, whichever comes first.[13] On information and belief, this warranty coverage includes defects like the Roof-Crush Defect in the Roof-Crush Defect Vehicles.

36.     Because the Roof-Crush Defect Vehicles are all model year 2016 and older, no Roof-Crush Defect Vehicles are still covered under Ford's new vehicle and powertrain warranties.

**C.     The Roof-Crush Defect**

37.     As multiple juries and courts have concluded in a host of personal injury and wrongful death lawsuits, the roof design in 1999-2016 Ford SuperDuty trucks (which all share the PHN-131 design platform) is defective because the roofs are easily crushed in rollover accidents causing grave and fatal injuries to vehicle occupants.[14]

---

[13] *See, e.g.,* **Exhibit 3**, MY 2013 Ford SuperDuty brochure, at 29; **Exhibit 4**, MY 2009 Ford SuperDuty brochure, at 16; **Exhibit 5**, MY 2011 Ford SuperDuty brochure, at 15.

[14] *See, e.g., Wurm v. Ford Motor Co.*, 2:18-cv-02322 (D. Kan.) (Crushed roof on 1999 F-250 SuperDuty); **Exhibit 11**, *Taylor v. Ford Motor Co.*, 1:06-cv-00069 (D. Maine) (Crushed roof in 2002 F-250 SuperDuty); *Gibson v. Ford Motor Co.*, 1:06-cv-01237 (N.D. Ga.) (Crushed roof on 2001 F-350 SuperDuty); *Pena, et al. v. Ford Motor Co.,* 4:2008-cv-00501 (D. Ariz.) (Crushed roof in F-250 SuperDuty); *Ott v. Ford Motor Co.*, 4:03-cv-00101 (W.D. Ky.) (Crushed roof in 2000 F-250 SuperDuty); *Aguirre v. Ford Motor Co.*, 7:15-cv-00063 (W.D. Tex.) (Crushed roof in 2006 F-350 SuperDuty).

- 16 -

38.     The complaints, trial briefs, orders, findings of fact and other

pleadings in these cases convincingly establish a disturbing timeline evidencing

that Ford not only knew that the SuperDuty trucks had unsafe and inadequate roof

strength, but since there was no applicable standard regulating roof strength, Ford

purposefully downgraded roof strength in order to save manufacturing costs and

thereby enhance its profits. These facts establish that Ford had safer alternative

designs available, yet it chose not to rectify this defect.[15]

39.     For example, the trial brief in *Ott v. Ford Motor Co.* explained with

respect to a model year 2000 F-250 SuperDuty:

> Ford admits it did not perform a physical roof strength
> test prior to the vehicle being sold—not a dolly rollover
> test, not a roof drop test and not a Federal Motor Vehicle
> Safety Standard ('FMVSS') 216 roof crush test. Ford
> claims it performed a computer version of the FMVSS
> 216 test, but it cannot find the test data or any test report.
> Litigation testing shows that not only did the F-250 roof
> fail to meet Ford's 10,500 pound roof strength design
> target, it also shows that the roof strength of its F-250
> Super Duty truck is weaker that its smaller and lighter
> pickup trucks—the F-150 and Ranger."[16]

40.     *Ott* marshalled shocking evidence that Ford deliberately *reduced* the

strength and structural integrity of the SuperDuty roof system in order save

---

[15] *See id*.

[16] *See* **Exhibit 6** (*Ott*, 4:03-cv-00101, Dkt. No. 76-2 at 3).

production costs and "enhance the corporate overall truck profitability."[17] Plaintiff

included the following table of design changes made *pre-production* to the 1999

model year SuperDuty:

**Pre-Production Design Changes in PHN-131 Roof Structure (between 3/31/94 program implementation and 1/05/98 Job #1)[8]**

| Design Change | Date | % Reduction | Savings |
|---|---|---|---|
| Downgage roof bow from 1 mm to 0.9 mm | Between 1/19/95 and 11/26/95 | 10% | Unknown |
| Downgage roof bow from 0.9 mm to 0.8 mm | 11/27/95 | 10.1% | Unknown |
| Delete front outer windshield header | 7/12/96 | ? | $3.50 per vehicle $500,000 tooling cost |
| Replace high strength Boron steel in SuperCab rear door vertical beam (floating B-pillar) with a mild steel | 12/10/96 | ? | $20.86 per vehicle $1,033,800 tooling cost |
| Downgage A-pillar from 2.5 mm to 2.4 mm | Between 5/20/97 and 1/05/98 | 4% | Unknown |

41.     Plaintiff further detailed post-production design changes to the

SuperDuty roof structure that were implemented before plaintiff Ott's model year

2000 SuperDuty was manufactured:[18] Plaintiff explained: "While the pre-

---

[17] *See id.* at 7.

