# EXHIBIT 8

FILED
U.S. DISTRICT COURT
WESTERN DISTRICT OF KY

05 OCT 19 PM 12: 22

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT OWENSBORO
CIVIL ACTION NO. 4:03CV-101(M)

SUSAN OTT, INDIVIDUALLY AND AS PERSONAL                          PLAINTIFF
REPRESENTATIVE OF THE ESTATE OF DANIEL OTT,
DECEASED, AND AS NEXT FRIEND FOR SARAH OTT,
STEVEN OTT, SAMUEL OTT, SAVANNAH OTT,
STEFFANIE OTT AND SPENCER OTT, UNMARRIED INFANTS

VS.                          **PLAINTIFF'S TRIAL BRIEF**

FORD MOTOR COMPANY                                              DEFENDANT

* * * * *

RICHARD HAY
RHONDA HATFIELD-JEFFERS
203 West Columbia Street
P.O. Box 1124
Somerset, KY 42502-1124
Telephone: 606/679-2214
Facsimile: 606/678-4696

and

MARK P. ROBINSON, JR.
LaMAR BROWN
Robinson, Calcagnie & Robinson
620 Newport Center Drive, Seventh Floor
Newport Beach, CA 92660
Telephone: 949/720-1288
Facsimile: 949/720-1292

COUNSEL FOR PLAINTIFF



## INTRODUCTION

This is a product liability case involving a 2000 Ford F-250 Super Duty SuperCab pickup truck. Daniel Ott died in a rollover accident due to: (1) a weak and untested roof structure – allowing the roof to collapse to the level of the dash; and, (2) poorly designed and ineffective occupant restraints – which would have allowed Daniel Ott to strike the roof or be partially ejected from the vehicle even if the roof had not collapsed.

Daniel was 42 years old at the time of his death. He is survived by his wife, Susan, and six minor children.  The children ranged in age from two to twelve at the time of their father's death.

## CLAIMS

Susan Ott filed suit against Ford Motor Company in June, 2003. Her complaint alleges claims against Ford Motor Company based on: (1) strict tort liability; (2) negligent design and testing; and, (3) negligent failure to warn.

More specifically, Susan Ott claims:

(1)     The roof structure of the F-250 was grossly inadequate to protect occupants in rollover accidents. The roof structure was poorly designed, and the material lacked adequate strength to prevent the roof from crushing.



(2)    Ford either negligently failed to test the vehicle's roof strength, or performed inadequate testing. Ford admits it did not perform a physical roof strength test prior to the vehicle being sold – not a dolly rollover test, not a roof drop test and not a Federal Motor Vehicle Safety Standard ("FMVSS") 216 roof crush test. Ford claims it performed a computer version of the FMVSS 216 test, but it cannot find the test data or any test report. Litigation testing shows that not only did the F-250 roof fail to meet Ford's 10,500 pound roof strength design target,[1] it also shows that the roof strength of its F-250 Super Duty truck is weaker than its smaller and lighter pickup trucks – the F-150 and Ranger.

(3)    The front occupant restraint system was defectively and negligently designed. As the F-250 Super Duty SuperCab has "clam-shell" doors (doors which open in opposite directions) and no B-pillar (center roof support pillar), the upper anchor of the restraint system was affixed to the roof rail. With this poor design, every inch of roof crush results in an inch of slack to the occupant's seatbelt. The restraint system design was made even worse by Ford's choice of a "pass-through" seatbelt latch plate, as opposed to a cinching type latch plate.  A pass-through latch plate allows the slack placed in the seatbelt due to roof crush to not only affect the shoulder belt, but to pass the slack into the lap belt. Additionally, the restraint system should have had a pre-tensioner, which removes slack from the belt in the very early stages of an accident.

A much better restraint system, and a safer alternative design for a SuperCab vehicle that does not have a B-pillar, is a seat integrated restraint system. In a seat integrated restraint system, the seatbelt is anchored to the seat – not the roof rail. DaimlerChrysler put this safer restraint system in its Dodge SuperCab truck in 1998.

