# EXHIBIT 10





Home › Forums › Ford Forums Community › Latest Ford News and Racing N... › **Ford Worldwide News** ›

## U.S.:Danger Overhead: Crushed Roofs,Thousands killed, hurt as auto roofs collapse

| → Jump to Latest | Follow |
|---|---|

1 - 13 of 13 Posts

**Stacy94PGT** · Registered
Joined Feb 22, 2001 · 7,859 Posts

✓ Discussion Starter  ·  #1  ·  Apr 11, 2004

Danger Overhead: Crushed Roofs

Thousands killed, hurt as auto roofs collapse

By Bill Vlasic, and Jeff Plungis / The Detroit News

Penny Shipler remembers the Chevrolet Blazer rolling over and over, then the sound of the roof crashing down over her head.

When it finally stopped, she tried to move. "I was thinking get out, I had to get out," she said. "I thought I was getting out."

But the Nebraska woman was paralyzed, her spinal cord crushed on impact with the metal roof that caved in around her.

It's the hidden risk in any rollover accident, whether the roof stays intact or collapses with catastrophic results.

Each year, an estimated 7,000 people are killed or severely injured in rollovers in which the roof crushed, according to federal statistics.

Yet Detroit's Big Three automakers, armed with political muscle and reams of research, have fought costly upgrades to a 33-year-old roof-strength standard, even while their own European operations build and test stronger roofs.

General Motors Corp. and Ford Motor Co. essentially drafted the regulation as it stands.

In 1971, the automakers led an industrywide effort to convince federal officials to adopt a minimum standard for roof strength — but only after their vehicle fleets failed the government's first proposed test, according to internal corporate documents examined by The Detroit News.

The industry wanted "something that will allow our vehicles to pass," Peter Bertelson, who headed Ford's crash-test programs in the late 1960s, told The News.

Critics say the industry-backed test, Federal Motor Vehicle Safety Standard 216, is too weak to save lives, particularly as rollover-prone SUVs and pickups proliferate.

Now the National Highway Traffic Safety Administration, under pressure from safety advocates and Congress, says it's finally time to fix rule 216 and plans to propose a tougher standard later this year.

The stakes for automakers are enormous. Changes in roof structures could add cost and weight to millions of vehicles.

"It's been known for quite some time that this is a standard that needs updating," NHTSA Chief Dr. Jeffrey Runge told The News.

His opinion is hardly shared by members of the Big Three.

"There is no correlation between roof strength and the likelihood of injury in a rollover crash," said Robert Lange, GM's executive director for vehicle structure and safety integration.

safety integration.

That position seems incomprehensible to Shipler, a quadriplegic since her accident seven years ago.

"If they don't think the roof matters, let them live a full day as a quad and see what it entails," said Shipler, 36, who won an $18.6 million lawsuit against GM last year.

Juries in Texas, California and Nebraska have repeatedly rejected Big Three-backed studies that deny a link between crushed roofs and injuries.

With huge judgments coming in, including a $225 million verdict against Ford in a roof crush case, safety groups have stepped up their campaign for a new roof-strength standard.

"We think the auto manufacturers' basic claim is not true," said Gerald Donaldson, director of the consumer group Advocates for Highway and Auto Safety. "Roof strength is absolutely critical."

NHTSA is looking hard at recent crash data to establish a direct relationship between collapsing roofs and catastrophic injuries.

In filings with NHTSA, GM, Ford and DaimlerChrysler contend there is no need for new standards.

But it is an industry divided, with the Big Three's own European operations — Opel, Saab, Volvo, Mercedes-Benz — performing rollover tests that far exceed the 216 standard.

NHTSA publishes safety ratings based on frontal- and side-impact crash tests, but consumers don't know how their vehicle's roof will react to a rollover — until it happens.

And it can occur in an instant, such as when Patrick Parker hit a deer and rolled his Ford F-250 pickup in northern Texas, and ended up a quadriplegic.

"People have been telling NHTSA that 216 is inadequate for years, and they have done nothing," said Dena Parker, Patrick's wife. "How many more people have to die or end up like Patrick?"

NHTSA backs down

The consequences of crushed roofs were clear to federal regulators as early as 1969.

"Approximately 1,400 motor vehicle occupants were killed in that year by impact with roof structure in rollover accidents," the National Highway Safety Bureau, NHTSA's predecessor, said in 1971.

Engineers in Detroit grappled with their own analyses of rollover accident data. An internal study by Ford's Automotive Safety Research Office — dated July 8, 1968 — reached "some very basic" conclusions.

"People are injured by roof collapse," the Ford study said. "The total number of nationwide deaths and injuries cannot be estimated but it is a significant number."

With the government considering its first roof-strength standard, GM and Ford conducted their own tests — rolling cars over on ramps, dropping them upside down, loading pressure on the A-pillars that frame the windshield.

A series of inverted drop tests at Ford produced startling results, said Bertelson, the former manager of Ford's Impact Dynamics Department.

"We dropped 40 or 42 different cars on their roofs in 1968," said Bertelson, now retired and living in Arizona. "The engineers who worked for me were just shocked. The roof strength was terrible."

At the urging of GM and Ford, federal regulators proposed a static test that applied specific pressure to both A-pillars. But on Jan. 8, 1971, five of six GM vehicles failed the test, according to documents on file in the Shipler case.

Two months later, Ford's Working Safety Committee reported that "current 1971-72 vehicles will not meet the requirements of the notice."

Ford put a price tag on passing the government's initial test. "All car lines, as currently programmed, would require new A-pillars at a cost of $9 to $15 per car," Ford's Safety and Emissions Programs Group said in a document dated March 22, 1971.

GM, Ford and Chrysler protested the two-pillar test. Ford questioned whether crushed roofs even posed a danger — a direct contradiction of its own 1968 study.

"The data do not implicate top intrusion as an automotive safety problem," Ford said in its April 5, 1971, comments to the agency.

NHTSA relented, reducing the load angles of the pressure test and limiting it to just one side of the vehicle.

But the agency did not back down from its original premise.

"For non-ejected front seat occupants in rollover accidents," NHTSA said, "serious injuries are more frequent when the roof collapses."

Trucks, SUVs at risk

When rule 216 went into effect in 1973, passenger cars outnumbered light trucks almost 5 to 1. But with the explosive growth of SUVs and pickups, light trucks make up more than half of all new vehicles sold today.

And with more trucks come more rollovers.

In the 216 test, one side of the roof must support one and a half times the unloaded weight of the vehicle. For cars, there is a 5,000-pound limit.

To address the onslaught of bigger trucks, NHTSA attempted in 1989 to apply the regulation to vehicles weighing up to 10,000 pounds. But the Big Three lobbied against it and NHTSA gave in, agreeing only to a 6,000-pound limit.

In effect, the heaviest trucks and SUVs, mainstream products like the Dodge Durango, Lincoln Navigator and Chevy Tahoe, are technically exempt from the 216 test.

Safety experts contend that automakers routinely "design down" to meet the bare-minimum requirements of 216.

"Some manufacturers take weight out to reduce their strength-to-weight ratios down closer to the minimum," said Steve Forrest, senior engineer of the firm Safety Analysis and Forensic Engineering, which advises plaintiffs in lawsuits against automakers.

In 1999, Ford twice reduced the thickness of the steel in the A-pillars of its heavy-duty F-series pickups, according to internal documents subpoenaed in Patrick Parker's 2002 lawsuit against Ford.

The savings, the documents said, totaled $2.42 per truck.

The F-250 pickup that Patrick Parker was driving is one of the heaviest trucks on the market and not covered by rule 216.

"What is the rationale in thinking if it's heavier that it doesn't have to meet the standard?" said Dena Parker. "It's just crazy."

Ford declined interview requests on rule 216, referring inquiries to the Alliance of Automobile Manufacturers, a Washington-based industry trade group.

But the alliance, which also represents GM, DaimlerChrysler and other automakers, has little to say publicly.

"We are conducting field research on roof strength, and it would be inappropriate to comment before we have collected or analyzed the data," said Eron Shosteck, an alliance spokesman.

DaimlerChrysler issued a brief statement on 216: "Chrysler Group tests its vehicles beyond the requirements of the federal standard."

At GM, Lange said roof strength is one of many variables considered in designing a new car or truck.

"We manage very deliberately the overall mass of the vehicle and its body structure," he said.

European manufacturers, including GM's Saab and Opel units, employ high-strength steel to improve the strength of roofs. But concerns about extra weight and cost preclude using stronger steel in mass-market domestic vehicles.

