# EXHIBIT 11

## UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

CARYL E. TAYLOR, individually and )
as personal representative of the estate of )
MARK E. TAYLOR, )
           )
        Plaintiff )
           )
v. )                Civ. No. 06-69-B-W
           )
FORD MOTOR COMPANY, )
           )
        Defendant )

## RECOMMENDED DECISION ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Caryl Taylor contends that her deceased husband's 2002 Ford F-250 Super Cab pickup truck was defectively designed and that her husband would likely have survived a roll-over event but for alleged defects in the roof and door assemblies. Ms. Taylor never designated a automotive engineer or other design expert to support her claim of design defect. Ford Motor Company argues that this omission calls for judgment in its favor as a matter law and has filed a motion for summary judgment to that effect (Doc. No. 43). The Court referred the motion to me for a recommended decision and based on my review I recommend that the Court grant the motion, in part, based on certain concessions made by Taylor, but not as to the chief contention Ford makes with respect to the need for Taylor to have her own design expert.

### Facts

The following facts are material to the summary judgment motion. They are drawn from the parties' statements of material facts in accordance with Local Rule 56. See Doe v. Solvay



<u>Pharms., Inc.</u>, 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the mandatory procedure for establishing factual predicates needed to support or overcome a summary judgment motion); <u>Toomey v. Unum Life Ins. Co.</u>, 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56).

On June 2, 2004, Mark Taylor lost control of his 2002 F-250 4x4 Super Duty, Super Cab pickup truck and left the highway on which he was traveling. (Ford's Statement of Material Facts ¶ 2, 4, Doc. No. 44.) Before coming to a rest in the highway median the pickup rolled over two times. (<u>Id.</u> ¶¶ 5.) Caryl Taylor, the plaintiff herein and the representative of the decedent's estate, has not designated an expert to address any professional engineering standards that might have applied to Ford's design and manufacture of the subject pickup truck's doors and roof support structures. (<u>Id.</u> ¶ 10.) That is the sum and substance of the material facts that Ford offers in its statement of material facts. There is no factual assertion in Ford's statement of material facts to the effect that the pickup truck's roof and door design were reasonably safe or that the utility of the design outweighed any relative danger it might have given rise to. Despite Ford's failure to assert any material facts with respect to the safety of its product in its statement, Taylor has set forth the evidence that she would rely on at trial to support a finding that the truck's roof and door system were unreasonably dangerous in the foreseeable event of a rollover. Among other findings a jury could make in the plaintiff's favor are the following.

The Super Cab design consists of a passenger compartment having both front and back seats that can be accessed through a pair of doors on each side of the passenger compartment. The two doors on each side latch to one another when closed, because there is no fixed frame

component, or "B pillar," situated between the front and rear doors.[1]  B pillars are important

structural components of an automobile roof.[2]  Use of a B pillar in a passenger compartment with

both front and back seats serves to support the middle span of the side roof rail by joining it to

the "rocker," the frame component that runs along the bottom of the frame, underneath the doors.

The B pillar is the roof support pillar that is roughly in line with the back of the front seat of a

typical pickup truck.  It is the pillar to which the front door would normally latch upon closing.

Instead of having a fixed B pillar, Ford characterizes the Super Cab as having a "floating B

pillar."  The B pillar "floats" because, when the doors are open, the B pillar no longer exists.  In

order for the floating B pillar to lend structural support to the roof, the rear door of the Super Cab

must be securely latched to the roof rail and rocker panel when it is closed.  After the rear door is

closed, the front door can be closed by means of a latch connecting it to the rear door.  (Pl.'s

Add'l Statement ¶¶ 61, 102-103, 106, 110-112, Doc. No. 86.)

Federal Motor Vehicle Safety Standard (FMVSS) 216 is a federal standard that applies to

roof crush loads for passenger vehicles.  (Id. ¶ 117.)  The standard calls for passenger

compartment roofs to have sufficient strength to resist deformation beyond a certain degree when

a force of one and one-half times the vehicle weight is applied using a specified test device.  (Id.

¶ 118.)  Although the standard is not applicable to heavy pickups like the subject pickup, Ford

treated it as a relevant standard to consider when designing its heavier pickup trucks.[3]  Ford

internal documents, circa 1992, reflect that Ford tested its heavier F-Series pickups against the

---

[1]     The roof of a typical automobile with both front and back seats is supported by three pillars on each side:
the A pillars at the front, on each side of the windshield, the C pillars at the back of the passenger compartment
behind the rear seats, and the B pillars, between the A and C pillars and behind the front door.

[2]     A "roof crush" document produced by Ford in the early nineties observed that it is "primordial" to have a
good B pillar structure to meet high roof crush loads.  (Pl.'s Add'l Statement ¶ 105.)  This comment was a summary
statement made in a document discussing compliance with roof crush requirements set in the FMVSS 216 standard
applicable to passenger vehicles with a gross vehicle weight under 6,000 lbs.  (Pl.'s Ex. 40 at 1, 24.)

