UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| STEVEN BECK, DAVID BRADEN, MARK WILLARD, MATTHEW WILSON, individually and on behalf of all others similarly situated, | No. 2:22-cv-12079-PDB-DRG |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| FORD MOTOR COMPANY, a Delaware Limited Liability Company, | |
| Defendant. | |

**AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ......................................................................... 1

II.   JURISDICTION ......................................................................... 6

III.  VENUE ......................................................................................... 7

IV.   PARTIES ..................................................................................... 7

      A.    Plaintiffs ......................................................................... 7

            1.    Steven Beck (California)........................................ 7

            2.    David Braden (California) ..................................... 8

            3.    Mark Willard (New Jersey) ................................... 9

            4.    Matthew Wilson (Pennsylvania)........................... 10

      B.    Defendant ....................................................................... 11

V.    FACTUAL ALLEGATIONS ...................................................... 13

      A.    Ford marketed the Roof-Crush Risk Vehicles as safe and
            reliable, and Ford knew that these attributes were
            material to consumers.................................................... 13

      B.    Ford's Vehicle Warranties ............................................. 19

      C.    The Roof-Crush Risk ..................................................... 20

      D.    Ford knew of the Roof-Crush Risk and never disclosed
            the Roof-Crush Risk to Plaintiffs and the Class. ............ 28

            1.    Ford knew the relationship between roof strength and
                  rollover injury severity before the Roof-Crush Risk
                  Vehicles were developed. ...................................... 29

            2.    Ford ignored the importance of roof strength in
                  preventing serious injury and death when designing
                  the Roof-Crush Risk Vehicles. .............................. 34

- i -

3.      Ford reduced the roof strength of PHN131 vehicles to save money ............................................................................ 43

E.      All class members could have been made aware of the Roof-Crush Risk at the point of sale. ................................................ 47

VI.     TOLLING OF THE STATUTE OF LIMITATIONS ................................ 48

A.      Discovery Rule Tolling ......................................................... 48

B.      Estoppel ................................................................................ 49

VII.    CLASS ALLEGATIONS ........................................................................ 49

VIII.   CLAIMS .................................................................................................. 54

A.      Nationwide Claims .............................................................. 54

COUNT I VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT (15 U.S.C. § 2301, *et seq.*) .................................................... 54

COUNT II FRAUDULENT CONCEALMENT (COMMON LAW) ................... 58

COUNT III UNJUST ENRICHMENT (COMMON LAW) .............................. 62

B.      State-Specific Claims ........................................................... 63

1.      California ................................................................... 63

COUNT IV VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT (Cal. Civ. Code § 1750, *et seq.*) ...................... 63

COUNT V VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code § 17200) ........................ 67

COUNT VI VIOLATIONS OF CALIFORNIA FALSE ADVERTISING LAW (Cal. Bus. & Prof. Code § 17500, *et seq.*) ............. 70

COUNT VII VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY  ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER CALIFORNIA LAW (Cal. Civ. Code §§ 1791.1 & 1792) ........................ 72

2.      New Jersey ................................................................. 75

COUNT VIII VIOLATION OF THE NEW JERSEY CONSUMER
FRAUD ACT (N.J.S.A. § 56:8-1, *et seq.*) .................................................... 75

COUNT IX BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER NEW JERSEY LAW ........................... 80

        3.     Pennsylvania ............................................................. 82

COUNT X VIOLATION OF THE PENNSYLVANIA UNFAIR
TRADE PRACTICES AND CONSUMER PROTECTION LAW
(73 P.S. § 201-1, *et seq.*) ................................................................. 82

COUNT XI BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER PENNSYLVANIA LAW
(13 Pa. Cons. Stat. Ann. § 2314) ................................................. 86

REQUEST FOR RELIEF .................................................................... 88

DEMAND FOR JURY TRIAL ............................................................ 89

011115-11/2039942 V1

Plaintiffs file this lawsuit individually and on behalf of proposed nationwide and statewide classes. Plaintiffs allege the following based on personal knowledge as to their own acts and experiences and, as to all other matters, based on the investigation of counsel:

## I.      INTRODUCTION

1.      The most important duty of a car manufacturer is to provide consumers with a safe car. A second related duty is to promptly warn consumers and fix or replace a car where the manufacturer learns of a risk that implicates serious safety issues. Ford Motor Company ("Ford") breached these fundamental duties by selling Ford SuperDuty pick-up trucks that Ford knew had a dangerously weak roof structure that would collapse in the event of a roll-over accident, paralyzing, gravely injuring or killing vehicle occupants. Though Ford knew of the roof-crush risk prior to selling the SuperDuty pick-up trucks at issue, it did nothing to promptly warn owners and lessees, instead promoting a discredited theory that roof strength did not prevent injuries in rollover crashes, while entering into secret settlements with crash victims and their families to hide the deadly nature of its roof design.

2.      Model year 1999–2016 Ford SuperDuty pick-up trucks (the "Roof-Crush Risk Vehicles") contain a roof design that causes the roofs to be instantly

- 1 -

crushed in the event of a rollover accident, resulting in paralysis, grave injury, and death to vehicle occupants (the "Roof-Crush Risk").

3.      The Roof-Crush Risk exposes putative class members to an unreasonable risk of paralysis, grave injury, and death if their vehicle is involved in a rollover accident.

4.      This catastrophic injury and death risk is the direct result of a design that was known by Ford to be extraordinarily weak and is still unremedied by Ford. Not only did Ford fail to disclose the Roof-Crush Risk to consumers before their purchases of Roof-Crush Risk Vehicles, but it also misrepresented the vehicles' safety, reliability, functionality, and quality by this omission. Ford also omitted the consequences, including the serious safety hazards and monetary harm caused by the Roof-Crush Risk—e.g., damage to a vehicle and paralysis, grave injury, or death to persons in the vehicle or another vehicle in proximity should the Roof-Crush Risk Vehicle become involved in an accident.

5.      The dangerous and deadly roof design of the Roof-Crush Risk Vehicles gained national attention on August 19, 2022, when a jury in Georgia awarded $1.7 billion in punitive damages to the family of Melvin and Voncile Hill,

- 2 -

who were killed when the roof of their 2002 F-250 SuperDuty collapsed in a rollover accident.[1]

6.     In that case, the lawyers for the plaintiffs argued that the roofs on the 1999–2016 SuperDuty trucks were defectively designed and dangerously weak and that Ford knew of the dangers posed by the roofs. The plaintiffs' attorneys pointed to evidence they said showed the roof on these trucks failed in the company's own internal testing and that Ford engineers developed a stronger roof for its SuperDuty pickups in 2004 but that roof wasn't used in trucks sold to customers until the 2017 model year, according to court documents.[2]

7.     The pretrial order in the Hill case states that Ford has identified 162 lawsuits and 83 similar incidents of the roof crush involving the 1999–2016 SuperDuty trucks.[3]

8.     A vehicle that is knowingly designed to fail and introduce a risk of paralysis, grave injury, or death in a foreseeable and common type of accident is not fit for its ordinary purpose. When a vehicle manufacturer has the ability to eliminate a grave safety risk on a vehicle model line but chooses not to do so in

---

[1] *See* **Exhibit 1**, *Roof Strength on Older Ford Trucks Called Into Question by $1.7 Billion Jury Verdict*, WSJ (Aug. 22, 2022), available at: https://www.wsj.com/articles/ford-faces-1-7-billion-verdict-in-fatal-rollover-of-f-250-pickup-11661033662 (last visited Sept. 1, 2022).

[2] *See id.*

[3] *See id.*

order to save manufacturing costs, and then fails to warn purchasers of these vehicles of this known and deadly risk, such manufacturer engages in a depraved and deadly fraud for which it should be held accountable.

9.      Ford knew about the Roof-Crush Risk well before the Roof-Crush Risk Vehicles went to market, and certainly knew well before it issued its much stronger redesigned roof which it affirmatively chose not to use on the Roof-Crush Risk Vehicles. Ford's knowledge is evidenced by: (1) its own internal investigations and documents from years before the release of the first Roof-Crush Risk Vehicle as further described below; (2) the rigorous pre-launch testing of the Roof-Crush Risk Vehicles; (3) the direct and public reports of deadly accidents involving Roof-Crush Risk Vehicles; and (4) Ford's own investigation of accidents in the Roof-Crush Risk Vehicles and its practice of settling lawsuits involving such accidents with secrecy clauses that hide the dangerous nature of the Roof-Crush Risk and its knowledge of the Roof-Crush Risk while it continued to sell Roof-Crush Risk Vehicles.

10.      Ford offers no reimbursement to Roof-Crush Risk Vehicle owners and lessees for out-of-pocket expenses, loss of use, and loss of value. Because a repair to the Roof-Crush Risk Vehicles is not being made, putative class members are left without a safely operable vehicle for an unknown and potentially lengthy period.

11.     Because of Ford's omissions regarding the Roof-Crush Risk and failure to act in disclosing and providing a remedy, it has violated state consumer protection acts, been unjustly enriched, and breached implied warranties of merchantability. Plaintiffs and other owners and lessees of the Roof-Crush Risk Vehicles have been injured in fact, incurred damages, and suffered ascertainable losses in money and property. Had Plaintiffs and the putative class members known of the Roof-Crush Risk, then they would either not have purchased or leased those vehicles or would have paid substantially less for them.

12.     Ford may argue in response to this complaint that many class members and even Plaintiffs have not had a rollover crash where their roof was crushed and as such are uninjured. This argument would only further evidence Ford's callous disregard for the safety and wellbeing of its own customers. Ford has knowingly placed its customers at risk of paralysis, grave injury, and death, just so it could save a few dollars of manufacturing costs, and thus increase profits, on some of its most expensive truck offerings. Ford had a duty to tell the truth at the point of sale and Plaintiffs and members of the class were injured by overpaying for cars that would have sold for less if the truth had been told, or they would not have paid for them at all. And Plaintiffs don't have to wait for the ticking time bomb to explode before they can claim injury.

- 5 -

13.    Plaintiffs bring this class action to redress Ford's misconduct. Plaintiffs seek damages and a repair under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301-2312, state consumer protection acts, state implied warranty acts, and unjust enrichment at common law.

## II.    JURISDICTION

14.    This Court has original jurisdiction over this lawsuit under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) and (6), because Plaintiffs and Defendant are citizens of different states; there are more than 100 members of the Nationwide Class and the state subclasses (as defined herein); the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest, and costs; and class members reside across the United States. The citizenship of each party is described further below in the "Parties" section.

15.    This Court has personal jurisdiction over the Defendant by virtue of its transactions and business conducted in this judicial district, and because Defendant is headquartered in Michigan. Defendant has transacted and done business, and violated statutory and common law, in the State of Michigan and in this judicial district.

- 6 -

### III.   VENUE

16.   Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendant transacts substantial business and is headquartered in this district.

### IV.   PARTIES

**A.   Plaintiffs**

**1.   Steven Beck (California)**

17.   Plaintiff and proposed class representative Steven Beck ("Plaintiff" for purposes of this Section) is a resident and citizen of Paso Robles, California. On or about June 1, 2015, Plaintiff purchased a new Ford F-350 SuperDuty from South Bay Ford in Hawthorne, California. Plaintiff's Ford F-350 SuperDuty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

18.   Plaintiff purchased his Roof-Crush Risk Vehicle as his primary vehicle for work in his vineyard and occasional personal use.

19.   Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these were the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the other large work trucks available in the marketplace. However, despite touting the safety and reliability aspect of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before his purchase.

- 7 -

20.     Plaintiff is concerned about driving the Roof-Crush Risk Vehicle because he no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident. This is an especially acute problem because Plaintiff has also experienced the so-called "death-wobble" in his truck, which he fears could easily result in a rollover incident.[4]

21.     Plaintiff would not have purchased a Roof-Crush Risk Vehicle if he had been aware of the Roof-Crush Risk.

**2.     David Braden (California)**

22.     Plaintiff and proposed class representative David Braden ("Plaintiff" for purposes of this Section) is a resident and citizen of San Bernadino, California. On or about September 23, 2006, Plaintiff purchased a new Ford F-350 Dually SuperDuty from Fairview Ford in San Bernadino, California. Plaintiff's Ford F-350 SuperDuty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

23.     Plaintiff purchased his Roof-Crush Risk Vehicle as his primary vehicle for personal use and for his work delivering newspapers.