[18] *See id.* at 9.

production and post-production changes only equal $28.21 per vehicle, the overall

profit to Ford is increased to millions of dollars. If Ford sells 100,000 vehicles per

year for 9 years, this $28.21 translates to Ford profit in excess of $25 million!"[19]

**Post-Production Design Changes in the PHN-131 Roof Structure and Support
(after January 5, 1998 Job #1 and before June 28, 2000 when Ott vehicle assembled)[9]**

| Design Change | Date | % Reduction | $ Savings |
|---|---|---|---|
| Downgage   A-pillar from 2.40 mm to 2.35 mm | 9/18/98 | 2% | 70¢ per vehicle (35¢ per A-pillar) |
| Downgage A-pillar from 2.35 mm to 2.20 mm | 3/30/99 | 6.4% | $1.72 per vehicle (86¢ per A-pillar) |
| Downgage SuperCab rear door vertical beam (floating B-pillar) from 1.50 mm to 1.20 mm | 6/15/99 | 20% | 96¢ per vehicle (48¢ per door) |
| Downgage inner windshield header from 1.20 mm to 1.07 mm | 8/10/99 | 11% | 17¢ per vehicle |
| Downgage roof bow from 0.80 mm to 0.74 mm | 8/10/99 | 7.5% | 10¢ per vehicle (5¢ per roof bow) |
| Downgage A-pillar reinforcement from 2.1 mm to 2.0 mm | 9/20/99 | 4.8% | 20¢ per vehicle (10¢ per A-pillar) |

42.     In the $1.7 billion *Hill* case, plaintiffs presented evidence that the

SuperDuty roof failed in Ford's internal testing, leading Ford engineers to develop

---

[19] *See id.*

a stronger alternative. But even though the alternative design was available as early as 2004, Ford elected not to use it in SuperDuty trucks until the 2017 model year.[20]

43.     The pretrial order in *Hill* stated that "Ford has identified 162 lawsuits and 83 similar incidents of the roof crush involving 1999-2016 Super Duty trucks."[21]

44.     Another WSJ article on the *Hill* case noted that as early as 1989, NHTSA had proposed extended roof strength regulations that would apply to vehicles up to 10,000 pounds, which would include the SuperDuty trucks.[22] But Ford (and its rival, GM) lobbied NHTSA to lower the threshold to 8500 pounds, which would exclude the SuperDuty from the requirements.[23]

45.     According to the WSJ, "The auto maker argued that for heavier vans and trucks—those with a gross weight of over 8,500 pounds—there was

---

[20] **Exhibit 1**, *Roof Strength on Older Ford Trucks Called Into Question by $1.7 Billion Jury Verdict*, WSJ, Aug 22, 2022, available at: https://www.wsj.com/articles/ford-faces-1-7-billion-verdict-in-fatal-rollover-of-f-250-pickup-11661033662 (last visited Sept. 1, 2022).

[21] *See id.*

[22] *See* **Exhibit 9**, *Ford Trucks Highlighted in $1.7 Billion Verdict Weren't Subject to Tougher Safety Rules*, WSJ, Aug 25, 2022, available at: https://www.wsj.com/articles/ford-trucks-in-1-7-billion-verdict-werent-subject-to-tougher-safety-rules-11661439150 (last visited Sept. 1, 2022).

[23] *See id.*

- 20 -

insufficient evidence to determine that the stiffer requirements would enhance the safety of these vehicles."[24]

46.     On information and belief, Ford failed to adequately research, design, test, and manufacture the Roof-Crush Defect Vehicles before warranting, advertising, promoting, marketing, and selling the Roof-Crush Defect Vehicles as suitable and safe for use in an intended and reasonably foreseeable manner.

47.     On information and belief, Ford knew or should have known the Roof-Crush Defect Vehicles contained the Roof-Crush Defect and should have warned or disclosed this fact to Plaintiff and putative class members before selling or leasing the vehicles.

48.     Plaintiff's counsel continues to investigate whether additional manufacturing periods and model years of Ford F-series trucks are also plagued with the Roof-Crush Defect.

**D.     Ford knew or should have known of the Roof-Crush Defect and never disclosed the defect to Plaintiff and the Class.**

49.     For the reasons set forth above and on information and belief, Ford knew about the Roof-Crush Defect before the Roof-Crush Defect Vehicles went to market.

---

[24] *Id.*

50.     The consequences of crushed roofs were clear to Ford and to federal regulators as early as 1969. "Approximately 1,400 motor vehicle occupants were killed in that year by impact with roof structure in rollover accidents," the National Highway Safety Bureau, NHTSA's predecessor, said in 1971.[25]

51.     "Engineers in Detroit grappled with their own analyses of rollover accident data. An internal study by Ford's Automotive Safety Research Office — dated July 8, 1968 — reached 'some very basic' conclusions. 'People are injured by roof collapse,' the Ford study said. 'The total number of nationwide deaths and injuries cannot be estimated but it is a significant number.'"[26]

52.     Much like Big Tobacco contradicted its own science that showed smoking was deadly, "Ford questioned whether crushed roofs even posed a danger — a direct contradiction of its own 1968 study. 'The data do not implicate top intrusion as an automotive safety problem,' Ford said in its April 5, 1971, comments to the agency."[27]

53.     Ford's rejection of its own tests and efforts to increase profits, as outlined above by purposefully degrading the strength of the roof both pre- and

---

[25] *See* **Exhibit 10**, *U.S.: Danger Overhead: Crushed Roofs, Thousands killed, hurt as auto roofs collapse,* available at: https://www.fordforums.com/threads/u-s-danger-overhead-crushed-roofs-thousands-killed-hurt-as-auto-roofs-collapse.64660/ (last visited Sept. 1, 2022).