---

[1] Plaintiff's trial exhibit 18, p. 52 (7890 0056).

General Motors put this safer restraint system in its SuperCab pickup in 1999. Daniel Ott's F-250 SuperCab was supposed to have the safer seat integrated restraints – but did not because of cost overruns.



2000 Ford F250 Super Duty



2000 Chevrolet



2000 Dodge

(4)    Ford Motor Company claimed its Super Duty trucks were "Built Ford Tough," that "Quality was Job #1," and otherwise represented the F-250 Super Duty truck to be strong and well-built. Not only were Ford's representations inaccurate, they were misleading.

Due to the gross vehicle weight rating which Ford assigned to the F-250 Super Duty truck, it was not required to meet the federal roof crush standard (applicable to cars and trucks with a gross vehicle weight rating of 6,000 pounds or less), or Ford's Light Truck Safety Design Guidelines (applicable to light trucks with a gross vehicle weight rating of 8,500 pounds or less). The F-250 Super Duty has a gross vehicle weight rating of 8,800 pounds. Because Ford was not required to meet any standards, Ford designed its Super Duty truck roof to be substantially weaker than smaller and lighter Ford pickup trucks which had to meet these guidelines.

Susan Ott's evidence will support a verdict on all three causes of action: (1) strict tort liability; (2) negligent design and testing; and, (3) negligent failure to warn.

## FACTS

### The Vehicle

The vehicle in question is a 2000 Ford F-250 Super Duty SuperCab pickup truck. The vehicle was assembled at Ford's Kentucky Truck Plant in Louisville, Kentucky on June 28, 2000. Six weeks later, the truck was purchased from a local Ford dealership by Daniel Ott's employer, Ervin Cable Construction, Inc.  Daniel Ott selected and arranged for the purchase of the vehicle as his personal "company car."

The Ford F-250 Super Duty is part of Ford's "PHN-131" platform. The PHN-131 program was "defined" in late 1993, implemented in early 1994, and the final design "sign-off" occurred in 1996.[2] The first PHN-131 Super Duty truck rolled off the assembly line of Ford's Kentucky Truck Plant on January 5, 1998, and was first sold as a 1999 model year truck. In Ford jargon, the first vehicle to come off the assembly line is known as "Job #1."

---

[2] Plaintiff's trial exhibits 15 (at PHNC 05176) and 18.

Ford's PHN-131 platform includes the F-250, F-350, F-450 and F-550 Super Duty trucks. Although the PHN-131 platform is Ford's "Super Duty" pickup truck, Ford classifies it as a "light truck," along with its lighter F-150 pickup trucks and its even lighter Ranger pickup trucks.

The PHN-131 platform is available in three cab configurations: Regular Cab (2 door), SuperCab (4 door, with full-size front doors and short back doors, with the front and back doors opening in opposite directions) and Crew Cab (4 doors). The Regular Cab has an A-pillar and B-pillar. The SuperCab has an A-pillar and C-pillar. The Crew Cab has an A-pillar, B-pillar and C-pillar.



REGULARCAB



SUPERCAB



CREWCAB

The PHN-131 platform is still being produced today, and will continue to be produced and sold through the 2006 model year. As such, the 1999 through 2006 model year vehicles whether the F-250, 350, 450 or 550, are substantially the same vehicle.

Ford also assembles the PHN-131 Super Duty truck in Cuautitlan, Mexico and in Ipiranga, Brazil.