"We try to provide safety performance without burdening consumers with added costs," Lange said.

He said GM does use high-strength steel in the United States "when appropriate," but would not identify specific models. One is the 2004 Cadillac SRX, a luxury SUV that a GM product brochure says has extra steel "to provide superior occupant protection."

Safety cages with stronger roofs have been common for years in European brands such as Mercedes-Benz, BMW, Volkswagen and Volvo. To test roof strength, prototypes are rolled off a moving dolly to simulate actual accident conditions.

The Alliance of Automobile Manufacturers rejects so-called dynamic rollover tests, calling them "hopelessly unrepeatable." Yet dynamic tests designed to simulate real-world crashes are routine for European brands.

Why test beyond the minimum standard of 216?

"If you look at Volvo's history in safety, our target has always been to overachieve," said Hans Wikman, project manager for Volvo's XC90 sport utility vehicle.

Human impact

Rule 216 has been under study by NHTSA since the early 1990s, but the path to a new roof-strength standard has taken a tortuous route.

While roof-strength has been on NHTSA's agenda for years, the agency has focused on other priorities such as air bags, child safety seats, and frontal- and side-impact standards.

An official public comment period on 216 has dragged on for 28 months, yielding thousands of pages of documents submitted from both sides of the issue.

NHTSA Chief Runge pledges to propose a new standard this year, but could be hamstrung by a battle in Congress over tying new safety rules to sweeping federal highway legislation.

"There's some distrust there because NHTSA has waited so long to upgrade 216," said Sean Kane, whose consulting firm, Strategic Safety, works with plaintiffs' lawyers. "But it's an industry problem, and it's getting worse."

Bertelson, who has testified in several lawsuits, looks back on Ford's early roof-strength tests and questions why a federal safety standard written in the 1970s is still on the books.

"It's long overdue," he said. "This has been on my conscience for 30 years."

A mother's struggle

And in a tiny tract house on the outskirts of Lincoln, Neb., Penny Shipler wonders what her life would be like today if not for the accident that ravaged her spinal cord on the night of Sept. 11, 1997.

A single mother who waitressed at a local restaurant, Shipler accepted a ride home from work that night from a friend, Kenneth Long, in his 1996 Chevy S-10 Blazer.

Just before midnight, Long lost control of the SUV on a deserted stretch of highway.

The vehicle rolled at least four times, according to court testimony. The roof on the driver's side suffered marginal damage, and Long walked away from the wreck.

But the roof crushed down 8 inches on the passenger side. When police arrived at the scene, Shipler was hanging upside down, paralyzed from the neck down, her lap-and-shoulder belt still buckled.

Shipler sued GM and Long. Last September, after a five-week trial, a Lancaster County jury awarded Shipler $19.5 million in damages, a figure later reduced by the judge to $18.6 million.

GM is appealing the verdict. During the trial, the automaker argued that no roof would have stayed intact during such a violent accident. But the jury rejected the defense.

"I felt GM was guilty," said juror Deena Douglas.

"The roof is like an eggshell. You're in a tank with an eggshell on top of your head, which is the most important part of your body. I don't get it."

The appeal process could drag on for two years, said Dan McCord, Shipler's attorney. For now, Shipler and her 6-year-old son, Keenan, subsist on about $800 a month in Social Security and disability checks.

She can move her arms, but has no feeling in her torso and lower body. Confined to a motorized wheelchair too big to fit through her bathroom door, Shipler counts on the help of her little boy to make it through each day.

A life-care specialist testified at her trial that Shipler will need at least $10 million worth of medical care and assistance in the future.

"People say, 'Oh my God, you got $20 million,' " she said. "It's not much fun, I don't think, to be a millionaire and be a quad."

On a snowy February afternoon, Shipler waited outside her home for a city bus to take her to the bank, a journey that takes her six hours to complete.

She tries not to be bitter that the deformed roof of an SUV sentenced her to a life of paralysis.

"Of course you get angry, but you can't spend your life angry," she said. "If (GM) does admit guilt or responsibility, there's a lot they're going to have to change."

But it all seems unreal to her, how an obscure, decades-old federal safety rule still stands after thousands of injuries and deaths in rollover accidents where roofs crushed.

"Their point right now is to worry about the cost of what it's going to take to change the vehicle," she said. "Well, look at the cost of what happens after the vehicle crashes."

---

Stacy94PGT
My first car was a 67 Mustang Coupe, 2nd one was a 67 Cougar XR-7, 3rd one was a 66 Mustang Coupe. Why did I get rid of these cars for ? I know why, because I'm stupid, stupid,

T **The Stylist** · Formerly J-type
Joined Feb 21, 2001 · 1,629 Posts

#2 · Apr 11, 2004

As far as I'm concerned, Ford, GM and DaimlerChrysler should have their arses kicked by the Government for taking the approach to roof crush safety in the way that they have. If the Volvo XC90 can use high strength Boron steel in its roof structure so can the rest of Vehicles in the FMC empire - regardless of cost and weight.

I'm a happy camper!

S **Stacy94PGT** · Registered
Joined Feb 22, 2001 · 7,859 Posts

🔵 Discussion Starter · #3 · Apr 12, 2004

Danger Overhead: Crushed Roofs

Seat belts not enough to save lives in rollovers

Man's death mirrors thousands each year

By Bill Vlasic and Jeff Plungis / The Detroit News

LINCOLN, Neb. — He was cruising over a slight rise on Highway 33 when Clyde "Ray" Noyes saw a car stopped up ahead, waiting to turn into a farmhouse driveway.

Noyes pulled his Ford F-150 SuperCab pickup left to pass. But an oncoming car was approaching fast.

He cut back sharply to the right. The pickup's wheels skidded into a low guardrail. Then, the 4,600-pound truck flipped on its side, and rolled over several times before coming to rest in a shallow culvert on the edge of a cornfield.

And when a Lancaster County sheriff's deputy got to the accident scene at 7:06 p.m. last July 11, Noyes was dead in the driver's seat, his lap-and-shoulder belt buckled and the roof of the F-150's cab crumpled down over his head.

It was a split-second traffic maneuver that turned disastrous, one of nearly 7,000 deaths and serious injuries linked each year to crushed vehicle roofs.

But Noyes' death is also a chilling example of how seat-belted motorists are killed or injured when their vehicles' roofs crush around them.

An average of 3,700 deaths and serious injuries occur annually in rollover accidents in which the victims are belted and the roof is crushed, according to the National Highway Traffic Safety Administration.

No subset of rollover statistics is under greater scrutiny by NHTSA, which is expected this year to propose a tougher new roof-strength standard to replace the current rule enacted back in 1971.

"The biggest increase in rollover deaths is coming from belted occupants," said Sean Kane of the research firm Strategic Safety. "It is the key correlation between roof-crush and injury severity.

For more than 30 years, Detroit's Big Three automakers have maintained that crushed roofs do not cause fatal or catastrophic injuries, but simply reflect the violent circumstances of certain rollover accidents.

But that explanation provides little solace to the Noyes family.

"Accidents can happen, but Ray didn't have to die," said his widow, Sally Noyes.

Ray Noyes, 65, was an American success story — an Eagle Scout, a U.S. Navy chief petty officer, nuclear-plant engineer, youth wrestling coach, husband, father and grandfather.

He died on a rural road he'd traveled countless times, a ruler-straight stretch of two-lane blacktop cutting through the farms and pastures of southeastern Nebraska.

But it could have been any rollover anywhere: a momentary loss of control, a vehicle upended, a roof crushed — and a life lost.

Ray Noyes had more than 200,000 miles on his old-model Toyota pickup when he finally decided to buy a new truck.

And like any project he took on, Noyes analyzed it in detail.

"Ray was an engineer, a nuclear engineer," said his stepson Mitch Krenk. "He researched everything to death."

Born in 1937 in the tiny Nebraska town of Imperial, Noyes was a self-made man with a tireless work ethic. He joined the Navy at age 19, spent 10 years on active duty, and returned to earn degrees in mechanical and nuclear engineering.

A stocky, crew-cut former wrestler, Noyes had a lifelong love of machinery. "On our first date, he took me to Brownville (Neb.) to see the big hole in the ground for the Cooper nuclear plant," Sally Noyes said.

"Ray was a hardware man," said Larry Harrold, his longtime supervisor at the Energy Northwest public utility in Richland, Wash. "He had a nose for staying on top of problems and coming up with solutions."