[3]     One employee in Ford's "Compliance Assurance, Automotive Safety Office" opined: "The Light Truck
Safety Design Guidelines should be followed . . . ."  (Pl.'s Ex. 44 at 2.)

standard as well as other vehicles that were over the weight limit set in the standard, at least prior to the development of the Super Cab in question. (Pl.'s Ex. 40 at 10, 14, 44.) Subsequently, a March 1995 Ford internal document reflects that, prior to the release of the 1996 Super Cab design, Ford decided that it would not subject its heavier trucks (those on the PHN 131 platform like the subject truck) to FMVSS 216 testing. (Pl.'s Add'l Statement ¶ 130.) One reference in the document reflects that Ford was engaged in roof crush modeling at the time, "concentrating on the 4-door SuperCab." (Pl.'s Ex. 44 at 2.) That modeling suggested "peak resistance" of 10,000 lbs. (Id.) It is not entirely plain what a FMVSS 216 target would be. The PHN 131 platform vehicles weigh in excess of 8,500 lbs., with the subject pickup at 8,800 lbs., which would suggest a target resistance measure in the 13,000 lb. range. However, there is a statement to the effect that the relevant vehicle weight is 7,700 lbs., which would result in a 11,550 lb. resistance target under FMVSS 216. (Pl.'s Add'l Statement ¶ 154.) The document reflects that Ford engineers determined not to plan any "actual tests" for roof crush, in part because "there is no REGULATORY REQUIREMENT for roof crush resistance in vehicles of more than 6,000 lbs." (Id. (emphasis in original); Pl.'s Add'l Statement ¶¶ 115, 130.)

Subsequent to March 1995, Ford implemented a handful of "downgrades" to roof structural components, including in the roof bows, the windshield header, the A pillar and the B pillar. (Pl.'s Add'l Statement ¶¶ 178, 180, 184-186, 190-191.) In 2003, subsequent to these changes, experts performed a roof crush test on a 2001 F-250 Super Cab pickup in accordance with the FMVSS 216 standard and recorded a result of 9,800 pounds. (Pl.'s Add'l Statement ¶¶ 146-147.)[4]

---

[4]      Ford admits the factual statement concerning the results of the third-party roof crush analysis. (Reply Statement ¶¶ 146-147.)

4

In the rollover event, the roof of the pickup truck impacted with the ground, causing a deformation of the roof rail.  With this impact the upper latch on the rear door "failed" or "separated."  (<u>Id.</u> ¶¶ 43-45.)  This separation enabled a void to form between the door frame and the roof rail, meaning that the B pillar was floating rather than in position during the rollover event.  The anterior portion of Mr. Taylor's head entered this void and was crushed between the structural components in the course of the rollover event.  (<u>Id.</u> ¶¶ 6, 16, 26, 29.)

In 1995, prior to the manufacture of the subject pickup truck, the National Highway Traffic Safety Administration, as part of its rule-making authority, stated with respect to passenger vehicles weighing 10,000 pounds or less, that performance standards applicable to door retention components "are intended to minimize the likelihood of occupants being ejected from the vehicle in the event of a crash" and that "specified test load should [not] be divided by the number of latches fitted to a single door."  (<u>Id.</u> ¶ 75;  NHTSA Fed. Motor Vehicle Safety Standards; Door Locks and Door Retention Components, Final Rule, 60 Fed. Reg. 50,124 (Sept. 28, 1995) (to be codified at 49 C.F.R. pt. 571), Pl.'s Ex. 30 at 1, 5.)  The NHTSA found:

> Real world crash data show that latch failures are the dominant cause of door openings and that they are seldom loaded symmetrically.  Since side door latches that individually meet the requirements of Standard No. 206 have significantly reduced side door openings in crashes and have saved an estimated 400 lives per year, NHTSA has decided that the proposed requirements should be applied to each back door latch tested.

(60 Fed. Reg. at 50,128, Pl.'s Ex 30 at 5.)  Although the last observation is stated in terms of back door latches (such as those on rear hatchback doors), the point of the rule is to "extend[] the standard's requirements [FMVSS standard 206], currently applicable only to side doors, to the back doors . . . "  (60 Fed. Reg. at 50,124; Pl.'s Ex. 30 at 1.)  That standard, FMVSS 206, requires that a latch withstand 2,000 lbs. of force.  (Pl.'s Add'l Statement ¶ 78.)

5

The upper latch used by Ford to secure the top of the rear door (the floating B pillar) to the roof rail is known as a D5 latch.[5]  (Id. ¶ 62.)  It is undisputed that the D5 latch is "very small in size."  (Id. ¶ 65.)  Ford understood that the D5 latch would "give well before the D21."  (Id. ¶ 79, citing Pl.'s Ex. 31 at 2.)  Ford understood that strength testing on the D5 latch resulted in only 1,828 lbs. of resistance, whereas FMVSS 206 calls for at least 2,000 lbs. and Ford's internally adopted standard ostensibly calls for 2,500 lbs.  (Id. ¶ 78.)

Photographic evidence of the wreck and the accident scene offers some evidence of the performance of the roof system in the rollover event.  By the conclusion of the rollover event, all four doors of the pickup truck had burst open.  (Id. ¶ 42.)  The median in which the rollover event occurred consisted of a moderate slope of smooth, grass-covered ground leading to a more or less level expanse of grass-covered ground (as opposed to a concrete or asphalt surface).  (Pl.'s Exs. 16A, 16L.)  The fact that the rollover occurred on such terrain puts it in the category of a more or less "average" rollover event, rather than an "extreme" event, at least according to Taylor's biomechanics/accident reconstruction expert.  (Pl.'s Add'l Statement ¶ 24.)  The roof of the pickup truck crumpled inward significantly, both vertically and horizontally, enough to touch the driver's side head rest.  (Id. ¶ 41;  Pl.'s Ex. 16A.)

The record lacks any evidence tending to demonstrate the utility of the Super Cab floating B pillar design as compared to a four-door cab having a fixed B pillar.