24.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these

---

[4] *See* **Exhibit 2,** *What You Should Know About the Ford Super Duty Death Wobble*, Motorbiscuit.com, available at: https://www.motorbiscuit.com/what-you-should-know-about-the-ford-super-duty-death-wobble/ (last visited Sept. 1, 2022).

- 8 -

were the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the other large work trucks available in the marketplace. However, despite touting the safety and reliability aspect of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before his purchase.

25.     Plaintiff is concerned about driving the Roof-Crush Risk Vehicle because he no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident.

26.     Plaintiff would not have purchased a Roof-Crush Risk Vehicle if he had been aware of the Roof-Crush Risk.

**3.     Mark Willard (New Jersey)**

27.     Plaintiff and proposed class representative Mark Willard ("Plaintiff" for purposes of this Section) is a resident and citizen of Honey Brook, Pennsylvania. In August 2021, Plaintiff purchased a used 2002 Ford F-250 SuperDuty from a private party in New Milford, New Jersey. Plaintiff's Ford F-250 SuperDuty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Defect.

28.     Plaintiff purchased his Roof-Crush Risk Vehicle for hauling his other vehicles and for personal use.

- 9 -

29.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these were the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the other large work trucks available in the marketplace. However, despite touting the safety and reliability aspect of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before his purchase.

30.     Plaintiff is concerned about driving the Roof-Crush Risk Vehicle because he no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident.

31.     Plaintiff would not have purchased a Roof-Crush Risk Vehicle if he had been aware of the Roof-Crush Defect.

**4.     Matthew Wilson (Pennsylvania)**

32.     Plaintiff and proposed class representative Matthew Wilson ("Plaintiff" for purposes of this Section) is a resident and citizen of Derry, Pennsylvania. In July 2020, Plaintiff purchased a used 2010 Ford F-250 SuperDuty from used-vehicle dealership in Mount Pleasant, Pennsylvania. Plaintiff's Ford F-250 SuperDuty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

33.     Plaintiff purchased his Roof-Crush Risk Vehicle as his primary vehicle for work for his handyman business and for personal use.

34.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these were the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the other large work trucks available in the marketplace. However, despite touting the safety and reliability aspect of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before his purchase.

35.     Plaintiff is concerned about driving the Roof-Crush Risk Vehicle because he no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident.

36.     Plaintiff would not have purchased a Roof-Crush Risk Vehicle if he had been aware of the Roof-Crush Risk.

**B.     Defendant**

37.     Defendant Ford Motor Company ("Ford") is a Delaware limited liability company organized and existing under the laws of the State of Delaware. Ford's principal place of business and headquarters is One American Road, Dearborn, Michigan 48126.

38.     Ford is a motor vehicle manufacturer and a licensed distributor of new, previously untitled Ford motor vehicles. The Ford brand is one of the "Big Three" American automobile brands. Ford engages in commerce by distributing and selling new and used passenger cars and motor vehicles under its Ford brand.

39.     Ford, through its various entities, designs, manufactures, markets, distributes, and sells automobiles throughout the U.S. and worldwide. Ford and its agents designed and manufactured the Roof-Crush Risk Vehicles. Ford also developed and disseminated the owner's manuals and warranty booklets, advertisements, brochures, and other promotional materials relating to the Roof-Crush Risk Vehicles, with the intent that such documents be purposely distributed throughout all fifty states. Ford is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

40.     Ford authorized automobile dealerships sell automobiles under the Ford brand name and disseminate vehicle information provided by Ford to customers. At all relevant times, Ford's dealerships served as its agents for motor vehicle repairs and warranty issues because they performed repairs, replacements, and adjustments covered by Ford's manufacturer warranty under the contracts between Ford and its nearly 10,000 authorized dealerships worldwide.

- 12 -

# V.    FACTUAL ALLEGATIONS

**A.    Ford marketed the Roof-Crush Risk Vehicles as safe and reliable, and Ford knew that these attributes were material to consumers.**

41.    The Ford Roof-Crush Risk Vehicles are marketed to consumers as safe, reliable vehicles, and Ford knew these qualities were material to consumers in marketing them in this manner. These qualities were in fact material to Plaintiffs.

42.    For example, in the sales brochure for the 2013 Ford F-350 SuperDuty (Plaintiff Beck's truck), Ford touted various safety features "like the driver and right-front-passenger front airbags, front-seat side airbags, and our Safety Canopy® System with its rollover sensor and side-curtain airbags" in the Roof-Crush Risk Vehicles.[5]

---

[5] *See* **Exhibit 3**, MY 2013 Ford SuperDuty brochure, at 16.

- 13 -

## LOTS OF WAYS TO MAKE IT YOURS.

   



Take comfort in serious safety standards like the driver and right-front-passenger front airbags, front-seat side airbags, and our Safety Canopy® System with its rollover sensor and side-curtain airbags. Add options to help power your electronics, extend your cargo-carrying capabilities, stow your valuables securely out of sight and much more. Build the Super Duty® you want, just the way you want it.

6 airbags standard

Mini-console with front bucket seats[1]

Flow-through center console[1] with 110-volt power outlet and two 12-volt powerpoints

Stowable bed extender[1]

LARIAT Crew Cab with lockable rear under-seat storage[1] and flow-through center console[1]

- 14 -

43.     On the final page of the brochure, knowing safety is material to Plaintiffs and putative class members, Ford emphasized the key points of its SuperDuty advertising: "Quality, Green, Safe and Smart."[6]



44.     Ford also emphasizes the SuperDuty's overall reliability, noting the truck "has endured more torture testing than any previous generation of Ford Truck" and that "A world-class team put this truck through a groundbreaking battery of computer simulations, lab and real-world test, running it for thousands of hours on end in extreme conditions."[7]

---

[6] **Exhibit 3**, MY 2013 Ford SuperDuty brochure, at 29.
[7] *Id.* at 3.

011115-11/2039942 V1



# OUTWORKS ALL THE REST.

This Super Duty® has endured more torture testing than any previous generation of Ford Truck — including over 10 million cumulative miles on the most tested Power Stroke® diesel engine ever. A world-class team put this truck through a groundbreaking battery of computer simulations, lab and real-world tests, running it for thousands of hours on end in extreme conditions. Scorching heat. Bitter cold. Loaded to the max. Up the steepest grades. All to confirm that it is far more than the sum of its parts.

Super Duty is built to be the best, most capable truck in its class,[1] bringing you the best diesel and gas fuel economy,[2] plus max. capabilities and lots of other features only Ford can deliver. With the most configurations of any truck in its class, there's a Super Duty just right for you and your work.

## Best in Class

- Max. Horsepower and Torque: Diesel and Gas
- Max. Conventional Towing: 18,500 lbs.[3]
- Max. 5th-Wheel Towing: 24,700 lbs.[3]
- Max. GCWR: 33,000 lbs.[3]
- Max. Payload: 7,260 lbs.[3]
- Fuel Economy: Diesel and Gas

## Class Exclusive

- 5th-Wheel/Gooseneck Trailer Tow Prep Package[4]
- Standard Trailer Sway Control on both SRW and DRW
- Hill Descent Control™[4]
- Tailgate Step[4]
- Cable Lock by Master Lock[4,5]
- LCD Productivity Screen[4]
- Standard MyKey®
- Standard Safety Canopy® System
- Live-Drive Power Take-Off (PTO)[4]

[1] Class is Full-Size Pickups over 8,500 lbs. GVWR vs. 2012/2013 competitors. [2] Based on Ford drive-cycle tests of comparably equipped 2011/2012 Ford and 2011/2012 competitive models. [3] When properly equipped. [4] Available feature. [5] Ford Licensed Accessory. See your dealer for limited warranty details.

2013 **SUPER DUTY**®
ford.com



- 16 -

45.    Ford repeatedly emphasized the capability and structural strength of the SuperDuty, proclaiming it "The most capable Pickup in North America. Its muscular sheet metal wraps around an incredibly strong structure and its stance clues you in to the huge capabilities on tap."[8]



46.    Ford also repeatedly stressed the safety of its SuperDuty line, emphasizing "Safe Trucks" as one of the four pillars of the product line.[9]

---

[8] **Exhibit 4**, MY 2009 SuperDuty brochure, at 2.
[9] *See id.*, at 22.



47.     And throughout its brochures, Ford stresses "Built Ford Tough" and "Durability: SuperDuty is built to the extremely high standards of durability and reliability you'd expect in a full-size pickup that's Built Ford Tough."[10]

Thank you for your interest in the **2011 Ford Super Duty**. Included in this brochure you'll find information about:

**POWER:** 6.2L gas and 6.7L Power Stroke™ turbo diesel engine with greater displacement and impressive fuel economy are all-new Super Duty powerplants.

**DURABILITY:** Super Duty is built to the extremely high standards of durability and reliability you'd expect in a full-size pickup that's Built Ford Tough.

**CAPABILITY:** Tons of great features, like new Anti-Sway Control, that make working those tough jobs a lot easier. And best-in-class payload and towing? You bet.

**PRODUCTIVITY:** Available Ford Work Solutions™ and new 4.2-inch LCD Productivity Screen are two big Super duty features that'll favorably impact your bottom line.

---

[10] *See, e.g.*, **Exhibit 5**, 2011 SuperDuty brochure, at 2.

48.     Plaintiffs and putative class members, believing in the safety and durability of the Roof-Crush Risk Vehicles as touted by Ford, paid many thousands of dollars for the vehicles. The Manufacturer's Suggested Retail Price ("MSRP") for Plaintiff Beck's Roof-Crush Risk Vehicle, the 2013 Ford F-350 SuperDuty, starts at $30,770 for the base-level trim and goes up to $55,540 for the SuperDuty Platinum 4WD DRW Crew Cab.[11] The MSRP for the most recent Roof-Crush Risk Vehicle, the 2016 Ford F-350 SuperDuty, starts at $33,280 for the base-level trim and goes up to $59,340 for the SuperDuty Platinum 4WD DRW Crew Cab.[12]

49.     Plaintiffs and putative class members would not have paid these prices for Roof-Crush Risk Vehicles if they had known that the vehicles were not, in fact, safe and durable.

## B.     Ford's Vehicle Warranties

50.     Ford's New Vehicle Limited Warranty for SuperDuty model years 1998–2016 provides "bumper-to-bumper" coverage for 3 years/36,000 miles, whichever comes first.[13]

---

[11] **Exhibit 6**, *2013 Ford F-350*, Motortrend.com, https://www.motortrend .com/cars/ford/f-350/2013/ (last visited Sept. 1, 2022).

[12] **Exhibit 7**, *2016 Ford F-350*, Motortrend.com, https://www.motortrend .com/cars/ford/f-350/2016/ (last visited Sept. 1, 2022).

[13] *See, e.g.*, **Exhibit 3**, MY 2013 Ford SuperDuty brochure, at 29; **Exhibit 4**, MY 2009 Ford SuperDuty brochure, at 16; **Exhibit 5**, MY 2011 Ford SuperDuty brochure, at 15.

51.     Because the Roof-Crush Risk Vehicles are all model year 2016 and older, no Roof-Crush Risk Vehicles are still covered under Ford's new vehicle and powertrain warranties.