[26] *Id.*

[27] *Id.*

post-production of the first Roof-Crush Defect Vehicles, squarely evidences Ford's

knowledge that the Roof-Crush Defect Vehicles were defective and had an unsafe

and dangerous design from before the sale of the first 1999 model year SuperDuty.

54.     All owners and lessees of the Roof-Crush Defect Vehicles have paid

huge premiums for the supposed toughness, durability and safety of their

SuperDuty vehicles. Because Ford sold them vehicles with the Roof-Crush Defect,

they have all suffered ascertainable loss.

**E.     All class members could have been made aware of the Roof-Crush Defect at the point of sale.**

55.     Plaintiff and all putative class members were necessarily exposed to

Ford's omissions before purchasing the Roof-Crush Defect Vehicles because they

each interacted with an authorized Ford dealer at the point of sale. These dealers

could have disclosed the omitted information to each class member, but they failed

to do so. As a district court affirmed in another consumer class action case against

Ford, all class members in that case would have "been aware of a disclosure" from

Ford about the defect at the point of sale because class members "interact[ed] with

an authorized Ford dealer prior to purchase." *Daniel v. Ford Motor Co.*, 2016 WL

8077932, at *8 (E.D. Cal. Sept. 23, 2016). The same is true here.

## VI.   TOLLING OF THE STATUTE OF LIMITATIONS

**A.   Discovery Rule Tolling**

56.   Because Ford omitted the existence of the Roof-Crush Defect, class members had no way of knowing about the unreasonable fire risk of the Roof-Crush Defect Vehicles.

57.   Within the period of any applicable statutes of limitation, Plaintiff and members of the proposed Classes could not have discovered through the exercise of reasonable diligence that Ford was omitting the defect complained of herein.

58.   Plaintiff and putative class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Ford did not report information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Ford had omitted information about the unreasonable risk of injury or death of the Roof-Crush Defect Vehicles, which was discovered by Plaintiff only shortly before this action was filed.

59.   For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Roof-Crush Defect Vehicles.

000700-00/2020553 V1

**B.     Estoppel**

60.     Ford was under a continuous duty to disclose to Plaintiff and putative

class members the true character, quality, and nature of the fire risk of the Roof-

Crush Defect Vehicles.

61.     Ford knowingly, affirmatively, and actively concealed or recklessly

disregarded the true nature, quality, and character of the Roof-Crush Defect

Vehicles.

62.     Ford knowingly decreased the strength and safety of the roof in the

Roof-Crush Defect Vehicles in order to increase profits. Ford did this both before

the first sale of a Roof-Crush Defect Vehicle and on an ongoing basis in the years

following such first sale.

63.     Based on the foregoing, Ford is estopped from relying on any statutes

of limitations in defense of this action.

## VII.   CLASS ALLEGATIONS

64.     Plaintiff brings this action on behalf of himself and as a class action,

pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil

Procedure, on behalf of the following Nationwide Class and California Subclass:

> **Nationwide Class**: All persons or entities who purchased
> or leased model year 1999-2016 Ford SuperDuty vehicle,
> including the F-250, F-350, F-450 and F-550 (the "Roof-
> Crush Defect Vehicles").

> **California Subclass**: All persons or entities who purchased or leased one or more of the Roof-Crush Defect Vehicles in the State of California.

65.     Excluded from the definitions of the Nationwide Class and California Subclass are any personal injury or property damages claims resulting from the fires or explosions caused by the Roof-Crush Defect Vehicles. Also excluded from the Nationwide Class and California Subclass are Ford and its subsidiaries and affiliates; all persons who make a timely election to be excluded from this action; governmental entities; the Judge to whom this case is assigned and his/her immediate family; and Plaintiff's Counsel. Plaintiff reserves the right to revise the class definitions based upon information learned through discovery.

66.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

67.     This action has been brought and may be properly maintained on behalf of the Nationwide Class and California Subclass proposed herein under Federal Rule of Civil Procedure 23.

68.     **Numerosity**. Federal Rule of Civil Procedure 23(a)(1): The members of the Nationwide Class and California Subclass are so numerous and geographically dispersed that individual joinder of all class members is

- 26 -

impracticable. For purposes of this complaint, Plaintiff alleges that there are estimated to be at least 5.2 million Roof-Crush Defect Vehicles in the Nationwide Class.[28] The precise number of class members is unknown to Plaintiff but may be ascertained from Ford's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and published notice.