## The PHN-131 Cost-Containment Plan

The PHN-131 was supposed to have gone into production on August 4, 1997, as a 1998 model year vehicle.[3] However, Ford Motor Company made a decision to defer the program for five months to "improve the PHN-131 financial equation."[4] Ford reduced its investment in the PHN-131 platform "by over $600 million."[5] Ford documents show the $600 million was cut from the PHN-131 program to "enhance the corporate overall truck profitability."[6]

Not only was the PHN-131 program "Job #1" delayed five months to increase Ford's profits, Ford knew that it was going to continue to cut costs to the PHN-131 platform even after the vehicle was first placed on the market.[7]

A summary of the pre-production design changes that enhanced Ford's profits – but weaken the roof – are as follows:

---

[3] Plaintiff's trial exhibit 15, at PHNC 05176.
[4] *Id.* at PHNC 05123.
[5] *Id.*
[6] Plaintiff's trial exhibit 17.
[7] *Id.*

### Pre-Production Design Changes in PHN-131 Roof Structure
### (between 3/31/94 program implementation and 1/05/98 Job #1)[8]

| Design Change | Date | % Reduction | Savings |
|---|---|---|---|
| Downgage roof bow from 1 mm to 0.9 mm | Between 1/19/95 and 11/26/95 | 10% | Unknown |
| Downgage roof bow from 0.9 mm to 0.8 mm | 11/27/95 | 10.1% | Unknown |
| Delete front outer windshield header | 7/12/96 | ? | $3.50 per vehicle $500,000 tooling cost |
| Replace high strength Boron steel in SuperCab rear door vertical beam (floating B-pillar) with a mild steel | 12/10/96 | ? | $20.86 per vehicle $1,033,800 tooling cost |
| Downgage A-pillar from 2.5 mm to 2.4 mm | Between 5/20/97 and 1/05/98 | 4% | Unknown |

---

[8] Plaintiff's trial exhibit 23.

Ford continued to weaken the roof – and enhance its profits - even after the PHN-131 went into production in January, 1998:

### Post-Production Design Changes in the PHN-131 Roof Structure and Support (after January 5, 1998 Job #1 and before June 28, 2000 when Ott vehicle assembled)[9]

| Design Change | Date | % Reduction | $ Savings |
|---|---|---|---|
| Downgage A-pillar from 2.40 mm to 2.35 mm | 9/18/98 | 2% | 70¢ per vehicle (35¢ per A-pillar) |
| Downgage A-pillar from 2.35 mm to 2.20 mm | 3/30/99 | 6.4% | $1.72 per vehicle (86¢ per A-pillar) |
| Downgage SuperCab rear door vertical beam (floating B-pillar) from 1.50 mm to 1.20 mm | 6/15/99 | 20% | 96¢ per vehicle (48¢ per door) |
| Downgage inner windshield header from 1.20 mm to 1.07 mm | 8/10/99 | 11% | 17¢ per vehicle |
| Downgage roof bow from 0.80 mm to 0.74 mm | 8/10/99 | 7.5% | 10¢ per vehicle (5¢ per roof bow) |
| Downgage A-pillar reinforcement from 2.1 mm to 2.0 mm | 9/20/99 | 4.8% | 20¢ per vehicle (10¢ per A-pillar) |

While the pre-production and post-production changes only equal $28.21 per vehicle, the overall profit to Ford is increased to millions of dollars. If Ford sells 100,000 vehicles per year for 9 years, this $28.21 translates to a Ford profit in excess of $25 million!

Ford admits it made no design changes to offset the 11 roof structure deletions and downgages. Even more astonishing, Ford did not perform a single test to determine what effect any of these deletions and downgages had on the PHN-131's roof strength, or occupant safety.

---

[9] Plaintiff's trial exhibit 24.

## Lack of Testing

Ford did not perform a single physical test to evaluate the PHN-131 roof structure. Ford claims it developed a "computer model" of the PHN-131 platform, and performed analyses on the computer model to determine roof strength. Ford cannot produce the computer model, or any test reports.[10]

Ford did perform computer testing on other aspects of the PHN-131 cab, such as side impact testing and cab durability ("noise, vibration and harshness") testing, but admits that the computer model used for these tests cannot be used to determine roof strength.