Methodical and meticulous, Noyes poured over product specifications of pickup trucks in the spring of 2000. For an engineer whose favorite book was "Why Materials Fail," selecting a new truck was no small deal.

"We'd stop at a store and he'd be down on his knees looking at tires," said his son Chuck Noyes. "He just really thought things through."

Noyes settled on a bright red, 2000 Ford F-Series SuperCab with leather captain chairs, 17-inch cast-aluminum wheels, and a special towing package. When he retired from Energy Northwest, Noyes packed up his Ford and moved his family back to their roots in Nebraska.

But he was never far from a toolbox, tinkering in the garage and building a home office exactly like the chief's quarters on a naval warship. Mostly, Noyes enjoyed the fruits of retirement — spending time with old pals, hunting at his cabin in Wyoming, and cheering on his grandsons at sporting events.

It wasn't hard to pick his booming baritone out of a crowd at a high-school basketball game.

"Every time my son made a basket, Ray would jump up and yell, 'All right!' " Krenk said. "I finally told him he didn't have to cheer during warm-ups."

Red lights flashing

On Friday nights, things get lively at the Veterans Of Foreign Wars Post 4959 in Crete, Neb. While the vets kick back and swap stories, their wives cook up a spread of ribs and side dishes for supper.

Ray and Sally Noyes came early for "Grill Menu" night at the VFW last July 11, bringing along Sally's 90-year-old mother, Alice Weiss. After they ate, Sally headed off to a meeting for her 50th class reunion of Crete High School.

Noyes took his mother-in-law home, then started east on Highway 33 for the 20-minute trip back to Lincoln.

The weather was clear and warm. The speed limit was 55 mph. Noyes was halfway home when it happened.

He saw the car stopped in front of him and reacted. If he had lost control just up the road, his F-150 might never have rolled.

Except he hit the only guardrail for miles. The F-150's right wheels dug into the rail's three metal cables, and the truck rolled over onto its right side, according to the police report.

The passenger side took the first blow, but the roof on the driver's side bore the brunt of the crash.

On impact, the roof over Noyes crushed down at least 10 inches, nearly to the back of his seat. The roof on the other side hardly was deformed.

Lancaster County Sheriff's Deputy Derek Horalek witnessed the rollover from down the road, and was on the scene almost instantly. Noyes, he said in his accident report, was wearing his lap-and-shoulder belt.

Noyes was taken to Bryan Lincoln General Hospital West, where he was pronounced dead on arrival. The certificate of death lists "cardiac arrest" and "trauma from MVA (motor vehicle accident)" as the causes.

Later that evening, Sally Noyes rode down Highway 33 with her sister, and passed the flashing red lights of police cars on the shoulder of the road.

"I said, 'There must have been an accident,' " she said. " 'It looks like a red pickup.' It never dawned on us ..."

I said, 'There must have been an accident,'" she said. "It looks like a red pickup.' It never dawned on us ... ."

She arrived home to find the front door locked and the house dark. When she got inside, the phone was ringing. There had been, she was told, an accident on Highway 33.

Crash-test findings

When he saw his father's F-150 at the storage yard, Chuck Noyes was shocked at the damage on the driver's side roof.

"The roof looked like a crinkled aluminum can, just crushed on one side," Chuck Noyes said. "It was like a karate chop just chopped it. The passenger door opened up fine."

Auto-safety experts agree that no two rollover accidents are identical, and that trucks roll differently than passenger cars.

But certain characteristics appear frequently in rollover conditions.

The leading side of the roll very often suffers less damage than the trailing side of the vehicle. If a car or truck rolls to the right, the left side of the roof crushes with more force.

And the trailing side — where Ray Noyes sat — is where the worst injuries occur.

In a 1994 study of 58 rollover accidents, former General Motors Corp. engineer Don Friedman cataloged where injuries occurred in relation to the leading side of the vehicle.

Nearly 85 percent of the deaths and severe injuries happened on the trailing side, and the majority of those victims wore seat belts.

Friedman recently expanded the study to 800 rollovers from 1992 to 1998, and found that 90 percent of deaths and injuries occurred on the trailing side.

Federal Motor Vehicle Safety Standard 216, which is under review by NHTSA, only requires automakers to test one side of the roof.

Pressure equal to 1.5-times the vehicle's weight is applied gradually. If the roof crushes five inches or less into the passenger compartment, it passes 216.

Safety advocates contend that testing one side, particularly with the windshield intact, fails to show how the second side will perform in a rollover.

"The roof has got to be able to withstand what is a predictable and serious problem with these vehicles," said R. David Pittle, senior vice president of technical policy and advocacy for Consumers Union.

Detroit's Big Three automakers for decades have argued that crushed roofs have nothing to do with serious injuries in rollovers. Instead, they say injuries are caused by occupants "diving" into the roof before it collapses.

Ford Motor Co. has declined interview requests from The News on the topic of roof strength. But Ford's position on the issue is clearly spelled out in government documents.

In a 2001 filing with NHTSA, Ford said "crash data suggesting the presence of roof deformation and occupant injury does not establish a causal connection between the two."

Moreover, Ford rejects the notion that rule 216 needs updating after more than 30 years.

"There is no added benefit to occupant safety with increased overall roof strength," the company said.

But safety experts say the growing percentage of belted rollover victims seems linked to the strength of the roof — or lack of it.

Ten years ago, 16 percent of the people injured in rollovers were belted, said Ken Digges, a professor with the National Crash Analysis Center at George Washington University.

Now NHTSA estimates that belted occupants represent 55 percent of deaths and injuries in roof-crush, rollover cases.

"As the percentage of belted occupants rises," said Digges, "roof crush becomes more important."

The metal A-pillars that frame the windshield are critical to the strength of a vehicle's roof. On Noyes' truck, the A-pillar on the left side was nearly flattened. The roof itself came down directly over the driver's seat.

Noyes was a formidable man, a 6-foot-2, former University of Nebraska heavyweight wrestler in robust good health. His lap-and-shoulder belt held him in his seat

Noyes was a formidable man, a 6-foot-2, former University of Nebraska heavyweight wrestler in robust good health. His lap-and-shoulder belt held him in his seat — right in the path of the crushed metal roof.

"The greater the roof crush, the higher the likelihood of head injuries," Digges said.

"We have studied two levels of roof intrusion ... five inches and 10 inches," he said. "We found that the higher level had more frequent head impacts."

Family takes action

Did the roof of his F-150 kill Ray Noyes?

"There was massive blunt head trauma, which can cause brain-stem separation," said Timothy Eves, a lawyer for the Noyes family.

A wrongful-death lawsuit against Ford will be filed within weeks, Eves said. Sally Noyes struggled with her decision to sue, but felt a lawsuit would help expose the problem of crushed roofs

"You have to get their attention and their attention is lawsuits," she said. "I'm thinking of other people. How many more will this happen to?"

The family can't accept that a hard-core engineer bought a brand-new, top-of-the-line truck that couldn't protect him in a rollover.

"How often did he buy a new vehicle? Only twice in a lifetime," said his stepdaughter Carrie Vitullo. "It makes you mad. I think about it every time I see a Ford truck on the highway."

Noyes chose the Ford F-150 only after looking at every comparable pickup on the market.

"Ray thought he was buying the best, toughest truck out there," Krenk said. "Most people buy a full-size pickup because it's tough. You know, it's Ford tough."

After the accident, Krenk and Chuck Noyes went to the scene and picked Noyes' tools out of the high grass. His two sisters, Barbara and Josephine, found his billfold. "When they came back, they were shaking," Krenk said.

At his funeral, a video tribute was shown to a soundtrack of his favorite singer, Willie Nelson. There was Ray hunting in the mountains, celebrating with friends and family, posing proudly in his Navy uniform.

When he goes hunting now, Chuck Noyes always takes his favorite gun — a .338-caliber rifle that his father machined himself on a small lathe. It was a gift for his high-school graduation.

"The barrel, when he got it, was just a big chunk of steel," he said. "It took him two years to get it done. He wasn't fast, but he was very meticulous."

In the basement of her home, Sally Noyes keeps the "chief's quarters" just as her husband left it. Naval commendations are framed on the walls. Engineering manuals line the bookshelves. The carpet is the same shade of green that Navy captains have on a ship at sea.

"That was Ray," she said. "He had to have the green carpet."

Each year, an average of 253,000 vehicles roll over in the U.S. More than 26,000 people are killed or seriously injured. In 6,900 cases, there was roof-crush present in the vehicle. And in 3,700 instances, the victims were belted.

Ray Noyes was one of them.