### Discussion

A party moving for summary judgment is entitled to judgment in its favor only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

---

[5]        The latch used at the bottom of the rear door is a larger and stronger D21.  The D21 is also used to latch the front door to the rear door.  (Pl.'s Add'l Statement ¶¶ 62-63.)

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if its

resolution would "affect the outcome of the suit under the governing law," and the dispute is

genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In reviewing the record for

a genuine issue of material fact, the Court must view the summary judgment facts in the light

most favorable to the nonmoving party and credit all favorable inferences that might reasonably

be drawn from the facts without resort to speculation. Merch. Ins. Co. v. U. S. Fid. & Guar. Co.,

143 F.3d 5, 7 (1st Cir. 1998). If such facts and inferences could support a favorable verdict for

the nonmoving party, then there is a trialworthy controversy and summary judgment must be

denied. ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

Caryl Taylor's complaint asserts seven claims: strict liability, negligence, breach of

warranty, lack of crashworthiness, breach of fiduciary duty, misrepresentation, and deceptive

trade practices. (Ford's Statement ¶ 8.) The Court has already dismissed the fourth count (the

lack of crashworthiness claim) based on the fact that it describes a theory of liability rather than a

cause of action. (Id.; Order on Mot. to Dismiss at 5, Doc. No. 14.) In Taylor's opposition to the

pending summary judgment motion, she expressly abandons her warranty claim, fiduciary duty

claim, misrepresentation claim, and deceptive practices claim. (Pl.'s Opp'n at 2, Doc. No. 87.)

This means that Ford's motion for summary judgment must be granted at least with respect to

counts III, V, VI and VII. What remains are her strict liability and negligence claims, counts I

and II, respectively. As to these remaining claims, Taylor has further narrowed the focus of her

case by abandoning some of the theories she previously advanced for her husband's death.

Specifically, Taylor is no longer attempting to demonstrate that the pickup was unreasonably

safe in regard to its window glass, handling, or stability characteristics. Instead, she focuses on her core contention that the roof and door structures of the subject pickup truck made it unreasonably vulnerable to roof collapse and door opening in a rollover event. (Id. at 1.)

Ford's motion is an exceedingly focused one. Ford argues exclusively that Taylor must, as a matter of law, have an automobile design expert in her corner in order to provide a fact finder with professional engineering standards and related expert knowledge. Without this assistance, Ford says, a fact finder would be entirely at a loss how to connect the dots necessary to return a plaintiff's verdict. I ultimately conclude that Maine law does not so hold and recommend that the Court not embrace such a hard line evidentiary rule. The question, of course, is whether the evidentiary record is rich enough to support the necessary findings, inferential or otherwise, on the danger/utility test that governs products liability claims brought in Maine courts. In support of her opposition, Taylor has submitted a statement of additional material facts containing a significant catalogue of testimonial and documentary evidence that is material to the danger/utility test and that provides a fair degree of context for the engineering involved.[6] That evidence, derived in large measure from Ford itself, is able to support reasonable and troubling inferences about the worthiness of the subject model truck's Super Cab floating B pillar design when it comes to protecting an occupant in a roll-over event. In my view, that evidence deserves a chance to be tested in the context of a trial so that the community judgment function of Maine's products liability regime has a chance to operate.

---

[6]     I have not recounted all of that evidence. In particular, Taylor has obtained some third-party studies or reports that are material to Taylor's claim. It does not appear to me that Taylor can introduce this hearsay evidence at trial without some sponsoring testimony from an expert witness.

**A.     The testimony of a product design expert on the issue of professional design standards is not required in a products liability case under existing Maine law.**

Ford characterizes the issue in its motion as whether Maine law requires Taylor to provide "qualified automotive engineering expert opinion testimony" to demonstrate the existence of a design defect in the roof and door assembly of the subject pickup truck.  (Def.'s Reply Mem. at 2, Doc. No. 95.)  Ford maintains that the First Circuit has determined that Maine law requires expert testimony to prove that a defendant manufacturer violated the standard of due care associated with the design or manufacture of its product, citing Walker v. Gen. Elec. Co., 968 F.2d 116, 117 (1st Cir. 1992).  (Def.'s Reply Mem. At 2-3.)  In Walker, the First Circuit affirmed the entry of a directed verdict by this Court, following trial, in favor of a defendant manufacturer on products liability claims of negligence, strict liability, and breach of the implied warranty of fitness and merchantability.  Id. at 117 & n.1.  Both the District Court's judgment and the First Circuit's opinion rested on the fact that the plaintiff's own expert denied the existence of a specific defect, a design error, or any act of negligence in regard to the product's design or manufacture.  Id. at 118.  That expert testimony was the only evidence offered by the plaintiff on the issue of defect.  Id. at 120.  On those facts, the First Circuit could not find error in the Court's decision to direct a verdict for the defendant.  Id.