## C.     The Roof-Crush Risk

52.     A picture is worth a thousand words. Below are pictures of Roof-Crush Risk Vehicles that were involved in rollover accidents:











011115-11/2039942 V1



53.     As multiple juries and courts have concluded in a host of personal

injury and wrongful death lawsuits, the roof design in 1999–2016 Ford SuperDuty

trucks (which all share the PHN-131 design platform) is dangerous because the

roofs are easily crushed in rollover accidents, causing paralysis and other grave and fatal injuries to vehicle occupants.[14]

54.     The complaints, trial briefs, orders, findings of fact, and other pleadings in these cases convincingly establish a disturbing timeline evidencing that Ford not only knew that the SuperDuty trucks had unsafe and inadequate roof strength, but since there was no applicable standard regulating roof strength, Ford purposefully downgraded roof strength to save manufacturing costs and thereby enhance its profits. These facts establish that Ford had safer alternative designs available, yet it chose not to utilize them in the SuperDuty trucks.[15]

55.     For example, the trial brief in *Ott v. Ford Motor Co.* explained with respect to a model year 2000 F-250 SuperDuty:

> Ford admits it did not perform a physical roof strength test prior to the vehicle being sold—not a dolly rollover test, not a roof drop test and not a Federal Motor Vehicle Safety Standard ('FMVSS') 216 roof crush test. Ford claims it performed a computer version of the FMVSS 216 test, but it cannot find the test data or any test report. Litigation testing shows that not only did the F-250 roof

---

[14] *See, e.g.*, *Wurm v. Ford Motor Co.*, No. 2:18-cv-02322 (D. Kan.) (crushed roof on 1999 F-250 SuperDuty); *Taylor v. Ford Motor Co.*, No. 1:06-cv-00069 (D. Maine) (crushed roof in 2002 F-250 SuperDuty) (*see* **Exhibit 10**, *Taylor* Dkt. No. 97); *Gibson v. Ford Motor Co.*, No. 1:06-cv-01237 (N.D. Ga.) (crushed roof on 2001 F-350 SuperDuty) (*see* **Exhibit 12**, *Gibson* Dkt. No. 177-1); *Pena v. Ford Motor Co.*, No. 4:2008-cv-00501 (D. Ariz.) (crushed roof in F-250 SuperDuty); *Ott v. Ford Motor Co.*, No. 4:03-cv-00101 (W.D. Ky.) (crushed roof in 2000 F-250 SuperDuty) (*see* **Exhibit 8**, Ott Dkt. No. 76-2); *Aguirre v. Ford Motor Co.*, No. 7:15-cv-00063 (W.D. Tex.) (crushed roof in 2006 F-350 SuperDuty).

[15] *See id.*

- 24 -

> fail to meet Ford's 10,500 pound roof strength design
> target, it also shows that the roof strength of its F-250
> SuperDuty truck is weaker that its smaller and lighter
> pickup trucks—the F-150 and Ranger."[16]

56.    *Ott* marshalled shocking evidence that Ford deliberately *reduced* the

strength and structural integrity of the SuperDuty roof system in order save

production costs and "enhance the corporate overall truck profitability."[17] Plaintiff

included the following table of design changes made *pre-production* to the 1999

model year SuperDuty:

| Pre-Production Design Changes in PHN-131 Roof Structure (between 3/31/94 program implementation and 1/05/98 Job #1)[8] | | | |
|---|---|---|---|
| Design Change | Date | % Reduction | Savings |
| Downgage roof bow from 1 mm to 0.9 mm | Between 1/19/95 and 11/26/95 | 10% | Unknown |
| Downgage roof bow from 0.9 mm to 0.8 mm | 11/27/95 | 10.1% | Unknown |
| Delete front outer windshield header | 7/12/96 | ? | $3.50 per vehicle $500,000 tooling cost |
| Replace high strength Boron steel in SuperCab rear door vertical beam (floating B-pillar) with a mild steel | 12/10/96 | ? | $20.86 per vehicle $1,033,800 tooling cost |
| Downgage A-pillar from 2.5 mm to 2.4 mm | Between 5/20/97 and 1/05/98 | 4% | Unknown |

---

[16] *See* **Exhibit 8**, *Ott*, No. 4:03-cv-00101, Dkt. No. 76-2, at 3.

[17] *See id.* at 7.

57.     Plaintiff further detailed post-production design changes to the SuperDuty roof structure that were implemented before plaintiff Ott's model year 2000 SuperDuty was manufactured:[18] Plaintiff explained: "While the pre-production and post-production changes only equal $28.21 per vehicle, the overall profit to Ford is increased to millions of dollars. If Ford sells 100,000 vehicles per year for 9 years, this $28.21 translates to Ford profit in excess of $25 million!"[19]

**Post-Production Design Changes in the PHN-131 Roof Structure and Support (after January 5, 1998 Job #1 and before June 28, 2000 when Ott vehicle assembled)[9]**

| Design Change | Date | % Reduction | $ Savings |
|---|---|---|---|
| Downgage   A-pillar from 2.40 mm to 2.35 mm | 9/18/98 | 2% | 70¢ per vehicle (35¢ per A-pillar) |
| Downgage A-pillar from 2.35 mm to 2.20 mm | 3/30/99 | 6.4% | $1.72 per vehicle (86¢ per A-pillar) |
| Downgage SuperCab rear door vertical beam (floating B-pillar) from 1.50 mm to 1.20 mm | 6/15/99 | 20% | 96¢ per vehicle (48¢ per door) |
| Downgage inner windshield header from 1.20 mm to 1.07 mm | 8/10/99 | 11% | 17¢ per vehicle |
| Downgage roof bow from 0.80 mm to 0.74 mm | 8/10/99 | 7.5% | 10¢ per vehicle (5¢ per roof bow) |
| Downgage A-pillar reinforcement from 2.1 mm to 2.0 mm | 9/20/99 | 4.8% | 20¢ per vehicle (10¢ per A-pillar) |

---

[18] *See id.* at 9.

[19] *See id.*

58.     In the *Hill* case, where the jury awarded $1.7 billion in punitive

damages, plaintiffs presented evidence that the SuperDuty roof failed in Ford's

internal testing, leading Ford engineers to develop a stronger alternative. But even

though the alternative design was available as early as 2004, Ford elected not to

use it in SuperDuty trucks until the 2017 model year.[20]

59.      The pretrial order in *Hill* stated that "Ford has identified 162 lawsuits

and 83 similar incidents of the roof crush involving 1999-2016 SuperDuty

trucks."[21]

60.     Another WSJ article on the *Hill* case noted that as early as 1989,

NHTSA had proposed extended roof strength regulations that would apply to

vehicles up to 10,000 pounds, which would include the SuperDuty trucks.[22] But

Ford (and its rival, GM) lobbied NHTSA to lower the threshold to 8,500 pounds,

which would exclude the SuperDuty trucks from the requirements.[23]

---

[20] **Exhibit 1**, *Roof Strength on Older Ford Trucks Called Into Question by $1.7 Billion Jury Verdict*, WSJ (Aug. 22, 2022), available at: https://www.wsj.com/articles/ford-faces-1-7-billion-verdict-in-fatal-rollover-of-f-250-pickup-11661033662 (last visited Sept. 1, 2022).

[21] *See id.*

[22] *See* **Exhibit 9**, *Ford Trucks Highlighted in $1.7 Billion Verdict Weren't Subject to Tougher Safety Rules*, WSJ (Aug. 25, 2022), available at: https://www.wsj.com/articles/ford-trucks-in-1-7-billion-verdict-werent-subject-to-tougher-safety-rules-11661439150 (last visited Sept. 1, 2022).

[23] *See id.*

61.     According to the WSJ, "The auto maker argued that for heavier vans and trucks—those with a gross weight of over 8,500 pounds—there was insufficient evidence to determine that the stiffer requirements would enhance the safety of these vehicles."[24]

62.     On information and belief, Ford failed to adequately research, design, test, and manufacture the Roof-Crush Risk Vehicles before warranting, advertising, promoting, marketing, and selling the Roof-Crush Risk Vehicles as suitable and safe for use in an intended and reasonably foreseeable manner.

63.     Ford plainly knew the Roof-Crush Risk Vehicles contained the Roof-Crush Risk and it should have warned or disclosed this fact to Plaintiffs and putative class members before selling or leasing the vehicles.

64.     Plaintiffs' counsel continues to investigate whether additional manufacturing periods and model years of Ford F-series trucks are also plagued with the Roof-Crush Risk.

**D.     Ford knew of the Roof-Crush Risk and never disclosed the Roof-Crush Risk to Plaintiffs and the Class.**

65.     For the reasons set forth above and below, Ford knew about the Roof-Crush Risk before the Roof-Crush Risk Vehicles went to market.

---

[24] *Id.*

### 1. Ford knew the relationship between roof strength and rollover injury severity before the Roof-Crush Risk Vehicles were developed.

66.     In 1960, Ford conducted a dynamic rollover test of a Ford Falcon to evaluate the car's roof structure. The design of the car's windshield header was a "hat section"—an open section design that is very similar to the design in many cars and SUVs throughout the 1970s to the present.[25]

67.     During the Falcon test, Ford found, "[t]he roof structure proved inadequate. The front of the roof collapsed. The hat section reinforcement at the very front of the roof was insufficient to withstand the load."[26]

68.     Ford emphasized the relationship between strong roofs and safe cars as early as 1964. An advertisement for the 1964 Country Squire station wagon depicted nine children on the car's roof and claimed "How long a life your car body has depends on how solidly it's built …. That's why all Ford-built cars give you so much extra reinforcing. Take the roof these youngsters are perched on. Three separate steel braces make it super-solid to sit on (or ride under)."[27]

---

[25] **Exhibit 13**, Byron Bloch, *Protecting Occupants in Rollover Crashes: Case Examples and Latest Technologies*, available at: https://www-esv.nhtsa.dot.gov/Proceedings/22/files/22ESV-000344.pdf (last visited Sept. 23, 2022).

[26] *Id.*

[27] **Exhibit 14**, 1964 Ford Country Squire station wagon advertisement.

- 29 -

69.     In the late 1960s, shoulder belts became mandatory, and Ford was concerned about the relationship between roof crush and belted occupants who would be seated upright as a vehicle rolled over.[28]

70.     In 1968, Ford issued an intra-company safety evaluation entitled "Roof Strength Study" or "the Weaver memo." Ford noted, "Roof intrusion may have a more pronounced effect on occupant injuries with increased usage of upper torso restraints. People are injured by roof collapse. The total number of nationwide deaths and injuries cannot be estimated but it is a significant number."[29]

71.     The Roof Strength Study identified the risk posed by rollover crashes with belted occupants, "It seems unjust to penalize people wearing effective restraint systems by exposing them to more severe rollover injuries than they might expect with no restraints."[30]

72.     In 1969, the consequences of crushed roofs also became clear to federal regulators. "Approximately 1,400 motor vehicle occupants were killed in that year by impact with roof structure in rollover accidents," the National

---

[28] **Exhibit 13**, Byron Bloch, *Protecting Occupants in Rollover Crashes: Case Examples and Latest Technologies*, available at: https://www-esv.nhtsa.dot.gov/Proceedings/22/files/22ESV-000344.pdf (last visited Sept. 23, 2022).
[29] *Id.*
[30] *Id.*

Highway Safety Bureau, which later became the National Highway Traffic Safety Administration, or NHTSA, said in 1971.[31]

73.     On January 6, 1971, federal regulators proposed a safety standard to "reduce deaths and injuries due to the intrusion of the roof into the passenger compartment in rollover crashes."[32]

74.     Regulators initially proposed testing both front corners of a passenger vehicle roof. To pass the test, a car's roof could not have more than five inches of intrusion into the passenger compartment.[33]

75.     General Motors (GM) and the Automobile Manufacturers Association (AMA) subsequently submitted comments to the National Highway Safety Bureau arguing for changes that weakened the proposed test procedures.[34]

76.     Ford was a member of the Automobile Manufacturers Association.[35]

---

[31] **Exhibit 15**, *U.S.: Danger Overhead: Crushed Roofs, Thousands killed, hurt as auto roofs collapse,* available at: http://www.anderson.ucla.edu/documents/areas/adm/loeb/05b16-1.pdf (last visited Sept. 23, 2022).

[32] **Exhibit 16**, *Industry Concealment of Tests Undermined Development of Meaningful Rollover Crash Roof Crush Resistance Standard in 1971*, available at: https://www.citizen.org/sites/default/files/industry_undermines_roof_strength_standard_of_1971.pdf (last visited Sept. 23, 2022).

[33] *Id.*

[34] *Id.*

[35] **Exhibit 17**, Article regarding Alliance of Automobile Manufacturers, available at: https://www.automotive-fleet.com/encyclopedia/alliance-of-automobile-manufacturers (last visited Sept. 23, 2022).