69.    **Commonality and Predominance**: Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual class members, including, without limitation:

a.    Whether Ford engaged in the conduct alleged herein;

b.    Whether the Roof-Crush Defect creates an unreasonable risk of injury and death in the Roof-Crush Defect Vehicles;

c.    When Ford first knew about the Roof-Crush Defect;

d.    Whether Ford designed, manufactured, marketed, and distributed the Roof-Crush Defect Vehicles with defective component(s) that create an unreasonable risk of injury or death in the event of a rollover accident;

e.    Whether Ford's conduct renders it liable for breach of the implied warranty of merchantability;

---

[28] *See* **Exhibit 9**, *Ford Trucks Highlighted in $1.7 Billion Verdict Weren't Subject to Tougher Safety Rules*, *supra*, n.21.

f.  Whether Ford has been unjustly enriched at the expense of Plaintiff and class members;

g.  Whether Plaintiff and class members overpaid for their vehicles at the point of sale; and

h.  Whether Plaintiff and class members are entitled to damages and other monetary relief and, if so, in what amount.

70.  **Typicality**: Federal Rule of Civil Procedure 23(a)(3): Plaintiff's claims are typical of the other class members' claims because, among other things, all class members were comparably injured through Ford's wrongful conduct as described above.

71.  **Adequacy**: Federal Rule of Civil Procedure 23(a)(4): Plaintiff is an adequate class representative because his interests do not conflict with the interests of the other members of the classes he seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this action vigorously. The interests of the classes will be fairly and adequately protected by Plaintiff and his counsel.

72.  **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and other class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against

- 28 -

Ford, so it would be impracticable for the members of the Nationwide Class and California Subclass to individually seek redress for Ford's wrongful conduct. Even if Nationwide Class and California Subclass members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII.  CLAIMS

**A.    Nationwide Claims**

### COUNT I

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *et seq.*)

**(Alleged by Plaintiff on behalf of the Nationwide Class)**

73.    Plaintiff re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

74.    Plaintiff brings this claim on behalf of the Nationwide Class.

75.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

76.    The Roof-Crush Defect Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Plaintiff and

Nationwide Class members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

77.    Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

78.    15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

79.    Ford provided Plaintiff and Nationwide Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Ford warranted that the Roof-Crush Defect Vehicles were fit for their ordinary purpose and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

80.    Ford breached its implied warranties, as described herein, and is therefore liable to Plaintiff under 15 U.S.C. § 2310(d)(1). Without limitation, the Roof-Crush Defect Vehicles share a common defect in that they are all equipped with a defect in design and manufacturing of the roof system that makes the vehicles unsafe in the event of a rollover accident, causing an unreasonable risk

of death, serious bodily harm, and property damage to owners and lessees of the Roof-Crush Defect Vehicles. The Roof-Crush Defect rendered the Roof-Crush Defect Vehicles unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

81.     As discussed herein, on information and belief, Ford knew or should have known about the Roof-Crush Defect from its purposeful degradation of the strength of the roof systems in the Roof-Crush Defect Vehicles before launching the Roof-Crush Defect Vehicles. Ford omitted information about the Defect and its consequences from Plaintiff and class members, misrepresented the qualities of the Roof-Crush Defect Vehicles, and has failed to provide a fix for the Defect.

82.     Any effort by Ford to limit the implied warranties in a manner that would exclude coverage of the Roof-Crush Defect Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

83.     Any limitations Ford might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between Ford and Plaintiff, because, at the time of purchase and lease, Plaintiff had no other options for purchasing warranty coverage other than directly from Ford.

84.     Any limitations Ford might seek to impose on its warranties are substantively unconscionable. Ford knew or should have known that the Roof-

- 31 -

Crush Defect Vehicles were defective and that the Roof-Crush Defect Vehicles could cause grave injuries or death when used as intended long before Plaintiff and class members knew or should have known. Ford failed to disclose this defect to Plaintiff and class members. Thus, enforcement of the durational limitations on the warranties is harsh and would shock the conscience.

85. Plaintiff has had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between Ford and Plaintiff. Nonetheless, privity is not required here because Plaintiff is an intended third-party beneficiary of contracts between Ford and its dealers, and specifically, of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Roof-Crush Defect Vehicles and have no rights under the warranty agreements provided with the Roof-Crush Defect Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Roof-Crush Defect Vehicles are dangerous instrumentalities due to the aforementioned defect, as the Roof-Crush Defect present an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Roof-Crush Defect Vehicles.

86. Under 15 U.S.C. § 2310(e), Plaintiff is entitled to bring this class action and is not required to give Ford notice and an opportunity to cure until

- 32 -

such time as the Court determines the representative capacity of Plaintiff under Rule 23 of the Federal Rules of Civil Procedure.