Ford employee Shabbir Dohadwala was the person responsible for performing computer testing for PHN-131 body structure durability – as opposed to safety. Mr. Dohadwala testified that durability testing determined how the PHN-131 body structure would hold up over years of use.  Although Mr. Dohadwala had nothing to do with computer testing for safety purposes, he testified that if Ford made any change in the body structure, a test should be performed to see what effect that change has on vehicle safety.[11] Despite Mr. Dohadwala's testimony about what should be done, Ford did not conduct a single test, not even a computer test, to determine the effect of the numerous deletions and downgages to the roof structure.

## The Accident

On October 19, 2000, Daniel Ott left work early to attend a parent-teacher conference. He was traveling west on Kentucky Highway 270 in Webster County. Just after cresting a small hill, his right front tire dropped off of the edge of the roadway.

---

[10] Ford produced three computer analysis reports used in the early design of the PHN-131, but these analyses were based on "a surrogate model of the PN96 [the 1996-2003 F-150] cab." Plaintiff's trial exhibit 21.
[11] S. Dohadwala depo. at 30-31.

Daniel steered left to regain control of the vehicle, which caused the vehicle to enter into a passenger-side leading slide. The vehicle crossed the centerline, left the roadway, and impacted an earth embankment. The Ford truck then began to roll. Susan Ott's accident reconstructionist says the vehicle rolled 1½ times; Ford's accident reconstructionist says it rolled 2½ times.

The vehicle came to rest in the roadway, on its roof. During the rollover, the roof crushed down to the dashboard. Daniel, who was wearing his seatbelt, was partially ejected, with his head pinned underneath the roof of the truck.[12]  The immediate cause of death was blunt force trauma to Daniel's head.[13]





---

[12] Deposition of County Coroner, Larry Vanover, at 6.
[13] Id., at 5.

### The Ott Family

Daniel Ott was 42 years old at the time of his death. He is survived by his wife,

Susan, and their six children:

> Sarah, age 12 at her father's death;
> Steven, age 10 at his father's death;
> Samuel, age 7 at his father's death;
> Savannah, age 6 at her father's death;
> Steffanie, age 4 at her father's death; and,
> Spencer, age 2 at his father's death.






## DAMAGES

Susan Ott, as Personal Representative of the Estate of Daniel Ott, is seeking compensation for Daniel's destroyed earning capacity. At the time of his death, Daniel was Director of Operations for Ervin Cable Construction, Inc. in Sturgis, Kentucky. He was earning over $150,000 per year. Before moving to Kentucky from California, Daniel had averaged earning over $400,000 per year with Can-Am Construction, another cable construction company. Susan Ott's expert economist, Dr. William Baldwin, has projected Daniel's destroyed earning capacity to be as high as $10,006,425.

Susan Ott, as Next Friend of her minor children, seeks to recover compensation for each child's loss of the aid, assistance, services, society and companionship resulting from their father's death. Testimony will show that Daniel was a great father, and that the loss to each child is very substantial.

## APPLICABLE LAW

### Liability Issues

1.     Causes of Action. In a claim involving a defective product, the plaintiff may pursue, and the jury should be instructed on, strict liability, negligence and breach of warranty. *Ostendorf v. Clark Equipment Co.*, 122 S.W.3d 530, 535 (Ky. 2003); *Williams v. Fulmer*, 695 S.W.2d 411, 413 (Ky. 1985).

2.     Strict Liability. Kentucky adopted "strict liability" for product liability claims in *Dealers Transport Co. v. Battery Distributing Co.*,  402 S.W.2d 441, 446 (Ky. 1966)(adopting *Restatement of The Law of Torts,* §402A, which states that: "One who sells any product in a defective condition unreasonably dangerous to the user . . . is subject to liability for the physical harm thereby caused . . . .")