 The Ford F-150 SuperCab that Ray Noyes was driving hit a guardrail, flipped and rolled, the roof caving in at least 10 inches on the driver's side. The truck is in storage.

---

Stacy94PGT
My first car was a 67 Mustang Coupe, 2nd one was a 67 Cougar XR-7, 3rd one was a 66 Mustang Coupe. Why did I get rid of these cars for ? I know why, because I'm stupid, stupid,

---

**S**  **Stacy94PGT** · Registered
Joined Feb 22, 2001 · 7,859 Posts

🔵 Discussion Starter  ·  #4  ·  Apr 12, 2004                                    ⋮

Lawsuits target Ford SuperCab roof

Jury links vehicle's roof design to ejection

By Bill Vlasic and Jeff Plungis / The Detroit News

Key trial evidence

As part of its defense in the Benavides v. Ford lawsuit, Ford Motor Co. hired an outside firm to do a 45 mph dolly rollover test on a F-150 Supercab. The truck suffered severe damage to the roof. The test showed the doors flying open and dummies being partially ejected.

The plaintiff's lawyers used Ford's own tests to convince a jury that the crushed roof helped cause the fatal ejection of Paul Alaniz and Laura Benavides. The jury awarded their survivors $225 million.

CORPUS CHRISTI, Texas — Ford Motor Co. has settled a number of lawsuits challenging the strength of the roof in its F-Series SuperCab pickup.

One case, however, stands out from the rest.

In December 2002, a Duval County, Texas, jury found that a crushed roof caused the side doors of a 2000-model SuperCab to burst open, ejecting Paul Alaniz and Laura Benavides to their deaths from the rolling pickup.

The verdict is believed to be the first time that a jury linked roof deformation to occupant ejection in a rollover accident.

Detroit's Big Three automakers have long maintained that ejection is an entirely separate issue from the growing debate over federal standards governing roof strength.

But in Benavides v. Ford, the jury ruled that a crushed roof forced open the driver's door and the rear-hinged passenger door on the same side.

"It was clearly a survivable accident if the doors had stayed closed," said Jeff Wigington, the attorney for the Alaniz family.

Ford declined interview requests. In court, the automaker's lawyers argued that the driver, Paul Alaniz, was solely at fault because he consumed alcohol on the evening of the accident, then lost control of his F-150 on a two-lane highway about 75 miles southwest of Corpus Christi.

The jury didn't agree, and awarded the Alaniz and Benavides families a combined $225 million — one of the biggest automotive product-liability judgments on record.

Ford chose not to appeal the case and, instead, negotiated a confidential settlement, Wigington said.

A critical piece of evidence introduced at trial was a four-minute video of an F-150 SuperCab ejected off a moving dolly at about 45 miles per hour.

Ford commissioned an outside firm to do the test, primarily to show the jury how severe the accident was that killed Alaniz and Benavides.

Instead, the plaintiffs' attorneys offered the video into evidence.

In the dolly-rollover test, the SuperCab's doors popped open on the driver's side, and test dummies were partially ejected from the vehicle.

Because of its "barn-door" style center-opening doors, the SuperCab has no B-pillars supporting the roof in the center of the truck.

Door latches failed

At the Benavides trial, former Ford engineer John Stilson, testified that latches fastening the front and rear driver's side doors failed because the roof caved in.

"On the second roll, the driver's door latch failed because of the manner in which the roof crushed," said Stilson, testifying on behalf of the plaintiffs.

Each year, more than 26,000 people are killed or seriously injured in rollover accidents, according to the National Highway Traffic Safety Administration. Nearly 7,000 deaths and serious injuries involve accidents where the vehicle roof crushed.

NHTSA only considers crushed roofs a factor in rollovers accidents where the occupants aren't ejected. Safety experts, however, say deformed roofs do play a role in rollover ejections.

"The roof-crush mode influences not only roof deformation, it can influence the risk of ejection," said Ken Digges of the National Crash Analysis Center at George

Washington University, which is conducting an extensive roof crush study for NHTSA.

Crush-related ejections are usually tied to windshields or windows breaking in a rollover, with occupants ejected out the opening, said former General Motors Corp. engineer Donald Friedman, a frequent plaintiff's witness in roof crush lawsuits.

High rollover rate faulted

Critics claim the Ford F-150 SuperCab appears to have an abnormally high rate of ejections in rollovers. (The lawsuits against the SuperCab predate Ford's redesign of its F-Series lineup for the 2004 model year.)

A total of 134 people were fatally ejected from F-Series SuperCabs from 1998 to 2001, according to a Ford internal document introduced at the Benavides trial.

The CrewCab version of the F-Series, which has four conventional doors with front hinges, accounted for 71 fatal ejections during the same period.

Even if an occupant is not ejected, the lack of B-pillars in the SuperCab weakens the overall roof structure, said Houston plaintiff's attorney Mikal Watts.

"Everyone, including everyone at Ford, knows the roof structure on these trucks simply will not protect people in rollover accidents," Watts said after a Texas jury awarded $18 million to Mario Castro, who was paralyzed in a SuperCab rollover.

In the Benavides trial, Ford lawyer Rosewell Page III said the SuperCab's roof exceeded Federal Motor Vehicle Safety Standard 216 by 43 percent. "The vehicle was reasonably safe," he said.

But the circumstances of the accident convinced the jury otherwise.

On the evening of July 20, 2001, Paul Alaniz, 35, drove to a club in Kingsville, Texas, with three friends: Laura Benavides, 20; Juan Flores, 26; and Eluterio Elizondo, 24.

Alaniz, a physical-education teacher and youth football coach, drank at least two beers during the night out, according to trial testimony. His blood-alcohol level was 0.04 percent, half of the legal limit in Texas.

On the return trip, Alaniz drove with Benavides seated behind him. Flores and Elizondo were in the front and rear seats on the passenger side.

About 2:30 a.m., Alaniz lost control of the F-150. The truck tipped on the passenger side, and rolled three times off State Highway 2285, according to court records.

The roof on the driver's side — the "trailing" side in the rollover — was crushed severely. Both doors on the driver's side came open. Alaniz and Benavides were ejected an estimated 100 feet into a field of sagebrush and cactus.

Seat belts not used

But the doors on the passenger side stayed closed. Both Flores and Elizondo stayed in the vehicle and were uninjured.

None of the four were wearing seat belts.

"The two on the side where the roof crushed and the doors popped open, they died," said Tony Alaniz, Paul's younger brother. "The two on the right side where the doors stayed closed, they lived."

Page, Ford's lawyer, blamed Paul Alaniz for the wreck.

"If Mr. Alaniz had not lost control of this vehicle, there would be no accident and there would be no death," Page said.

The wreck, he said, was a "violent" accident.

"Accidents happen every day," Page said in court. "People die on the highway."

Tony Alaniz said his older brother was hardly a reckless driver.

"He never had a speeding ticket in his life, never had a single citation for anything," he said. "He didn't fall asleep. He went off the road, overcorrected, and the truck rolled over."

He wears a gold chain that he took off his brother's body at the accident scene nearly three years ago. Last month, Tony Alaniz visited the site, marked by two white, wooden crosses on the roadside.

"It's just something that's so hard to accept," he said. "You know, I had that same truck. Paul liked it so much he bought one just like it."

He sold his SuperCab after the accident, and now drives a four-door sedan.

Photo courtesy of Alaniz family

A jury found that a crushed roof caused the side doors of this F-Series SuperCab to burst open, ejecting Paul Alaniz and Laura Benavides to their deaths as the truck rolled.

---

Stacy94PGT

My first car was a 67 Mustang Coupe, 2nd one was a 67 Cougar XR-7, 3rd one was a 66 Mustang Coupe. Why did I get rid of these cars for ? I know why, because I'm stupid, stupid,

---

R    **russellw** · Registered
Joined Feb 28, 2002 · 3,657 Posts

#5 · Apr 12, 2004                                                              ⋮

It is incomprehensible that a 30 odd year old standard could still be current in this day and age. It is equally incomprehensible that a Government body tasked with acting as the industry watch dog can continually bow to pressure from industry lobby groups.
How a government agency can accept that a standard should be modified because the Big Three can't meet it is bordering on the criminal, yet here we are 3 decades later, with heavier vehicles, still applying the same hopelessly inadequate set of standards.

The manufacturers should be shot for lobbying against their own engineering information and for wanting to save the $2 odd per vehicle.
The regulatory body should be shot for allowing it to happen and then continujing the travesty by taking so long to address it.