Contrary to what Ford argues, Walker does not really stand for the proposition that an expert is required in order to prove defective design or manufacture in a products liability case subject to Maine law.  The First Circuit certainly did not express its opinion in those terms.  Nor could it reasonably have construed the case in that fashion when the case presented by the plaintiff actually included expert opinion testimony on the existence of a defect.  A fairer

9

characterization of <u>Walker</u> is that it represents the way in which unfavorable concessions by a plaintiff's expert can scuttle a case.[7]

The other authority relied on by Ford in support of an expert requirement are Law Court opinions addressed to professional negligence claims. Ford observes that the Law Court has squarely established the need for expert testimony in cases addressed to professional standards of conduct, including engineering standards, citing <u>Seven Tree Manor, Inc. v. Kallberg</u>, 688 A.2d 916, 917 (Me. 1991). (Def.'s Reply Mem. At 3.) In <u>Kallberg</u>, the Law Court held that expert testimony is necessary to establish professional negligence on the part of an engineer, just as it is required to demonstrate professional negligence on the part of a doctor or lawyer, excepting only circumstances where professional negligence would be "obvious" to lay jurors. <u>Id.</u> at 917-18. Ford's position is that the rule announced in <u>Kallberg</u> should extend to products liability claims because product claims include the issue of design defect and, at least in the case of an automobile, professional engineers perform the design work. Taylor's responsive argument is that the <u>Kallberg</u> rule is only apt in a professional malpractice case, not in a products liability case. (Pl.'s Opposition at 3.) Taylor's argument is correct, in my view, because <u>Kallberg</u> did not involve a strict liability claim arising from the use of a consumer product. Instead, it involved an

---

[7]    Another relevant case not cited by either party is <u>Weisgram v. Marley Company</u>, 528 U.S. 440 (2000), in which the Supreme Court considered whether it was appropriate for the Court of Appeals for the Eighth Circuit to remand a case with instructions to enter judgment for the defendant after sustaining the defendant's appeal on <u>Daubert</u> grounds in a products liability case. <u>Id.</u> at 443. The Court held that Rule 50 permits a court of appeals to direct the entry of judgment as a matter of law whenever it should conclude "that further proceedings are unwarranted because the loser on appeal has had a full and fair opportunity to present the case" and that the "authority to make this determination is no less when the evidence is rendered insufficient by the removal of erroneously admitted testimony than it is when the evidence, without any deletion, is insufficient." <u>Id.</u> at 444. Consequently, the Court affirmed the judgment of the Court of Appeals that the deletion of expert testimony from the record called for entry of judgment in the defendant's behalf. This resolution lends the appearance of an opinion that expert testimony is essential to a products liability case. That is not, however, the holding of <u>Weisgram</u>. The Court clearly indicated that the stricken expert testimony was "the sole evidence supporting plaintiff's product defect charge," <u>Id.</u> at 445, a point also made by the Court of Appeals, <u>Weisgram v. Marley Co.</u>, 169 F.3d 514, 522 (8th Cir. 1999).

engineer's dereliction of duty in the design and construction of a septic system, duties he assumed in his professional capacity. 688 A.2d at 917. There has been no case since Kallberg that has incorporated the rule of Kallberg into a Maine products liability case. That may be because plaintiffs have customarily relied on experts to present products liability claims, but there is also a solid legal basis for distinguishing professional negligence claims from products liability claims.

Maine law gives products liability cases a special status in the form of a "strict liability" regime.[8] The danger/utility test prescribed by the Law Court for a products liability claim is a far different standard than the breach of duty standard applied in a claim of professional negligence. Consequently, a plaintiff is supposed to be able to prove a products liability claim in Maine "without having to prove negligence on the part of the defendant." Austin v. Raybestos-Manhattan, Inc., 471 A.2d 280, 282-83 (Me. 1984). If a products liability plaintiff is not required to prove garden-variety negligence (breach of the standard of due care that a reasonable person would observe under the circumstances) because of the strict liability products regime, it would be quite a pronouncement to hold that the plaintiff must meet the even higher due care standard that applies in a professional negligence case, where the standard is set by the professionals themselves, rather than by juror meditation on what the hypothetical reasonable

---

[8]    Strict liability in Maine is governed by 14 M.R.S.A. § 221 (1980), which reads:

One who sells any goods or products in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to a person whom the manufacturer, seller or supplier might reasonably have expected to use, consume or be affected by the goods, or his property, if the seller is engaged in the business of selling such a product and it is expected to and does reach the user or consumer without significant change in the condition in which it is sold. This section applies although the seller has exercised all possible care in the preparation and sale of his product and the user or consumer has not bought the product from or entered into any contractual relation with the seller.

person would have done in like circumstances.  A professional negligence claim, in other words, is even less congruous with a strict liability claim than an ordinary negligence claim is.  Unlike the professional defendant, who is able to escape liability for harmful conduct so long as that conduct was consistent with the then-applicable standard of practice within the profession, a product manufacturer is decidedly *not* supposed to be able to escape liability for an unreasonably dangerous product based on a showing that most, or even all, comparable products are equally dangerous.  Under a strict liability regime, product design engineers do not get to set the standard for due care in regard to acceptable consumer product safety, even if product manufacturers require engineers to design the products in question.  To the contrary, strict liability "applies though the seller has exercised all possible care in the preparation and sale of [the] product."  14 M.R.S.A. § 221.  These important distinctions between the law of products liability and the law of negligence strongly caution against incorporating the rule laid down in <u>Kallberg</u> into the products liability context.

Other Law Court cases suggest there is a judicial policy in Maine to administer strict liability claims and negligence claims consistently when both claims arise out of an allegation of a defective design that produces an unreasonably dangerous product.  In <u>Stanley v. Schiavi Mobile Homes, Inc.</u>, the Law Court stated:

> In actions based upon defects in design, negligence and strict liability theories overlap in that under both theories the plaintiff must prove that the product was defectively designed thereby exposing the user to an unreasonable risk of harm. Such proof will involve an examination of the utility of its design, the risk of the design and the feasibility of safer alternatives.