77.     Much like Big Tobacco contradicted its own science that showed smoking was deadly, "Ford questioned whether crushed roofs even posed a danger — a direct contradiction of its own 1968 study. 'The data do not implicate top intrusion as an automotive safety problem,' Ford said in its April 5, 1971, comments to the agency."[36]

78.     NHTSA published its *minimal* requirement for roof crush resistance in December 1971, Motor Vehicle Safety Standard 216 (FMVSS 216). "The final standard reflects, almost without change, the modifications to the rule that had been suggested by GM and the AMA."[37]

79.     Although the agency adopted a watered-down version of FMVSS 216, it still recognized the importance of roof strength in its rulemaking notices. The agency found, "serious injuries are more frequent when the roof collapses" and "It has been determined, therefore, that improved roof strength will increase occupant protection in rollover crashes."[38]

---

[36] **Exhibit 15**, *U.S.: Danger Overhead: Crushed Roofs, Thousands killed, hurt as auto roofs collapse,* available at: http://www.anderson.ucla.edu/documents/areas/adm/loeb/05b16-1.pdf (last visited Sept. 23, 2022).

[37] **Exhibit 16**, *Industry Concealment of Tests Undermined Development of Meaningful Rollover Crash Roof Crush Resistance Standard in 1971*, available at: https://www.citizen.org/sites/default/files/industry_undermines_roof_strength_standard_of_1971.pdf (last visited Sept. 23, 2022).

[38] **Exhibit 13**, Byron Bloch, *Protecting Occupants in Rollover Crashes: Case Examples and Latest Technologies*, available at: https://www-esv.nhtsa.dot.gov/Proceedings/22/files/22ESV-000344.pdf (last visited Sept. 23, 2022).

011115-11/2039942 V1

80.     In 1982, NHTSA issued a report, *Light Vehicle Occupant Protection—Top and Rear Structures and Interiors*. This comprehensive analysis found "accident statistics show that the degree of roof intrusions is highly associated with occupant injury severity and rate."[39]

81.     NHTSA and the Department of the Air Force's Armstrong Laboratory published the report *Vehicle and Occupant Response in Rollover Crash Tests* in 1992. This report published findings from twenty-four rollover crashes that NHTSA had sponsored to study vehicle and occupant dynamics. The report concluded, "Most of the tests resulted in significant roof crush. Often the body was trapped by the roof crush. In these cases, the head/neck system was vulnerable to large loads from the roof."[40]

82.     In 1994, Australian scientists published *Rollover Crash Study on Vehicle Design and Occupant Injuries*. One of the report's "main conclusions" was "[i]n mass data and other crash collections, the weight of evidence is in agreement with a relationship between roof crush and occupant injury. There is a convincing

---

[39] **Exhibit 13**, Byron Bloch, *Protecting Occupants in Rollover Crashes: Case Examples and Latest Technologies*, available at: https://www-esv.nhtsa.dot.gov/Proceedings/22/files/22ESV-000344.pdf (last visited Sept. 23, 2022).

[40] *Id.*

relationship between rollover and spinal cord injury. Finally, there is strong

evidence of a connection between local roof crush and spinal cord injury."[41]

83.     With respect to other popular vehicles in Ford's offerings, Ford

admitted and promoted the notion that strong roof structures were important. In

advertisements for the 1994 Ford Mustang, Ford touted the car's "Reinforced Roof

Structure" and highlighted "[t]he A-pillars of both the coupe and convertible are

reinforced. And, on the coupe, key areas of the roof are also reinforced to resist

collapse in a rollover-type accident."[42]

## 2.     Ford ignored the importance of roof strength in preventing serious injury and death when designing the Roof-Crush Risk Vehicles.

84.     In the 1990s, Ford divided their pickup truck business into the PN96

and PHN131 platforms. The PN96 trucks have a GVWR of 8,500 lbs. or less. The

PHN131 trucks have a GVWR over 8,500 lbs.[43]

85.     The Roof-Crush Risk Vehicles are PHN131 platform vehicles.[44]

---

[41] **Exhibit 18**, Monash University study titled *Rollover Crash Study – Vehicle design and occupant injuries*, available at: https://www.monash.edu/muarc/archive/our-publications/reports/muarc065 (last visited Sept. 23, 2022).
[42] **Exhibit 13**, Byron Bloch, *Protecting Occupants in Rollover Crashes: Case Examples and Latest Technologies*, available at: https://www-esv.nhtsa.dot.gov/Proceedings/22/files/22ESV-000344.pdf (last visited Sept. 23, 2022).
[43] **Exhibit 11**, *Taylor*, 1:06-cv-00069, Dkt. No. 86 at 8.
[44] *Id.*

86.     On April 17, 1991, NHTSA issued a rule that extended FMVSS 216 to light trucks, vans, buses, and multipurpose passenger vehicles (MPVs) with a Gross Vehicle Weight Rating (GVWR) of 6,000 lbs. or less. The agency specifically declined to extend the standard to light trucks, vans, buses, and MPVs with a GVWR of up to 10,000 lbs.[45]

87.     Beginning in 1991, Ford's internal safety guidelines extended the requirement for FMVSS 216 testing to trucks with a GVWR of less than 8,500 lbs.[46]

88.     In 2009, NHTSA issued a new roof crush standard, FMVSS 216a. This new standard applies to passenger cars, MPVs, trucks, and buses with a GVWR of 10,000 lbs. or less.[47]

89.     Under FMVSS 216a, vehicles greater than 6,000 lbs. are required to withstand 1.5 times the unloaded vehicle weight of the vehicle.[48]

---

[45] **Exhibit 19**, *1971 Roof Strength Standard: 33-Year Old Standard Does Not Provide Basic Rollover Crashworthiness Protections*, available at: https://www.citizen.org/sites/default/files/chron_roof_crush.pdf (last visited Sept. 23, 2022).

[46] **Exhibit 11**, *Taylor*, 1:06-cv-00069, Dkt. No. 86 at 20.

[47] 49 C.F.R. § 571.216a (2018).

[48] *Id.*

90.     Bruno Barthelemy was the engineering supervisor responsible for the design and development of the PHN131 body shell from January 1993 to June 1995.[49]

91.     A vehicle's body shell is the structure that surrounds the occupants of a vehicle, including the doors, roof, pillars, roof rails, windshield header, rear header, windshield, and rear window.[50]

92.     Barthelemy led the engineering team responsible for setting a roof strength target for the PHN131 vehicles.[51]

93.     Because there were no federal or internal Ford guidelines that set a target roof strength for the PHN131 vehicles, Barthelemy and his team decided the PHN131 roof strength needed to be as good as the PN96.[52]

94.     The target roof strength for the PHN131 vehicles was one-and-a-half times the vehicle's maximum unloaded weight.[53]

95.     The one-and-a-half times maximum vehicle unloaded weight target did not include a factor that considered variations in manufacturing.[54]

---

[49] **Exhibit 11**, *Taylor*, 1:06-cv-00069, Dkt. No. 86 at 20.
[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.*

96.     Barthelemy's design focus was not safety. The target roof strength was required because "[t]he engineers needed some kind of target from a structural engineering point of view. They need a target so they could say this is enough or they need to continue, so that is how they set the target up."[55]

97.     Barthelemy knew that in many accident situations a rollover was inevitable when designing the PHN131 body shell.[56]

98.     Richard Vanker, body engineering manager for the PHN131 platform (including the Roof-Crush Risk Vehicles) between January 1996 and June 1998, knew it was statistically foreseeable that PHN131 vehicles would be involved in rollovers. He knew that high center of gravity vehicles were more likely to rollover than standard passenger cars.[57]

99.     Despite this knowledge, no physical roof crush testing was ever performed on PHN131 vehicles (including Roof-Crush Risk Vehicles) before they were sold to the public.[58]

100.    In 1995, James K. Wagner, Automotive Safety and Engineering Standards FAO at Ford, described why physical roof crush testing was not performed on the PHN131 vehicles.[59]

---

[55] *Id.*

[56] *Id.* at 21.

[57] *Id.*

[58] *Id.*

[59] **Exhibit 12**, *Gibson*, No. 1:06-cv-01237, Dkt. No. 177-1 at 3.

- 37 -

101.    In a message entitled "PHN131 Safety PAT Mtg. Recap – 1/19/95" Wagner noted, "The LAW applies only to vehicles of 6,000 lbs. GVW and under."; "The PHN131 Safety Panel Chart … merely stated that the vehicles would meet all Safety Design Guidelines."; "There are no roof crush requirements in the Heavy Truck Safety Design Guidelines."; "There are no Safety Design Guidelines covering vehicles of 8,501 through 19,999 lbs. GVW."[60]

102.    In the same message, Wagner also noted, "Work on the PHN131 roof crush model has been underway since June, concentrating on the 4-door SuperCab. The model itself was derived from that developed for the 3-door PN96 SuperCab which has been shown to correlate very well with actual tests … On account of the relatively close correlation of the models and the PN96 simulation's effective approximation of actual test data and also the fact that there is no REGULATORY REQUIREMENT for roof crush resistance in vehicles of more than 6,000 lbs. GVW, no actual tests are planned."[61]

103.    Thus, after Ford itself successfully lobbied federal regulators not to impose a roof strength regulation on big trucks like the Roof-Crush Risk Vehicles, Ford then used this lack of regulation as its own internal excuse and justification to

---

[60] *Id.*
[61] *Id.* (emphasis in original).

build the Roof-Crush Risk Vehicles with extraordinarily weak roof structures, and then decline to even measure just how weak they actually were.

104.   In lieu of a physical test, Ford used Computer Aided Engineering (CAE) to model the PHN131's roof strength.[62]

105.   Information about the roof strength of the PHN131, as it was determined by CAE, is available in a series of memos addressed to Barthelemy.[63]

106.   The October 11, 1994 memo indicated that CAE analysis of an X-shaped roof bow yielded an increase in peak roof crush resistance from 9,600 lbs. to 10,600 lbs.[64]

107.   The October 26, 1994 memo indicated that placing a proposed X-shaped roof bow in the rear increased front roof crush peak resistance by 1100 lbs. and rear roof crush resistance by 1700 lbs. with a weight penalty of 1.5 lbs. The resultant roof crush resistances were 10,700 lbs. in the front and 10,400 lbs. in the rear.[65]

---

[62] **Exhibit 11**, *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 21.
[63] *Id.*; **Exhibit 12**, *Gibson*, No. 1:06-cv-01237, Dkt. No. 177-1 at 15–25.
[64] **Exhibit 11**, *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 22; **Exhibit 12**, *Gibson*, No. 1:06-cv-01237, Dkt. No. 177-1 at 15–25.
[65] **Exhibit 11**, *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 22; **Exhibit 12**, *Gibson*, No. 1:06-cv-01237, Dkt. No. 177-1 at 15–25.

- 39 -

108.    The January 19, 1995 memo reported the CAE analysis of placing an X-shaped roof bow in the rear and a second bow in the front. The resultant roof crush resistance was 10,980 lbs.[66]

109.    A second memo from January 19, 1995, reported the CAE analysis of placing two (non-X-shaped) roof bows in the roof. The resultant crush resistance was 10,000 lbs.[67]

110.    Despite this unrefuted evidence that the roofs could be strengthened using the X-shaped roof bows, they were never incorporated into the PHN131 because the engineers were meeting their self-imposed roof crush targets.[68]

111.    Ford's Analytical Sign-Off for PHN131 CP Design provides additional information about roof crush strength.[69]

112.    At the time the Analytical Sign-Off is submitted the design of the vehicle is totally done.[70]

---

[66] **Exhibit 11**, *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 22; **Exhibit 12**, *Gibson*, No. 1:06-cv-01237, Dkt. No. 177-1 at 15–25.
[67] **Exhibit 11**, *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 22; **Exhibit 12**, *Gibson*, No. 1:06-cv-01237, Dkt. No. 177-1 at 15–25.
[68] **Exhibit 11**, *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 23; **Exhibit 12**, *Gibson*, No. 1:06-cv-01237, Dkt. No. 177-1 at 15–25.
[69] **Exhibit 11**, *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 23.
[70] *Id.*

113.   Attachment 6 to the Analytical Sign-Off, "PHN131 Safety Status," lists the target structural safety goals for the PHN131 vehicles. The Regular Cab is 9,600 lbs. The Super Cap is 10,500 lbs. The Crew Cab is 10,500 lbs.[71]

114.   On April 26, 1996, the Regular Cab roof crush strength was 9,648 lbs. The Super Cab strength was 10,600 lbs. The Crew Cab strength was 10,484 lbs.[72]

115.   Ford does not have a copy of the CAE test on which the Analytical Sign-Off for roof crush is based.[73]

116.   On July 1, 2003, for purposes of litigation, a third-party performed a roof crush test on a 2001 Ford F-250 Super Cab according to NHTSA FMVSS 216 testing procedure.[74]

117.   The result of that test was approximately 9,800 lbs.[75] This indicates that when a third-party conducted a physical roof crush test of a PHN131 vehicle it performed 800 lbs. lower than Ford indicated it would in the Analytical Sign Off.