87.    Plaintiff would suffer economic hardship if he returned his Roof-Crush Defect Vehicle but did not receive the return of all payments made by him. Because Ford will not acknowledge any revocation of acceptance and immediately return any payments made, Plaintiff has not re-accepted his Roof-Crush Defect Vehicle by retaining it.

88.    The amount in controversy of Plaintiff's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed based on all claims to be determined in this lawsuit. Plaintiff, individually and on behalf of all other Nationwide Class members, seeks all damages permitted by law, including diminution in value of the Roof-Crush Defect Vehicles, in an amount to be proven at trial. In addition, under 15 U.S.C. § 2310(d)(2), Plaintiff is entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiff and Nationwide Class members in connection with the commencement and prosecution of this action.

89.    Plaintiff also seeks the establishment of a Ford-funded program for Plaintiff and Nationwide Class members to recover out-of-pocket costs incurred in

attempting to rectify and mitigate the effects of the Roof-Crush Defect in their Roof-Crush Defect Vehicles.

## COUNT II

### FRAUDULENT CONCEALMENT
### (COMMON LAW)
### (Alleged by Plaintiff on behalf of the Nationwide Class)

90.    Plaintiff realleges and incorporate by reference all paragraphs as though fully set forth herein.

91.    Plaintiff asserts this claim on behalf of himself and the Nationwide Class, or, in the alternative, on behalf of the California Subclass.

92.    A nationwide class is appropriate because the elements of a fraudulent concealment (or "fraud by concealment") claim are virtually identical in all states. In all states, Plaintiffs can prevail by showing that: (i) Ford had a duty to disclose material facts in connection with the sale or lease of the Roof-Crush Defect Vehicles; (ii) Ford either (a) knowingly made a false representation concerning material information in connection with the sale or lease of the Roof-Crush Defect Vehicles; or (b) knowingly concealed material information in connection with the sale or lease of the Roof-Crush Defect Vehicles; or (c) knowingly failed to disclose material information in connection with the sale or lease of the Roof-Crush Defect Vehicles; and (iii) as a result of Ford's conduct, Plaintiff suffered economic damages.

- 34 -

93.    Ford concealed and suppressed material facts concerning the serious safety defects in Plaintiff's vehicle.

94.    Ford sold the Roof-Crush Defect Vehicle to Plaintiff without disclosing the Roof-Crush Defect and concealed and suppressed the defect from regulators and consumers.

95.    Ford concealed and suppressed the Roof-Crush Defect with the intent to deceive Plaintiff.

96.    Ford did so in order to falsely assure purchasers, lessees, and owners of the Roof-Crush Defect Vehicles that the vehicles they were purchasing or leasing were safe and reliable and would live up to the performance characteristics associated with the Ford brand, and then to avoid the cost and negative publicity of a recall. The concealed information was material to consumers, both because it concerned the quality, safety, and performance of the Roof-Crush Defect Vehicles and because the information would have significantly decreased the value and sales price of the vehicles.

97.    Ford had a duty to disclose the Roof-Crush Defect because it was known and only knowable by Ford; Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to, or reasonably discoverable by, Plaintiff. Ford also had a duty to disclose because it made many affirmative representations about the safety, durability, and quality of the Roof-Crush Defect

- 35 -

Vehicles, as set forth above; these representations were misleading, deceptive, and incomplete without the disclosure of the Roof-Crush Defect. Finally, once the Roof-Crush Defect Vehicles were on the road, Ford had a duty to monitor the Roof-Crush Defect Vehicles under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

98.    Ford concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt Ford's image and cost Ford money, and it did so at the expense of Plaintiff and the Nationwide Class.

99.    On information and belief, Ford has still not made full and adequate disclosure and continues to defraud Plaintiff and the Nationwide Class and conceal material information regarding the Roof-Crush Defect.

100.   Plaintiff was unaware of these omitted material facts and would not have acted as he did if he had known of the concealed and/or suppressed facts, in that he would not have purchased his Roof-Crush Defect Vehicle if he knew of the Roof-Crush Defect. Plaintiff's actions were justified. Ford was in exclusive control of the material facts and such facts were not known to the public, including Plaintiff.

101.   Because of the concealment and/or suppression of the facts, Plaintiff and other class members sustained damage. In purchasing his Roof-Crush Defect Vehicle, Plaintiff did not get the benefit of his bargain since the vehicle was worth

less than it would have been without the defect, and because he owns a vehicle that diminished in value as a result of Ford's concealment of, and failure to timely disclose and remedy, the defect. Had Plaintiff been aware of the concealed defects that existed in the Roof-Crush Defect Vehicles, Plaintiff would have paid less for his vehicle or would not have purchased it at all.

102.   Accordingly, Ford is liable to Plaintiff and the Nationwide Class for damages in an amount to be proven at trial.

103.   Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and class members' rights and well-being in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## UNJUST ENRICHMENT
## (COMMON LAW)

### (Alleged by Plaintiff on behalf of the Nationwide Class)

104.   Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

105.   Plaintiff asserts this claim on behalf of himself and the Nationwide Class, or, in the alternative, on behalf of the California Subclass. A Nationwide

- 37 -

Class is appropriate because the elements of unjust enrichment are uniform in all states.