3.    <u>Defective and Unreasonably Dangerous</u>. A product is defective and unreasonably dangerous if an ordinarily prudent company, being fully aware of the risk, would not have put the product on the market in the condition it was in. *Nichols v. Union Underwear Co., Inc.,* 602 S.W.2d 429, 433 (Ky. 1980); *Montgomery Elevator v. McCullough,* 676 S.W.2d 776, 780-81 (Ky. 1984).

4.    <u>Crashworthiness Case</u>. Crashworthiness or enhanced injury cases are treated as any other product liability case, with the claim being that "the design of the vehicle failed to reasonably protect the occupant in a collision." *Toyota Motor Corp. v. Gregory,* 136 S.W.3d 35, 41 (Ky. 2004).

5.    <u>Factors Tending to Prove Product Defect</u>. Factors relevant to proving a product defective and unreasonably dangerous are:

(a)    <u>Feasible safer alternative design</u>. Evidence of a feasible safer alternative design is important, if not mandatory, to proving product defect. *Toyota Motor Corp. v. Gregory,* 136 S.W.3d 35, 41-42 (Ky. 2004); *Montgomery Elevator v. McCullough,* 676 S.W.2d 776, 780 (Ky. 1984), and see, *Restatement Third, Torts: Product Liability,* §2 (A.L.I. 1998), which provides that: "A product...is defective in design when the foreseeable risk of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design . . . ." Here, Susan Ott will show feasible safer alternative roof structure and restraint system designs – including designs by Ford, and its subsidiary, Volvo.

(b)    <u>Subsequent design change</u>. A manufacturer's change in the design of a product is "highly probative" to show an alternative design that was "both safer and feasible." *Ford Motor Co. v. Fulkerson,* 812 S.W.2d 119, 126 (Ky. 1991). As the Kentucky Supreme Court noted in *Ford Motor Co. v. Fulkerson,* the prohibition of evidence of

subsequent remedial measures in a negligence case does not apply to a product liability case. *Id.,* at 125. Of course, Ford's relevant "remedial" design changes in this case, such as installing a seat integrated restraint system in its 2001 model year Super Duty SuperCab, occurred before Daniel Ott's rollover accident, thus the subsequent remedial measures rule is not applicable.

(c)    <u>State-of-the-art</u>. KRS 411.310(2).   A manufacturer's compliance with the state-of-the-art of the industry is evidence that the product was not defective. Here, neither the F-250 roof structure nor the occupant restraint system was state-of-the-art. They were not even state-of-the-industry.

(d)    <u>Failure to warn</u>. A manufacturer has a duty to provide adequate warning of the risks associated with its product. This duty requires a manufacturer to provide "fair and adequate notice of the possible consequences of use or even misuse" of the product. *Post v. American Cleaning Equipment Corporation,* 437 S.W.2d 516, 520 (Ky. 1969). And see *King v. Ford Motor Company,* 209 F.3d 886, 894-895 (6th Cir. 2000).

(e)    <u>Other substantially similar incidents</u>. Under Kentucky law, evidence of other similar incidents is relevant not just to prove "notice" of the hazard, but also to prove design defect. *Montgomery Elevator Co. v. McCullough,* 676 S.W.2d 776, 783 (Ky. 1984). And as the Sixth Circuit Court of Appeals recently stated:

> The substantial similarity rule does not require identical products;
> nor does it require us to compare the products in their entireties.
> The rule requires substantial similarity among the variables relevant
> to the plaintiff's theory of defect.

*Clark v. Chrysler Corp.,* 310 F.3d 461, 473 (6th Cir. 2002), *vac. on other grounds by Chrysler Corp. v. Clark,* 540 U.S. 801 (2003).