None of that is any consolation to the families of those needlessly killed and injured but undoubtedly the cost of the lawsuits will eventually force both parties to actually do something.

I wonder where the actuarial document is that worked out that it was cheaper to wear the odd lawsuit than to spend $2.50 for every F-Series truck built over the last 30 years? By my reckoning that is about US$60 million saved at todays value.

Little wonder we don't trust the bastards. Wonder what the AU figures are like?

Russ

---

**BA GT-p: driven quietly to a place of worship each Sunday - exactly as intended by the manufacturer.**

---

T    **The Stylist** · Formerly J-type
Joined Feb 21, 2001 · 1,629 Posts

#6 · Apr 12, 2004                                                              ⋮

Those pictures look pretty shocking, however I've looked around the Fowles/Pickles damaged auction websites where you can find AU and BA Falcons that have roof crush damage even worse than that.

Although the above may not be a fair comment as I don't know the circumstances of those crashes but it does give an insight as to how the local cars perform.

---

I'm a happy camper!

---

S    **Stacy94PGT** · Registered
Joined Feb 22, 2001 · 7,859 Posts

⊘ Discussion Starter · #7 · Apr 13, 2004                                      ⋮

Feds, Big Three gird for roof showdown

Automakers fight plan to toughen roof-crush rules

By Jeff Plungis and Bill Vlasic / The Detroit News

by Jeff Plungis and Bill Vlasic / The Detroit News

Lisa Nipp / Gannett News Service
Jeffrey Runge, head of the National Highway Traffic Safety Administration, told a House panel that the Senate bill would interfere with NHTSA's ability to carry out its own priorities.

WASHINGTON — After years of debate and thousands of lives lost, a showdown is looming over the U.S. government's safety standard for vehicle roofs.

While Detroit's Big Three automakers staunchly oppose new regulations — contending crushed roofs don't cause deaths and injuries — the nation's top auto-safety official says it's time to act.

"We have to tackle this problem," Dr. Jeffrey Runge, head of the National Highway Traffic Safety Administration, told The Detroit News. "That's not me being hysterical. That's me looking at the data."

With an increasing number of drivers buying rollover-prone SUVs and pickups, an estimated 7,000 people are killed or seriously injured each year when the roofs of their vehicles collapse in rollover accidents, according to NHTSA.

For automakers, much is riding on the outcome. New regulations could mean substantial investments in stronger roof structures. And any admission that roofs have been substandard could lead to more product-liability lawsuits.

Updating Federal Motor Vehicle Safety Standard 216 has been on the government's agenda since the regulation was adopted 33 years ago as a "temporary" measure.

Yet NHTSA's critics say that rule 216 is a telling example of the agency's inability to stand up to the powerful auto industry.

For years, NHTSA has struggled to push through new or updated safety regulations in the face of political opposition and the powerful auto-industry lobby.

It took the nationwide Firestone tire controversy before the agency finally moved to rewrite its three-decade old federal tire standard in 2000.

"The agency not only simmers for years, it simmers for decades, and nothing happens," said Gerald Donaldson, senior research director of the Washington-based Advocates for Highway and Auto Safety.

Although an official public-comment period on rule 216 has dragged on for 28 months, NHTSA says it is firmly committed to proposing a new roof strength standard this year.

"When rollovers do occur, they're very dangerous and very lethal," Runge said. "Intuitively, you know if you have a stronger roof structure, you're better protected."

Congress will play a major role in shaping any new regulation. The Senate has already passed a bill that calls for tougher roof-crush rules. The House and the Bush administration, however, have signaled that they oppose the Senate's plan.

Auto-safety advocates are also clamoring for their voice to be heard on rule 216 .

In a key closed-door session on March 22, three of the most influential auto industry watchdogs met privately with Runge to discuss roof strength.

Ex-General Motors Corp. engineer Don Friedman — accompanied by Joan Claybrook, president of Public Citizen, and Clarence Ditlow, Center for Auto Safety executive director — showed Runge a dynamic rollover test that may evaluate a vehicle's performance in real-life rollover conditions.

Friedman and Claybrook also briefed the staff of Sen. John McCain, R-Ariz., as well as staffers for the House Energy and Commerce Committee.

"This has become a much bigger problem with the SUV," Ditlow said. "By the time they became popular in the 1990s, every engineer in America knew we had a problem."

Pressure builds

But with a long list of traffic-safety issues on NHTSA's agenda, where does a new roof standard rate?

Safety advocates like Claybrook, who headed NHTSA from 1977 to 1980, say roof-crush is a critical problem that has to become a priority.

"These are the most preventable injuries in auto crashes," said Claybrook. "The cardinal principle of occupant protection is the integrity of the passenger compartment."

Victims of rollover accidents in which the roof collapsed also want their say.

victims of rollover accidents in which the roof collapsed also want their say.

John Hess is one of them.

On Dec. 25, 1987 — Christmas Day — Hess was riding in a Ford F-150 pickup on his way to find batteries for his 7-year-old daughter's new toy.

When the pickup went through an intersection, the truck was hit by a car that ran a red light, according to court records.

Hess's pickup rolled over. The roof collapsed, crumpling to just inches above his seat.

The roof hit Hess so hard that his lower body broke the seat springs. He was left a paraplegic, and in a subsequent trial a California jury awarded him $12.5 million.

Hess, from his home in Castaic, Calif., follows the debate over roof crush in Washington. The government makes its point, Hess said, and the auto industry has its say.

But what about the victims?

"It seems like people like me have nothing to say about all of this," Hess said. "It seems like the people who have had to pay the consequences should have a lot more to say about it."


Window of opportunity


The next stage of debate will begin later this year when NHTSA proposes a new test for roof strength.

The agency is in the midst of a major study to determine the relationship between crushed roofs and highway deaths anf catastrophic injuries. In addition, the National Crash Analysis Center at George Washington University also is digging into years of rollover accident data, to determine the impact of collapsing roofs.

The existing 216 test was devised decades before rollover-prone SUVs ruled the road. The test consists of gradually applying a force of 1.5 times the vehicle's weight to a steel plate on one side of the roof.

But the big question is, how much further a new test should go?

Safety advocates say the current test does not replicate the forces a car or truck experiences in a rollover. The test applies force to one side of the roof. But in the real world, the most damage usually occurs when the trailing side contacts the ground, after the roof structure has been weakened.

And through a loophole, the heaviest SUVs and pickups, those with gross vehicle weights of 6,000 pounds or more, don't face any government regulation.

NHTSA officials say they most likely will adjust the angles and forces in the current regulation instead of devising a more technically dynamic test. Regulators also expect to require markedly better seat belts as part of a new rule 216.

"This is a critically important issue," said Dr. Ricardo Martinez, who headed NHTSA from 1994-99. "We know the technology is there. We now have SUVs that have become the family station wagon. They are very rollover prone, but they provide very little protection in a rollover crash."

But auto companies, facing huge potential liabilities in court cases, have pressed NHTSA to do more research before changing rule 216.

The Big Three are united in their opposition to a new roof-strength standard.

Occupant safety "is not likely to be enhanced as a result of additional roof crush requirements," DaimlerChrysler AG said a filing with NHTSA in 2001. "The scientific research instead suggests that FMVSS 216 appears adequate and sufficient in scope."


Congressional showdown


The Senate voted in February to give NHTSA specific directions on roof crush. Its legislation calls for the agency to issue a set of new regulations, including a final "rollover crashworthiness standard."

The provision calls for NHTSA to consider a roof-strength standard "based on dynamic tests that realistically duplicate the actual forces transmitted to a passenger motor vehicle during an on-roof rollover crash."

But a new rule 216 could become mired in politics.

At a March 18 hearing, House Energy and Commerce Committee questioned the need to update rule 216. Leading the charge was U.S. Rep. John Dingell, D-Dearborn, the Big Three's most influential defender in Congress.

Dearborn, the Big Three's most influential defender in Congress.

Dingell said nobody has made a compelling case that a congressional mandate is necessary to improve the roof-strength standard.

"You may be better off with a strong roof," Dingell told The News. "But they don't know what a strong roof is, and they don't know how to design the test. They don't know how much better a strong roof will do in a rollover."

Dingell said he may support a new regulation if a public-safety need was demonstrated — and it would not add significant costs to vehicles.

The Bush administration also has weighed in against the Senate plan, primarily if it interferes with the rest of NHTSA's current auto-safety agenda.

But long-time auto-safety advocates see this year as the prime opportunity to make a change in rule 216.