462 A.2d 1144, 1148 (Me. 1983).  The purpose of this language is not to establish a heightened standard for proving the existence of a defect, but to make clear that proof of an unreasonably dangerous product design using exclusively the danger/utility test is sufficient under Maine law

12

to establish not only the strict liability claim, but also the associated negligence claim.[9]  In other

words, where consumer products are concerned, proof of a professional negligence standard is

simply not required for either a strict liability claim or a negligence claim.  In St. Germain v.

Husqvarna Corp., the Law Court effectively said exactly that, holding that it was proper for a

Superior Court justice to instruct a jury on the danger utility test for purposes of a negligence

claim concerning the design of a chainsaw, and that it was error for the justice to direct a verdict

against a strict liability defective design claim on the basis of any defect standard other than the

danger/utility test.[10]  544 A.2d 1283, 1285-86 (Me. 1988).  St. Germain weighs against

application of the Kallberg rule precisely because St. Germain demonstrates that a products

liability case is not subject to any professional duty of care standard.  Until the Law Court should

rule otherwise, my recommendation is that the Court should decline to impose a rule of law that

products liability plaintiffs must prove design defects by means of expert testimony.  Although

lay jurors may lack the knowledge needed to design certain products, that does not mean they

---

[9]       There is a degree of circularity in Law Court opinions about the products liability standard.  In Guiggey v. Bombardier, the Court stated:  "In order to prevent a summary judgment, plaintiff was required to present evidence that the snowmobile was defective and unreasonably dangerous . . . ."  615 A.2d 1169, 1172 (Me. 1992).  The statement that a plaintiff must establish that the product is "defective *and* unreasonably dangerous" suggests two separate elements.  However, the very next sentence in the Guiggey opinion reads:  "To determine whether a product is defectively dangerous, we balance the danger presented by the product against its utility."  Id.  In other words, "defective and unreasonably dangerous" is compacted into "defectively dangerous," and the determination of a dangerous defect is made to turn entirely on the danger/utility balancing test.  My understanding of Maine law is that a design is defective if the fact finder fairly determines that the danger of the design outweighs its utility;  that a finding of defect arises from an application of the danger/utility test and that the presence of "a defect" is not something to be considered apart from the danger/utility test, at least in those cases where the claim is defective design as opposed to a one-time manufacturing flaw.

[10]      In her dissent from the St. Germain opinion, Justice Glassman contended that the Law Court was failing to observe the important distinction between a strict liability claim and a negligence claim, noting that a defendant in a products liability case can be liable despite "the exercise of utmost care."  544 A.2d at 1286.  Possibly in answer to this criticism, the majority specifically stated:  "In its instructions to the jury, the court set forth the exact same 'danger utility test' for negligence that it would have laid out for a strict liability count."  Id. at 1286.  Thus, the Law Court specifically condoned an instruction for the negligence claim that only required the plaintiff to satisfy the danger/utility test.  As concerns the present controversy, the St. Germain opinion is especially notable precisely because the Law Court effectively held that it was error for the Superior Court to direct a verdict against a products liability claim based on a judicial determination that the product was not "defective," when the evidence was sufficient to satisfy the danger/utility test.  In effect, where products are concerned there is no "design defect" standard other than the danger/utility test.

lack the judgment needed here to appreciate the danger posed by the product design in light of the specific harm that befell Mr. Taylor and to weigh that danger against whatever utility arises from the product design.[11]

Finally, Ford gathers an appreciable collection of non-binding precedent reflecting that both state and federal courts in a handful of states have set down strict requirements that plaintiffs support products liability cases with expert witness testimony. In some of these courts it appears that Ford would likely win its summary judgment motion regardless of the quality of the evidence Taylor has gathered, due to her failure to secure an expert competent to testify concerning the technical aspects of motor vehicle roof design. In others, it is difficult to tell whether the absence of a plaintiff's expert would foreclose any possibility of getting to trial. For the Court's convenience, I have outlined the cases cited by Ford below.

Price v. General Motors Corp., 931 F.2d 162 (1st Cir. 1991): Here our Court of Appeals rejected a claim that a design defect was present in a power steering system based on a loss of power steering fluid due to a leak. Id. at 163-64. The Court affirmed the entry of summary judgment in favor of the manufacturer because there was no evidence of manufacturer responsibility for the leak:

> Even if the Price vehicle leaked power steering fluid, the leak could as well have been due to inadequate maintenance, improper repairs to any of several hoses and seals, or defective non-GMC replacement parts, as it could to an original design or manufacturing defect. The Prices purchased their 1981 Citation second-hand in 1983, after it had been driven more than 63,000 miles; they drove it approximately 15,000 additional miles. Appellants offered no evidence relating to the maintenance and repair history of the vehicle prior to their purchase. Moreover, appellants conceded that the transmission was either "repaired or replaced" and that they did not know whether any replacement hoses or seals which may have been used were GMC products. In addition, appellants initiated

---

[11]     That is not to say that in the vast majority of cases, and ultimately perhaps even in this case, plaintiffs will be able to prove an unreasonably dangerous design, by a preponderance of the evidence, without the aid of expert testimony.

no discovery concerning these matters. Finally, appellants' own expert conceded that he had no way of knowing whether any of the mechanical parts in the power steering mechanism were original.

Id. at 165-66.  Price does not include any common law rule requiring expert testimony in product design cases and is addressed to the problem of a used vehicle with a condition that could have arisen from any number of causes that cannot be attributed to the manufacturer.  Price obviously does not support Ford's motion.  Additionally, the forum law in Price is Massachusetts law, not Maine law.