118.   Ford uses the maximum possible Unloaded Vehicle Weight when assessing the roof strength to weight ratio (1.5:1) to assure all variants of a particular vehicle model comply with FMVSS 216.[76]

---

[71] **Exhibit 12**, *Gibson*, No. 1:06-cv-01237, Dkt. No. 177-1 at 32.
[72] *Id.*
[73] **Exhibit 11**, *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 25.
[74] *Id.* at 23.
[75] *Id.*
[76] *Id.* at 24.

119.    According to Ford's own calculations submitted to NHTSA, the PHN131 Super Cab has a maximum possible Unloaded Vehicle Weight of 7,969 lbs. and would have to withstand a 14,344 lbs. load to meet the requirements of FMVSS 216.

120.    The 14,344 lbs. figure includes a 20% compliance margin.[77]

121.    According to the Ford Vehicle Information Matrix, the maximum possible Unloaded Vehicle Weight of the PHN131 vehicle line is 7,700 lbs.

122.    The PHN131 vehicle line would need to withstand 11,550 lbs. to meet the requirements of FMVSS 216.[78]

123.    The PHN131 vehicle line would need to withstand 13,860 lbs. to meet the requirements of FMVSS 216 with a 20% compliance margin.[79]

124.    Thus, the target structural safety goals for the PHN131 vehicles in the Analytical Sign Off were—at a minimum—1,050 lbs. below the current requirements of FMVSS 216.[80]

---

[77] *Id.*

[78] This figure is the maximum Unloaded Vehicle Weight (7,700 lbs.) multiplied by 1.5.

[79] This figure is the maximum Unloaded Vehicle Weight (7,700 lbs.) multiplied by 1.5 plus 20%.

[80] This figure is the PHN131 vehicle line's maximum Unloaded Vehicle Weight (7,700 lbs.) multiplied by 1.5 (11,550 lbs.) subtracted from the highest target roof crush strength in the Analytical Sign Off (10,500 lbs.).

### 3.    Ford reduced the roof strength of PHN131 vehicles to save money.

125.    Ford planned to reduce the cost of the PHN131 vehicle as early as January 1996.[81]

126.    Ford planned to reduce the cost per unit by $358 six months after launch.[82]

127.    On July 12, 1996, Ford approved the deletion of the front header outer from the PHN131 vehicle's design.[83]

128.    The deletion of the windshield outer saved Ford $3.50 per vehicle and $500,000 in tooling costs.[84]

129.    Deletion of the front header outer weakened the windshield header.[85]

130.    When you downgage you steel you reduce its thickness. When you reduce the thickness of steel, you tend to lessen the structural capacity.[86]

131.    On August 8, 1999, Ford authorized a downgage from 1.2 mm to 1.07 mm for the windshield header inner. This was an 11% decrease in thickness for a cost savings of $0.17 per vehicle.[87]

---

[81] **Exhibit 11**, *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 26.
[82] *Id.*
[83] *Id.* at 27.
[84] *Id.*
[85] *Id.*
[86] **Exhibit 11**, *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 29.
[87] *Id.* at 28.

132. On November 27, 1995, the roof bows (roof reinforcements) were redesigned and redrawn. The new bow metal was 0.8 mm thick, downgaged from 0.9 mm. This was a reduction in thickness of 10.1%.[88]

133. On August 10, 1999, a design change was approved that downgaged the roof bows from 0.8mm to 0.74mm. This was a 7.5% reduction in thickness and resulted in a cost savings of 5 cents per bow or 10 cents per vehicle.[89]

134. The A-pillar is the part of the vehicle to which the windshield and front door hinges are attached.[90]

135. As of May 1997, the PHN131 A-Pillar was designed to be 2.5mm thick.[91]

136. On September 18, 1998, Ford downgaged the A-Pillar from 2.4mm to 2.35mm. This was downgage of 2%, for a cost savings of $0.70 per vehicle and no tooling cost.[92]

137. On March 30, 1999, Ford approved a down gage of the A-pillar from 2.35 mm to 2.2 mm. This was a downgage of 6.4% with a cost savings of $0.86 per A-Pillar or $1.72 per vehicle.[93]

---

[88] *Id.*
[89] *Id.*
[90] *Id.* at 29.
[91] *Id.*
[92] *Id.*
[93] *Id.*

- 44 -

138.   Internal Ford documents concluded that it is "primordial" to have a strong B-pillar structure in order to meet a high roof crush load.[94]

139.   On December 4, 1996, Ford authorized the replacement of the Boron steel rear door front vertical beam with a vertical beam made of mild steel. The vertical beam is what Ford generically called the "floating B-pillar."[95]

140.   Boron steel is 4 or 5 times stronger than normal steel.[96]

141.   Replacing the Boron steel part with a mild steel part saved $20.86 per vehicle and tooling costs of $1,033,800.[97]

142.   On June 15, 1999, Ford authorized the downgage of the rear door front vertical beam from 1.5 mm to 1.2 mm. The 20% downgage resulted in a savings of $0.48 per door or $0.96 per vehicle.[98]

143.   In sum, Ford significantly weakened the PHN131 roof structure when it deleted the front header outer, replaced the Boron steel B-pillar with mild steel, and downgaged the windshield header inner, roof bows, A-pillar, and rear front door vertical beam.

---

[94] *Id.* at 18.
[95] *Id.* at 29.
[96] *Id.* at 30.
[97] *Id.* at 29.
[98] *Id.* at 30.

143.   Ford has no test results to show what affect any of the downgages and changes in roof and door structure had on roof crush strength on the PHN131.[99]

144.   Ford did not even attempt to ascertain how much weaker its hunger for profits made the roof structures of the Roof-Crush Risk Vehicles.

144.   As late as 2005, Ford maintained the position (contrary to its own engineers in the 1960s and 1970s) that roof crush does not cause injury. Susan Cischke, Ford's vice president for environmental and safety engineering said, "There is no data out there to suggest people are injured by a roof collapsing."[100]

145.   Ford has previously been found liable for sacrificing safety in pursuit of profits, most notably in relation to the Pinto's defective fuel tank.[101]

146.   Ford has identified 162 lawsuits and 83 similar incidents of the roof crush involving the 1999–2016 SuperDuty trucks.[102]

147.   Ford's rejection of its own tests and efforts to increase profits, as outlined above by purposefully degrading the strength of the roof both pre- and

---

[99] *Id.* at 31.

[100] **Exhibit 20**, *Not the Top of the Safety Priorities*, N.Y. TIMES (May 14, 2005), available at: https://www.nytimes.com/2005/05/14/automobiles/not-the-top-of-the-safety-priorities.html (last visited Sept. 23, 2022).

[101] *See, e.g.*, *Grimshaw v. Ford Motor Co.*, 174 Cal. Rptr. 348, 358 (Ct. App. 1981).

[102] **Exhibit 1**, *Roof Strength on Older Ford Trucks Called Into Question by $1.7 Billion Jury Verdict*, WSJ (Aug. 22, 2022), available at: https://www.wsj.com/articles/ford-faces-1-7-billion-verdict-in-fatal-rollover-of-f-250-pickup-11661033662 (last visited Sept. 1, 2022).

post-production of the first Roof-Crush Risk Vehicles, squarely evidences Ford's

knowledge that the Roof-Crush Risk Vehicles had an unsafe and dangerous design

from before the sale of the first 1999 model year SuperDuty.

148.   All owners and lessees of the Roof-Crush Risk Vehicles have paid

huge premiums for the supposed toughness, durability and safety of their

SuperDuty vehicles. Because Ford sold them vehicles with the Roof-Crush Risk,

they have all suffered ascertainable loss.

**E.     All class members could have been made aware of the Roof-Crush Risk at the point of sale.**

149.   Plaintiffs and all putative class members were necessarily exposed to

Ford's omissions before purchasing the Roof-Crush Risk Vehicles because they

each interacted with an authorized Ford dealer at the point of sale and/or they were

repeatedly exposed to Ford's advertising and marketing. These dealers could have

disclosed the omitted information to each class member, but they failed to do so.

As a district court affirmed in another consumer class action case against Ford, all

class members in that case would have "been aware of a disclosure" from Ford

about the defect at the point of sale because class members "interact[ed] with an

authorized Ford dealer prior to purchase." *Daniel v. Ford Motor Co.*, 2016 WL

8077932, at *8 (E.D. Cal. Sept. 23, 2016). The same is true here.

## VI.   TOLLING OF THE STATUTE OF LIMITATIONS

**A.   Discovery Rule Tolling**

150.   Because Ford omitted the existence of the Roof-Crush Risk, class members had no way of knowing about the unreasonable risk of paralysis, grave injury or death that could result in the event of a rollover accident in the Roof-Crush Risk Vehicles.

151.   Within the period of any applicable statutes of limitation, Plaintiffs and members of the proposed Classes could not have discovered through the exercise of reasonable diligence that Ford was omitting the roof-crush risk complained of herein.

152.   Plaintiffs and putative class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Ford did not report information within its knowledge to federal and state authorities, its dealerships, or consumers and purposefully used secrecy clauses in settlements with owners of Roof-Crush Risk Vehicles; nor would a reasonable and diligent investigation have disclosed that Ford had omitted information about the unreasonable risk of paralysis, grave injury or death of the Roof-Crush Risk Vehicles, which was discovered by Plaintiffs only shortly before this action was filed.

- 48 -

153.   For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Roof-Crush Risk Vehicles.

**B.    Estoppel**

154.   Ford was under a continuous duty to disclose to Plaintiffs and putative class members the true character, quality, and nature of the risk of paralysis, grave injury and death of the Roof-Crush Risk Vehicles.

155.   Ford knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the Roof-Crush Risk Vehicles.

156.   Ford knowingly decreased the strength and safety of the roof in the Roof-Crush Risk Vehicles in order to increase profits. Ford did this both before the first sale of a Roof-Crush Risk Vehicle and on an ongoing basis in the years following such first sale.

157.   Based on the foregoing, Ford is estopped from relying on any statutes of limitations in defense of this action.

## VII.   CLASS ALLEGATIONS

158.   Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of

- 49 -

Civil Procedure, on behalf of the following Nationwide Class and California

Subclass:

> **Nationwide Class**: All persons or entities who purchased
> or leased model year 1999–2016 Ford SuperDuty
> vehicle, including the F-250, F-350, F-450, and F-550
> (the "Roof-Crush Risk Vehicles").

> **California Subclass**: All persons or entities who purchased or
> leased one or more of the Roof-Crush Risk Vehicles in the State
> of California.

> **New Jersey Subclass**: All persons or entities who purchased or
> leased one or more of the Roof-Crush Risk Vehicles in the State
> of New Jersey.

> **Pennsylvania Subclass**: All persons or entities who purchased
> or leased one or more of the Roof-Crush Risk Vehicles in the
> State of Pennsylvania.

159.  Excluded from the definitions of the Nationwide Class and state

Subclasses are any personal injury or property damages claims resulting from

accidents involving the Roof-Crush Risk Vehicles. Also excluded from the

Nationwide Class and state Subclasses are Ford and its subsidiaries and affiliates;

all persons who make a timely election to be excluded from this action;

governmental entities; the Judge to whom this case is assigned and his/her

immediate family; and Plaintiffs' Counsel. Plaintiffs reserve the right to revise the

class definitions based upon information learned through discovery.