106.   This claim is pleaded in the alternative to the contract-based claims brought on behalf of Plaintiff and the Nationwide Class.

107.   Ford has received and retained a benefit from Plaintiff and Nationwide Class members and inequity has resulted.

108.   Ford has benefitted from selling, leasing, and distributing the Roof-Crush Defect Vehicles for more than they were worth because of Ford's conduct described herein, at a profit, and Plaintiff and putative class members have overpaid for the Roof-Crush Defect Vehicles.

109.   Thus, Plaintiff and the Nationwide Class conferred a benefit on Ford.

110.   It is inequitable for Ford to retain these benefits.

111.   Plaintiff and Nationwide Class members were not aware of the true facts about the Roof-Crush Defect Vehicles and did not benefit from Ford's conduct described herein.

112.   Ford knowingly accepted the benefits of its unjust conduct.

113.   As a result of Ford's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

**B.      State-Specific Claims**

## COUNT IV

### VIOLATION OF THE CALIFORNIA
### CONSUMER LEGAL REMEDIES ACT
### (Cal. Civ. Code § 1750, *et seq.*)

**(Alleged by Plaintiff on behalf of the California Subclass)**

114.    Plaintiff and the California Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

115.    Plaintiff brings this claim on behalf of himself and the California Subclass.

116.    Ford is a person as defined in California Civil Code § 1761(c).

117.    Plaintiff and California Subclass members are consumers as defined in California Civil Code § 1761(d).

118.    Ford engaged in unfair and deceptive acts in violation of the California Consumer Legal Remedies Act ("CLRA") through the practices described herein, and by omitting the Roof-Crush Defect and misrepresenting and misleading Plaintiff and the California Subclass about the Roof-Crush Defect Vehicles, along with omitting the risks, costs, and monetary damage resulting from the defect. These acts and practices violate, at a minimum, the following sections of the CLRA: (a)(2) misrepresenting the source, sponsorship, approval, or certification of goods or services; (a)(5) representing that goods or services have sponsorships, characteristics, uses, benefits, or quantities which they do not have,

- 39 -

or that a person has a sponsorship, approval, status, affiliation, or connection which they do not have; (a)(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and (a)(9) advertising goods and services with the intent not to sell them as advertised.

119.   Ford's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of misleading a substantial portion of the purchasing public and imposed a serious safety risk on the public.

120.   Ford knew or should have known that its conduct violated the CLRA.

121.   Ford knew or should have known about the Roof-Crush Defect affecting the Roof-Crush Defect Vehicles owned or leased by Plaintiff and California Subclass members based on (i) its own pre-sale durability testing; (ii) its own efforts to increase profits by decreasing roof strength; and (iii) Ford's own investigation of accidents involving in the Roof-Crush Defect Vehicles.

122.   In the course of its business, Ford violated the CLRA and engaged in deceptive acts or practices with the marketing and sale or lease of the Roof-Crush Defect Vehicles because it misrepresented and omitted material facts concerning the Roof-Crush Defect Vehicles, specifically the existence of the Roof-Crush Defect, as alleged herein. Ford omitted the fact of the Roof-Crush Defect from Plaintiff and the California Subclass members. Ford also mispresented the safety,

- 40 -

quality, functionality, and reliability of the Roof-Crush Defect Vehicles given the existence of the Roof-Crush Defect in them.

123.   Ford owed Plaintiff and the California Subclass a duty to disclose the true safety and reliability of the Roof-Crush Defect Vehicles because Ford:

a.   Possessed exclusive knowledge about the Roof-Crush Defect;

b.   Omitted the foregoing from Plaintiff and the California Subclass;

c.   Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Roof-Crush Defect Vehicles, while withholding material facts from Plaintiff and the California Subclass that contradicted these representations; and/or

d.   Had duties under the TREAD Act and related regulations to disclose and remedy the Defect.

124.   In failing to disclose the Roof-Crush Defect and associated safety risks and repair costs that result from it, Ford has misrepresented the Roof-Crush Defect Vehicles, omitted disclosure the Roof-Crush Defect, and breached its duty to disclose.

125.   The facts omitted and misrepresented by Ford to Plaintiff and California Subclass members, as described herein, are material in that a reasonable consumer would have considered them important in deciding whether to purchase the Roof-Crush Defect Vehicles or to pay a lesser price. Had Plaintiff and California Subclass members known about the defective nature of the Roof-Crush

- 41 -

Defect Vehicles, they would not have purchased or leased the Roof-Crush Defect

Vehicles or would have paid less for them.

126.   On or about September 1, 2022, Plaintiff's undersigned counsel

provided Ford written notice of their violations of the CLRA under California Civil

Code § 1782(a) regarding the Roof-Crush Defect Vehicles.