<u>Causation Issues</u>

6.     <u>Substantial factor test</u>.  Under Kentucky law, causation is determined by whether or not the Defendant's conduct is a substantial factor in causing the Plaintiff's injury.  *Claycomb v. Howard,* 493 S.W.2d 714, 718 (Ky. 1973); *Deutsch v. Shein,* 597 S.W.2d 141, 144 (Ky. 1980); *Morales v. American Honda Motor Co., Inc.,* 151 F.3d 500, 507 (6th Cir. 1998)("Causation or proximate cause is defined by the substantial fact test: was the defendant's conduct a substantial factor in bringing about plaintiff's harm?").

<u>Damage Issues</u>

7.     <u>Destruction of decedent's power to earn money</u>.  Under Kentucky law, the destruction of the decedent's power to earn money is recoverable in a wrongful death action. *Adams v. Davis,* 578 S.W.2d 899 (Ky. 1979); *Birkenshaw v. Union Light, Heat & Power Co.,* 889 S.W.2d 804 (Ky. 1994).

8.     <u>Evidence of inflation and present value</u>. Under Kentucky law, the jury does not need to consider the effects of inflation in increasing the value of the decedent's earning power, nor should the jury consider the present value of the decedent's destroyed earning power, as "the two totally offset each other." *Paducah Area Public Library v. Terry,* 655 S.W.2d 19, 25 (Ky. App. 1983). The Kentucky Court of Appeals specifically found that evidence of inflation and present value "is not prejudicial but irrelevant and non-essential; all however within the discretion of the trial court." *Id.*

9.     <u>Child's claim for loss of parental consortium</u>. Under Kentucky law, a minor child is entitled to recover for the loss of parental consortium resulting from the death of a parent. *Giuliani v. Guiler,* 951 S.W.2d 318 (Ky. 1997). The child is entitled to recover for

this loss from the date of the parent's death until the child reaches the age of majority. *Charash v. Johnson*, 43 S.W.3d 274, 278-79 (Ky. App. 2001).

    10.   <u>Punitive Damages</u>.  Plaintiff is seeking punitive damages.

In order to justify punitive damages there must be first a finding of failure to exercise reasonable care, and then an additional finding that this negligence was accompanied by "wanton or reckless disregard for the lives, safety or property of others." *City of Middlesboro v. Brown*, 63 S.W.3d 179, 181 (Ky. 2001), *citing Horton v. Union Light, Heat and Power Co.*, 690 S.W.2d 382, 389-90 (Ky. 1985). The most recent punitive damages opinion from the Kentucky Supreme Court is *Sand Hill Energy, Inc. v. Smith*, 142 S.W.3d 153 (Ky. 2004). In *Sand Hill*, the Court sets forth the new punitive damages instruction to be given to Kentucky juries in light of *State Farm Mutual Insurance Co. v. Campbell*, 538 U.S. 408 (2003).

## CONCLUSION

Susan Ott's evidence will justify a substantial damage award against Ford – for both compensatory and punitive damages.

                          Respectfully submitted,


RICHARD HAY
RHONDA HATFIELD-JEFFERS
203 West Columbia Street
P.O. Box 1124
Somerset, KY 42502-1124
Telephone: 606/679-2214
Facsimile: 606/678-4696

        and

MARK P. ROBINSON, JR.
LaMAR BROWN
Robinson, Calcagnie & Robinson
620 Newport Center Drive, Seventh Floor
Newport Beach, CA 92660
Telephone: 949/720-1288
Facsimile: 949/720-1292

COUNSEL FOR PLAINTIFF

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was this /8ᵗʰ day of October, 2005 served upon the following persons by mailing a true and correct copy of same by First Class, U.S. Mail, postage prepaid and addressed to:

Paul Malek, Esquire
D. Alan Thomas, Esquire
Huie Fernambucq Stewart, LLP
Three Protective Center, Suite 200
2801 Hwy. 280 South
Birmingham, AL 35223-2484

R. Thad Keal, Esquire
Michelle Turner, Esquire
Turner Keal & Dallas, PLLC
5924 Timber Ridge Road, Suite 102
Prospect, KY 40059

RICHARD HAY
Co-counsel for Plaintiff