Claybrook's Public Citizen organization brought roof-crush victims to Washington last month to lobby for new legislation. Safety watchdogs see the 216 debate as their best chance in years to pressure NHTSA for tougher regulations.

"You have to light a bonfire under the agency," said Donaldson of the Advocates for Highway and Auto Safety.

There is reason to be skeptical. Congress called for new standards for occupant protection in rollovers as far back as 1991.

Then, NHTSA studied the issue for three years, focusing on tests to measure vehicle stability in road maneuvers that might lead to rollover.

But, in 1994, U.S. Transportation Secretary Frederico Pena brought the project to a halt.

Pena said said that a rollover-avoidance test was too technically difficult. Instead, he said that NHTSA would concentrate on how vehicles could withstand rollovers better.

A stronger roof crush test would have to wait.

"The slower they are," said David Pittle, senior vice president for technical policy and advocacy at Consumers Union, "the more the risk, the longer the risks are in the marketplace, the more people are injured or killed until those standards are in place and those hazards are reduced."


Limited NHTSA resources

Now, a decade later, it falls to Runge and his staff to address the strength of vehicle roofs.

NHTSA officials, feeling criticism from safety advocates, say the agency is ready to move.

"If you look at the things we promised, then you're right, we didn't put out," said Stephen Kratzke, NHTSA's associate administrator for safety performance standards. "It's fair enough to hold us accountable for that."

The agency's small budget and staff have hamstrung its efforts, consumer groups say.

"There's no doubt these are complicated issues, but it has been far too slow," said David Pittle, senior vice president for technical policy and advocacy at Consumers Union. "The slower they are, the longer the risks are in the marketplace."

---

Stacy94PGT
My first car was a 67 Mustang Coupe, 2nd one was a 67 Cougar XR-7, 3rd one was a 66 Mustang Coupe. Why did I get rid of these cars for ? I know why, because I'm stupid, stupid,

---

S   **Stacy94PGT** · Registered
Joined Feb 22, 2001 · 7,859 Posts

✔ Discussion Starter · #8 · Apr 13, 2004                                                ⋮

What they said: Reaction

"We have to tackle this problem. That's not me being hysterical. That's me looking at the data."
Jeffrey Runge
NHTSA director


"Field research and analysis indicates that real-world injury is not likely to be enhanced as a result of additional roof crush requirements. The scientific research instead suggests that FMVSS 216 appears adequate and sufficient in scope and applicability as it is written."

Matthew Reynolds
DaimlerChrysler safety executive In the company's official comments to NHTSA in 2001

"These are the most preventable injuries in auto crashes. The cardinal principle of occupant protection is the integrity of the passenger compartment."
Joan Claybrook
Former NHTSA administrator and now president of Washington watchdog group Public Citizen

"You may be better off with a strong roof. But they don't know what a strong roof is, and they don't know how to design the test. They don't know how much better a strong roof will do in a rollover."
Rep. John Dingell
U.S. House of Representatives, D-Dearborn

"We the undersigned believe that it is time for our government to step in and protect consumers from large corporations, namely the auto manufacturers, from producing, marketing and selling unsafe vehicles to unaware consumers."
Dena and Patrick Parker
In a petition to federal regulators

"Automakers have cheap technology at their fingertips to do it. The amount of material that would need to be added to the roof pillars is really a small percentage of the vehicle's overall costs. Rollover is really a simple fix."
Raphael Grzebieta
President of the Australasian College of Road Safety

---

Stacy94PGT
My first car was a 67 Mustang Coupe, 2nd one was a 67 Cougar XR-7, 3rd one was a 66 Mustang Coupe. Why did I get rid of these cars for ? I know why, because I'm stupid, stupid,

---

**S**  **Stacy94PGT** · Registered
Joined Feb 22, 2001 · 7,859 Posts

✔ Discussion Starter · #9 · Apr 13, 2004

Options exist for stronger roofs

Structural foam, high-strength steel would absorb impact, create 'simple fix,' some say.

By Jeff Plungis and Bill Vlasic / The Detroit News

Automaker options
Here are some ways automakers could bolster vehicle roof strength:

* High-strength steel. Alloys can add strength without weight, but tend to be costlier.
* Structural foam. Cheap and well-known, keeps beams from bending.
* Automaker options
* Reinforced pillars. Makes them stronger during a crash.
* Roll bars. Can be blended into a roof structure, keeping them invisible to passengers.
Sources: Center for Auto Safety, Union of Concerned Scientists, Monash University

WASHINGTON — Building stronger vehicle roofs is relatively simple by auto industry standards, and the technology to do it has been available for decades, engineers say.

"Strengthening roof pillars to sustain a rollover is a trivial structural engineering exercise," said Raphael Grzebieta, president of the Australasian College of Road Safety, an organization of automotive researchers based in Australia.

Some examples are already on the road today.

Ford Motor Co.-owned Volvo of Sweden, for example, employs a high-strength, boron-steel alloy to reinforce the roof structure of its Volvo XC90 SUV. The alloy is light and strong, but more expensive than conventional steel.

But there are also inexpensive options.

Engineers say the U.S. auto industry could greater utilize technologies such as structural foam, used extensively in the production of aircraft, and high-strength steel.

Foam is cheap and easy to work with. The material stiffens and ensures that hollow steel beams don't bend or lose their structural integrity. It also absorbs energy during a crash.

during a crash.

"Automakers have cheap technology at their fingertips to do it," said Grzebieta, an engineer with Monash University in Australia. "The amount of material that would need to be added to the roof pillars is really a small percentage of the vehicle's overall costs. Rollover is really a simple fix."

In addition to high-strength steel and structural foam, engineers say, automakers have several other options, such as:

* Roll bars integrated into a vehicle's roof structure. In a report released last year called "Building a Better SUV," the Union of Concerned Scientists and the Center for Auto Safety estimated a roll cage could be incorporated into a passenger car roof structure for about $50 and would add 15 pounds of weight.

* Stronger roof pillars. One way to strengthen the roof structure is to add steel tubes inside the A pillar, which frames the windshield. Automakers also can change the shape of roof pillars to add strength.

* Better roof design. The XC90 has rounded corners on its roof. That means it is less likely to hit the ground hard during a rollover. A vehicle with square corners, like the Hummer, is likely to catch the ground harder and absorb a greater impact.

"If you tell an automotive engineer to make a roof 10 times stronger, he will be able to do it," said Carl Nash, a former NHTSA official now working on roof-crush lawsuits. "But you just need something strong enough to keep its basic strength in a rollover. To do that, you need something more like 1 1/2 or two times the (current) strength."

Other kinds of safety technology might emerge once the NHTSA develops a more sophisticated regime of testing — one that would measure how crash test dummies are injured in simulated rollovers.

That sort of crash test is known as a dynamic test. NHTSA does dynamic crash tests for other common types of crashes, like frontal and side-impact crashes.

Agency officials say that is a long-term project when it comes to rollovers. NHTSA administrator Dr. Jeffrey Runge told lawmakers on Capitol Hill that the agency did not know of any dynamic tests that could meet a basic legal requirement — repeatability.

But researchers are working on them. At least three devices have been developed that claim to be dynamic and repeatable:

* Ford's Controlled Rollover Impact System. The CRIS device consists of a truck trailer equipped with a scaffolding that holds a car or truck. The scaffolding is able to rotate the test vehicle at a predetermined rate while the tractor-trailer moves forward. The suspended vehicle is then dropped on a test track.

* Don Friedman, a former GM engineer who now consults on safety issues for plaintiffs' attorneys, advocates a system by A. Jordan & Co., a California testing firm. It uses a giant rotisserie-like device to rotate a vehicle cab, while on the surface below, a steel structure is moved to impact the roof like the ground would in a rollover crash.

* Australian researchers at Monash University, trying to address concerns about rollover deaths in the Australian army, proposed using a system that combined elements of a drop test and the CRIS truck. A vehicle is suspended from a crane on the back of a truck traveling at 30 mph.

While the NHTSA hopes to update rule 216, Runge cautions that improving roof strength alone only will help in a fraction of rollover crashes.

That's why the agency is looking at new kinds of seat belts, technologies like side air bags and electronic stability control, along with a new roof-strength test.

"One single countermeasure isn't going to solve this problem," Runge said. "We have to look at the vehicle as a system."

---

Stacy94PGT
My first car was a 67 Mustang Coupe, 2nd one was a 67 Cougar XR-7, 3rd one was a 66 Mustang Coupe. Why did I get rid of these cars for ? I know why, because I'm stupid, stupid,

---

R   **russellw** · Registered
Joined Feb 28, 2002 · 3,657 Posts

#10   ·   Apr 14, 2004                                                                                    ⋮

Paint me red and call me cynical but why do I get the feeling that the lobbyists and politics will be the only winners in this little debate?