Elwell v. Conair, Inc., 145 F. Supp. 2d 79 (D. Me. 2001):  In this case Magistrate Judge Cohen granted a summary judgment motion against claims of product defect after excluding expert witness testimony, but he made it plain that "[w]hether expert testimony is required on this point or not, the plaintiff fails to identify any source of [design defect] evidence other than the [excluded expert] testimony."  Id. at 91.  Elwell does not assist Ford, either.

Worsham v. A.H. Robins Co., 734 F.2d 676, 680, 685 (11th Cir. 1984):  Here the Eleventh Circuit actually affirmed a judgment against the manufacturer of the Dalkon Shield IUD on claims of negligence *despite* the absence of expert testimony on the duty of care.  The Court observed that there was "a total lack of testimony by plaintiff's experts that the acts of the company violated the standard of care applicable to a reasonably prudent pharmaceutical company."  Id. at 685.  The Court also allowed that "there are cases in which a case would fail without expert testimony because the technical and scientific aspects of the case would result in a jury's inability to comprehend the issues."  Id.  Nevertheless, the Court concluded that the standard of care was not beyond the jurors and that the case did not present the kind of "rare" claim for which the law mandates expert testimony.  Id.

Bauman v. Volkswagenwerk Aktiengesellschaft, 621 F.2d 230 (6th Cir. 1980): Here the Sixth Circuit stated the following rule in a case involving a claim of a defective door latch in a Karman Ghia: "Where the part is not patently defective, expert testimony is the only available method to establish defectiveness." Id. at 234. The Court stated the rule even though the case included expert testimony on the defect in question that the Court concluded was sufficient to support a plaintiff's verdict.

Alves v. Mazda Motor of America, 448 F. Supp. 2d 285 (D. Mass. 2006): Here the District Court applied Massachusetts law requiring expert testimony in a products liability case when the nature of the defect is complex. The case before the Court involved allegations related to airbag deployment in a relatively low-speed collision and the Court observed that the jury would have no knowledge of potential alternative designs.[12] Id. at 297. The facts also indicate that the vehicle was disposed of before anyone was able to inspect it. Id. at 289.

Davis v. Ford Motor Co., 375 F. Supp. 2d 518 (S.D. Miss. 2005): Here the District Court stated that expert testimony is essential to prove a product defect. Id. at 523. The plaintiffs did have an expert witness, but the witness was unable to ever inspect the vehicle components that were the focus of the defect claim and only offered a theory explaining "what could have happened." Id. The Court observed in a footnote: "plaintiffs cannot prove the existence of a defect at the time the vehicle left the manufacturer merely by showing that the seatbelt and the door somehow came unlatched or otherwise failed during the accident. They need expert proof that these systems were defective, and this, they obviously lack." Id. n.7. Davis contains one of

---

[12] The alternative design issue is different in this case. The floating B pillar design departs from the fixed B pillar design that is virtually ubiquitous in automobile passenger compartments, so it is apparent to the fact finder what the alternative design would be. Also, Ford documents reflect that this departure is a safety concern. It would seem that jurors could draw the necessary inferences as to the existence of at least one safer, alternative design, even if they could not design a roof support system themselves.

the most emphatic statements of the rule Ford asks the Court to embrace. There is no indication in the decision whether the record contained any documents reflecting a departure from standard seatbelt or door latch design or documents reflecting the use of a latch that the manufacturer considered likely to fail or otherwise recognized as inferior.

Browder v. General Motors Corp., 5 F. Supp. 2d 1267 (M.D. Ala. 1998): In this case the District Court applied an Alabama rule that expert testimony is required in products liability cases whenever "the product in question is of a complex and technical nature," like the Massachusetts rule. Id. at 1281. The decision reflects abundant problems with the way in which the plaintiff utilized her expert and that there really was no evidence available, other than excluded expert testimony, to support her claim. Id. at 1273-75, 1280-84. Thus, on its facts, Browder fits comfortably with cases like Walker and Elwell, in which expert testimony is all the plaintiff relies on and that testimony is taken away on evidentiary grounds.

Cardullo v. General Motors Corp., 378 F. Supp. 890 (E.D. Penn. 1974): Here, the District Court faulted the plaintiff for not having an expert to explain the state of the art in automotive design pertaining to single- versus dual-cylinder brake systems. The question was whether it was negligent of GM to use a single-cylinder system in its Corvairs when it used a dual-cylinder system in its Cadillacs. Id. at 893. The Court ruled that expert testimony is essential to instruct the jury about the workings of brake systems, the "state of the art" in the industry at the time the Corvair was designed, and how the defendant's design reflected a failure to use reasonable care to adopt a safe design. (Id. at 893-94.) It is apparent from the Court's discussion, however, that the plaintiffs merely based their case on whatever inferences might arise from the fact that GM used a better system on its more expensive vehicles, which was insufficient on its own to satisfy the due care standard the Court was applying.

17

Humphreys v. General Motors Corp., 839 F. Supp. 822 (N.D. Fla. 1993): The District Court in this case observed: "Indeed, the record at this point contains not a single photograph, report or affidavit attesting to the condition of the car after the accident and the alleged failure of the seat back and seat belt." Id. at 824. On top of these evidentiary shortcomings, the plaintiffs lacked an expert for trial. Id. Not surprisingly, the defendant succeeded in obtaining a favorable disposition on its summary judgment motion. The Court concluded that the plaintiffs could not depend utterly on their own answer to an interrogatory to create a genuine issue for trial. Id. at 827. The summary judgment record in Humphreys bore no resemblance to the record Ms. Taylor has presented here.