160.  Certification of Plaintiffs' claims for class-wide treatment is

appropriate because Plaintiffs can prove the elements of his claims on a class-wide

basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

161.   This action has been brought and may be properly maintained on behalf of the Nationwide Class and state Subclasses proposed herein under Federal Rule of Civil Procedure 23.

162.   **Numerosity**. Federal Rule of Civil Procedure 23(a)(1): The members of the Nationwide Class and state Subclasses are so numerous and geographically dispersed that individual joinder of all class members is impracticable. For purposes of this complaint, Plaintiffs allege that there are estimated to be at least 5.2 million Roof-Crush Risk Vehicles in the Nationwide Class.[103] The precise number of class members is unknown to Plaintiffs but may be ascertained from Ford's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and published notice.

163.   **Commonality and Predominance**: Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact,

---

[103] *See* **Exhibit 9**, *Ford Trucks Highlighted in $1.7 Billion Verdict Weren't Subject to Tougher Safety Rules*, WSJ (Aug. 25, 2022), available at: https://www.wsj.com/articles/ford-trucks-in-1-7-billion-verdict-werent-subject-to-tougher-safety-rules-11661439150 (last visited Sept. 1, 2022).

which predominate over any questions affecting individual class members,

including, without limitation:

      a.    Whether Ford engaged in the conduct alleged herein;

      b.    Whether the Roof-Crush Risk creates an unreasonable risk of paralysis, grave injury and death in the Roof-Crush Risk Vehicles;

      c.    When Ford first knew about the Roof-Crush Risk;

      d.    Whether Ford designed, manufactured, marketed, and distributed the Roof-Crush Risk Vehicles with component(s) that create an unreasonable risk of paralysis, grave injury or death in the event of a rollover accident;

      e.    Whether Ford's conduct renders it liable for breach of the implied warranty of merchantability;

      f.    Whether Ford has been unjustly enriched at the expense of Plaintiffs and class members;

      g.    Whether Plaintiffs and class members overpaid for their vehicles at the point of sale; and

      h.    Whether Plaintiffs and class members are entitled to damages and other monetary relief and, if so, in what amount.

164.  **Typicality**: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other class members' claims because, among other things, all class members were comparably injured through Ford's wrongful conduct as described above.

165.  **Adequacy**: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate class representatives because their interests do not conflict with the interests of the other members of the classes they seek to represent; Plaintiffs have

- 52 -

retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The interests of the classes will be fairly and adequately protected by Plaintiffs and their counsel.

166. **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and other class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for the members of the Nationwide Class and state Subclasses to individually seek redress for Ford's wrongful conduct. Even if Nationwide Class and state Subclass members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII.  CLAIMS

**A.    Nationwide Claims**

### COUNT I

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *et seq.*)

### (Alleged by Plaintiffs on behalf of the Nationwide Class)

167.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

168.    Plaintiffs bring this claim on behalf of the Nationwide Class.

169.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

170.    The Roof-Crush Risk Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Plaintiffs and Nationwide Class members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

171.    Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

172.    15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

- 54 -

173.   Ford provided Plaintiffs and Nationwide Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Ford warranted that the Roof-Crush Risk Vehicles were fit for their ordinary purpose and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

174.   Ford breached its implied warranties, as described herein, and is therefore liable to Plaintiffs under 15 U.S.C. § 2310(d)(1). Without limitation, the Roof-Crush Risk Vehicles share a common defect in that they are all equipped with a defect in design and manufacturing of the roof system that makes the vehicles unsafe in the event of a rollover accident, causing an unreasonable risk of paralysis, grave injury and death to owners and lessees of the Roof-Crush Risk Vehicles. The Roof-Crush Risk rendered the Roof-Crush Risk Vehicles unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

175.   As discussed herein, Ford knew about the Roof-Crush Risk from its purposeful degradation of the strength of the roof systems in the Roof-Crush Risk Vehicles before launching the Roof-Crush Risk Vehicles. Ford omitted

- 55 -

information about the Roof-Crush Risk and its consequences from Plaintiffs and class members, misrepresented the qualities of the Roof-Crush Risk Vehicles, and has failed to provide a fix for the Roof-Crush Risk.

176.   Any effort by Ford to limit the implied warranties in a manner that would exclude coverage of the Roof-Crush Risk Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

177.   Any limitations Ford might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between Ford and Plaintiffs, because, at the time of purchase and lease, Plaintiffs had no other options for purchasing warranty coverage other than directly from Ford.

178.   Any limitations Ford might seek to impose on its warranties are substantively unconscionable. Ford knew that the Roof-Crush Risk Vehicles were unsafe and that the Roof-Crush Risk Vehicles could cause paralysis, grave injuries or death when used as intended long before Plaintiffs and class members knew or should have known. Ford failed to disclose this risk to Plaintiffs and class members. Thus, enforcement of the durational limitations on the warranties is harsh and would shock the conscience.

179.   Plaintiffs have had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between Ford and Plaintiffs. Nonetheless, privity is not required here because Plaintiffs are an intended third-

- 56 -

party beneficiary of contracts between Ford and its dealers, and specifically, of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Roof-Crush Risk Vehicles and have no rights under the warranty agreements provided with the Roof-Crush Risk Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Roof-Crush Risk Vehicles are dangerous instrumentalities due to the aforementioned defect, as the Roof-Crush Risk present an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Roof-Crush Risk Vehicles.

180.   Under 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give Ford notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs under Rule 23 of the Federal Rules of Civil Procedure.

181.   Plaintiffs would suffer economic hardship if they returned their Roof-Crush Risk Vehicles but did not receive the return of all payments made by them. Because Ford will not acknowledge any revocation of acceptance and immediately return any payments made, Plaintiffs have not re-accepted their Roof-Crush Risk Vehicles by retaining them.

182.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum

- 57 -

of $50,000, exclusive of interest and costs, computed based on all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of all other Nationwide Class members, seek all damages permitted by law, including diminution in value of the Roof-Crush Risk Vehicles, in an amount to be proven at trial. In addition, under 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and Nationwide Class members in connection with the commencement and prosecution of this action.

183.   Plaintiffs also seek the establishment of a Ford-funded program for Plaintiffs and Nationwide Class members to recover out-of-pocket costs incurred in attempting to rectify and mitigate the effects of the Roof-Crush Risk in their Roof-Crush Risk Vehicles.

## COUNT II

### FRAUDULENT CONCEALMENT
### (COMMON LAW)

**(Alleged by Plaintiffs on behalf of the Nationwide Class)**

184.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

185.   Plaintiffs assert this claim on behalf of themselves and the Nationwide Class, or, in the alternative, on behalf of the state Subclasses.

- 58 -

186. A nationwide class is appropriate because the elements of a fraudulent concealment (or "fraud by concealment") claim are virtually identical in all states. In all states, Plaintiffs can prevail by showing that: (i) Ford had a duty to disclose material facts in connection with the sale or lease of the Roof-Crush Risk Vehicles; (ii) Ford either (a) knowingly made a false representation concerning material information in connection with the sale or lease of the Roof-Crush Risk Vehicles; or (b) knowingly concealed material information in connection with the sale or lease of the Roof-Crush Risk Vehicles; or (c) knowingly failed to disclose material information in connection with the sale or lease of the Roof-Crush Risk Vehicles; and (iii) as a result of Ford's conduct, Plaintiffs suffered economic damages.

187. Ford concealed and suppressed material facts concerning the serious safety risks in Plaintiffs' vehicles.

188. Ford sold the Roof-Crush Risk Vehicles to Plaintiffs without disclosing the Roof-Crush Risk and concealed and suppressed the risk from regulators and consumers.

189. Ford concealed and suppressed the Roof-Crush Risk with the intent to deceive Plaintiffs.

190. Ford did so in order to falsely assure purchasers, lessees, and owners of the Roof-Crush Risk Vehicles that the vehicles they were purchasing or leasing were safe and reliable and would live up to the performance characteristics

- 59 -

associated with the Ford brand, and then to avoid the cost and negative publicity of a recall. The concealed information was material to consumers, both because it concerned the quality, safety, and performance of the Roof-Crush Risk Vehicles and because the information would have significantly decreased the value and sales price of the vehicles.

191.   Ford had a duty to disclose the Roof-Crush Risk because it was known and only knowable by Ford; Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to, or reasonably discoverable by, Plaintiffs. Ford also had a duty to disclose because it made many affirmative representations about the safety, durability, and quality of the Roof-Crush Risk Vehicles, as set forth above; these representations were misleading, deceptive, and incomplete without the disclosure of the Roof-Crush Risk. Finally, once the Roof-Crush Risk Vehicles were on the road, Ford had a duty to monitor the Roof-Crush Risk Vehicles under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

192.   Ford concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt Ford's image and cost Ford money, and it did so at the expense of Plaintiffs and the Nationwide Class.

- 60 -

193.   On information and belief, Ford has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Nationwide Class and conceal material information regarding the Roof-Crush Risk.

194.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Roof-Crush Risk Vehicles if they knew of the Roof-Crush Risk. Plaintiffs' actions were justified. Ford was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

195.   Because of the concealment and/or suppression of the facts, Plaintiffs and other class members sustained damage. In purchasing their Roof-Crush Risk Vehicles, Plaintiffs did not get the benefit of the bargain since the vehicle was worth less than it would have been without the Roof-Crush Risk, and because they own vehicles that diminished in value as a result of Ford's concealment of, and failure to timely disclose and remedy, the Roof-Crush Risk. Had Plaintiffs been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased them at all.

196.   Accordingly, Ford is liable to Plaintiffs and the Nationwide Class for damages in an amount to be proven at trial.

197.   Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and class members' rights and well-being in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT III**

**UNJUST ENRICHMENT
(COMMON LAW)**

**(Alleged by Plaintiffs on behalf of the Nationwide Class)**

198.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

199.   Plaintiffs assert this claim on behalf of themselves and the Nationwide Class, or, in the alternative, on behalf of the state Subclasses. A Nationwide Class is appropriate because the elements of unjust enrichment are uniform in all states.

200.   This claim is pleaded in the alternative to the contract-based claims brought on behalf of Plaintiffs and the Nationwide Class.

201.   Ford has received and retained a benefit from Plaintiffs and Nationwide Class members and inequity has resulted.

202.   Ford has benefitted from selling, leasing, and distributing the Roof-Crush Risk Vehicles for more than they were worth because of Ford's conduct

described herein, at a profit, and Plaintiffs and putative class members have overpaid for the Roof-Crush Risk Vehicles.

203.   Thus, Plaintiffs and the Nationwide Class conferred a benefit on Ford.

204.   It is inequitable for Ford to retain these benefits.

205.   Plaintiffs and Nationwide Class members were not aware of the true facts about the Roof-Crush Risk Vehicles and did not benefit from Ford's conduct described herein.

206.   Ford knowingly accepted the benefits of its unjust conduct.

207.   As a result of Ford's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

**B.      State-Specific Claims**

      **1.      California**

**COUNT IV**

**VIOLATION OF THE CALIFORNIA
CONSUMER LEGAL REMEDIES ACT
(Cal. Civ. Code § 1750, *et seq.*)**

**(Alleged by Plaintiffs Beck and Braden on behalf of the California Subclass)**

208.   Plaintiffs Beck and Braden ("Plaintiffs" for purposes of this Count) and the California Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

209.   Plaintiffs bring this claim on behalf of themselves and the California Subclass.

- 63 -

210.   Ford is a person as defined in California Civil Code § 1761(c).

211.   Plaintiffs and California Subclass members are consumers as defined in California Civil Code § 1761(d).

212.   Ford engaged in unfair and deceptive acts in violation of the California Consumer Legal Remedies Act ("CLRA") through the practices described herein, and by omitting the Roof-Crush Risk and misrepresenting and misleading Plaintiffs and the California Subclass about the Roof-Crush Risk Vehicles, along with omitting the risks, costs, and monetary damage resulting from the Roof-Crush Risk. These acts and practices violate, at a minimum, the following sections of the CLRA: (a)(2) misrepresenting the source, sponsorship, approval, or certification of goods or services; (a)(5) representing that goods or services have sponsorships, characteristics, uses, benefits, or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection which they do not have; (a)(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and (a)(9) advertising goods and services with the intent not to sell them as advertised.