127.   Plaintiff and California Subclass members' injuries were proximately

caused by Ford's deceptive business practices.

128.   Plaintiff and California Subclass members seek all relief available

under the CLRA, including equitable relief, damages, and attorneys' fees.

## COUNT V

### VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (Cal. Bus. & Prof. Code § 17200)

### (Alleged by Plaintiff on behalf of the California Subclass)

129.   Plaintiff and the California Subclass reallege and incorporate by

reference all paragraphs as though fully set forth herein.

130.   Plaintiff brings this claim on behalf of himself and the California

Subclass.

131.   The California Unfair Competition Law ("UCL") prohibits acts of

"unfair competition," including any "unlawful, unfair or fraudulent business act or

practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. &

Prof. Code § 17200.

132.   In the course of its business, Ford engaged in deceptive acts or practices with the marketing and sale or lease of the Roof-Crush Defect Vehicles because it misrepresented and omitted material facts concerning the Roof-Crush Defect Vehicles, specifically the existence of the Roof-Crush Defect, as alleged herein. Ford omitted the fact of the Roof-Crush Defect from Plaintiff and California Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Roof-Crush Defect Vehicles given the existence of the Roof-Crush Defect in them.

133.   Ford engaged in unfair competition and unfair, unlawful, or fraudulent business practices through the conduct, statements, and omissions described herein, and by omitting the Roof-Crush Defect in the Roof-Crush Defect Vehicles from Plaintiff and California Subclass members, along with omitting the risks, costs, and monetary damage resulting from the defect. Ford should have disclosed this information because it was in a superior position to know the true facts related to the Roof-Crush Defect, and Plaintiff and California Subclass members could not reasonably be expected to learn or discover the true facts related to the Roof-Crush Defect.

134.   The Roof-Crush Defect causes grave injury or death in the Roof-Crush Defect Vehicles in the event of a rollover accident, and this constitutes a safety issue that triggered Ford's duty to disclose the safety issue to consumers.

- 43 -

135.    Ford's acts and practices misled and deceived Plaintiff and are likely to deceive the public. In failing to disclose the Roof-Crush Defect and omitting other material facts from Plaintiff and California Subclass members, Ford breached its duty to disclose these facts, violated the UCL, and caused injuries to Plaintiff and California Subclass members. Ford's omissions and misrepresentations concerned information that was material to Plaintiff and California Subclass members, as it would have been to all reasonable consumers.

136.    The injuries suffered by Plaintiff and California Subclass members are not greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiff and California Subclass members could or should have reasonably avoided.

137.    Ford's acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750, *et seq.*, and California Commercial Code § 2313. Ford knew or should have known its conduct violated the UCL.

138.    Plaintiff and California Subclass members have suffered an injury in fact, including the loss of money or property, because of Ford's unfair, unlawful, and deceptive practices.

139.    Plaintiff seeks to enjoin further unlawful, unfair, and fraudulent acts or practices by Ford, to obtain restitutionary disgorgement of all monies and

- 44 -

revenues generated because of such practices, and all other relief allowed under California Business & Professions Code § 17200.

## COUNT VI

### VIOLATIONS OF CALIFORNIA FALSE ADVERTISING LAW
### (Cal. Bus. & Prof. Code § 17500, et seq.)

### (Alleged by Plaintiff on behalf of the California Subclass)

140.   Plaintiff and the California Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

141.   Plaintiff brings this claim on behalf of himself and the California Subclass.

142.   California Business & Professions Code § 17500 states: "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

143.   Ford caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements

- 45 -

that were untrue or misleading, and which were known, or through the exercise of reasonable care should have been known to Ford, to be untrue and misleading to consumers, including Plaintiff and California Subclass members.

144.   Ford violated Section 17500 because its misrepresentations and omissions regarding the safety, reliability, and functionality of the Roof-Crush Defect Vehicles as described herein were material, untrue, and misleading, and likely to deceive a reasonable consumer.

145.   Plaintiff and California Subclass members have suffered an injury in fact, including the loss of money or property, because of Ford's deceptive advertising. In purchasing or leasing their Roof-Crush Defect Vehicles, Plaintiff and California Subclass members relied on Ford's misrepresentations and omissions regarding the safety, reliability, and functionality of the vehicles. Ford's representations and omissions were untrue because the Roof-Crush Defect Vehicles were sold or leased with the Roof-Crush Defect. Had Plaintiff and California Subclass members known this, they would not have purchased or leased their Roof-Crush Defect Vehicles or paid as much for them. Accordingly, Plaintiff and California Subclass members overpaid for their Roof-Crush Defect Vehicles and did not receive the benefit of their bargain.

146.   All the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Ford's business. Ford's wrongful conduct is part of a

- 46 -

pattern or generalized course of conduct that is still perpetuated and repeated, both in California and nationwide.