Undoubtedly any measures taken wouldn't save all of those lives. Good old US citizens still like to believe (and are legislatively still supported in some States) that they have a democratic right to not wear seat belts - generally known as the "I hve the right to spread mah brains all over the countryside" rule. Likewise, some of the impacts will be of sufficient force that the roof is going to crush anyway with the same deadly result to the occupants.

If only 10% of those lives are saved that's 700 extra living people and who knows how many that aren't rendered immobile for the rest of their days.

It sickens me to think that the power brokers wil win this one but given the fact that they have managed to evade the issue for 30 years we can rest assured that they will dodge the bullet again. In the meantime people will continue to die needlessly, lawyers will get rich and the automakers will no doubt still sleep at night.

In Australian terms let me quote the following short snippets from **Michael Henderson** and **Michael Paine** in their research:

*Rollover crashes, especially in the country, are usually very destructive events.*
*About 15% of passenger cars in fatal crashes in Australia have overturned.*
*Between about 13% and 16% of all passenger-car occupants killed in Australia died primarily as a result of injuries received in a rollover. Vehicle damage often includes deformation of the roof and its supporting structures. Head and neck injury are common, and associated with roof deformation. Strengthening of the roof is often suggested as an appropriate countermeasure for such injuries.*

*There are currently no rules covering the strength of the roofs of passenger cars in Australia.*

Answers my earlier question I believe.

*Review of the local statistics indicates that if a roof crush standard (or any other measure) were perfectly effective in preventing death or injury in rollover, the maximum benefit for belted occupants would be in the order of 30 deaths and 140 serious injuries prevented a year.*

Ironically one of the things looked at was the introduction of a standard similar to FMVSS216 ….

*The cost to Australian manufacturers of introducing a standard based on FMVSS 216 is estimated by the Federal Chamber of Automotive Industries to be, for those small minority of current models (some 2%) which are believed not to comply with FMVSS 216, $125,000 (average) per body style for development and testing programs.*

*Some testing of Australian vehicles to FMVSS 216 has been performed in Australia, at Monash University. With the exception of a 1990 sedan all vehicles passed this test. The results from these tests confirm that the loading which in the end defines the crush is a bending one on the A pillar, rather than an axial load. This is in accordance with field observations. The windscreen, and its bonding to the body structure, has great influence on the resistance to crush, because the screen is supporting the pillar.*

*Thus, the main conclusion of this review is that the FMVSS 216 is an inadequate standard, and that there would be little or no incremental benefit in introducing an Australian Design Rule based on it.*

Well thankfully someone seems to have a clue.

*It is recommended as follows:*
*that in the short term the Federal Office of Road Safety review the feasibility of introducing an Australian Design Rule based on the newly amended FMVSS 201 for head impact protection;*

*Out of the 228 total number of occupants killed in rollovers, 179 cases (78.5%) died either without a collision occurring before the roll (88 cases), or after a collision that in itself was not lifethreatening (91 cases). On rural roads, overturning is associated with 15% of fatal crashes involving passenger cars. The incidence is more than twice as high for vans and four-wheel-drive vehicles, at 32% and 34% respectively.*

Of more concern in the data set are the following numbers which refer to the wearing of seat belts - seems this message is still not getting through even in this country.

*The very low proportion of males wearing seat belts (46%) is noteworthy. Other data have shown that individuals who crash are generally less likely to have been wearing seat belts. A known benefit of wearing a seat belt is the prevention of ejection.*

The percentage of women wearing seatbelts wasn't much better at 58%. 38 of the 57 unbelted occupants were ejected from the vehicle (66%) whereas only 5 of the 65 belted occupants were.

*As noted, there were a few cases where the deceased occupant was ejected apparently despite wearing a seat belt. To the extent possible these circumstances were confirmed. Apparently the occupant either slipped out of the belt, or the seat back deformed enough to allow the occupant to be dislodged from behind the belt, or the structure was sufficiently destroyed to disrupt the belt mountings.*

Obviously any rollover protection is only going to be of benefit to belted occupants who were still in their seats - in this research they were left with 51 cases to study.
Of those, only 45 were in front seat positions (30 drivers and 15 passengers) of whom 30 (66%) sustained head injuries in the order of MAIS4+ (very, very bad); including 9 with an MAIS of 6+ (unsurviveable).

*Most of the fatal head injuries were associated with head-to-roof contact, and with*
*contact with the road and other external surfaces. " Lozenging", or "side-away" of the roof structures, in particular, appeared to allow partial ejection of the head although a seat belt was worn. In one or two cases where photographs were available in the file, survival (of occupants other than the deceased) was on the face of it surprising, given extreme damage and distortion of the roof structures in the vicinity of the survivor.*

Much of the US data is based on the Malibu I and II tests conducted in the early 1980's using identical Chevvy Malibu vehicles (hence the name), which were

Much of the US data is based on the Malibu I and II tests conducted in the early 1980's using identical Chevvy Malibu vehicles (hence the name), which were dropped from a dolly platform to simulate a roll-over. These tests have been the topic of major debate for the last two decades but it appears that at least two things were clearly wrong with them - (1) the dummies used did not very accurately imitate huiman neck and torso reactions and (2) the rollovers themselves only generated axial loads in a single direction unlike real world ones. The Malibu tests (in summary) concluded that there was no causal relationship between roof crush and head/neck injury. Subsequent analysis of the data using complex models to simulate real human behaviour draw a somewhat different conclusion -

*The risk of neck injury depends on both the magnitude and the duration of forces (as for most parts of the body). The neck force on initial roof contact was similar in magnitude, whatever the roof stiffness. However, for the rigid roof case the neck force duration at a high force level was too short to indicate injury potential. On the other hand, in the production vehicle the duration of neck force was sufficient to indicate an AIS 5 or higher injury level. Further, the increase in force level agreed with the magnitude and duration of the roof deformation curve.*
*What this means in the real world is that at first impact the human neck may receive a short sharp shock axially, which is not injurious. As the roof collapses, the neck is forced to bend under the combined loads of the inverted torso and the distortion of the roof and lateral supports. Whenever roof deformation resulted in compression of the simulated occupant between the roof and the seat, neck forces exceeded tolerance levels because of the extended load duration. This explanation is consistent with findings of flexion/compression neck injury in rollover crashes in the field.*

*...injury to the spine does appear to be more of a risk in rollovers than other kinds of*
*crash. Wigglesworth (1991) analysed accident reports for 67 patients admitted to three spinal cord injury units in Australia in 1987. Among vehicle occupants, out of a total of 44 cases 38 occurred as a consequence of rollovers. At the AIS 2 and AIS 3+ injury levels, rollovers were clearly associated with the highest risk, both for the cervical and thoracolumbar spine.*

Now for some Aussie research ....

*A recent Australian study of rollover crashes was aimed at investigation of the relationship between vehicle design and the nature and severity of occupant injuries. Rechnitzer and Lane (1994), of the Monash University Accident Research Centre, reviewed the literature on rollover crashes and, as the present consultants have done, re-analysed results from published rollover crash tests. They also studied in depth a selection of real-world rollover crashes.*
*This new in-depth crash study confirmed once again that ejection is a significant factor in fatal crashes. Of the 13 fatalities in the sample, ejection occurred in about half the cases, with the seat belt not having been worn.*
*Rechnitzer and Lane concluded that severe spinal injuries could arise from three factors related to vehicle design. The first is "mechanistic", simply being the loss of vertical occupant space through roof intrusion, both vertical and lateral. This, thereby, imposes bending and compression loading of the spine. The second factor is impact loading via head contact with the ledge formed by the underside of the roof and the frame of the door. This can result in inertial body loads acting on the cervical spine. Third, they note the lack of effective padding on potential head contact surfaces and consequently the lack of an intervening energy-absorbing structure to reduce impact and acceleration loads. Severe injuries to occupants who are not ejected, particularly to the head, spine and thorax, only appeared to occur to occupants seated to the side of the vehicle where significant roof contact occurred with the ground or road surface, or where there was significant roof crush. Therefore, these severe injuries cannot be ascribed to crash severity alone.*

In laymans terms this means that (1) you run out of space for your head (2) your head hits the door or (3) something else solid. Either way you are in serious sh*t at this point.