Nissan Motor Co. v. Armstrong, 145 S.W.3d 131 (Tex. 2004): In a products liability case involving allegations of defect based on the unexplained acceleration of a vehicle, the Supreme Court of Texas observed that a plaintiff could not succeed merely with evidence that the vehicle malfunctioned for an unknown reason. The Court required more: "competent expert testimony and objective proof that a defect caused the acceleration." It observed that other courts have done the same, rejecting claims based on "unintended acceleration alone," or "on lay testimony regarding its cause," or "on defects not confirmed by actual inspection." Id. at 137.

Drysdale v. Ford Motor Co., 947 P.2d 678 (Utah 1997): Drysdale presents the Supreme Court of Utah's reversal of a summary judgment motion that was issued in favor of Ford. The trial court granted the motion based on the fact that the car in question, a Ford Pinto, was destroyed shortly after the accident so that neither party was ever able to inspect it for defects. Id. at 679. The Supreme Court said that rationale did not hold up because the claim was that the defect would be evidence in any 1980 Ford Pinto. Id. at 680. The Court also observed that there was a variety of material evidence, including, regulatory standards, vehicle specifications,

18

computer modeling, police reports and photographs of the vehicle and crash scene, as well as

expert witness testimony that every Ford Pinto has the same defect. Id. at 681. The Court did

not state that expert witness testimony was essential. It is not apparent to me how Drysdale

supports Ford's motion.

Peters v. General Motors Corp., 200 S.W.3d 1 (Mo. Ct. App. 2006): Here the

intermediate appellate court overturned a plaintiff's verdict involving a claim of a defective

cruise control system. The case does not concern an absence of expert testimony on design

defect at all because the Court concluded that GM failed to preserve its objection to design defect

expert testimony and that the defect testimony that came in rendered the products liability claim

"submissible" to the jury. Id. at 20-21. The Court ordered a new trial based on evidentiary

rulings unrelated to the issue of any need for expert testimony.

Pruitt v. General Motors Corp., 86 Cal. Rptr. 2d 4 (Cal. Ct. App. 1999): This case is

another airbag case. The plaintiff had an expert but lost before the jury. She complained that the

trial court should have given an instruction on the "consumer expectation" rule. The Court ruled

that the consumer expectation test did not apply to the facts because airbag deployment is not

something within the common experience of lay jurors and that, therefore, the plaintiff needed an

expert to discuss airbag design "tradeoffs involving complex technical issues." Id. at 6.[13]

Gynan v. Jeep Corp., 434 N.E.2d 688 (Mass. Ct. App. 1982): Here the intermediate

appellate court considered whether it was error for the trial court to direct a defendant's verdict

---

[13] Where California's consumer expectation rule applies a products liability case may proceed in the absence of expert testimony and a *defendant's* expert testimony may even be inadmissible. Soule v. General Motors Corp., 882 P.2d 298, 308 (1994). The alternative test is the "risk-benefit" test and expert testimony is the norm. The Court acknowledges that hybrid approaches are feasible, even where crashworthiness is an issue, Id. at 308 n.4, 309, though it held that the consumer expectation test should not have been available to the jury in a case involving a moderate-speed collision and a claim that a car was defective because its wheel came off and crumpled the car's floor framing causing serious injury, Id. at 310. In any event, California law in this arena has a complexity that has little resemblance to Maine law and there is no benefit to deciding how a California court would treat this case.

following an opening statement in which the plaintiff's counsel failed to outline any evidence showing any defect in the vehicle or a causal connection between a defect and the plaintiff's injuries. The plaintiff was a pedestrian struck by the vehicle who alleged it had an unreasonably diminished field of vision for its operators. The Court held that it was proper to direct a verdict before any evidence was presented because there was no expert for the plaintiff to discuss the placement of headlights in "compliance with Federal and other standards of illumination and of the state of motor vehicle design in 1974." Id. at 691. Interestingly, the opinion includes a cite to Smith v. Ariens Co., 377 N.E.2d 954 (Mass. 1978), where the Supreme Judicial Court of Massachusetts held that an expert was not needed to support a claim that a snowmobile was defective due to metal protrusions on its brake bracket because it was "within the knowledge of a jury whether unshielded metal protrusions on the handle bar of a snowmobile constitute a defect in design which creates an unreasonable risk of harm." Id. at 957-58.

These cases present, predominantly, case-by-case approaches to specific factual circumstances. While there are some courts that would presumptively reject any case of design defect in which the plaintiff has not secured a design defect expert,[14] the general read is that the courts are all dealing with the basic question of whether the available evidence is sufficient to bring the technical issues within the practical abilities of lay jurors. In the instant case, Taylor has targeted a design issue that arises out of Ford's exercise of discretion in relation to technical design issues, but she has also obtained evidence, including design-related documents created by Ford, that tend to outline the parameters that guided Ford's exercise of that discretion and might fairly enable reasonable people other than automotive design engineers to draw unfavorable

---

[14] The hard-line rules, applied literally, would foreclose a case even if the record contained admissions by the defendant on every element of the claim.

inferences relative to the safety of the Super Cab floating B pillar design, as built in the subject
model truck.[15]  Although the fact finder would not be qualified to design a vehicle roof system, it
does not necessarily follow that the inexpert fact finder cannot determine when, relying on
parameters available in the record, a given compromise in vehicle safety crosses the strict
liability threshold that divides acceptably safe products from unacceptably dangerous ones.