213.   Ford's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of misleading a substantial portion of the purchasing public and imposed a serious safety risk on the public.

- 64 -

214.   Ford knew or should have known that its conduct violated the CLRA.

215.   Ford knew about the Roof-Crush Risk affecting the Roof-Crush Risk Vehicles owned or leased by Plaintiffs and California Subclass members based on (i) its own testing, studies and designs of the Roof-Crush Risk Vehicles; (ii) its own lobbying of regulatory authorities to minimize the regulation of roof strength in the Roof-Crush Risk Vehicles; (iii) its decision to put profits ahead of safety and purposefully weaken the roof structure in the Roof-Crush Risk Vehicles in order to increase profits; (iv) its own pre-sale durability testing; and (v) Ford's own investigation of accidents involving in the Roof-Crush Risk Vehicles.

216.   In the course of its business, Ford violated the CLRA and engaged in deceptive acts or practices with the marketing and sale or lease of the Roof-Crush Risk Vehicles because it misrepresented and omitted material facts concerning the Roof-Crush Risk Vehicles, specifically the existence of the Roof-Crush Risk, as alleged herein. Ford omitted the fact of the Roof-Crush Risk from Plaintiffs and the California Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Roof-Crush Risk Vehicles given the existence of the Roof-Crush Risk in them.

217.   Ford owed Plaintiffs and the California Subclass a duty to disclose the true safety and reliability of the Roof-Crush Risk Vehicles because Ford:

      a.     Possessed exclusive knowledge about the Roof-Crush Risk;

- 65 -

b.    Omitted the foregoing from Plaintiffs and the California Subclass;

c.    Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Roof-Crush Risk Vehicles, while withholding material facts from Plaintiffs and the California Subclass that contradicted these representations; and/or

d.    Had duties under the TREAD Act and related regulations to disclose and remedy the Roof-Crush Risk.

218.   In failing to disclose the Roof-Crush Risk and associated safety risks and repair costs that result from it, Ford has misrepresented the Roof-Crush Risk Vehicles, omitted disclosure the Roof-Crush Risk, and breached its duty to disclose.

219.   The facts omitted and misrepresented by Ford to Plaintiffs and California Subclass members, as described herein, are material in that a reasonable consumer would have considered them important in deciding whether to purchase the Roof-Crush Risk Vehicles or to pay a lesser price. Had Plaintiffs and California Subclass members known about the nature of the Roof-Crush Risk Vehicles, they would not have purchased or leased the Roof-Crush Risk Vehicles or would have paid less for them.

220.   On or about September 1, 2022, Plaintiffs' undersigned counsel provided Ford written notice of their violations of the CLRA under California Civil Code § 1782(a) regarding the Roof-Crush Risk Vehicles.

221.   Plaintiffs and California Subclass members' injuries were proximately caused by Ford's deceptive business practices.

222.   Plaintiffs and California Subclass members seek all relief available under the CLRA, including equitable relief, damages, and attorneys' fees.

## COUNT V

## VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
(Cal. Bus. & Prof. Code § 17200)

**(Alleged by Plaintiffs Beck and Braden on behalf of the California Subclass)**

223.   Plaintiffs Beck and Braden ("Plaintiffs" for purposes of this Count) and the California Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

224.   Plaintiffs bring this claim on behalf of themselves and the California Subclass.

225.   The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

226.   In the course of its business, Ford engaged in deceptive acts or practices with the marketing and sale or lease of the Roof-Crush Risk Vehicles because it misrepresented and omitted material facts concerning the Roof-Crush Risk Vehicles, specifically the existence of the Roof-Crush Risk, as alleged herein.

- 67 -

Ford omitted the fact of the Roof-Crush Risk from Plaintiffs and California Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Roof-Crush Risk Vehicles given the existence of the Roof-Crush Risk in them.

227.   Ford engaged in unfair competition and unfair, unlawful, or fraudulent business practices through the conduct, statements, and omissions described herein, and by omitting the Roof-Crush Risk in the Roof-Crush Risk Vehicles from Plaintiffs and California Subclass members, along with omitting the risks, costs, and monetary damage resulting from the Roof-Crush Risk. Ford should have disclosed this information because it was in a superior position to know the true facts related to the Roof-Crush Risk, and Plaintiffs and California Subclass members could not reasonably be expected to learn or discover the true facts related to the Roof-Crush Risk.

228.   The Roof-Crush Risk causes paralysis, grave injury or death in the Roof-Crush Risk Vehicles in the event of a rollover accident, and this constitutes a safety issue that triggered Ford's duty to disclose the safety issue to consumers.

229.   Ford's acts and practices misled and deceived Plaintiffs and are likely to deceive the public. In failing to disclose the Roof-Crush Risk and omitting other material facts from Plaintiffs and California Subclass members, Ford breached its duty to disclose these facts, violated the UCL, and caused injuries to Plaintiffs and

- 68 -

California Subclass members. Ford's omissions and misrepresentations concerned information that was material to Plaintiffs and California Subclass members, as it would have been to all reasonable consumers.

230.   The injuries suffered by Plaintiffs and California Subclass members are not greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiffs and California Subclass members could or should have reasonably avoided.

231.   Ford's acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750, *et seq.*, and California Commercial Code § 2313. Ford knew or should have known its conduct violated the UCL.

232.   Plaintiffs and California Subclass members have suffered an injury in fact, including the loss of money or property, because of Ford's unfair, unlawful, and deceptive practices.

233.   Plaintiffs seek to enjoin further unlawful, unfair, and fraudulent acts or practices by Ford, to obtain restitutionary disgorgement of all monies and revenues generated because of such practices, and all other relief allowed under California Business & Professions Code § 17200.

## COUNT VI

## VIOLATIONS OF CALIFORNIA FALSE ADVERTISING LAW
### (Cal. Bus. & Prof. Code § 17500, *et seq.*)

### (Alleged by Plaintiffs Beck and Braden on behalf of the California Subclass)

234.   Plaintiffs Beck and Braden ("Plaintiffs" for purposes of this Count) and the California Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

235.   Plaintiffs bring this claim on behalf of themselves and the California Subclass.

236.   California Business & Professions Code § 17500 states: "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

237.   Ford caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or through the exercise of

- 70 -

reasonable care should have been known to Ford, to be untrue and misleading to consumers, including Plaintiffs and California Subclass members.

238.  Ford violated Section 17500 because its misrepresentations and omissions regarding the safety, reliability, and functionality of the Roof-Crush Risk Vehicles as described herein were material, untrue, and misleading, and likely to deceive a reasonable consumer.

239.  Plaintiffs and California Subclass members have suffered an injury in fact, including the loss of money or property, because of Ford's deceptive advertising. In purchasing or leasing their Roof-Crush Risk Vehicles, Plaintiffs and California Subclass members relied on Ford's misrepresentations and omissions regarding the safety, reliability, and functionality of the vehicles. Ford's representations and omissions were untrue because the Roof-Crush Risk Vehicles were sold or leased with the Roof-Crush Risk. Had Plaintiffs and California Subclass members known this, they would not have purchased or leased their Roof-Crush Risk Vehicles or paid as much for them. Accordingly, Plaintiffs and California Subclass members overpaid for their Roof-Crush Risk Vehicles and did not receive the benefit of their bargain.

240.  All the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Ford's business. Ford's wrongful conduct is part of a

pattern or generalized course of conduct that is still perpetuated and repeated, both in California and nationwide.

241.   Plaintiffs, individually and on behalf of the California Subclass members, requests this Court enter such orders or judgments as necessary to enjoin Ford from continuing its unlawful and deceptive advertising, to restore to Plaintiffs and California Subclass members any money Ford acquired by its deceptive advertising, including restitution and restitutionary disgorgement, and for such other relief permitted.

## COUNT VII

### VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER CALIFORNIA LAW (Cal. Civ. Code §§ 1791.1 & 1792)

**(Alleged by Plaintiffs Beck and Braden on behalf of the California Subclass)**

242.   Plaintiffs Beck and Braden ("Plaintiffs" for purposes of this Count) and the California Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

243.   Plaintiffs bring this claim on behalf of themselves and the California Subclass.

244.   Plaintiffs and California Subclass members are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

245.   The Roof-Crush Risk Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

246.   Ford is the "manufacturer" of the Roof-Crush Risk Vehicles within the meaning of Cal. Civ. Code § 1791(j).

247.   Ford impliedly warranted to Plaintiffs and the California Subclass that the Roof-Crush Risk Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Roof-Crush Risk Vehicles do not have the quality that a buyer would reasonably expect and were therefore not merchantable.

248.   Cal. Civ. Code § 1791.1(a) states:

> "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:
>
> (1)   Pass without objection in the trade under the contract description.
>
> (2)   Are fit for the ordinary purposes for which such goods are used.
>
> (3)   Are adequately contained, packaged, and labeled.
>
> (4)   Conform to the promises or affirmations of fact made on the container or label.

249.   The Roof-Crush Risk Vehicles were not merchantable when sold or leased because they contain the Roof-Crush Risk and pose an unreasonable risk of paralysis, grave injury or death due to the Roof-Crush Risk as described herein.

- 73 -

Without limitation, the Roof-Crush Risk Vehicles share a common defect in that they are all equipped with the Roof-Crush Risk that makes the vehicles susceptible to the roof crushing in a rollover accident, causing an unreasonable risk of paralysis, grave injury or death to lessees and owners of the Roof-Crush Risk Vehicles. This Roof-Crush Risk renders the Roof-Crush Risk Vehicles when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving.

250.   Ford breached the implied warranty of merchantability by selling Roof-Crush Risk Vehicles containing a defect leading to grave risk of injury or death during ordinary operating conditions. This defect has deprived Plaintiffs and California Subclass members of the benefit of their bargain.

251.   Notice of breach is not required because Plaintiffs and California Subclass members did not purchase their automobiles directly from Ford. Nonetheless, Plaintiffs' counsel sent notification to Ford on or about September 1, 2022.

252.   Plaintiffs and California Subclass members were and are third-party beneficiaries to Ford's contracts with Ford-certified/authorized retailers who sold or leased the Roof-Crush Risk Vehicles to Plaintiffs and California Subclass members.

253.    As a direct and proximate result Ford's breach of the implied warranty of merchantability, Plaintiffs and California Subclass members received goods whose dangerous condition now renders them at least partially inoperable and substantially impairs their value. Plaintiffs and California Subclass members have been damaged as they overpaid for their vehicles, and now suffer the partial or complete loss of use of their Roof-Crush Risk Vehicles.

254.    Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs and California Subclass members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Roof-Crush Risk Vehicles, or the overpayment or diminution in value of their Roof-Crush Risk Vehicles.

255.    Under Cal. Civ. Code § 1794, Plaintiffs and California Subclass members are entitled to costs and attorneys' fees.

**2.    New Jersey**

## COUNT VIII

## VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
### (N.J.S.A. § 56:8-1, *et seq.*)

**(Alleged by Plaintiff Willard on behalf of the New Jersey Subclass)**

256.    Plaintiff Willard and the New Jersey Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

257.    Plaintiff Willard brings this action on behalf of himself and the New Jersey Subclass.

- 75 -

258.   Plaintiff Willard and the New Jersey Subclass members are "persons" under the New Jersey Consumer Fraud Act ("New Jersey CFA").

259.   All of the acts complained of herein were perpetrated by Ford in the course of trade or commerce within the meaning of the New Jersey CFA.

260.   The New Jersey CFA makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J. STAT. ANN. § 56:8-2.

261.   Ford engaged in unlawful trade practices, including representing that the Roof-Crush Risk Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Roof-Crush Risk Vehicles are of a particular standard and quality when they are not; advertising the Roof-Crush Risk Vehicles with the intent not to sell them as advertised; and engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

011115-11/2039942 V1

262.   In purchasing or leasing the Roof-Crush Risk Vehicles, Plaintiff Willard and the New Jersey Subclass were deceived by Ford's failure to disclose the Roof-Crush Risk and misrepresentations about the Roof-Crush Risk Vehicles.