147.   Plaintiff, individually and on behalf of the California Subclass members, requests this Court enter such orders or judgments as necessary to enjoin Ford from continuing its unlawful and deceptive advertising, to restore to Plaintiff and California Subclass members any money Ford acquired by its deceptive advertising, including restitution and restitutionary disgorgement, and for such other relief permitted.

## COUNT VII

### VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER CALIFORNIA LAW (Cal. Civ. Code §§ 1791.1 & 1792)

### (Alleged by Plaintiff on behalf of the California Subclass)

148.   Plaintiff and the California Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

149.   Plaintiff brings this claim on behalf of himself and the California Subclass.

150.   Plaintiff and California Subclass members are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

151.   The Roof-Crush Defect Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

- 47 -

152.    Ford is the "manufacturer" of the Roof-Crush Defect Vehicles within the meaning of Cal. Civ. Code § 1791(j).

153.    Ford impliedly warranted to Plaintiff and the California Subclass that the Roof-Crush Defect Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Roof-Crush Defect Vehicles do not have the quality that a buyer would reasonably expect and were therefore not merchantable.

154.    Cal. Civ. Code § 1791.1(a) states:

> "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:
>
> (1)    Pass without objection in the trade under the contract description.
>
> (2)    Are fit for the ordinary purposes for which such goods are used.
>
> (3)    Are adequately contained, packaged, and labeled.
>
> (4)    Conform to the promises or affirmations of fact made on the container or label.

155.    The Roof-Crush Defect Vehicles were not merchantable when sold or leased because they contain the Roof-Crush Defect and pose an unreasonable risk of injury or death due to the Roof-Crush Defect as described herein. Without limitation, the Roof-Crush Defect Vehicles share a common defect in that they are all equipped with the Roof-Crush Defect that makes the vehicles susceptible to the

roof crushing in a rollover accident, causing an unreasonable risk of death, serious

bodily harm, and property damage to lessees and owners of the Roof-Crush Defect

Vehicles. This Defect renders the Roof-Crush Defect Vehicles when sold or leased

and at all times thereafter, unmerchantable and unfit for their ordinary use of

driving.

156.   Ford breached the implied warranty of merchantability by selling

Roof-Crush Defect Vehicles containing a defect leading to grave risk of injury or

death during ordinary operating conditions. This defect has deprived Plaintiff and

California Subclass members of the benefit of their bargain.

157.   Notice of breach is not required because Plaintiff and California

Subclass members did not purchase their automobiles directly from Ford.

Nonetheless, Plaintiff's counsel sent notification to Ford on or about September 1,

2022.

158.   Plaintiff and California Subclass members were and are third-party

beneficiaries to Ford's contracts with Ford-certified/authorized retailers who sold

or leased the Roof-Crush Defect Vehicles to Plaintiff and California Subclass

members.

159.   As a direct and proximate result Ford's breach of the implied warranty

of merchantability, Plaintiff and California Subclass members received goods

whose dangerous condition now renders them at least partially inoperable and

- 49 -

substantially impairs their value. Plaintiff and California Subclass members have been damaged as they overpaid for their vehicles, and now suffer the partial or complete loss of use of their Roof-Crush Defect Vehicles.

160.   Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiff and California Subclass members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Roof-Crush Defect Vehicles, or the overpayment or diminution in value of their Roof-Crush Defect Vehicles.

161.   Under Cal. Civ. Code § 1794, Plaintiff and California Subclass members are entitled to costs and attorneys' fees.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of members of the Nationwide Class and California Subclass, respectfully requests that the Court enter judgment in their favor and against Ford, as follows:

A.   Certification of the proposed Nationwide Class and California Subclass, including appointment of Plaintiff's counsel as Class Counsel;

B.   Restitution, including at the election of Nationwide Class and California Subclass members, recovery of the purchase price of their Roof-Crush Defect Vehicles, or the overpayment for their vehicles;

C.   Damages, costs, and disgorgement in an amount to be determined at trial;

     D.      An order requiring Ford to pay both pre- and post-judgment interest on any amounts awarded;

     E.      An award of costs and attorneys' fees; and

     F.      Such other or further relief as may be appropriate.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all claims so triable.

DATED: September 2, 2022           Respectfully Submitted,

                         */s/ Steve W. Berman*
                         Steve W. Berman
                         Thomas E. Loeser
                         **HAGENS BERMAN SOBOL SHAPIRO LLP**
                         1301 Second Avenue, Suite 2000
                         Seattle, WA 98101
                         Telephone: (206) 623-7292
                         Facsimile:  (206) 623-0594
                         steve@hbsslaw.com
                         toml@hbsslaw.com

                         E. Powell Miller (P39487)
                         Sharon S. Almonrode (P33938)
                         Dennis A. Lienhardt (P81118)
                         **THE MILLER LAW FIRM PC**
                         950 W. University Drive, Suite 300
                         Rochester, MI 48307
                         Telephone: (248) 841-2200
                         epm@millerlawpc.com
                         ssa@millerlawpc.com
                         dal@millerlawpc.com

                         *Attorneys for Plaintiff*