The article also reviewed rollover footage from rally racing and noted:

*Slow motion analysis of the videos revealed that substantial changes in the*
*angular velocity occur as parts of the vehicle contact the ground. This results in high tangential forces on the occupants. In some video frames the head and arms of occupants (most of whom were wearing at least four-point rally-style harnesses) can be clearly seen extended well outside open/broken side windows. This appears to be a whipping action which, fortunately, tends to pull the occupant back inside the vehicle just before the adjacent cantrail (roof header rail) makes contact with the ground.*

.. and indeed the attached video stills do show the helmeted head well outside the vehicle side window - bearing in mind that the roll is over in 1.2 seconds!

*This analysis raises several issues about roof crush and injuries.*
*• For simple side-on rollovers, the vertical impacts with the ground are likely to be of sufficiently low speed not to pose a direct problem with typical car roofs.*
*• End-over-end rollovers and launching rollovers, where the car centre of gravity gains significant height above the ground, involve much larger vertical impacts. Roof strength is more critical.*
*• Roof lozenging (side-sway) is clearly a cause for concern. It is promoted by the kind of horizontal loading imposed when there is considerable forward movement of the car as it rolls. This tends to bend the roof supports. Among possible effects is shattering of the side window, so that the occupant is exposed to a greater risk of direct contact with the ground or partial ejection. Restrained occupants who are partially ejected may be subjected to a whipping action that forces the inboard side of their head into contact with the outside upper edge of the side window frame.*

In the Australian tests mentioned above which were performed to the US standard (in 1991) all but one car passed the test including an EA Falcon, VN Commodore, Camry, Pulsar and Magna. The failure was an EA Falcon with the wrong windscreen bonding used - a lesson for those wanting to save a few $$ on a windscreen repair.

So what do our regulators think, given the acknowledged faults in the FMVSS216 test?

*The FCAI expressed the view that the introduction of an ADR for passenger roof crush strength is not justified, given the high expectation of the current level of*
*compliance with FMVS 216. An ADR would impose unnecessary testing and compliance costs on vehicle manufacturers, and additional workload on FORS staff for no*
*perceived benefit.*

*perceived benefit.*

Good to know that regulatory blindness is universal.

Now the all important conclusion:

*Our main conclusion is that the FMVSS 216 is an inadequate standard, and that there would be little or no incremental benefit in introducing an Australian Design Rule based on it. Because we do not believe its introduction would reduce harm to a measurable extent, we have not attempted a formal cost/benefit analysis of the proposal. We do believe, however, that the matter of roof strength and its relationship to occupant injury is far from settled, and that more work should be done on the matter. It was not part of our brief for this project to examine such issues, but*
*we agree generally with Rechnitzer and Lane (1994) that vehicle design improvements should include the following:*
*• better integrity for the side windows;*
*• increasing A and B pillar strength;*
*• providing more energy-absorbing padding in the head-strike areas (see following discussion on the new FMVSS 201);*
*• modification of the framing in the door/roof region to reduce the risk of the head locking in to this angle;*
*• improvements in seat belt design to reduce occupant movement in rollovers;*
*• improvements in door integrity and side padding.*

*To these we would add reduction of head injury potential by redesign of roof framing to eliminate or redirect sharp welded flanges. In most cars these are directed inwards and are unprotected by any padding. Particularly when distorted, these present a cutting edge that is a real threat to the head even in the absence of significant crush.*

*So the debate continues ....*

Cheers
Russ

**BA GT-p: driven quietly to a place of worship each Sunday - exactly as intended by the manufacturer.**

**The Stylist** · Formerly J-type
Joined Feb 21, 2001 · 1,629 Posts

#11  ·  Apr 14, 2004

As far as I'm concerned the windscreen should not be relied on as a structural enhancment as it generally breaks apart after loading on the A-pillars is applied during the first stages of a rollover. Initial crash testing for a new car being developed in my view should include rollover tests without the windshield to see how it performs.

Curtain airbags that stay inflated for the duration of the rollover should be used in all vehicles to help stop occupants being ejected but just as importantly to protect the head from striking the roof/door frame and the roof/door pillars.

A new rollover standard can't come soon enough. We have crash testing for frontal and side collisions where today's latest cars have a 4-5 star NCAP crash test rating but nothing for the area that is supposed to protect our most important body part - the head.

I'm a happy camper!

**Stacy94PGT** · Registered
Joined Feb 22, 2001 · 7,859 Posts

✔ Discussion Starter  ·  #12  ·  May 11, 2004

Sweeping roof rule changes in doubt

Safety agency indicates it will only modify current tests rather than ordering overhaul

By Jeff Plungis / Detroit News Washington Bureau

WASHINGTON — The National Highway Traffic Safety Administration hinted Monday it is leaning toward modifying the nation's 33-year-old vehicle roof strength test rather than backing the sweeping overhaul sought by some safety advocates.

At a meeting of the Society of Automotive Engineers in Washington, NHTSA researchers gave an update on the agency's vehicle tests that will form the basis of a new roof-strength regulation the agency is expected to propose later this year.

About 7,000 people are killed or seriously injured each year in rollover crashes where roofs collapse.

Detroit's Big Three automakers have fought costly upgrades to the existing roof standard, even while their own European operations build and test stronger roofs.

NHTSA has said it will likely revise the current standard — Federal Motor Vehicle Safety Standard 216 — in which a 30-inch by 72-inch steel plate is pressed against the side of a car or truck's roof at 1.5 times the vehicle's weight.

If the roof crushes less than five inches when it reaches the maximum force, the vehicle passes.

Auto safety proponents say the government's roof-strength test doesn't come close to simulating the forces in a real-world rollover accident.

Some are pushing for NHTSA to adopt measures such as a dynamic test where test vehicles would be rolled over.

NHTSA researchers are experimenting with angles and forces with the current static test, according to the presentation Monday by Donald Willke, NHTSA's chief of defects analysis and crashworthiness at its Ohio test track.

He told the engineering gathering that the agency's vehicle testing showed little difference in damage patterns between what happens in static, steel-plate tests and what is seen in real-world crashes.

NHTSA officials have said that they knew of no road test, also known as a dynamic test, that could meet the legal standard of repeatability.

NHTSA's tests have to produce the same results each time they are run to ensure objectivity.

"We have not found dynamic vehicle rollover testing to be repeatable," Willke said.

But NHTSA was challenged on the issue of repeatability by Acen Jordan, owner of a California-based independent testing firm. Jordan showed a video demonstrating a rollover test device he claims produces repeatable test results.

On the Jordan device, a vehicle cab spins on a rotisserie-like device at a predetermined roll rate. The spinning cab is lowered onto a moving platform designed to simulate pavement.

Mike Leigh, a Ford Motor Co. engineer, presented data from rollover tests that showed test dummies coming in contact with the roof before the roof collapses.

The results were similar to "diving" injuries that have been observed and disclosed in previous industry studies.

Critics of the current standard — which tests one side of the roof — say it fails to simulate the likely additional damage done when the roof hits the ground for a second time, after the first impact has weakened the roof structure.

"They're not getting to the fundamental issue, which is testing on both sides," said Clarence Ditlow, executive director of the Center for Auto Safety, a Washington watchdog group. "I was disappointed."

In Monday's presentation and previous interviews, NHTSA did not indicate it has finalized its new roof-testing procedures. NHTSA is expected to propose tentative rules later this year. They will not be finalized until 2006.

Congress may act on the roof-strength issue this year. The Senate passed legislation in February that would call for a tougher roof-strength test.

Key lawmakers in the House said they were content to leave the issue to NHTSA.

---

Stacy94PGT
My first car was a 67 Mustang Coupe, 2nd one was a 67 Cougar XR-7, 3rd one was a 66 Mustang Coupe. Why did I get rid of these cars for ? I know why, because I'm stupid, stupid,

---

R    **russellw** · Registered
Joined Feb 28, 2002 · 3,657 Posts



#13 · May 12, 2004

Why aren't we surprised??

BA GT-p: driven quietly to a place of worship each Sunday - exactly as intended by the manufacturer.

1 - 13 of 13 Posts

This is an older thread, you may not receive a response, and could be reviving an old thread. Please consider creating a new thread.

## Join the discussion

Continue with Facebook

G  Continue with Google

or **sign up with email**

Home   About Us   Terms of Use   Privacy Policy   Help   Contact Us   Business Directory   Grow Your Business   NEW

VerticalScope Inc., 111 Peter Street, Suite 600, Toronto, Ontario, M5V 2H1, Canada

The Fora platform includes forum software by XenForo