**B.** **Taylor's opposition is sufficient to generate a genuine issue on the danger/utility test.**

The claims that remain in this case are governed by the danger/utility test, which requires
the fact finder to "balance the danger presented by the product against its utility."  Guiggey v.
Bombadier, 615 A.2d 1169, 1172 (Me. 1992).  What follows is an effort to apply that test to the
evidence put forward by Ms. Taylor.  Unfortunately, it is necessary for the Court to do so largely
without the benefit of argument from Ford, because Ford chose to vet the issue based exclusively
on Taylor's failure to secure a design expert to support her case.  That Ford's motion is so
targeted is illustrated by its reply memorandum, in which Ford states:  "Given the plaintiff's
concessions, the only remaining question . . . is simple and straight-forward:  Does Maine law
require the plaintiff to present qualified automotive engineering expert opinion testimony to
prove her claims . . . ."  (Def.'s Reply Mem. At 2.)  Ford argues in that memorandum that Taylor
must lose because Ford has asserted that its engineers "considered carefully how to design the
Ford F-250 roof, door and door latches so as to comply with reasonable and accepted principles
within the field of automotive engineering and safety" and Taylor does not have an expert
available to gainsay these representation.  (Id. at 4.)  The problem with this argument is that,
even if it were conclusively established that Ford complied with the automotive engineering

---

[15]        In effect, documents and testimony obtained from Ford (apart from its designated expert witnesses) can
educate the jury to a sufficient degree to take the factual issues out of the "too complex" category.

standards it references, such a finding would not preclude the products liability claim, because the dangerousness of the Super Cab design in question may exceed its utility no matter how carefully Ford's engineers labored to design a safe roof system. Putting this non-issue aside, I will consider here how a reasonable fact finder might view the evidence and the inferences that might fairly be drawn from it.

Proof of a products liability claim involves an examination of the utility of the product's design, the risk of that design and the feasibility of safer alternatives. Schiavi Mobile Homes, 462 A.2d at 1148. I do not intend to exhaustively catalogue the significance of every piece of evidence in the record, particularly in light of Ford's choice not to include danger/utility arguments in its memoranda. I merely chart the likely path that the fact finder would follow in order to return a plaintiff's verdict.

The first waypoint concerns design utility. The record is presently silent on the question of what utility the Super Cab design offers consumers. Because the Court must draw inferences in favor of Taylor in the context of this summary judgment contest, I conclude that the fact finder might fairly regard the Super Cab design as offering no real utility to a passenger or, at best, only a negligible amount of convenience when it comes to entering and exiting the rear area of the passenger compartment.

The next waypoint is risk. The record would seem to reflect that there is an inherent risk in the transition from a fixed B pillar to a floating B pillar. Additionally, the record reflects that there is an appreciable risk in this particular floating B pillar configuration by virtue of the D5 latch used to secure the floating B pillar to the roof rail. The fact finder might fairly conclude that the D5 latch is a relatively small and weak latch to rely on to secure the floating B pillar to the roof rail, the very portion of the roof system likely to impact the ground during a rollover

event. That latch was demonstrated not to be sufficient to withstand the minimum standard of 2,000 pounds of force. Although Ford maintains that the remaining D21 latch at the rocker and the latch between the doors would still provide support to the B pillar, the accident demonstrates that, even if the front and back doors remained latched to each other, a gap can form where the doors meet the roof, creating a serious risk of crushing injury to an occupant. Additionally, the fact finder might fairly conclude that the existence of this gap due to a failure of the D5 latch fundamentally compromises the structural integrity of the floating B pillar because the pillar no longer bridges the gap between the roof rail and the rocker. Finally, when considering the risk of separation between the rear door top and the roof rail, the fact finder might fairly infer that interrelated support structures were not sufficient to prevent excessive loading of the D5 latch because roof crush performance was recognized to fall below the FMVSS 206 standard, a standard that Ford regarded as a relevant guideline in the context of its own roof crush safety modeling.

The final waypoint concerns the feasibility of safer alternatives. The Super Cab design is a departure from the fixed B pillar design that is customary in the industry. It seems obvious that the fact finder could fairly infer that the departure moves down the safety scale rather than up and that the fixed B pillar design is the safer alternative. It appears to be implicit in the case that even the use of a D21 latch in place of the D5 would have been an improvement, as Ford understood the D5 latch would fail "well before" the D21 latch, yet used the D5 latch in a critical location in its floating B pillar design.

## Conclusion

Although it is difficult to understand why someone would choose to pursue a claim of this kind without the aid of an expert witness, the rigid evidentiary rule that Ford wants the Court

to embrace—that products liability claims require expert testimony whenever design issues are non-obvious—is ill-advised in light of the strict liability regime that exists in Maine with respect to consumer products. The proper question, of course, is whether or not the evidence that does exist in the record is able to support a non-speculative finding that the roof and door design of the Super Cab pickup truck in question presented an unreasonably dangerous condition. I conclude that the fact finder could fairly infer that the risk of the floating B pillar design in the subject truck, anchored at the roof rail with an insufficient D5 latch, outbalances whatever utility arises from the design, and that safer alternatives exist in the fixed B pillar design that this design departs from.[16]

Because Taylor abandons her warranty claim, fiduciary duty claim, misrepresentation claim, and deceptive practices claim, I RECOMMEND that the Court GRANT, IN PART Ford's motion for summary judgment, insofar as it requests an entry of judgment against Counts III, V, VI and VII. Otherwise, I RECOMMEND that the Court DENY the motion, IN PART, to the extent it requests an entry of judgment against Counts I and II.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

---

[16]     Ford's motion for summary judgment does not include causation arguments and I have not independently raised them.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

March 28, 2008

25