263.   Plaintiff Willard and the New Jersey Subclass members reasonably relied on Ford's material omissions and false misrepresentations. They had no way of knowing that Ford's representations were false and misleading. Plaintiff Willard and the New Jersey Subclass members did not, and could not, unravel Ford's deception on their own.

264.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, such as Plaintiff Willard and the New Jersey Subclass members.

265.   Ford knew or should have known that its conduct violated the New Jersey CFA.

266.   Ford's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of misleading a substantial portion of the purchasing public and imposed a serious safety risk on the public.

267.   Ford knew about the Roof-Crush Risk affecting the Roof-Crush Risk Vehicles owned or leased by Plaintiff Willard and New Jersey Subclass members based on (i) its own testing, studies and designs of the Roof-Crush Risk Vehicles; (ii) its own lobbying of regulatory authorities to minimize the regulation of roof

strength in the Roof-Crush Risk Vehicles; (ii) its decision to put profits ahead of safety and purposefully weaken the roof structure in the Roof-Crush Risk Vehicles in order to increase profits; (iii) its own pre-sale durability testing; and (iv) Ford's own investigation of accidents involving in the Roof-Crush Risk Vehicles.

268.   Ford owed Plaintiff and the New Jersey Subclass a duty to disclose the true safety and reliability of the Roof-Crush Risk Vehicles because Ford:

    a.   Possessed exclusive knowledge about the Roof-Crush Risk;

    b.   Omitted the foregoing from Plaintiff and the New Jersey Subclass;

    c.   Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Roof-Crush Risk Vehicles, while withholding material facts from Plaintiff and the New Jersey Subclass that contradicted these representations; and/or

    d.   Had duties under the TREAD Act and related regulations to disclose and remedy the Roof-Crush Risk.

269.   Ford had a duty to disclose the Roof-Crush Risk, because, having volunteered to provide information to Plaintiff Willard and the New Jersey Subclass, Ford had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiff relied on Ford's material omissions and representations that the Roof-Crush Risk Vehicles they were purchasing safe and free from serious safety defects.

270.   Plaintiff Willard and the New Jersey Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did

if they had known of the omitted facts, in that they would not have purchased or leased the Roof-Crush Risk Vehicles manufactured by Ford, would have paid less, and would have taken other affirmative steps considering the information omitted from them. Plaintiff Willard and the New Jersey Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public or Plaintiff Willard and the New Jersey Subclass.

271.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff Willard and the New Jersey Subclass. Had Plaintiff Willard and the New Jersey Subclass members known the truth about the Roof-Crush Risk they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiff Willard and the New Jersey Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Roof-Crush Risk Vehicles.

272.   Plaintiff Willard and the New Jersey Subclass are entitled to recover legal and/or equitable relief, including an order enjoining Defendants' unlawful conduct, treble damages, costs, and reasonable attorneys' fees pursuant to N.J. STAT. ANN. § 56:8-19, and any other just and appropriate relief.

011115-11/2039942 V1

## COUNT IX

## BREACH OF IMPLIED WARRANTY OF
## MERCHANTABILITY UNDER NEW JERSEY LAW

### (Alleged by Plaintiff Willard on behalf of the New Jersey Subclass)

273.   Plaintiff Willard and the New Jersey Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

274.   Plaintiff Willard brings this action on behalf of himself and the New Jersey Subclass.

275.   Ford is a "merchant" with respect to motor vehicles.

276.   Under New Jersey law, an implied warranty of merchantability attaches to the Roof-Crush Risk Vehicles.

277.   The Roof-Crush Risk Vehicles were not merchantable when sold or leased because they contain the Roof-Crush Risk and pose an unreasonable risk of paralysis, grave injury or death due to the Roof-Crush Risk as described herein. Without limitation, the Roof-Crush Risk Vehicles share a common defect in that they are all equipped with the Roof-Crush Risk that makes the vehicles susceptible to the roof crushing in a rollover accident, causing an unreasonable risk of paralysis, grave injury or death to lessees and owners of the Roof-Crush Risk Vehicles. This Roof-Crush Risk renders the Roof-Crush Risk Vehicles when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving.

- 80 -

278.   Plaintiff Willard and the New Jersey Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized dealers who sold or leased the Roof-Crush Risk Vehicles to Plaintiff Willard and the New Jersey Subclass members.

279.   It was reasonable to expect that Plaintiff Willard and the New Jersey Subclass members would use, consume, or be affected by the Roof-Crush Risk Vehicles.

280.   Ford was provided notice of these issues within a reasonable time of Plaintiff Willard and the New Jersey Subclass members' knowledge of the non-conforming or defective nature of the Roof-Crush Risk Vehicles by the filing of this Complaint, consumer complaints to NHTSA regarding the Roof-Crush Risk that is the subject of this Complaint, and by the allegations contained in this and earlier Complaints.

281.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Willard and the New Jersey Subclass have been damaged in an amount to be determined at trial.

011115-11/2039942 V1

3.    **Pennsylvania**

## COUNT X

## VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### (73 P.S. § 201-1, *et seq.*)

**(Alleged by Plaintiff Wilson on behalf of the Pennsylvania Subclass)**

282.   Plaintiff Wilson and the Pennsylvania Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

283.   Plaintiff Wilson brings this action on behalf of himself and the Pennsylvania Subclass.

284.   Plaintiff Wilson and the Pennsylvania Subclass members purchased or leased their Roof-Crush Risk Vehicles primarily for personal, family, or household purposes within the meaning of 73 P.S. § 201-9.2.

285.   All of the acts complained of herein were perpetrated by Ford in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

286.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have … characteristics, …. Benefits or qualities that they do not have"; (ii) "Representing that goods or services are of a particular standard, quality or grade … if they are of another"; (iii) "Advertising goods or services with intent not to sell them as advertised"; and

- 82 -

(iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).

287.   Ford engaged in unlawful trade practices, including representing that the Roof-Crush Risk Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Roof-Crush Risk Vehicles are of a particular standard and quality when they are not; advertising the Roof-Crush Risk Vehicles with the intent not to sell them as advertised; and engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

288.   In purchasing or leasing the Roof-Crush Risk Vehicles, Plaintiff Wilson and the Pennsylvania Subclass were deceived by Ford's failure to disclose the Roof-Crush Risk and misrepresentations about the Roof-Crush Risk Vehicles.

289.   Plaintiff Wilson and the Pennsylvania Subclass members reasonably relied on Ford's material omissions and false misrepresentations. They had no way of knowing that Ford's representations were false and misleading. Plaintiff Wilson and the Pennsylvania Subclass members did not, and could not, unravel Ford's deception on their own.

290.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, such as Plaintiff Wilson and the Pennsylvania Subclass members.

291.   Ford knew or should have known that its conduct violated the Pennsylvania CPL.

292.   Ford's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of misleading a substantial portion of the purchasing public and imposed a serious safety risk on the public.

293.   Ford knew about the Roof-Crush Risk affecting the Roof-Crush Risk Vehicles owned or leased by Plaintiffs and Pennsylvania Subclass members based on (i) its own testing, studies and designs of the Roof-Crush Risk Vehicles; (ii) its own lobbying of regulatory authorities to minimize the regulation of roof strength in the Roof-Crush Risk Vehicles; (iii) its decision to put profits ahead of safety and purposefully weaken the roof structure in the Roof-Crush Risk Vehicles in order to increase profits; (iv) its own pre-sale durability testing; and (v) Ford's own investigation of accidents involving in the Roof-Crush Risk Vehicles.

294.   Ford owed Plaintiff and the Pennsylvania Subclass a duty to disclose the true safety and reliability of the Roof-Crush Risk Vehicles because Ford:

    a.   Possessed exclusive knowledge about the Roof-Crush Risk;

    b.   Omitted the foregoing from Plaintiff and the Pennsylvania Subclass;

    c.   Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Roof-Crush Risk Vehicles, while withholding material facts from Plaintiff and the Pennsylvania Subclass that contradicted these representations; and/or

- 84 -

      d.    Had duties under the TREAD Act and related regulations to disclose and remedy the Roof-Crush Risk.

295.   Ford had a duty to disclose the Roof-Crush Risk, because, having volunteered to provide information to Plaintiff Wilson and the Pennsylvania Subclass, Ford had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiff relied on Ford's material omissions and representations that the Roof-Crush Risk Vehicles they were purchasing safe and free from serious safety defects.

296.   Plaintiff Wilson and the Pennsylvania Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the omitted facts, in that they would not have purchased or leased the Roof-Crush Risk Vehicles manufactured by Ford, would have paid less, and would have taken other affirmative steps considering the information omitted from them. Plaintiff Wilson and the Pennsylvania Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public or Plaintiff Wilson and the Pennsylvania Subclass.

297.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff Wilson and the Pennsylvania Subclass. Had Plaintiff Wilson and the Pennsylvania Subclass members known the truth about the Roof-Crush Risk they would not have

- 85 -

purchased or leased the vehicles or would have paid significantly less for them. Plaintiff Wilson and the Pennsylvania Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Roof-Crush Risk Vehicles.

298.   Ford is liable to Plaintiff Wilson and the Pennsylvania Subclass for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 P.S. § 201-9.2(a).

## COUNT XI

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER PENNSYLVANIA LAW (13 Pa. Cons. Stat. Ann. § 2314)

**(Alleged by Plaintiff Wilson on behalf of the Pennsylvania Subclass)**

299.   Plaintiff Wilson and the Pennsylvania Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

300.   Plaintiff Wilson brings this action on behalf of themselves and the Pennsylvania Subclass.

301.   Ford is a "merchant" with respect to motor vehicles.

302.   Under Pennsylvania law, an implied warranty of merchantability attaches to the Roof-Crush Risk Vehicles.

303.   The Roof-Crush Risk Vehicles were not merchantable when sold or leased because they contain the Roof-Crush Risk and pose an unreasonable risk of

- 86 -

paralysis, grave injury or death due to the Roof-Crush Risk as described herein. Without limitation, the Roof-Crush Risk Vehicles share a common defect in that they are all equipped with the Roof-Crush Risk that makes the vehicles susceptible to the roof crushing in a rollover accident, causing an unreasonable risk of paralysis, grave injury or death to lessees and owners of the Roof-Crush Risk Vehicles. This Roof-Crush Risk renders the Roof-Crush Risk Vehicles when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving when sold and leased, and at all times thereafter.

304. Plaintiff Wilson and the Pennsylvania Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized dealers who sold or leased the Roof-Crush Risk Vehicles to Plaintiff Wilson and the Pennsylvania Subclass members.

305. It was reasonable to expect that Plaintiff Wilson and the Pennsylvania Subclass members would use, consume, or be affected by the Roof-Crush Risk Vehicles.

306. Ford was provided notice of these issues within a reasonable time of Plaintiff Wilson and the Pennsylvania Subclass members' knowledge of the non-conforming or defective nature of the Roof-Crush Risk Vehicles by the filing of this Complaint, consumer complaints to NHTSA regarding the Roof-Crush Risk that is

- 87 -

the subject of this Complaint, and by the allegations contained in this and earlier Complaints.

307.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Wilson and the Pennsylvania Subclass have been damaged in an amount to be determined at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class and state Subclasses, respectfully requests that the Court enter judgment in their favor and against Ford, as follows:

A.   Certification of the proposed Nationwide Class and state Subclasses, including appointment of Plaintiffs' counsel as Class Counsel;

B.   Restitution, including at the election of Nationwide Class and state Subclass members, recovery of the purchase price of their Roof-Crush Risk Vehicles, or the overpayment for their vehicles;

C.   Damages, costs, and disgorgement in an amount to be determined at trial;

D.   An order requiring Ford to pay both pre- and post-judgment interest on any amounts awarded;

E.   An award of costs and attorneys' fees; and

F.   Such other or further relief as may be appropriate.

- 88 -

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: September 27, 2022

Respectfully Submitted,

*/s/ Steve W. Berman*
Steve W. Berman
Thomas E. Loeser
Shelby Smith
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
toml@hbsslaw.com
shelby@hbsslaw.com

E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Dennis A. Lienhardt (P81118)
**THE MILLER LAW FIRM PC**
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com

*Attorneys for Plaintiff*

011115-11/2039942 V1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 27, 2022, the foregoing document was electronically filed using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

*/s/ Steve W. Berman*
Steve W. Berman
