UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

IN RE FORD SUPER DUTY ROOF-
CRUSH LITIGATION

No. 4:22-cv-12079-FKB-DRG

**<u>JURY TRIAL DEMANDED</u>**

**<u>SECOND CONSOLIDATED CLASS ACTION COMPLAINT</u>**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................ 1

II.   JURISDICTION ......................................................................... 11

III.  VENUE .................................................................................... 12

IV.  PARTIES.................................................................................. 12

     A.     Plaintiffs ........................................................................ 12

           1.     Justin Sager (Alabama) ...................................... 12

           2.     Sarah Ellers (Arizona)........................................ 13

           3.     John Stowers (Arkansas)..................................... 15

           4.     Steven Beck (California)...................................... 16

           5.     David Braden (California) .................................... 18

           6.     John Schabinger and Edward Blaine Schabinger (California)....................................................... 19

           7.     Eric "Ivan" Tellez (California) ............................. 20

           8.     Donald Marshall (Colorado)................................ 22

           9.     Brendan Lawless (Connecticut)............................ 23

           10.    Douglas Holicz (Florida) .................................... 24

           11.    John Koblasz (Florida)........................................ 25

           12.    William Brock (Illinois)....................................... 27

           13.    Ryan Scott (Illinois)........................................... 28

           14.    Richard Powell (Indiana) .................................... 29

           15.    Dwaine Stutler Jr. (Iowa)................................... 30

           16.    Jesse Porter (Montana)....................................... 32

17.   Mark Willard (New Jersey) ..................................................... 33

18.   Michael and Gail Gneckow (New Mexico) ............................. 34

19.   Mark Anderson (North Carolina) ............................................ 35

20.   Jonathan Taylor (North Carolina) ........................................... 37

21.   Kevin Thomas (North Carolina) .............................................. 38

22.   William Griffit (Oklahoma) .................................................... 39

23.   Desmond Rains (Oregon) ........................................................ 40

24.   Ryan Robbins (Oregon) ........................................................... 42

25.   Everett Sylvester Wilson III (South Carolina) ........................ 43

26.   Brenda L. Rhodes (Texas) ....................................................... 44

27.   Stephen T. Rhodes (Texas) ...................................................... 46

28.   Greg Duenes (Utah) ................................................................. 47

29.   Curtis Bright (Washington) ..................................................... 48

30.   Catherine Gosser (Washington) ............................................... 49

B.   Defendant ........................................................................................ 51

V.   FACTUAL ALLEGATIONS ..................................................................... 52

A.   Ford Super Duty trucks, including the Roof-Crush Risk
Vehicles, are immensely profitable. .............................................. 52

B.   Ford marketed the Roof-Crush Risk Vehicles as safe and
reliable because it knew that these attributes were
material to consumers ..................................................................... 53

C.   None of the Roof-Crush Risk Vehicles are covered under
Ford's new vehicles and powertrain warranties. ............................ 64

D.   The Roof-Crush Risk is an extraordinary safety hazard. ............... 64

E.   Ford knew of the Roof-Crush Risk and concealed it from
Plaintiffs and Class Members ......................................................... 76

1.   Ford knew the relationship between roof strength and rollover injury severity before the Roof-Crush Risk Vehicles were developed. ........................................................ 76

2.   Ford's ownership of Volvo provided further evidence of the importance of roof strength to vehicle safety. .............. 83

3.   Despite its knowledge that roof strength was integral to preventing serious injury and death from rollover accidents, Ford ignored the importance of roof strength when designing the Roof-Crush Risk Vehicles................................................................................. 85

4.   Ford reduced the roof strength of the Roof-Crush Risk Vehicles to save money. .......................................................... 94

5.   Ford could have designed Roof-Crush Risk Vehicles with a stronger, safer roof. ........................................................ 99

F.   All class members could have been made aware of the Roof-Crush Risk at the point of sale. ................................................ 101

VI.   TOLLING OF THE STATUTE OF LIMITATIONS ................................. 102

A.   The Discovery Rule justifies tolling. ............................................. 102

B.   Estoppel justifies tolling................................................................. 104

VII.   CLASS ALLEGATIONS ..................................................................... 105

VIII.   CLAIMS.............................................................................................. 110

A.   Nationwide Claims ........................................................................ 110

COUNT I VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT (15 U.S.C. § 2301, *et seq.*) ................................................................ 110

COUNT II FRAUDULENT CONCEALMENT (COMMON LAW) .................. 115

COUNT III UNJUST ENRICHMENT (COMMON LAW) ................................. 119

B.   State-Specific Claims .................................................................... 120

1.   Alabama ................................................................................ 120

COUNT IV VIOLATION OF THE ALABAMA DECEPTIVE TRADE
PRACTICES ACT (73 P.S. § 201-1, *et seq.*) ...............................................120

    2.    Arizona ............................................................................. 125

COUNT V VIOLATIONS OF THE ARIZONA CONSUMER FRAUD
ACT (Arizona Rev. Stat. § 44-1521, *et seq.*).......................................125

    3.    Arkansas ............................................................................ 129

COUNT VI VIOLATION OF THE DECEPTIVE TRADE PRACTICE
ACT (Ark. Code Ann. § 4-88-101, *et seq.*)..........................................129

COUNT VII BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER ARKANSAS LAW (Ark. Code
Ann. § 4-2-314)...........................................................................................134

    4.    California .......................................................................... 136

COUNT VIII VIOLATION OF THE CALIFORNIA CONSUMER
LEGAL REMEDIES ACT (Cal. Civ. Code § 1750, *et seq.*) ......................136

COUNT IX VIOLATIONS OF THE CALIFORNIA UNFAIR
COMPETITION LAW (Cal. Bus. & Prof. Code § 17200)..........................140

COUNT X VIOLATIONS OF CALIFORNIA FALSE ADVERTISING
LAW (Cal. Bus. & Prof. Code § 17500, *et seq.*) ...........................................143

COUNT XI VIOLATION OF SONG-BEVERLY CONSUMER
WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY
OF MERCHANTABILITY UNDER CALIFORNIA LAW (Cal.
Civ. Code §§ 1791.1 & 1792)......................................................................145

    5.    Colorado ........................................................................... 148

COUNT XII VIOLATION OF THE COLORADO CONSUMER
PROTECTION ACT (Col. Rev. Stat. §§ 6-1-101, *et seq.*) ..........................148

COUNT XIII BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER COLORADO LAW (Col. Rev.
Stat. § 4-2-314).............................................................................................153

    6.    Connecticut ....................................................................... 155

011115-11/2243027 V1

COUNT XIV VIOLATION OF CONNECTICUT UNLAWFUL
TRADE PRACTICES ACT (Conn. Gen. Stat. § 42-110a, *et seq.*) .............155

       7.    Florida ..................................................................................... 159

COUNT XV VIOLATION OF THE FLORIDA DECEPTIVE AND
UNFAIR TRADE PRACTICES ACT (Fla. Stat. § 501.201,
*et. seq.*)...........................................................................................159

COUNT XVI BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER FLORIDA LAW (Fla. Stat.
§ 672.314)........................................................................................163

       8.    Illinois .................................................................................... 165

COUNT XVII VIOLATION OF ILLINOIS CONSUMER FRAUD
AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS
505/1, *et seq.* and 720 ILCS 295/1a) ............................................165

COUNT XVIII BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER ILLINOIS LAW (810 Ill.
Comp. Stat. §§ 5/2-314 and 5/2A-212) .........................................170

       9.    Indiana...................................................................................... 172

COUNT XIX VIOLATION OF THE INDIANA DECEPTIVE
CONSUMER SALES ACT (Ind. Code § 24-5-0.5-3) .................................172

COUNT XX BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER INDIANA LAW (Ind. Code
§ 26-1-2-314) ..................................................................................177

       10.    Iowa........................................................................................ 179

COUNT XXI CONSUMER FRAUDS ACTS IN VIOLATION OF
IOWA LAW (IOWA CODE § 714H.1 *ET SEQ.*).......................................179

       11.    Montana ................................................................................. 183

COUNT XXII VIOLATION OF MONTANA UNFAIR TRADE
PRACTICES AND CONSUMER PROTECTION ACT OF 1973
(Mont. Code Ann. § 30-14-101, *et seq.*) ......................................183

COUNT XXIII BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER MONTANA LAW (Mont.
Code § 30-2-314) ........................................................................188

12.    New Jersey ............................................................. 190

COUNT XXIV VIOLATION OF THE NEW JERSEY CONSUMER
FRAUD ACT (N.J.S.A. § 56:8-1, *et seq.*) ....................................190

COUNT XXV BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER NEW JERSEY LAW ............................194

13.    New Mexico ............................................................ 196

COUNT XXVI VIOLATION OF THE NEW MEXICO UNFAIR
TRADE PRACTICES ACT (N.M. Stat. Ann. §§ 57-12-1, *et seq.*).............196

14.    North Carolina........................................................ 200

COUNT XXVII ...........................................................................200

VIOLATION OF THE NORTH CAROLINA UNFAIR AND
DECEPTIVE TRADE PRACTICES ACT (N.C. GEN. STAT. § 75-
1.1, *et seq.*) .................................................................................200

COUNT XXVIII BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER NORTH CAROLINA LAW.................206

15.    Oklahoma .............................................................. 208

COUNT XXIX VIOLATION OF OKLAHOMA CONSUMER
PROTECTION ACT (OKLA. STAT. TIT. 15, § 751, *et seq.*)....................208

COUNT XXX BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (OKLA. STAT. ANN. § 12A-2-314) .................213

16.    Oregon .................................................................. 215

COUNT XXXI VIOLATION OF THE OREGON UNLAWFUL
TRADE PRACTICES ACT (Or. Rev. Stat. §§ 646.605, *et seq.*) ...............215

COUNT XXXII BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER OREGON LAW (Or. Rev. Stat.
§ 72.3140)................................................................................219

- vi -

17.     South Carolina........................................................ 221

COUNT XXXIII VIOLATION OF THE SOUTH CAROLINA
UNFAIR TRADE PRACTICES ACT (S.C. Code Ann. § 39-5-10,
*et seq.*)...........................................................................................221

COUNT XXXIV BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER SOUTH CAROLINA LAW
(S.C. Code Ann. §§ 36-2-314 and 36-2A-212, *et seq.*)...............................227

18.     Texas ................................................................... 229

COUNT XXXV VIOLATION OF THE TEXAS DECEPTIVE TRADE
PRACTICES ACT (Tex. Bus. & Com. Code Ann. § 17.41,
*et seq.*)...........................................................................................229

COUNT XXXVI BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER TEXAS LAW........................................236

19.     Utah ..................................................................... 238

COUNT XXXVII VIOLATION OF THE UTAH CONSUMER SALES
PRACTICES ACT (Utah Code Ann. § 13-11-1, *et seq.*)...........................238

COUNT XXXVIII BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER UTAH LAW (Utah Code Ann.
§ 70A-2-314)...................................................................................242

20.     Washington ......................................................... 244

COUNT XXXIX VIOLATION OF THE WASHINGTON
CONSUMER PROTECTION ACT (Wash. Rev. Code Ann.
§§ 19.86.010, *et seq.*)......................................................................244

REQUEST FOR RELIEF.........................................................................248

DEMAND FOR JURY TRIAL..................................................................249

Plaintiffs file this lawsuit individually and on behalf of proposed nationwide and statewide classes. Plaintiffs allege the following based on personal knowledge as to their own acts and experiences and, as to all other matters, based on the investigation of counsel:

## I.      INTRODUCTION

1.      The most important duty of a car manufacturer is to provide consumers with a safe car. If the manufacturer fails to fulfill this foundational duty in the first instance, it is obligated to promptly warn consumers and fix or replace a car when the manufacturer learns of a risk that concerns serious safety issues. Defendant Ford Motor Company ("Ford") breached these fundamental duties when it sold over five million Super Duty pick-up trucks that it knew had a dangerously weak roof structure. Ford knew these roofs would collapse in the event of a roll-over accident but hid this defect from consumers for years—indeed, Ford continues to this day to deny its existence.

2.      Model year 1999–2016 Ford Super Duty pick-up trucks (the "Roof-Crush Risk Vehicles") were designed with a roof that is instantly crushed in the event of a rollover accident, resulting in paralysis, grave injury, and death to vehicle occupants (the "Roof-Crush Risk").

3.      In order to appreciate the hazards of the Roof-Crush Risk it is necessary to understand the layout and construction of a vehicle's roof. The

following diagram illustrates the components that comprise many vehicles' roofs, including the Roof-Crush Risk Vehicles:[1]



4.      Likewise, a picture of a Roof-Crush Risk vehicle after a rollover accident best illustrates the hazard to drivers:

---

[1] **Exhibit 33**, *Body Nomenclature*, Automotive Design in the Digital Age, available at: https://s3101959.wordpress.com/2012/03/ (last visited Apr. 4, 2023).



5.      Prior to the initial development of the Roof-Crush Risk Vehicles, which were first released in 1998, Ford's internal testing and safety evaluations showed that Ford knew rollovers were far more deadly than other types of accidents. These documents also show that Ford knew as early as the late 1960s that strong vehicle roofs were fundamental to minimizing death and serious injury in a rollover accident.[2]

---

[2] *See* **Exhibit 1**, Byron Bloch, *Protecting Occupants in Rollover Crashes: Case Examples and Latest Technologies*, available at: https://www-esv.nhtsa.dot .gov/Proceedings/22/files/22ESV-000344.pdf (last visited Sept. 23, 2022); **Exhibit 2**, Plaintiffs' Motion for Leave to File Third Amended Complaint to Add Putative Damages Claims Against Defendant Ford Motor Company at 84–87, *Welday v. Ford Motor Company*, No. 19CV33212 (Feb. 15, 2022).

6.     Federal regulators, the military, and scientists around the world reached the same conclusion in the early 1970s: rollover accidents caused grave occupant injuries and stronger roofs would increase occupant protection.[3]

7.     Ford's acquisition of Volvo in 1999 provided further evidence to Ford of the importance of roof strength in the event of a rollover accident—and that the Roof-Crush Risk Vehicles were unsafe as designed.[4]

8.     But in 1971, Ford—rejecting its own research—successfully lobbied the National Highway Transportation Safety Administration ("NHTSA") for changes that weakened roof strength testing procedures.[5]

---

[3] *See* **Exhibit 1**, Byron Bloch, *Protecting Occupants in Rollover Crashes: Case Examples and Latest Technologies*, available at: https://www-esv.nhtsa.dot .gov/Proceedings/22/files/22ESV-000344.pdf (last visited Sept. 23, 2022); **Exhibit 3**, Monash University study titled *Rollover Crash Study – Vehicle design and occupant injuries*, available at: https://www.monash.edu/muarc/archive/our-publications/reports/muarc065 (last visited Sept. 23, 2022).

[4] **Exhibit 6**, Plaintiffs' Response to Ford Motor Company's Three Motions for "Partial" Summary Judgment at 29, *Hill v. Ford Motor Company*, No. 16 C 04179-2 (Sept. 22, 2017).

[5] **Exhibit 4**, Bill Vlasic & Jeff Plungis, *U.S.: Danger Overhead: Crushed Roofs, Thousands killed, hurt as auto roofs collapse*, DETROIT NEWS AND FREE PRESS (Apr. 11, 2004), available at: http://www.anderson.ucla.edu/documents/areas/ adm/loeb/05b16-1.pdf (last visited Sept. 23, 2022).

- 4 -

9.     Ford then exploited the lack of government oversight and repeatedly weakened the roof structure on Roof-Crush Risk Vehicles to save money on labor and tooling costs.[6]

10.     In the years of development leading to the release of the 1999 PHN131 chassis—the platform used by all Roof-Crush Risk Vehicles—Ford weakened almost every component of the roof structure to save money. Specifically, Ford:

- Approved the deletion of the front header outer from the PHN131 vehicle's design, which saved $3.50 per vehicle and $500,000 in tooling costs but weakened the windshield header.[7]

- Redesigned and redrew the roof bows (roof reinforcements). The new bow metal was 0.8 mm thick, downgauged (reduced in thickness) from 0.9 mm. This was a reduction in thickness of 10.1%.[8]

- Authorized a downgauge from 1.2 mm to 1.07 mm for the windshield header inner. This was an 11% decrease in thickness for a cost savings of $0.17 per vehicle.[9]

- Downgauged the roof bows from 0.8mm to 0.74mm. This was a 7.5% reduction in thickness and resulted in a cost savings of 5 cents per bow or 10 cents per vehicle.[10]

- Downgauged the A-Pillar (the part of the vehicle to which the windshield and front door hinges are attached) from 2.5 to 2.4 to 2.35mm thick.[11]

---

[6] *See* **Exhibit 5**, *Taylor v. Ford*, 1:06-cv-00069 (D. Me.), Dkt. No. 86.

[7] *Id.* at 27.

[8] *Id.* at 28.

[9] *Id.*

[10] *Id.*

[11] *Id.*

This was downgauge of 6%, for a cost savings of $0.70 per vehicle and no tooling cost.[12]

- Later, further downgauged the A-pillar from 2.35 mm to 2.2 mm. This was a downgauge of 6.4% with a cost savings of $0.86 per A-Pillar or $1.72 per vehicle.[13]

- Authorized the replacement of the Boron steel rear door front vertical beam with a vertical beam made of mild steel. Boron steel is 4 or 5 times stronger than normal steel.[14] Replacing the Boron steel part with a mild steel part saved $20.86 per vehicle and tooling costs of $1,033,800.[15]

- Authorized the downgauge of the rear door front vertical beam from 1.5 mm to 1.2 mm. The 20% downgauge resulted in a savings of $0.48 per door or $0.96 per vehicle.[16]

11.     Without exception, these changes weakened the Super Duty roofs. Yet, Ford never conducted any testing to determine just how much weaker these changes made Super Duty roofs.[17]

12.     Indeed, Ford knew about the Roof-Crush Risk well before the Roof-Crush Risk Vehicles went to market. Ford's knowledge is evidenced by: (1) its own internal investigations and documents from years before the release of the first Roof-Crush Risk Vehicle as further described below; (2) the rigorous pre-launch testing of the Roof-Crush Risk Vehicles; (3) the direct and public reports of deadly

---

[12] *Id.*

[13] *Id.*

[14] *Id.* at 30.

[15] *Id.* at 29.

[16] *Id.* at 30.

[17] *Id.* at 31.

accidents involving Roof-Crush Risk Vehicles; (4) Ford's investigation of accidents involving the Roof-Crush Risk Vehicles; and (5) Ford's practice of secretly settling lawsuits involving such accidents, which hid the dangerous nature—and Ford's knowledge—of the Roof-Crush Risk.

13.    Though Ford knew of the Roof-Crush Risk prior to selling the trucks at issue, it did nothing to promptly warn owners and lessees. Instead, when confronted with cases claiming a defect existed, Ford asserted the false claim that roof strength does not prevent injuries in rollover crashes. Often, when a case alleged injury or wrongful death, Ford entered secret settlements with victims and their families to hide the deadly nature of its roof design.[18]

14.    Consequently, the Roof-Crush Risk exposes putative class members to an unreasonable risk of paralysis, grave injury, and death if their vehicle is involved in a rollover accident.

15.    This risk of catastrophic injury and death is the direct result of a roof design that Ford knew was extraordinarily weak. And these weak roofs remain unremedied by Ford. Not only did Ford fail to disclose the Roof-Crush Risk to consumers before their purchases of Roof-Crush Risk Vehicles, but it also

---

[18] **Exhibit 6**, Plaintiffs' Response to Ford Motor Company's Three Motions for "Partial" Summary Judgment at 88–123, *Hill v. Ford Motor Company*, No. 16 C 04179-2 (Sept. 22, 2017).

misrepresented the vehicles' safety, reliability, functionality, and quality by this omission. Ford also omitted the consequences, including the serious safety hazards and monetary harm caused by the Roof-Crush Risk—e.g., damage to the vehicle or another vehicle and paralysis, grave injury, or death to motorists—should the Roof-Crush Risk Vehicle become involved in an accident.

16.     Because of Ford's omissions regarding the Roof-Crush Risk and failure to act in disclosing and providing a remedy, it has violated state consumer protection acts, been unjustly enriched, and breached implied warranties of merchantability. Plaintiffs and other owners and lessees of the Roof-Crush Risk Vehicles have been injured in fact, incurred damages, and suffered ascertainable losses in money and property. Had Plaintiffs and the putative class members known of the Roof-Crush Risk, they would have either not purchased or leased their vehicles or would have paid substantially less for them.

17.     The dangerous and deadly design of the Roof-Crush Risk Vehicles finally gained national attention on August 19, 2022, when a jury in Georgia awarded $1.7 billion in punitive damages to the family of Melvin and Voncile Hill, who were killed when the roof of their 2002 F-250 Super Duty was crushed in a rollover accident.[19]

---

[19] *See* **Exhibit 7**, *Roof Strength on Older Ford Trucks Called into Question by $1.7 Billion Jury Verdict*, WSJ (Aug. 22, 2022), available at:

18.    The *Hill* case identified 162 lawsuits and 83 similar incidents of roof crush involving the 1999–2016 Super Duty trucks.[20]

19.    A vehicle that is knowingly designed to fail and introduces a risk of paralysis, grave injury, or death in a foreseeable and common type of accident is not fit for its ordinary purpose. When a vehicle manufacturer can eliminate a grave safety risk on a vehicle model line but instead chooses to save manufacturing costs and fails to warn purchasers of this known and deadly risk, such manufacturer engages in a depraved and deadly fraud for which it should be held accountable.

20.    Ford may argue in response to this complaint that many class members, and even Plaintiffs, are uninjured because they have not suffered a rollover crash where their roof was crushed. This argument would only further evidence Ford's callous disregard for the safety and wellbeing of its customers. Ford has knowingly placed its customers at risk of paralysis, grave injury, and death, just to save a few dollars of manufacturing costs and increase profits on some of its most profitable truck offerings. Ford had a duty to inform consumers of the Roof-Crush Defect at the point of sale and Plaintiffs and members of the

---

https://www.wsj.com/articles/ford-faces-1-7-billion-verdict-in-fatal-rollover-of-f-250-pickup-11661033662 (last visited Sept. 1, 2022).

[20] **Exhibit 6**, Plaintiffs' Response to Ford Motor Company's Three Motions for "Partial" Summary Judgment at 88–123, *Hill v. Ford Motor Company*, No. 16 C 04179-2 (Sept. 22, 2017).

classes were injured by overpaying for cars that they would have purchased for less if Ford had disclosed the risk, or they would not have paid for them at all. And Plaintiffs don't have to wait for the ticking time bomb to explode before they can claim injury.

21.     Due to the undisclosed Roof-Crush Risk, Plaintiffs were deprived of the benefit of their bargain in purchasing or leasing the Roof-Crush Risk Vehicles; further, Plaintiffs suffered an ascertainable loss of money, property, and/or resale value of their vehicles. Plaintiffs bring this class action to address Ford's misconduct. Plaintiffs seek damages and a repair under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301-2312, state consumer protection acts, state implied warranty acts, and unjust enrichment at common law for Ford's misconduct related to the design, manufacture, marketing, and sale of the Roof-Crush Risk Vehicles as alleged in this Complaint.

22.     Despite its knowledge, Ford failed to notify Plaintiffs of the defect with the Roof-Crush Risk Vehicles at the time of purchase, or at any time thereafter. Ford must reimburse Plaintiffs for the serious risk inherent in continuing to drive them.

23.     Ford has been unable or unwilling to develop, implement, and deliver a repair that relieves consumers from their current unsafe and unacceptable circumstances. Even if it could do so tomorrow, Plaintiffs would still have suffered

- 10 -

economic harm; had Ford disclosed the Roof-Crush Risk, consumers would have paid much less for their vehicles, if they would have purchased or leased them at all. This means that the Roof-Crush Risk Vehicles were, at the point of purchase and still today, far less valuable than bargained for and reasonably expected because of the Roof-Crush Risk. Consumers paid for reasonably expected value during this time period, which the Roof-Crush Risk prevented them from receiving.

24.    Plaintiffs unwittingly acquired life-threatening risk when purchasing or leasing their vehicles, which they would have not have voluntarily assumed either at all or without compensation. As evidence of this risk, Ford changed the roof design of its Super Duty trucks in 2017 to increase the roof strength. The undisclosed Roof-Crush Risk in 1999–2016 Super Duty trucks is Ford's responsibility to fix.

## II.    JURISDICTION

25.    This Court has original jurisdiction over this lawsuit under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) and (6), because Plaintiffs and Defendant are citizens of different states; there are more than 100 members of the Nationwide Class and the state subclasses (as defined herein); the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest,

and costs; and class members reside across the United States. The citizenship of each party is described further below in the "Parties" section.

26.     This Court has personal jurisdiction over the Defendant by virtue of its transactions and business conducted in this judicial district, and because Defendant is headquartered in Michigan. Defendant has transacted and done business, and violated statutory and common law, in the State of Michigan and in this judicial district.

## III.   VENUE

27.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendant transacts substantial business and is headquartered in this district.

## IV.   PARTIES

**A.     Plaintiffs**

**1.     Justin Sager (Alabama)**

28.     Plaintiff and proposed class representative Justin Sager ("Plaintiff" for purposes of this Section) is a resident and citizen of Toney, Alabama. On or about September 1, 2022, Plaintiff purchased a used 2016 Ford F-350 Super Duty from Harbin Ford in Scottsboro, Alabama with VIN 1FT8W3DTXGEB72024. Plaintiff's Ford F-350 Super Duty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

- 12 -

29.     Plaintiff purchased his Roof-Crush Risk Vehicle as his primary vehicle for personal use and for towing a fifth wheel.

30.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these are the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the other large work trucks available in the marketplace. However, despite touting the safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before his purchase.

31.     Plaintiff is concerned about driving the Roof-Crush Risk Vehicle because he no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident. Plaintiff must now choose between his own personal safety and that of his passengers, and his ability to use the vehicle that he paid for.

32.     Had Plaintiff been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiff would have paid less for his vehicle or would not have purchased it at all.

**2.     Sarah Ellers (Arizona)**

33.     Plaintiff and proposed class representative Sarah Ellers ("Plaintiff" for purposes of this Section) is a resident and citizen of Truth or Consequences, New

- 13 -

Mexico. On or about December 23, 2020, Plaintiff purchased a used 2003 Ford F-350 Super Duty from Auto Imports in Tucson, Arizona with VIN 1FTSW31P63EC97075. Plaintiff's Ford F-350 Super Duty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

34.    Plaintiff and her husband purchased their Roof-Crush Risk Vehicle to tow their home. The Roof-Crush Risk Vehicle is their primary vehicle.

35.    Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these are the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the other large work trucks available in the marketplace. However, despite touting the safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before her purchase.

36.    Plaintiff is concerned about driving the Roof-Crush Risk Vehicle because she no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident. Plaintiff must now choose between her own personal safety and that of her passengers, and her ability to use the vehicle that she paid for.

37.     Had Plaintiff been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiff would have paid less for her vehicle or would not have purchased it at all.

### 3.     John Stowers (Arkansas)

38.     Plaintiff and proposed class representative John Stowers ("Plaintiff" for purposes of this Section) is a resident and citizen of Evening Shade, Arkansas. On or about June 12, 2019, Plaintiff purchased a used 2007 Ford F-250 Super Duty from Simms Auto Sales in Searcy, Arkansas with VIN 1FTSW21P07EB24815. Plaintiff's Ford F-250 Super Duty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

39.     Plaintiff purchased his Roof-Crush Risk Vehicle as his primary vehicle for use on his farm.

40.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these are the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the other large work trucks available in the marketplace. However, despite touting the safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before his purchase.

- 15 -

41.    Plaintiff is concerned about driving the Roof-Crush Risk Vehicle because he no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident. Plaintiff must now choose between his own personal safety and that of his passengers, and his ability to use the vehicle that he paid for.

42.    Had Plaintiff been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiff would have paid less for his vehicle or would not have purchased it at all.

**4.    Steven Beck (California)**

43.    Plaintiff and proposed class representative Steven Beck ("Plaintiff" for purposes of this Section) is a resident and citizen of Paso Robles, California. On or about June 1, 2015, Plaintiff purchased a new Ford F-350 Super Duty from South Bay Ford in Hawthorne, California with VIN 1FT8W3BT6DEA08865. Plaintiff's Ford F-350 Super Duty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

44.    Plaintiff purchased his Roof-Crush Risk Vehicle as his primary vehicle for work in his vineyard and occasional personal use.

45.    Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these are the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the

- 16 -

other large work trucks available in the marketplace. However, despite touting the safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before his purchase.

46.     Plaintiff is concerned about driving the Roof-Crush Risk Vehicle because he no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident. Plaintiff is concerned about driving the Roof-Crush Risk Vehicle because he no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident. Plaintiff must now choose between his own personal safety and that of his passengers, and his ability to use the vehicle that he paid for. This is an especially acute problem because Plaintiff has also experienced the so-called "death-wobble" in his truck, which he fears could easily result in a rollover incident.[21]

47.     Had Plaintiff been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiff would have paid less for his vehicle or would not have purchased it at all.

---

[21] *See* **Exhibit 8,** *What You Should Know About the Ford Super Duty Death Wobble*, Motorbiscuit.com, available at: https://www.motorbiscuit.com/what-you-should-know-about-the-ford-super-duty-death-wobble/ (last visited Sept. 1, 2022).

### 5.    David Braden (California)

48.    Plaintiff and proposed class representative David Braden ("Plaintiff for purposes of this Section) is a resident and citizen of San Bernadino, California. On or about September 23, 2006, Plaintiff purchased a new Ford F-350 Dually Super Duty from Fairview Ford in San Bernadino, California with VIN 1FTWX32P26EA95738. Plaintiff's Ford F-350 Super Duty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

49.    Plaintiff purchased his Roof-Crush Risk Vehicle as his primary vehicle for personal use and for his work delivering newspapers.

50.    Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these are the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the other large work trucks available in the marketplace. However, despite touting the safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before his purchase.

51.    Plaintiff is concerned about driving the Roof-Crush Risk Vehicle because he no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident. Plaintiff must now choose between his

own personal safety and that of his passengers, and his ability to use the vehicle that he paid for.

52.    Had Plaintiff been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiff would have paid less for his vehicle or would not have purchased it at all.

### 6.    John Schabinger and Edward Blaine Schabinger (California)

53.    Plaintiff and proposed class representative John Schabinger ("Plaintiff" for purposes of this Section) is a resident and citizen of Granite Bay, California. Plaintiff and proposed class representative Edward Blaine Schabinger ("Plaintiff" for purposes of this Section) is a resident and citizen of Gig Harbor, Washington. In 2004, Plaintiff John Schabinger purchased a new Ford F-250 Super Duty from Future Ford in Roseville, California with VIN 1FTNW21P24EE09167 for his son, Plaintiff Edward Blaine Schabinger. Plaintiffs' Ford F-250 Super Duty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

54.    Plaintiff John Schabinger purchased the Roof-Crush Risk Vehicle for personal, family, or household purposes and Plaintiff Edward Blaine Schabinger accepted and uses the Roof-Crush Risk Vehicle for personal, family, or household purposes.

55.    Through exposure and interaction with Ford, Plaintiffs were aware of Ford's uniform and pervasive marketing messages of reliability and safety; these

- 19 -

are the primary reasons Plaintiffs purchased the Roof-Crush Risk Vehicle over other vehicles available in the marketplace. However, despite touting the safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiffs before their purchase, gift, and acceptance of the Roof-Crush Risk Vehicle.

56.     Plaintiffs are concerned about Plaintiff Edward Blaine Schabinger driving the Roof-Crush Risk Vehicle because Plaintiffs feel it is no longer safe for fear of what could happen if the vehicle were to be involved in a rollover accident. Plaintiffs must now choose between their own personal safety and that of their passengers, and their ability to use the vehicle that they paid for.

57.     Had Plaintiffs been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiffs would have paid less for their vehicle or would not have purchased, gifted, and accepted it at all.

### 7.     Eric "Ivan" Tellez (California)

58.     Plaintiff and proposed class representative Eric Ivan Tellez ("Plaintiff" for purposes of this Section) is a resident and citizen of Concord, California. On or about August 9, 2016, Plaintiff purchased a 2016 Ford F-350 Super Duty from Future Ford of Concord in Concord, California with VIN 1FT8W3BT9GED39895. Plaintiff's Ford F-350 Super Duty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

- 20 -

59.     In June 2020, Plaintiff also purchased a used 2000 Ford F-350 Super Duty from a private party in California with VIN 1FTSW31S3YEC82304. Plaintiff's Ford F-350 Super Duty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

60.     Plaintiff purchased his Roof-Crush Risk Vehicles for his food truck business.

61.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these are the primary reasons Plaintiff purchased his Roof-Crush Risk Vehicles over the other large work trucks available in the marketplace. However, despite touting the safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before his purchases.

62.     Plaintiff is concerned about driving the Roof-Crush Risk Vehicles because he no longer feels safe in them for fear of what could happen if the vehicles were to be involved in a rollover accident. Plaintiff must now choose between his own personal safety and that of his passengers, and his ability to use the vehicles that he paid for.

011115-11/2243027 V1

63.     Had Plaintiff been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiff would have paid less for his vehicles or would not have purchased them at all.

### 8.     Donald Marshall (Colorado)

64.     Plaintiff and proposed class representative Donald Marshall ("Plaintiff" for purposes of this Section) is a resident and citizen of Wiggins, Colorado. On or about October 31, 2015, Plaintiff purchased a new 2015 Ford F-350 Super Duty from Brighton Ford in Brighton, Colorado with VIN 1FT8W3BT0FEB87732. Plaintiff's Ford F-350 Super Duty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

65.     Plaintiff purchased his Roof-Crush Risk Vehicle for personal use and for work on his large property.

66.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these are the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the other large work trucks available in the marketplace. However, despite touting the safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before his purchase.

- 22 -

67.     Plaintiff is concerned about driving the Roof-Crush Risk Vehicle because he no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident. Plaintiff must now choose between his own personal safety and that of his passengers, and his ability to use the vehicle that he paid for.

68.     Had Plaintiff been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiff would have paid less for his vehicle or would not have purchased it at all.

### 9.     Brendan Lawless (Connecticut)

69.     Plaintiff and proposed class representative Brendan Lawless ("Plaintiff" for purposes of this Section) is a resident and citizen of Red Hook, New York. On or about February 10, 2018, Plaintiff purchased a used 2008 Ford F-350 Super Duty from a private seller in Connecticut with VIN 1FDWF37R88EA51092. Plaintiff's Ford F-350 Super Duty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

70.     Plaintiff purchased his Roof-Crush Risk Vehicle as his primary vehicle for personal use.

71.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these are the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the

- 23 -

other large work trucks available in the marketplace. However, despite touting the safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before his purchase.

72.    Plaintiff is concerned about driving the Roof-Crush Risk Vehicle because he no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident. Plaintiff must now choose between his own personal safety and that of his passengers, and his ability to use the vehicle that he paid for.

73.    Had Plaintiff been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiff would have paid less for his vehicle or would not have purchased it at all.

### 10.    Douglas Holicz (Florida)

74.    Plaintiff and proposed class representative Douglas Holicz ("Plaintiff" for purposes of this Section) is a resident and citizen of Jacksonville, Florida. On or about September 5, 2021, Plaintiff purchased a used 2013 Ford F-250 Super Duty from Gary Yeomans Ford Palm Bay in Palm Bay, Florida with VIN 1FT7W2B0DEA43918. Plaintiff's Ford F-250 Super Duty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

- 24 -

75.     Plaintiff purchased his Roof-Crush Risk Vehicle as his primary vehicle for work as an electrician and for personal use.

76.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these are the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the other large work trucks available in the marketplace. However, despite touting the safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before his purchase.

77.     Plaintiff is concerned about driving the Roof-Crush Risk Vehicle because he no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident. Plaintiff must now choose between his own personal safety and that of his passengers, and his ability to use the vehicle that he paid for.

78.     Had Plaintiff been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiff would have paid less for his vehicle or would not have purchased it at all.

**11.     John Koblasz (Florida)**

79.     Plaintiff and proposed class representative John Koblasz ("Plaintiff" for purposes of this Section) is a resident and citizen of Belle Isle, Florida. On or

- 25 -

about August 20, 2016, Plaintiff purchased a new 2016 Ford F-250 Super Duty from Kisselback Ford, an authorized Ford dealership in Kissimmee, Florida with VIN 1FT7W2B60GED21429. Plaintiff's Ford F-250 Super Duty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

80.    Plaintiff purchased his Roof-Crush Risk Vehicle as his primary vehicle for personal use.

81.    Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these are the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the other large work trucks available in the marketplace. However, despite touting the safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before his purchase.

82.    During the recent hurricane in Florida, a tree fell on Plaintiff's Roof-Crush Risk Vehicle, completely crushing the roof of his vehicle. Plaintiff is getting estimates to have it fixed now, and was told that the roof was the main issue.

83.    Plaintiff is concerned about driving the Roof-Crush Risk Vehicle because he no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident. Plaintiff must now choose between his

- 26 -

own personal safety and that of his passengers, and his ability to use the vehicle that he paid for.

84.     Had Plaintiff been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiff would have paid less for his vehicle or would not have purchased it at all.

### 12.   William Brock (Illinois)

85.     Plaintiff and proposed class representative William Brock ("Plaintiff" for purposes of this Section) is a resident and citizen of Beach Park, Illinois. On or about September 10, 2016, Plaintiff purchased a new 2016 Ford F-250 Super Duty from Gillespie Ford, an authorized Ford dealership in Gurnee, Illinois with VIN 1FT7W2BT8GEC49840. Plaintiff's Ford F-250 Super Duty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

86.     Plaintiff purchased his Roof-Crush Risk Vehicle as his primary vehicle for personal use and for work.

87.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these are the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the other large work trucks available in the marketplace. However, despite touting the safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its

- 27 -

agents or other representatives disclose the Roof-Crush Risk to Plaintiff before his purchase.

88.    Plaintiff is concerned about driving the Roof-Crush Risk Vehicle because he no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident. Plaintiff must now choose between his own personal safety and that of his passengers, and his ability to use the vehicle that he paid for.

89.    Had Plaintiff been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiff would have paid less for his vehicle or would not have purchased it at all.

**13.    Ryan Scott (Illinois)**

90.    Plaintiff and proposed class representative Ryan Scott ("Plaintiff" for purposes of this Section) is a resident and citizen of Dekalb, Illinois. On or about February 11, 2022, Plaintiff purchased a used 2011 Ford F-350 Super Duty from a private party in Illinois with VIN 1FT8W3BT8BEB72356. Plaintiff's Ford F-350 Super Duty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

91.    Plaintiff purchased his Roof-Crush Risk Vehicle for personal, family, and household use.

92.    Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these

- 28 -

are the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the other large work trucks available in the marketplace. However, despite touting the safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before his purchase.

93.     Plaintiff is concerned about driving the Roof-Crush Risk Vehicle because he no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident. Plaintiff must now choose between his own personal safety and that of his passengers, and his ability to use the vehicle that he paid for.

94.     Had Plaintiff been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiff would have paid less for his vehicle or would not have purchased it at all.

**14.    Richard Powell (Indiana)**

95.     Plaintiff and proposed class representative Richard Powell ("Plaintiff" for purposes of this Section) is a resident and citizen of Syracuse, Indiana. On or about September 1, 2021, Plaintiff purchased a used 2000 Ford F-350 Super Duty from Martin Dodge in Anderson, Indiana with VIN 1FTSW31SXYEB64668. Plaintiff's Ford F-350 Super Duty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

96.     Plaintiff purchased his Roof-Crush Risk Vehicle for business and personal use.

97.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these are the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the other large work trucks available in the marketplace. However, despite touting the safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before his purchase.

98.     Plaintiff is concerned about driving the Roof-Crush Risk Vehicle because he no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident. Plaintiff must now choose between his own personal safety and that of his passengers, and his ability to use the vehicle that he paid for.

99.     Had Plaintiff been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiff would have paid less for his vehicle or would not have purchased it at all.

**15.    Dwaine Stutler Jr. (Iowa)**

100.    Plaintiff and proposed class representative Dwaine Stutler Jr. ("Plaintiff" for purposes of this Section) is a resident and citizen of Castleton,

- 30 -

Illinois. In November 2012, Plaintiff purchased a used 2000 Ford F-350 Super Duty from Piehl Motors in Cedar Rapids, Iowa with VIN 1FTWX33FTYEC37585. Plaintiff's Ford F-350 Super Duty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

101.    Plaintiff purchased his Roof-Crush Risk Vehicle for personal use.

102.    Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these are the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the other large work trucks available in the marketplace. However, despite touting the safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before his purchase.

103.    Plaintiff is concerned about driving the Roof-Crush Risk Vehicle because he no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident. Plaintiff must now choose between his own personal safety and that of his passengers, and his ability to use the vehicle that he paid for.

104.    Had Plaintiff been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiff would have paid less for their vehicle or would not have purchased it at all.

- 31 -

### 16.    Jesse Porter (Montana)

105.    Plaintiff and proposed class representative Jesse Porter ("Plaintiff" for purposes of this Section) is a resident and citizen of Dixon, Montana. On or about February 7, 2022, Plaintiff purchased a used 2015 Ford F-350 Super Duty from Lithia Ford, an authorized Ford dealership, in Missoula, Montana with VIN 1FT8W3BT8FED42785. Plaintiff's Ford F-350 Super Duty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

106.    Plaintiff purchased his Roof-Crush Risk Vehicle for personal use.

107.    Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these are the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the other large work trucks available in the marketplace. However, despite touting the safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before his purchase.

108.    Plaintiff is concerned about driving the Roof-Crush Risk Vehicle because he no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident. Plaintiff must now choose between his own personal safety and that of his passengers, and his ability to use the vehicle that he paid for.

109.  Had Plaintiff been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiff would have paid less for his vehicle or would not have purchased it at all.

**17.  Mark Willard (New Jersey)**

110.  Plaintiff and proposed class representative Mark Willard ("Plaintiff" for purposes of this Section) is a resident and citizen of Honey Brook, Pennsylvania. In August 2021, Plaintiff purchased a used 2002 Ford F-250 Super Duty from a private party in New Milford, New Jersey with VIN 1FTNX21L72EB47556. Plaintiff's Ford F-250 Super Duty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

111.  Plaintiff purchased his Roof-Crush Risk Vehicle for hauling his other vehicles and for personal use.

112.  Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these are the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the other large work trucks available in the marketplace. However, despite touting the safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before his purchase.

- 33 -

113.   Plaintiff is concerned about driving the Roof-Crush Risk Vehicle because he no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident. Plaintiff must now choose between his own personal safety and that of his passengers, and his ability to use the vehicle that he paid for.

114.   Had Plaintiff been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiff would have paid less for their vehicle or would not have purchased it at all.

### 18.   Michael and Gail Gneckow (New Mexico)

115.   Plaintiffs and proposed class representatives Michael and Gail Gneckow ("Plaintiffs" for purposes of this Section) are residents and citizens of Coeur d'Alene, Idaho. On or about February 1, 1999, Plaintiffs purchased a new Ford F-250 Super Duty from Gurley Motor Company, an authorized Ford dealership in Gallup, New Mexico with VIN 1FTNW21F5XED28742. Plaintiffs' Ford F-250 Super Duty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

116.   Plaintiffs purchased their Roof-Crush Risk Vehicle for many activities associated with their small ranch and other daily activities, such as grocery shopping, hauling hay for horses, hauling ranch equipment, camping, and towing their boat. As Plaintiffs' sole personal vehicle from 1999 to 2007, their Roof-Crush

- 34 -

Risk Vehicle was used for all of their daily transportation needs, including family vacations with children and pets.

117.   Through exposure and interaction with Ford, Plaintiffs were aware of Ford's uniform and pervasive marketing messages of reliability and safety; these are the primary reasons Plaintiffs purchased the Roof-Crush Risk Vehicle over the other large work trucks available in the marketplace. However, despite touting the safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiffs before their purchase.

118.   Plaintiffs are concerned about driving the Roof-Crush Risk Vehicle because they no longer feel safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident. Plaintiffs must now choose between their personal safety and that of their passengers, and their ability to use the vehicle that they paid for.

119.   Had Plaintiffs been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiffs would have paid less for their vehicle or would not have purchased it at all.

**19.   Mark Anderson (North Carolina)**

120.   Plaintiff and proposed class representative Mark Anderson ("Plaintiff" for purposes of this Section) is a resident and citizen of Daytona Beach, Florida.

- 35 -

On or about June 2014, Plaintiff purchased a new Ford F-350 Super Duty from Tindall Ford, an authorized Ford dealership in Gastonia, North Carolina with VIN 1FT8W3BT7EEA51385. Plaintiff's Ford F-350 Super Duty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

121.   Plaintiff purchased his Roof-Crush Risk Vehicle as his primary vehicle for personal use.

122.   Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these are the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the other large work trucks available in the marketplace. However, despite touting the safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before his purchase.

123.   Plaintiff is concerned about driving the Roof-Crush Risk Vehicle because he no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident. Plaintiff must now choose between his own personal safety and that of his passengers, and his ability to use the vehicle that he paid for.

124.   Had Plaintiff been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiff would have paid less for his vehicle or would not have purchased it at all.

### 20.   Jonathan Taylor (North Carolina)

125.   Plaintiff and proposed class representative Jonathan Taylor ("Plaintiff" for purposes of this Section) is a resident and citizen of Trussville, Alabama. On or about February 27, 2010, Plaintiff purchased a used 2008 Ford F-250 Super Duty from Crossroads Ford of Cary in Cary, North Carolina with VIN 1FTSW21RX8EB60742. Plaintiff's Ford F-250 Super Duty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

126.   Plaintiff purchased his Roof-Crush Risk Vehicle as his primary vehicle for work as a high-voltage electrician and for personal use.

127.   Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these are the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the other large work trucks available in the marketplace. However, despite touting the safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before his purchase.

128.   Plaintiff is concerned about driving the Roof-Crush Risk Vehicle because he no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident. Plaintiff must now choose between his own personal safety and that of his passengers, and his ability to use the vehicle that he paid for.

129.   Had Plaintiff been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiff would have paid less for his vehicle or would not have purchased it at all.

### 21.   Kevin Thomas (North Carolina)

130.   Plaintiff and proposed class representative Kevin Thomas ("Plaintiff" for purposes of this Section) is a resident and citizen of Benton, Kentucky. In December 2005, Plaintiff purchased a used 2002 Ford F-250 Super Duty from Ken Feagin Used Trucks in Asheville, North Carolina with VIN 1FTNW21S52EB57495. Plaintiff's Ford F-250 Super Duty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

131.   Plaintiff purchased his Roof-Crush Risk Vehicle for personal, family, and household use.

132.   Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these are the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the

- 38 -

other large work trucks available in the marketplace. However, despite touting the safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before his purchase.

133.   Plaintiff is concerned about driving the Roof-Crush Risk Vehicle because he no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident. Plaintiff must now choose between his own personal safety and that of his passengers, and his ability to use the vehicle that he paid for.

134.   Had Plaintiff been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiff would have paid less for his vehicle or would not have purchased it at all.

**22.   William Griffit (Oklahoma)**

135.   Plaintiff and proposed class representative William P. Griffit ("Plaintiff" for purposes of this Section) is a resident and citizen of Grove, Oklahoma. On or about March 1, 2018, Plaintiff purchased a 2000 Ford F-250 Super Duty Lariat from a private party in Oklahoma with VIN 1FTNX20S9YEA68763. Plaintiff's Ford F-250 Super Duty Lariat is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

- 39 -

136.   Plaintiff purchased his Roof-Crush Risk Vehicle for personal, family, and household use.

137.   Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these are the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the other large work trucks available in the marketplace. However, despite touting the safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before his purchase.

138.   Plaintiff is concerned about driving the Roof-Crush Risk Vehicle because he no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident. Plaintiff must now choose between his own personal safety and that of his passengers, and his ability to use the vehicle that he paid for.

139.   Had Plaintiff been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiff would have paid less for his vehicle or would not have purchased it at all.

**23.   Desmond Rains (Oregon)**

140.   Plaintiff and proposed class representative Desmond Rains ("Plaintiff" for purposes of this Section) is a resident and citizen of Grants Pass,

- 40 -

Oregon. In July 2022, Plaintiff acquired a 1999 Ford F-350 Super Duty from a private party in Oregon with VIN 1FTWX33F9XEE45826. Plaintiff's Ford F-350 Super Duty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

141.   In September 2010, Plaintiff also purchased a 2000 Ford F-250 Super Duty from a private party in Oregon with VIN 1FTNX21F6YEE30680. In August 2011, Plaintiff's son was driving the 2000 F-250 Super Duty truck and was involved in a collision that resulted in a rollover of the vehicle. The roof of the F-250 Super Duty was completely crushed.

142.   Plaintiff purchased his Roof-Crush Risk Vehicles for personal, family, and household use.

143.   Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these are the primary reasons Plaintiff purchased his Roof-Crush Risk Vehicles over the other large work trucks available in the marketplace. However, despite touting the safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before his purchases.

144.   Plaintiff is concerned about driving the Roof-Crush Risk Vehicles because he no longer feels safe in them for fear of what could happen if the vehicle were to be involved in a rollover accident. Plaintiff must now choose between his

- 41 -

own personal safety and that of his passengers, and his ability to use the vehicles that he paid for.

145.   Had Plaintiff been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiff would have paid less for his vehicles or would not have purchased them at all.

### 24.   Ryan Robbins (Oregon)

146.   Plaintiff and proposed class representative Ryan Robbins ("Plaintiff for purposes of this Section) is a resident and citizen of Kelso, Washington. On or about December 3, 2010, Plaintiff purchased a used 2008 Ford F-250 Super Duty from Dicks Mackenzie Ford in Hillsboro, Oregon with VIN 1FTSW21R88EB97367. Plaintiff's Ford F-250 Super Duty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

147.   Plaintiff purchased his Roof-Crush Risk Vehicle for his growing family because he needed a larger and safer truck. Plaintiff's son was born on April 1, 2011, and he drove him home from hospital in this truck. Plaintiff also uses his Roof-Crush Risk Vehicle for towing a fifth wheel.

148.   Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these are the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the other large work trucks available in the marketplace. However, despite touting the

- 42 -

safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its

agents or other representatives disclose the Roof-Crush Risk to Plaintiff before his

purchase.

149.   Plaintiff is concerned about driving the Roof-Crush Risk Vehicle

because he no longer feels safe in it for fear of what could happen if the vehicle

were to be involved in a rollover accident. Plaintiff must now choose between his

own personal safety and that of his passengers, and his ability to use the vehicle

that he paid for.

150.   Had Plaintiff been aware of the concealed risks that existed in the

Roof-Crush Risk Vehicles, Plaintiff would have paid less for his vehicle or would

not have purchased it at all.

### 25.   Everett Sylvester Wilson III (South Carolina)

151.   Plaintiff and proposed class representative Everett Sylvester Wilson

III ("Plaintiff" for purposes of this Section) is a resident and citizen of Camden,

South Carolina. In or around 2016, Plaintiff purchased a new 2016 Ford F-350

Super Duty from Classic Ford, an authorized Ford dealer in Columbia, South

Carolina with VIN 1FT8W3BT0GEB38502. Plaintiff's Ford F-350 Super Duty is a

Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

152.   Plaintiff purchased his Roof-Crush Risk Vehicle as his primary

vehicle for personal use.

- 43 -

153.   Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these are the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the other vehicles available in the marketplace. However, despite touting the safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before his purchase.

154.   Plaintiff is concerned about driving the Roof-Crush Risk Vehicle because he no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident. Plaintiff must now choose between his own personal safety and that of his passengers, and his ability to use the vehicle that he paid for.

155.   Had Plaintiff been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiff would have paid less for his vehicle or would not have purchased it at all.

### 26.   Brenda L. Rhodes (Texas)

156.   Plaintiff and proposed class representative Brenda L. Rhodes ("Plaintiff" for purposes of this Section) is a resident and citizen of Lufkin, Texas. In or around 2013, Plaintiff purchased a new 2013 Ford F-250 Super Duty from an authorized Ford dealer in Texas with VIN 1FT7X2B67DEA48191. Plaintiff's Ford

- 44 -

F-250 Super Duty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

157.   Plaintiff purchased her Roof-Crush Risk Vehicle for personal, family, or household purposes.

158.   Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these are the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the other vehicles available in the marketplace. However, despite touting the safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before her purchase.

159.   Plaintiff is concerned about driving the Roof-Crush Risk Vehicle because she no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident. Plaintiff must now choose between her own personal safety and that of her passengers, and her ability to use the vehicle that she paid for.

160.   Had Plaintiff been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiff would have paid less for her vehicle or would not have purchased it at all.

27.   **Stephen T. Rhodes (Texas)**

161.   Plaintiff and proposed class representative Stephen T. Rhodes ("Plaintiff" for purposes of this Section) is a resident and citizen of Lufkin, Texas. In or around 2011, Plaintiff purchased a new 2011 Ford F-350 Super Duty from an authorized Ford dealer in Texas with VIN 1FT8W3DT7BEA98697. Plaintiff's Ford F-350 Super Duty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

162.   Plaintiff purchased his Roof-Crush Risk Vehicle for personal, family, or household purposes.

163.   Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these are the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the other vehicles available in the marketplace. However, despite touting the safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before his purchase.

164.   Plaintiff is concerned about driving the Roof-Crush Risk Vehicle because he no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident. Plaintiff must now choose between his own personal safety and that of his passengers, and his ability to use the vehicle that he paid for.

- 46 -

165.   Had Plaintiff been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiff would have paid less for his vehicle or would not have purchased it at all.

### 28.   Greg Duenes (Utah)

166.   Plaintiff and proposed class representative Greg Duenes ("Plaintiff" for purposes of this Section) is a resident and citizen of Idaho Falls, Idaho. On or about August 15, 2022, Plaintiff purchased a used 2008 Ford F-350 Super Duty from B Jensen Auto in Salt Lake City, Utah with VIN 1FTWW31R28EA87731. Plaintiff's Ford F-350 Super Duty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

167.   Plaintiff purchased his Roof-Crush Risk Vehicle for personal use and for his RV repair business. Plaintiff's son is primarily driving his Roof-Crush Risk Vehicle now.

168.   Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these are the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the other large work trucks available in the marketplace. However, despite touting the safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before his purchase.

- 47 -

169.   Plaintiff is concerned about his son driving the Roof-Crush Risk Vehicle because he no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident. Plaintiff must now choose between his son's safety and that of his passengers, and his ability to use the vehicle that he paid for.

170.   Had Plaintiff been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiff would have paid less for their vehicle or would not have purchased it at all.

### 29.   Curtis Bright (Washington)

171.   Plaintiff and proposed class representative Curtis Bright ("Plaintiff" for purposes of this Section) is a resident and citizen of Graham, Washington. In October 1999, Plaintiff purchased a new 2000 Ford F-350 Super Duty Extended Cab from Titus Will Ford in Tacoma, Washington with VIN 1FTNX21L2YEA87937. Plaintiff's Ford F-350 Super Duty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

172.   Plaintiff purchased his Roof-Crush Risk Vehicle for personal, family, and household use.

173.   Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these are the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the

- 48 -

other large work trucks available in the marketplace. However, despite touting the safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before his purchase.

174.   Plaintiff is concerned about driving the Roof-Crush Risk Vehicle because he no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident. Plaintiff must now choose between his own personal safety and that of his passengers, and his ability to use the vehicle that he paid for.

175.   Had Plaintiff been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiff would have paid less for his vehicle or would not have purchased it at all.

### 30.   Catherine Gosser (Washington)

176.   Plaintiff and proposed class representative Catherine Gosser ("Plaintiff" for purposes of this Section) is a resident and citizen of Snohomish, Washington. On or about May 30, 2016, Plaintiff purchased a certified pre-owned 2014 Ford F-350 Super Duty from Kendall Ford of Marysville in Marysville, Washington with VIN 1FT8W3BT3EEB54321. Plaintiff's Ford F-350 Super Duty is a Roof-Crush Risk Vehicle that suffers from the Roof-Crush Risk.

- 49 -

177.   Plaintiff purchased her Roof-Crush Risk Vehicle as her primary vehicle and for use on her hobby farm. Plaintiff also uses her Roof-Crush Risk vehicle to drive her kids to and from school.

178.   Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety; these are the primary reasons Plaintiff purchased the Roof-Crush Risk Vehicle over the other large work trucks available in the marketplace. However, despite touting the safety and reliability of the Roof-Crush Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Roof-Crush Risk to Plaintiff before her purchase.

179.   Plaintiff is concerned about driving the Roof-Crush Risk Vehicle because she no longer feels safe in it for fear of what could happen if the vehicle were to be involved in a rollover accident. Plaintiff must now choose between her own personal safety and that of her passengers, and her ability to use the vehicle that she paid for.

180.   Had Plaintiff been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiff would have paid less for her vehicle or would not have purchased it at all.

- 50 -

**B.  Defendant**

181.   Ford is a corporation organized and in existence under the laws of the State of Delaware. Ford's principal place of business and headquarters is One American Road, Dearborn, Michigan 48126.

182.   Ford is a motor vehicle manufacturer and a licensed distributor of new, previously untitled Ford Motor vehicles. The Ford brand is one of the "Big Three" American automobile brands. Ford engages in commerce by distributing and selling new and used passenger cars and motor vehicles under its Ford brand.

183.   Ford, through its various entities, designs, manufactures, markets, distributes, and sells automobiles throughout the U.S. and worldwide. Ford and its agents designed and manufactured the Roof-Crush Risk Vehicles. Ford also developed and disseminated the owner's manuals and warranty booklets, advertisements, brochures, and other promotional materials relating to the Roof-Crush Risk Vehicles, with the intent that such documents be purposely distributed throughout all fifty states. Ford is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

184.   Ford authorized automobile dealerships sell automobiles under the Ford brand name and disseminate vehicle information provided by Ford to customers. At all relevant times, Ford's dealerships served as its agents for motor vehicle repairs and warranty issues because they performed repairs, replacements,

- 51 -

and adjustments covered by Ford's manufacturer warranty under the contracts

between Ford and its nearly 10,000 authorized dealerships worldwide.

## V.    FACTUAL ALLEGATIONS

**A.    Ford Super Duty trucks, including the Roof-Crush Risk Vehicles, are immensely profitable.**

185.   Ford's CEO, Jim Farley, recently bragged "If the Super Duty was a

separate company, it would have more revenue than some Fortune 500

companies…. It's part of our F-Series, our most profitable vehicles globally."[22]

Farley also recently commented: "I just want to say, on the Super Duty, obviously

that's a quarter of our profitability as a company globally."[23] If Mr. Farley was

referring to the prior year, Ford's 2021 gross profit was $21.7 billion[24] and this

equates to about $5.3 billion of profit from Super Duty trucks, including the Roof-

---

[22] "Ford Super Duty trucks generate 'more revenue than some Fortune 500 companies,' CEO says", Yahoo! Finance, Sept. 28, 2020, https://finance.yahoo .com/news/ford-ceo-f-series-super-duty-trucks-revenue-151436052.html (last accessed 10/20/22).

[23] **Exhibit 9**, "FORD SUPER DUTY LINEUP IS AN EXTREMELY VALUABLE PROFIT GENERATOR", Ford Authority, May 6, 2022, https://fordauthority.com/2022/05/ford-super-duty-lineup-is-an-extremely-valuable-profit-generator/ (last accessed 10/20/22).

[24] *See* **Exhibit 10**, https://www.macrotrends.net/stocks/charts/F/ford-motor/gross-profit (stating Ford gross profit for 2021 was $21.69 billion).

- 52 -

Crush Risk Vehicles. Historically, Ford has captured 50% of the entire heavy duty truck market with its Super Duty offerings.[25]

**B.      Ford marketed the Roof-Crush Risk Vehicles as safe and reliable because it knew that these attributes were material to consumers.**

186.    The Ford Roof-Crush Risk Vehicles are marketed to consumers as safe, reliable vehicles, and Ford knew these qualities were material to consumers. These qualities were in fact material to Plaintiffs.

187.    From the first release of the Roof-Crush Risk Vehicles, Ford touted their strength and robust design. For example, in the 1999 brochure for the Super Duty trucks Ford claimed "Robust design. Body mounts and cab brackets are welded instead of riveted for increased strength"[26]



---

[25] *See, e.g.,* **Exhibit 11**, cars.com, https://news.pickuptrucks.com/2010/11/ford-super-duty-solidifies-reign-as-king-of-heavy-duty-truck-sales.html (last accessed 10/20/22) (citing a Ford analysis of R.L. Polk registration data).

[26] *See* **Exhibit 12,** MY 1999 Ford Super Duty brochure, at 12.

188.   Ford repeatedly emphasized the capability and structural strength of the Super Duty. In the 2009 brochure, Ford proclaimed it was "[t]he most capable Pickup in North America" and touted that "[i]ts muscular sheet metal wraps around an incredibly strong structure and its stance clues you in to the huge capabilities on tap."[27]



---

<sup>27</sup> **Exhibit 13**, MY 2009 Super Duty brochure, at 2.

189.   Ford also repeatedly stressed the safety of its Super Duty line,

emphasizing "Safe Trucks" as one of the four pillars of the product line.[28]



190.   The 2010 Super Duty brochure boasts: "Muscular sheet metal

wrapped around an incredibly strong structure alerts you to the huge capabilities on

tap."[29]

---

[28] *See id.*, at 22.

[29] *See* **Exhibit 14,** MY 2010 Ford Super Duty brochure, at 12.

011115-11/2243027 V1

Natural **BORN LEADER**

Muscular sheet metal wrapped around an incredibly strong structure alerts you to the **huge capabilities** on tap. **Best-in-class² towing and payload**, and the might of an available **6.4L Power Stroke®V8 Turbo Diesel** are just 2 of its many strengths. The cab offers **comfort that's unique** in the world of heavy-duty pickups. And no other truck in the class offers so many innovations to make work easier. Super Duty is part of **America's best-selling line of trucks for 32 years running. Ford F-Series.**

191.   In the 2011 Super Duty brochure, Ford claimed "DURABILITY: Super Duty is built to the extremely high standards of durability and reliability you'd expect in a full-size pickup that's Built Ford Tough."[30]

Thank you for your interest in the **2011 Ford Super Duty**. Included in this brochure you'll find information about:

**POWER:** 6.2L gas and 6.7L Power Stroke™ turbo diesel engine with greater displacement and impressive fuel economy are all-new Super Duty powerplants.

**DURABILITY:** Super Duty is built to the extremely high standards of durability and reliability you'd expect in a full-size pickup that's Built Ford Tough.

**CAPABILITY:** Tons of great features, like new Anti-Sway Control, that make working those tough jobs a lot easier. And best-in-class payload and towing? You bet.

**PRODUCTIVITY:** Available Ford Work Solutions™ and new 4.2-inch LCD Productivity Screen are two big Super duty features that'll favorably impact your bottom line.

192.   It also advertised and promoted its "Standard Safety Canopy® System" as a "Class Exclusive."[31]

---

[30] *See* **Exhibit 15,** MY 2011 Ford Super Duty brochure, at 2.

[31] *Id.* at 4.

- 56 -

**CLASS EXCLUSIVES**
- Live-Drive Power TakeOff (PTO)[4]
- 5th-Wheel/Gooseneck Trailer Tow Prep Package[4]
- Standard trailer sway control on both SRW and DRW
- LCD Productivity Screen[4]
- Standard Safety Canopy® System
- Ford Work Solutions™[4]
- Tailgate Step[4]

193.   In the sales brochure for the 2012 Ford F-350 Super Duty, Ford told buyers to "Take comfort in serious safety standards like the driver and right-front-passenger front airbags, front-seat side airbags, and our Safety Canopy® System with its rollover sensor and side-curtain airbags."[32] This brochure certainly gave the impression that the Roof-Crush Risk Vehicles would be safe in a rollover accident, even though Ford knew that this was not true.

---

[32] *See* **Exhibit 16**, MY 2012 Ford Super Duty brochure, at 16.

# LOTS OF WAYS TO MAKE IT YOURS.

   



Take comfort in serious safety standards like the driver and right-front-passenger front airbags, front-seat side airbags, and our Safety Canopy® System with its rollover sensor and side-curtain airbags. Add options to help power your electronics, extend your cargo-carrying capabilities, stow your valuables securely out of sight and much more. Build the Super Duty® you want, just the way you want it.

6 airbags standard

Mini-console with front bucket seats[1]

110-volt power outlet[1]

Stowable bed extender[1]

Crew Cab with lockable rear under-seat storage[1] and flow-through center console[1]

194.   And that year, Ford introduced its new brand pillars: "QUALITY, GREEN, SAFE AND SMART."[33]



195.   In the sales brochure for the 2013 Ford F-350 Super Duty (Plaintiff Beck's truck), Ford repeated its promises from 2012:[34]

---

[33] *Id.* at 28.

[34] *See* **Exhibit 17**, MY 2013 Ford Super Duty brochure, at 16.

011115-11/2243027 V1

# LOTS OF WAYS TO MAKE IT YOURS.

   



Take comfort in serious safety standards like the driver and right-front-passenger front airbags, front-seat side airbags, and our Safety Canopy® System with its rollover sensor and side-curtain airbags. Add options to help power your electronics, extend your cargo-carrying capabilities, stow your valuables securely out of sight and much more. Build the Super Duty® you want, just the way you want it.

6 airbags standard

Mini-console with front bucket seats[1]

Flow-through center console[1] with 110-volt power outlet and two 12-volt powerpoints

Stowable bed extender[1]

LARIAT Crew Cab with lockable rear under-seat storage[1] and flow-through center console[1]

196.   Again, on the final page of the 2013 brochure—knowing safety is material to Plaintiffs and putative class members—Ford emphasized the pillars of its brand: "Quality, Green, Safe and Smart."[35]



197.   Ford also emphasizes the Super Duty's overall reliability, noting the truck "has endured more torture testing than any previous generation of Ford Truck" and that "A world-class team put this truck through a groundbreaking battery of computer simulations, lab and real-world test, running it for thousands of hours on end in extreme conditions."[36]

---

[35] **Exhibit 17**, MY 2013 Ford Super Duty brochure, at 29.

[36] *Id.* at 3.

- 61 -



# OUTWORKS ALL THE REST.

This Super Duty® has endured more torture testing than any previous generation of Ford Truck – including over 10 million cumulative miles on the most tested Power Stroke® diesel engine ever. A world-class team put this truck through a groundbreaking battery of computer simulations, lab and real-world tests, running it for thousands of hours on end in extreme conditions. Scorching heat. Bitter cold. Loaded to the max. Up the steepest grades. All to confirm that it is far more than the sum of its parts.

Super Duty is built to be the best, most capable truck in its class,[1] bringing you the best diesel and gas fuel economy,[2] plus max. capabilities and lots of other features only Ford can deliver. With the most configurations of any truck in its class, there's a Super Duty just right for you and your work.

### Best in Class

- Max. Horsepower and Torque: Diesel and Gas
- Max. Conventional Towing: 18,500 lbs.[3]
- Max. 5th-Wheel Towing: 24,700 lbs.[3]
- Max. GCWR: 33,000 lbs.[3]
- Max. Payload: 7,260 lbs.[3]
- Fuel Economy: Diesel and Gas

### Class Exclusive

- 5th-Wheel/Gooseneck Trailer Tow Prep Package[4]
- Standard Trailer Sway Control on both SRW and DRW
- Hill Descent Control™[4]
- Tailgate Step[4]
- Cable Lock by Master Lock[4][5]
- LCD Productivity Screen[4]
- Standard MyKey®
- Standard Safety Canopy® System
- Live-Drive Power Take-Off (PTO)[4]

[1]Class is Full-Size Pickups over 8,500 lbs. GVWR vs. 2012/2013 competitors. [3]Based on Ford drive-cycle tests of comparably equipped 2011/2012 Ford and 2011/2012 competitive models. [2]When properly equipped. [4]Available feature. [5]Ford Licensed Accessory. See your dealer for limited warranty details.

2013 **SUPER DUTY**®
ford.com

BUILT Ford TOUGH

198.   For 2014, the look of Ford's brand pillars changed but the message stayed the same: "QUALITY, GREEN, SAFE, SMART."[37]



199.   Plaintiffs and putative class members believed Ford's claims about the safety and durability of the Roof-Crush Risk Vehicles, and they paid many thousands of dollars for the vehicles. The Manufacturer's Suggested Retail Price ("MSRP") for Plaintiff Beck's Roof-Crush Risk Vehicle, the 2013 Ford F-350 Super Duty, starts at $30,770 for the base-level trim and goes up to $55,540 for the Super Duty Platinum 4WD DRW Crew Cab.[38] The MSRP for the most recent Roof-Crush Risk Vehicle, the 2016 Ford F-350 Super Duty, starts at $33,280 for

---

[37] *See* **Exhibit 18,** MY 2014 Ford Super Duty brochure, at 15.

[38] **Exhibit 19**, *2013 Ford F-350*, MOTORTREND.COM, https://www.motortrend.com/cars/ford/f-350/2013/ (last visited Sept. 1, 2022).

- 63 -

the base-level trim and goes up to $59,340 for the Super Duty Platinum 4WD

DRW Crew Cab.[39]

200.   Plaintiffs and putative class members would not have paid these prices

for Roof-Crush Risk Vehicles if they had known that the vehicles were, in fact, not

safe and durable.

**C.      None of the Roof-Crush Risk Vehicles are covered under Ford's new
         vehicles and powertrain warranties.**

201.   Ford's New Vehicle Limited Warranty for Super Duty model years

1998–2016 provides "bumper-to-bumper" coverage for 3 years/36,000 miles,

whichever comes first.[40]

202.   Because the Roof-Crush Risk Vehicles are all model year 2016 and

older, no Roof-Crush Risk Vehicles are still covered under Ford's new vehicle and

powertrain warranties.

**D.      The Roof-Crush Risk is an extraordinary safety hazard.**

203.   According to NHTSA, "rollover crashes pose a serious threat to

vehicle occupants" and are one of the leading causes of auto-related fatalities.[41]

---

[39] **Exhibit 20**, *2016 Ford F-350*, MOTORTREND.COM, https://www.motortrend
.com/cars/ford/f-350/2016/ (last visited Sept. 1, 2022).

[40] *See, e.g.*, **Exhibit 17**, MY 2013 Ford Super Duty brochure, at 29;
**Exhibit 13**, MY 2009 Ford Super Duty brochure, at 16; **Exhibit 15**, MY 2011
Ford Super Duty brochure, at 15.

[41] **Exhibit 34**, NHTSA, Evaluation of FMVSS No. 216a, Roof Crush
Resistance, Upgraded Standard, November 2020, available at

- 64 -

From 2014 to 2018, rollover crashes accounted for approximately 2% of all vehicle crashes, yet rollover accidents were responsible for 24% of all fatalities.[42] In 2017, there were a total of 23,551 passenger vehicle fatalities, of which 7,170 fatalities, over 30% of all deaths, involved rollover incidents.[43] Put simply, "[s]tronger vehicle roofs save lives and prevent incapacitating injuries in rollover crashes."[44]

204.   A picture is worth a thousand words. Below are pictures of Roof-Crush Risk Vehicles that were involved in rollover accidents:

---

https://crashstats.nhtsa.dot.gov/Api/Public/Publication/813027#:~:text=216a-,FMVSS%20No.,threshold%20specified%20in%20FMVSS%20No.

[42] *Id.*

[43] *Id.*

[44] *Id.*



011115-11/2243027 V1





- 67 -



011115-11/2243027 V1





- 70 -

205.   In a host of personal injury and wrongful death lawsuits, multiple juries and courts have concluded that the 1999–2016 Ford Super Duty trucks (which all share the PHN-131 design platform) have a dangerous roof design because the roofs are easily crushed in rollover accidents, causing paralysis and other grave injuries—including death—to vehicle occupants.[45]

206.   The complaints, trial briefs, orders, findings of fact, and other pleadings in these cases convincingly establish a disturbing timeline that shows Ford not only knew that the Super Duty trucks had unsafe and inadequate roof strength, but, because there was no applicable government standard, Ford purposefully downgraded roof strength to save manufacturing costs and enhance its profits. These facts establish that Ford had safer alternative designs available, yet it chose not to utilize them in the Roof-Crush Risk trucks.[46]

---

[45] *See, e.g.*, *Wurm v. Ford Motor Co.*, No. 2:18-cv-02322 (D. Kan.) (crushed roof on 1999 F-250 Super Duty); *Taylor v. Ford Motor Co.*, No. 1:06-cv-00069 (D. Maine) (crushed roof in 2002 F-250 Super Duty) (*see* **Exhibit 21**, *Taylor* Dkt. No. 97); *Gibson v. Ford Motor Co.*, No. 1:06-cv-01237 (N.D. Ga.) (crushed roof on 2001 F-350 Super Duty) (*see* **Exhibit 22**, *Gibson* Dkt. No. 177-1); *Pena v. Ford Motor Co.*, No. 4:2008-cv-00501 (D. Ariz.) (crushed roof in F-250 Super Duty); *Ott v. Ford Motor Co.*, No. 4:03-cv-00101 (W.D. Ky.) (crushed roof in 2000 F-250 Super Duty) (*see* **Exhibit 23**, *Ott* Dkt. No. 76-2); *Aguirre v. Ford Motor Co.*, No. 7:15-cv-00063 (W.D. Tex.) (crushed roof in 2006 F-350 Super Duty).

[46] *See, e.g.*, *Wurm v. Ford Motor Co.*, No. 2:18-cv-02322 (D. Kan.) (crushed roof on 1999 F-250 Super Duty); *Taylor v. Ford Motor Co.*, No. 1:06-cv-00069 (D. Maine) (crushed roof in 2002 F-250 Super Duty) (*see* **Exhibit 21**, *Taylor* Dkt. No. 97); *Gibson v. Ford Motor Co.*, No. 1:06-cv-01237 (N.D. Ga.) (crushed roof on 2001 F-350 Super Duty) (*see* **Exhibit 22**, *Gibson* Dkt. No. 177-1); *Pena v. Ford*

- 71 -

207.   For example, the trial brief in *Ott v. Ford Motor Co.* explained with respect to a model year 2000 F-250 Super Duty:

> Ford admits it did not perform a physical roof strength test prior to the vehicle being sold—not a dolly rollover test, not a roof drop test and not a Federal Motor Vehicle Safety Standard ('FMVSS') 216 roof crush test. Ford claims it performed a computer version of the FMVSS 216 test, but it cannot find the test data or any test report. Litigation testing shows that not only did the F-250 roof fail to meet Ford's 10,500 pound roof strength design target, it also shows that the roof strength of its F-250 Super Duty truck is weaker than its smaller and lighter pickup trucks—the F-150 and Ranger."[47]

208.   *Ott* marshalled shocking evidence that Ford deliberately *reduced* the strength and structural integrity of the Super Duty roof system in order save production costs and "enhance the corporate overall truck profitability."[48] Plaintiff included the following table of design changes made *pre-production* to the 1999 model year Super Duty:

---

*Motor Co.*, No. 4:2008-cv-00501 (D. Ariz.) (crushed roof in F-250 Super Duty); *Ott v. Ford Motor Co.*, No. 4:03-cv-00101 (W.D. Ky.) (crushed roof in 2000 F-250 Super Duty) (*see* **Exhibit 23**, *Ott* Dkt. No. 76-2); *Aguirre v. Ford Motor Co.*, No. 7:15-cv-00063 (W.D. Tex.) (crushed roof in 2006 F-350 Super Duty).

[47] *See* **Exhibit 23**, *Ott*, No. 4:03-cv-00101, Dkt. No. 76-2, at 3.

[48] *See id.* at 7.

**Pre-Production Design Changes in PHN-131 Roof Structure (between 3/31/94 program implementation and 1/05/98 Job #1)[8]**

| Design Change | Date | % Reduction | Savings |
|---|---|---|---|
| Downgage roof bow from 1 mm to 0.9 mm | Between 1/19/95 and 11/26/95 | 10% | Unknown |
| Downgage roof bow from 0.9 mm to 0.8 mm | 11/27/95 | 10.1% | Unknown |
| Delete front outer windshield header | 7/12/96 | ? | $3.50 per vehicle $500,000 tooling cost |
| Replace high strength Boron steel in SuperCab rear door vertical beam (floating B-pillar) with a mild steel | 12/10/96 | ? | $20.86 per vehicle $1,033,800 tooling cost |
| Downgage A-pillar from 2.5 mm to 2.4 mm | Between 5/20/97 and 1/05/98 | 4% | Unknown |

209.   Plaintiff further detailed post-production design changes to the Super Duty roof structure that were implemented before the model year 2000 Super Duty was manufactured:[49]

---

[49] *See id*. at 9.

**Post-Production Design Changes in the PHN-131 Roof Structure and Support**
**(after January 5, 1998 Job #1 and before June 28, 2000 when Ott vehicle assembled)[9]**

| Design Change | Date | % Reduction | $ Savings |
|---|---|---|---|
| Downgage   A-pillar from 2.40 mm to 2.35 mm | 9/18/98 | 2% | 70¢ per vehicle (35¢ per A-pillar) |
| Downgage A-pillar from 2.35 mm to 2.20 mm | 3/30/99 | 6.4% | $1.72 per vehicle (86¢ per A-pillar) |
| Downgage SuperCab rear door vertical beam (floating B-pillar) from 1.50 mm to 1.20 mm | 6/15/99 | 20% | 96¢ per vehicle (48¢ per door) |
| Downgage inner windshield header from 1.20 mm to 1.07 mm | 8/10/99 | 11% | 17¢ per vehicle |
| Downgage roof bow from 0.80 mm to 0.74 mm | 8/10/99 | 7.5% | 10¢ per vehicle (5¢ per roof bow) |
| Downgage A-pillar reinforcement from 2.1 mm to 2.0 mm | 9/20/99 | 4.8% | 20¢ per vehicle (10¢ per A-pillar) |

210.   Plaintiff Ott likewise accounted for why these changes were made, "[w]hile the pre-production and post-production changes only equal [to] $28.21 per vehicle, the overall profit to Ford is increased to millions of dollars. If Ford sells 100,000 vehicles per year for 9 years, this $28.21 translates to Ford profit in excess of $25 million!"[50]

---

[50] *See id.*

211.   In the *Hill* case, where the jury awarded $1.7 billion in punitive damages, plaintiffs presented evidence that the Super Duty roof failed in Ford's internal testing, leading Ford engineers to develop a stronger alternative. But even though the alternative design was available as early as 2004, Ford elected not to use it in Super Duty trucks until the 2017 model year.[51]

212.   The pretrial order in *Hill* stated that "Ford has identified 162 lawsuits and 83 similar incidents of the roof crush involving 1999-2016 Super Duty trucks."[52]

213.   Another WSJ article on the *Hill* case noted that as early as 1989, NHTSA had proposed expanded roof strength regulations that would apply to vehicles up to 10,000 pounds, which would have included the Super Duty trucks.[53]

---

[51] **Exhibit 7**, *Roof Strength on Older Ford Trucks Called Into Question by $1.7 Billion Jury Verdict*, WSJ (Aug. 22, 2022), available at: https://www.wsj.com/articles/ford-faces-1-7-billion-verdict-in-fatal-rollover-of-f-250-pickup-11661033662 (last visited Sept. 1, 2022).

[52] *See* **Exhibit 6**, Plaintiffs' Response to Ford Motor Company's Three Motions for "Partial" Summary Judgment at 88–123, *Hill v. Ford Motor Company*, No. 16 C 04179-2 (Sept. 22, 2017).

[53] *See* **Exhibit 24**, *Ford Trucks Highlighted in $1.7 Billion Verdict Weren't Subject to Tougher Safety Rules*, WSJ (Aug. 25, 2022), available at: https://www.wsj.com/articles/ford-trucks-in-1-7-billion-verdict-werent-subject-to-tougher-safety-rules-11661439150 (last visited Sept. 1, 2022).

But Ford (and its rival, GM) lobbied NHTSA to lower the threshold to 8,500 pounds, which excluded the Roof-Crush Risk Vehicles from the requirements.[54]

214.   According to the WSJ, "[t]he auto maker argued that for heavier vans and trucks—those with a gross weight of over 8,500 pounds—there was insufficient evidence to determine that the stiffer requirements would enhance the safety of these vehicles."[55]

215.   Ford plainly knew the Roof-Crush Risk Vehicles contained the Roof-Crush Risk and it should have warned or disclosed this fact to Plaintiffs and putative class members before selling or leasing the vehicles.

## E.   Ford knew of the Roof-Crush Risk and concealed it from Plaintiffs and Class Members.

216.   For the reasons set forth above and below, Ford knew about the Roof-Crush Risk before the Roof-Crush Risk Vehicles went to market.

### 1.   Ford knew the relationship between roof strength and rollover injury severity before the Roof-Crush Risk Vehicles were developed.

217.   In 1960, Ford conducted a dynamic rollover test of a Ford Falcon to evaluate the car's roof structure. The design of the car's windshield header was a

---

[54] *See id.*

[55] *Id.*

"hat section"—an open section design that is very similar to the design in many cars and SUVs throughout the 1970s to the present.[56]

218.   During the Falcon test, Ford found, "[t]he roof structure proved inadequate. The front of the roof collapsed. The hat section reinforcement at the very front of the roof was insufficient to withstand the load."[57]

219.   Ford also emphasized the relationship between strong roofs and safe cars as early as 1964. An advertisement for the 1964 Country Squire station wagon depicted nine children on the car's roof and claimed: "How long a life your car body has depends on how solidly it's built …. That's why all Ford-built cars give you so much extra reinforcing. Take the roof these youngsters are perched on. Three separate steel braces make it super-solid to sit on (or ride under)."[58]

220.   In the late 1960s, shoulder belts became mandatory, and Ford was concerned about the relationship between roof crush and belted occupants who would be seated upright as a vehicle rolled over.[59]

---

[56] **Exhibit 1**, Byron Bloch, *Protecting Occupants in Rollover Crashes: Case Examples and Latest Technologies*, available at: https://www-esv.nhtsa.dot.gov/Proceedings/22/files/22ESV-000344.pdf (last visited Sept. 23, 2022).

[57] *Id.*

[58] **Exhibit 25**, 1964 Ford Country Squire station wagon advertisement.

[59] **Exhibit 1**, Byron Bloch, *Protecting Occupants in Rollover Crashes: Case Examples and Latest Technologies*, available at: https://www-esv.nhtsa.dot.gov/Proceedings/22/files/22ESV-000344.pdf (last visited Sept. 23, 2022).

221.   In 1968, Ford issued an intra-company safety evaluation entitled "Roof Strength Study" or "the Weaver memo." Ford noted: "Roof intrusion may have a more pronounced effect on occupant injuries with increased usage of upper torso restraints. People are injured by roof collapse. The total number of nationwide deaths and injuries cannot be estimated but it is a significant number."[60]

222.   The Roof Strength Study identified the risk posed by rollover crashes with belted occupants: "It seems unjust to penalize people wearing effective restraint systems by exposing them to more severe rollover injuries than they might expect with no restraints."[61]

181.   On June 25, 1968, Ford published an intra-company safety evaluation entitled "Rollover Accidents; A Basis for Establishing Future Roof Strength Performance Requirements." The evaluation indicated that rollover accidents were far more likely to result in fatalities than front, side, or rear collisions. The report also noted, "[m]any vehicles come to rest on the roof after rollover over [sic]. The roof therefore must support the weight of the vehicle." And the report made a critical recommendation: "It is recommended that roof structure, when subjected to

---

[60] *Id.*

[61] *Id.*

the static roof crush test, support twice the weight of the vehicle while restricting

deformation to a value to be determined by a proposed test fixture."[62]

223.   In 1969, the consequences of crushed roofs also became clear to

federal regulators. "Approximately 1,400 motor vehicle occupants were killed in

that year by impact with roof structure in rollover accidents," the National

Highway Safety Bureau, which later became the National Highway Traffic Safety

Administration, said in 1971.[63]

224.   On January 6, 1971, federal regulators proposed a safety standard to

"reduce deaths and injuries due to the intrusion of the roof into the passenger

compartment in rollover crashes."[64]

225.   Regulators initially proposed testing both front corners of a passenger

vehicle roof. To pass the test, a car's roof could not have more than five inches of

intrusion into the passenger compartment.[65]

---

[62] **Exhibit 2**, Plaintiffs' Motion for Leave to File Third Amended Complaint to Add Putative Damages Claims Against Defendant Ford Motor Company at 84–87, *Welday v. Ford Motor Company*, No. 19CV33212 (Feb. 15, 2022).

[63] **Exhibit 4**, *U.S.: Danger Overhead: Crushed Roofs, Thousands killed, hurt as auto roofs collapse,* available at: http://www.anderson.ucla.edu/documents/ areas/adm/loeb/05b16-1.pdf (last visited Sept. 23, 2022).

[64] **Exhibit 26**, *Industry Concealment of Tests Undermined Development of Meaningful Rollover Crash Roof Crush Resistance Standard in 1971*, available at: https://www.citizen.org/sites/default/files/industry_undermines_roof_strength _standard_of_1971.pdf (last visited Sept. 23, 2022).

[65] *Id.*

226.   General Motors (GM) and the Automobile Manufacturers Association (AMA) subsequently submitted comments to the National Highway Safety Bureau arguing for changes that weakened the proposed test procedures.[66]

227.   Ford, as a member of the Automobile Manufacturers Association,[67] supported changes to weaken the test procedures.

228.   Much like Big Tobacco contradicted its own science that showed smoking was deadly, "Ford questioned whether crushed roofs even posed a danger — a direct contradiction of its own 1968 study. 'The data do not implicate top intrusion as an automotive safety problem,' Ford said in its April 5, 1971, comments to the agency."[68]

229.   NHTSA published its *minimal* requirement for roof crush resistance in December 1971: Motor Vehicle Safety Standard 216 (FMVSS 216). "The final standard reflects, almost without change, the modifications to the rule that had been suggested by GM and the AMA."[69]

---

[66] *Id.*

[67] **Exhibit 27**, Article regarding Alliance of Automobile Manufacturers, available at: https://www.automotive-fleet.com/encyclopedia/alliance-of-automobile-manufacturers (last visited Sept. 23, 2022).

[68] **Exhibit 4**, *U.S.: Danger Overhead: Crushed Roofs, Thousands killed, hurt as auto roofs collapse,* available at: http://www.anderson.ucla.edu/documents/areas/adm/loeb/05b16-1.pdf (last visited Sept. 23, 2022).

[69] **Exhibit 26**, *Industry Concealment of Tests Undermined Development of Meaningful Rollover Crash Roof Crush Resistance Standard in 1971*, available at:

230. Although the agency adopted a watered-down version of FMVSS 216, it still recognized the importance of roof strength in its rulemaking notices. The agency found, "serious injuries are more frequent when the roof collapses" and "[i]t has been determined, therefore, that improved roof strength will increase occupant protection in rollover crashes."[70]

231. In 1982, the NHTSA issued *Light Vehicle Occupant Protection—Top and Rear Structures and Interiors*. This comprehensive analysis found "accident statistics show that the degree of roof intrusions is highly associated with occupant injury severity and rate."[71]

232. The NHTSA and the Department of the Air Force's Armstrong Laboratory published the report *Vehicle and Occupant Response in Rollover Crash Tests* in 1992. This report published findings from twenty-four rollover crashes that the NHTSA had sponsored to study vehicle and occupant dynamics. The report concluded, "[m]ost of the tests resulted in significant roof crush. Often the

---

https://www.citizen.org/sites/default/files/industry_undermines_roof_strength _standard_of_1971.pdf (last visited Sept. 23, 2022).

[70] **Exhibit 1**, Byron Bloch, *Protecting Occupants in Rollover Crashes: Case Examples and Latest Technologies*, available at: https://www-esv.nhtsa.dot.gov/ Proceedings/22/files/22ESV-000344.pdf (last visited Sept. 23, 2022).

[71] *Id.*

- 81 -

body was trapped by the roof crush. In these cases, the head/neck system was vulnerable to large loads from the roof."[72]

233. In 1994, Australian scientists published *Rollover Crash Study on Vehicle Design and Occupant Injuries*. One of the report's "main conclusions" was "[i]n mass data and other crash collections, the weight of evidence is in agreement with a relationship between roof crush and occupant injury. There is a convincing relationship between rollover and spinal cord injury. Finally, there is strong evidence of a connection between local roof crush and spinal cord injury."[73]

234. With respect to other popular vehicles in Ford's offerings, Ford admitted and promoted the notion that strong roof structures were important. In advertisements for the 1994 Ford Mustang, Ford touted the car's "Reinforced Roof Structure" and highlighted "[t]he A-pillars of both the coupe and convertible are reinforced. And, on the coupe, key areas of the roof are also reinforced to resist collapse in a rollover-type accident."[74]

---

[72] *Id.*

[73] **Exhibit 3**, Monash University study titled *Rollover Crash Study – Vehicle design and occupant injuries*, available at: https://www.monash.edu/muarc/archive/our-publications/reports/muarc065 (last visited Sept. 23, 2022).

[74] **Exhibit 1**, Byron Bloch, *Protecting Occupants in Rollover Crashes: Case Examples and Latest Technologies*, available at: https://www-esv.nhtsa.dot.gov/Proceedings/22/files/22ESV-000344.pdf (last visited Sept. 23, 2022).

## 2. Ford's ownership of Volvo provided further evidence of the importance of roof strength to vehicle safety.

235. Ford owned Volvo between 1999 and 2010.[75]

236. Ford had access to the safety features and technologies used in Ford's Volvo division.[76]

237. Volvo has a history of making roof strength a priority. In 1967, the company began reinforcing the roof support pillars of its 140 Series sedan.[77]

238. When Volvo introduced its first sport utility vehicle in 2002, the XC90, they had a promotional video claiming the strength of the roof "exceeds the legal requirements in the U.S.A. by more than 100 percent."[78]

239. The Volvo XC90 was sold as "a different S.U.V." with innovations to prevent and mitigate rollovers. A major feature of the car was a roof reinforced with high-strength boron steel. Volvo's internal documents show that the

---

[75] **Exhibit 30**, *This is Volvo*, Volvo, available at: https://www.media .volvocars.com/us/en-us/corporate/this-is-volvo (last visited Oct. 7, 2022).

[76] **Exhibit 6**, Plaintiffs' Response to Ford Motor Company's Three Motions for "Partial" Summary Judgment at 27, *Hill v. Ford Motor Company*, No. 16 C 04179-2 (Sept. 22, 2017).

[77] **Exhibit 29**, *Not the Top of the Safety Priorities*, N.Y. TIMES (May 14, 2005), available at: https://www.nytimes.com/2005/05/14/automobiles/not-the-top-of-the-safety-priorities.html (last visited Sept. 23, 2022).

[78] *Id.*

reinforced roof was a crucial component of the company's rollover protection strategy.[79]

240.   Ford's engineers in the Volvo division emphasized the importance of a strong roof structure with high integrity that would resist deformation.[80]

241.   These priorities were mirrored in advertisements for the 2002 XC90. "[Keeping] the passenger compartment intact is first of all a job for the vehicle's structure, including roof pillars and transverse roof profiles [i.e., roof bows]."[81]

242.   The roof on the 2002 XC90 was also built as a "safety cage" to ensure "survival space" for occupants in rollover crashes. This safety cage was "[a] rigid framework surrounding the occupants which creates a support for the interior safety equipment and provides a survival space for the vehicle occupants in case of a crash."[82]

243.   Rather than implement these safety features in Ford-branded vehicles, Ford engineers "told Volvo engineers in 2002 that they needed to de-emphasize

---

[79] *Id.*

[80] **Exhibit 6**, Plaintiffs' Response to Ford Motor Company's Three Motions for "Partial" Summary Judgment at 29, *Hill v. Ford Motor Company*, No. 16 C 04179-2 (Sept. 22, 2017).

[81] *Id.* at 131.

[82] *Id.* at 30.

vehicle rooftop safety in order to get in line" with the position of their corporate parent.[83]

### 3. Despite its knowledge that roof strength was integral to preventing serious injury and death from rollover accidents, Ford ignored the importance of roof strength when designing the Roof-Crush Risk Vehicles.

244.    In the 1990s, Ford divided their pickup truck business into the PN96 and PHN131 platforms. The PN96 trucks have a GVWR of 8,500 lbs. or less. The PHN131 trucks have a GVWR over 8,500 lbs.[84]

245.    Ford's PHN131 platform includes the F-250, F-350, F-450, and F-550 Super Duty trucks. Thus, the Roof-Crush Risk Vehicles are PHN131 platform vehicles.[85]

246.    The PHN131 platform is available in three cab configurations: Regular Cab (2 door), SuperCab (4 door, with full-size front doors and short back doors, with the front and back doors opening in opposite directions), and Crew Cab (4 doors). The Regular Cab has an A-pillar and B-pillar. The SuperCab has an A-pillar and C-pillar. The Crew Cab has an A-pillar, B-pillar, and C-pillar.[86]

---

[83] **Exhibit 31**, *Memos tell of Ford-Volvo safety dispute*, CNN (May 16, 2005), available at: http://www.cnn.com/2005/AUTOS/05/14/ford_volvo/ (last visited Oct. 7, 2022).

[84] **Exhibit 5**, *Taylor*, 1:06-cv-00069, Dkt. No. 86 at 8.

[85] **Exhibit 23**, *Ott*, No. 4:03-cv-00101, Dkt. No. 76-2, at 6.

[86] *Id.*

247. On April 17, 1991, the NHTSA issued a rule that extended the federal roof crush resistance standard, FMVSS 216, to light trucks, vans, buses, and multipurpose passenger vehicles (MPVs) with a Gross Vehicle Weight Rating (GVWR) of 6,000 lbs. or less. The agency specifically declined to extend the standard to light trucks, vans, buses, and MPVs with a GVWR of up to 10,000 lbs.[87]

248. Beginning in 1991, Ford's internal safety guidelines extended the requirement for FMVSS 216 testing to trucks with a GVWR of less than 8,500 lbs.[88]

249. In 2009, NHTSA issued a new roof crush standard, FMVSS 216a. This new standard applies to passenger cars, MPVs, trucks, and buses with a GVWR of 10,000 lbs. or less.[89]

250. Under FMVSS 216a, vehicles greater than 6,000 lbs. are required to withstand 1.5 times the unloaded vehicle weight of the vehicle.[90]

---

[87] **Exhibit 28**, *1971 Roof Strength Standard: 33-Year Old Standard Does Not Provide Basic Rollover Crashworthiness Protections*, available at: https://www.citizen.org/sites/default/files/chron_roof_crush.pdf (last visited Sept. 23, 2022).

[88] **Exhibit 15**, *Taylor*, 1:06-cv-00069, Dkt. No. 86 at 20.

[89] 49 C.F.R. § 571.216a (2018).

[90] *Id.*

- 86 -

251.   Bruno Barthelemy was the engineering supervisor responsible for the design and development of the PHN131 platform body shell from January 1993 to June 1995.[91]

252.   A vehicle's body shell is the structure that surrounds the occupants of a vehicle, including the doors, roof, pillars, roof rails, windshield header, rear header, windshield, and rear window.[92]

253.   Barthelemy led the engineering team responsible for setting a roof strength target for the PHN131 vehicles.[93]

254.   Because there were no federal or internal Ford guidelines that set a target roof strength for the PHN131 vehicles, Barthelemy and his team of Ford engineers decided the PHN131's roof strength needed to be as good as the PN96 (Ford's lighter, smaller truck platform).[94]

255.   The target roof strength for the PHN131 vehicles was one-and-a-half times the vehicle's maximum unloaded weight.[95]

---

[91] **Exhibit 15**, *Taylor*, 1:06-cv-00069, Dkt. No. 86 at 20.

[92] *Id.*

[93] *Id.*

[94] *Id.*

[95] *Id.*

256.   The one-and-a-half times maximum vehicle unloaded weight target did not include a factor that considered variations in manufacturing.[96]

257.   Barthelemy's design focus was not safety. The target roof strength was required because "[t]he engineers needed some kind of target from a structural engineering point of view. They need a target so they could say this is enough or they need to continue, so that is how they set the target up."[97]

258.   When designing the PHN131 body shell, Barthelemy knew that rollover accidents were inevitable.[98]

259.   Richard Vanker, body engineering manager for the PHN131 platform between January 1996 and June 1998, knew it was statistically foreseeable that PHN131 vehicles would be involved in rollovers. He knew that high center of gravity vehicles, like the Roof-Crush Risk trucks, were more likely to rollover than standard passenger cars.[99]

260.   Despite this knowledge, no physical roof crush testing was ever performed on PHN131 vehicles (including Roof-Crush Risk Vehicles) before they were sold to the public.[100]

---

[96] *Id.*

[97] *Id.*

[98] *Id.* at 21.

[99] *Id.*

[100] *Id.*

261.   In 1995, James K. Wagner, Automotive Safety and Engineering Standards FAO at Ford, described why physical roof crush testing was not performed on the PHN131 vehicles.[101]

262.   In a message entitled "PHN131 Safety PAT Mtg. Recap – 1/19/95" Wagner noted: "The LAW applies only to vehicles of 6,000 lbs. GVW and under."; "The PHN131 Safety Panel Chart . . . merely stated that the vehicles would meet all Safety Design Guidelines."; "There are no roof crush requirements in the Heavy Truck Safety Design Guidelines."; and "There are no Safety Design Guidelines covering vehicles of 8,501 through 19,999 lbs. GVW."[102]

263.   In the same message, Wagner also noted: "Work on the PHN131 roof crush model has been underway since June, concentrating on the 4-door SuperCab. The model itself was derived from that developed for the 3-door PN96 SuperCab which has been shown to correlate very well with actual tests . . . . On account of the relatively close correlation of the models and the PN96 simulation's effective approximation of actual test data and also the fact that there is no REGULATORY REQUIREMENT for roof crush resistance in vehicles of more than 6,000 lbs. GVW, no actual tests are planned."[103]

---

[101] **Exhibit 22**, *Gibson*, No. 1:06-cv-01237, Dkt. No. 177-1 at 3.

[102] *Id.*

[103] *Id.*

264.   Thus, after Ford successfully lobbied federal regulators not to impose a roof strength regulation on big trucks like the Roof-Crush Risk Vehicles, Ford then used this lack of regulation as its own internal excuse to build the Roof-Crush Risk Vehicles with extraordinarily weak roof structures. Later, Ford declined to even measure just how weak they actually were.

265.   In lieu of a physical test, Ford used Computer Aided Engineering (CAE) to model the PHN131's roof strength.[104]

266.   Information about the roof strength of the PHN131, as it was determined by CAE, is available in a series of memos addressed to Barthelemy.[105]

267.   The October 11, 1994 memo indicated that CAE analysis of an X-shaped roof bow yielded an increase in peak roof crush resistance from 9,600 lbs. to 10,600 lbs.[106]

268.   The October 26, 1994 memo indicated that placing a proposed X-shaped roof bow in the rear increased front roof crush peak resistance by 1,100 lbs. and rear roof crush resistance by 1,700 lbs. with a weight penalty of 1.5 lbs. The

---

[104] **Exhibit 5**, *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 21.

[105] *Id.*; **Exhibit 22**, *Gibson*, No. 1:06-cv-01237, Dkt. No. 177-1 at 15–25.

[106] **Exhibit 5**, *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 22; **Exhibit 22**, *Gibson*, No. 1:06-cv-01237, Dkt. No. 177-1 at 15–25.

011115-11/2243027 V1

resultant roof crush resistances were 10,700 lbs. in the front and 10,400 lbs. in the rear.[107]

269.   The January 19, 1995 memo reported the CAE analysis of placing an X-shaped roof bow in the rear and a second bow in the front. The resultant roof crush resistance was 10,980 lbs.[108]

270.   A second memo from January 19, 1995, reported the CAE analysis of placing two (non-X-shaped) roof bows in the roof. The resultant crush resistance was 10,000 lbs.[109]

271.   Despite this unrefuted evidence that the roofs could be strengthened using various roof bow configurations, none were ever incorporated into the PHN131 because Ford engineers were meeting their self-imposed roof crush targets.[110]

---

[107] **Exhibit 5**, *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 22; **Exhibit 22**, *Gibson*, No. 1:06-cv-01237, Dkt. No. 177-1 at 15–25.

[108] **Exhibit 5**, *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 22; **Exhibit 22**, *Gibson*, No. 1:06-cv-01237, Dkt. No. 177-1 at 15–25.

[109] **Exhibit 5**, *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 22; **Exhibit 22**, *Gibson*, No. 1:06-cv-01237, Dkt. No. 177-1 at 15–25.

[110] **Exhibit 5**, *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 23; **Exhibit 22**, *Gibson*, No. 1:06-cv-01237, Dkt. No. 177-1 at 15–25.

272.   The Analytical Sign-Off for the PHN131 design likewise provides insight into Ford's decision to employ dangerously weak roofs in the Roof-Crush Risk Vehicles.[111]

273.   At the time the Analytical Sign-Off is submitted the design of the vehicle is totally done.[112]

274.   Attachment 6 to the Analytical Sign-Off, "PHN131 Safety Status," lists the target structural safety goals for the PHN131 vehicles. The Regular Cab is 9,600 lbs. The Super Cap is 10,500 lbs. The Crew Cab is 10,500 lbs.[113]

275.   On April 26, 1996, the "Status" of the Regular Cab roof crush strength was 9,648 lbs. The "Status" of the SuperCab strength was 10,600 lbs. The "Status" of the Crew Cab strength was 10,484 lbs.[114]

276.   Ford does not have a copy of the CAE test on which the Analytical Sign-Off for roof crush is based.[115]

---

[111] **Exhibit 5**, *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 23.

[112] *Id.*

[113] **Exhibit 22**, *Gibson*, No. 1:06-cv-01237, Dkt. No. 177-1 at 32.

[114] *Id.*

[115] **Exhibit 5**, *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 25.

277.   On July 1, 2003, for purposes of litigation, a third-party performed a roof crush test on a 2001 Ford F-250 SuperCab according to the NHTSA FMVSS 216 testing procedure.[116]

278.   The result of that test was approximately 9,800 lbs.[117] This indicates that when a third-party conducted a physical roof crush test of a PHN131 vehicle it performed 800 lbs. lower than Ford indicated it would in the Analytical Sign Off.

279.   Ford uses the maximum possible Unloaded Vehicle Weight when assessing the roof strength to weight ratio (1.5:1) to assure all variants of a particular vehicle model comply with FMVSS 216.[118]

280.   According to Ford's own calculations submitted to NHTSA, the PHN131 SuperCab has a maximum possible Unloaded Vehicle Weight of 7,969 lbs. and would have to withstand a 14,344 lbs. load to meet the requirements of FMVSS 216.

281.   The 14,344 lbs. figure includes a 20% compliance margin.[119]

282.   According to the Ford Vehicle Information Matrix, the maximum possible Unloaded Vehicle Weight of the PHN131 vehicle line is 7,700 lbs.[120]

---

[116] *Id.* at 23.

[117] *Id.*

[118] *Id.* at 24.

[119] *Id.*

[120] *Id.*

283.   The PHN131 vehicle line would need to withstand 11,550 lbs. to meet the requirements of FMVSS 216.[121]

284.   The PHN131 vehicle line would need to withstand 13,860 lbs. to meet the requirements of FMVSS 216 with a 20% compliance margin.[122]

285.   Thus, the target structural safety goals for the PHN131 vehicles in the Analytical Sign Off were—at a minimum—1,050 lbs. below the current requirements of FMVSS 216.[123]

### 4.   Ford reduced the roof strength of the Roof-Crush Risk Vehicles to save money.

286.   Ford planned to reduce the cost of the PHN131 vehicle as early as January 1996.[124] And Ford planned to reduce the cost per unit by $358 six months after launch.[125]

---

[121] This figure is the maximum Unloaded Vehicle Weight (7,700 lbs.) multiplied by 1.5.

[122] This figure is the maximum Unloaded Vehicle Weight (7,700 lbs.) multiplied by 1.5 plus 20%.

[123] This figure does not include a compliance margin, and is simply the PHN131 vehicle line's maximum Unloaded Vehicle Weight (7,700 lbs.) multiplied by 1.5 (11,550 lbs.) subtracted from the highest target roof crush strength in the Analytical Sign Off (10,500 lbs.).

[124] **Exhibit 5**, *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 26.

[125] *Id.*

- 94 -

287.   On July 12, 1996, Ford approved the deletion of the front header outer from the PHN131 vehicle's design.[126] The deletion of the windshield outer saved Ford $3.50 per vehicle and $500,000 in tooling costs.[127] Deletion of the front header outer weakened the windshield header.[128]

288.   When you downgauge steel you reduce its thickness. When you reduce the thickness of steel, you lessen the structural capacity.[129] On August 8, 1999, Ford authorized a downgauge from 1.2 mm to 1.07 mm for the windshield header inner. This was an 11% decrease in thickness for a cost savings of $0.17 per vehicle.[130]

289.   On November 27, 1995, the roof bows (roof reinforcements) were redesigned and redrawn. The new bow metal was 0.8 mm thick, downgauged from 0.9 mm. This was a reduction in thickness of 10.1%.[131]

---

[126] *Id.* at 27.

[127] *Id.*

[128] *Id.*

[129] **Exhibit 5**, *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 29.

[130] *Id.* at 28.

[131] *Id.*

290.   On August 10, 1999, a design change was approved that downgauged the roof bows from 0.8mm to 0.74mm. This was a 7.5% reduction in thickness and resulted in a cost savings of 5 cents per bow or 10 cents per vehicle.[132]

291.   The A-pillar is the part of the vehicle to which the windshield and front door hinges are attached.[133] As of May 1997, the PHN131 A-Pillar was designed to be 2.5mm thick.[134] On September 18, 1998, Ford downgauged the A-Pillar from 2.4mm to 2.35mm. This was a downgauge of 2%, for a cost savings of $0.70 per vehicle and no tooling cost.[135]

292.   On March 30, 1999, Ford approved a downgauge of the A-pillar from 2.35 mm to 2.2 mm. This was a downgauge of 6.4% with a cost savings of $0.86 per A-Pillar or $1.72 per vehicle.[136]

293.   Internal Ford documents concluded that it is "primordial" to have a strong B-pillar structure in order to meet a high roof crush load.[137]

294.   On December 4, 1996, Ford authorized the replacement of the Boron steel rear door front vertical beam with a vertical beam made of mild steel. The

---

[132] *Id.*

[133] *Id.* at 29.

[134] *Id.*

[135] *Id.*

[136] *Id.*

[137] *Id.* at 18.

- 96 -

vertical beam is what Ford generically called the "floating B-pillar."[138] Boron steel is 4 or 5 times stronger than normal steel.[139] Replacing the Boron steel part with a mild steel part saved $20.86 per vehicle and tooling costs of $1,033,800.[140]

295.   On June 15, 1999, Ford authorized the downgauge of the rear door front vertical beam from 1.5 mm to 1.2 mm. The 20% downgauge resulted in a savings of $0.48 per door or $0.96 per vehicle.[141]

296.   In sum, Ford significantly weakened the PHN131 roof structure when it deleted the front header outer, replaced the Boron steel B-pillar with mild steel, and downgauged the windshield header inner, roof bows, A-pillar, and rear front door vertical beam.

297.   Ford has no test results to show what effect any of the downgauges and changes in roof and door structure had on roof crush strength.[142]

298.   Ford did not even attempt to ascertain how much weaker its hunger for profits made the roof structures of the Roof-Crush Risk Vehicles.

299.   As late as 2005, Ford maintained the position (contrary to its own engineers in the 1960s and 1970s) that roof crush does not cause injury. Susan

---

[138] *Id.* at 29.

[139] *Id.* at 30.

[140] *Id.* at 29.

[141] *Id.* at 30.

[142] *Id.* at 31.

Cischke, Ford's vice president for environmental and safety engineering said, "[t]here is no data out there to suggest people are injured by a roof collapsing."[143]

300.   Ford has previously been found liable for sacrificing safety in pursuit of profits, most notably in relation to the Pinto's defective fuel tank.[144]

301.   Ford has identified 162 lawsuits and 83 similar incidents of the roof crush involving the 1999–2016 Super Duty trucks.[145]

302.   Ford's rejection of its own tests and efforts to increase profits, as outlined above, by purposefully degrading the strength of the roof both pre- and post-production of the first Roof-Crush Risk Vehicles, squarely evidences Ford's knowledge that the Roof-Crush Risk Vehicles had an unsafe and dangerous design from before the sale of the first 1999 model year Super Duty.

303.   All owners and lessees of the Roof-Crush Risk Vehicles have paid huge premiums for the supposed toughness, durability, and safety of their Super Duty vehicles. Because Ford sold them vehicles with the Roof-Crush Risk, they have all suffered ascertainable loss.

---

[143] **Exhibit 29**, *Not the Top of the Safety Priorities*, N.Y. TIMES (May 14, 2005), available at: https://www.nytimes.com/2005/05/14/automobiles/not-the-top-of-the-safety-priorities.html (last visited Sept. 23, 2022).

[144] *See, e.g.*, *Grimshaw v. Ford Motor Co.*, 174 Cal. Rptr. 348, 358 (Ct. App. 1981).

[145] **Exhibit 6**, Plaintiffs' Response to Ford Motor Company's Three Motions for "Partial" Summary Judgment at 88–123, *Hill v. Ford Motor Company*, No. 16 C 04179-2 (Sept. 22, 2017).

5.    **Ford could have designed Roof-Crush Risk Vehicles with a stronger, safer roof.**

304.    In preparation for litigation related to a Roof-Crush Risk Vehicle, Ford created a chart comparing the strength-to-weight ratio (SWR) of 30 Ford cars and trucks.[146]

305.    The chart shows that the F-250 Super Duty roof had the lowest SWR in Ford's entire fleet of vehicles.[147]

306.    Strength, weight, and SWR affect the forces experienced inside a vehicle during a crash. The magnitude of those forces is directly related to the risk of injury.[148]

307.    Beginning in 2004, Ford organized a Roof Strength Task Force and assigned engineers to a project called the Enhanced Roof Strength Project (ERSP).[149] The purpose of the ERSP was to design a stronger and safer roof for

---

[146] **Exhibit 6**, Plaintiffs' Response to Ford Motor Company's Three Motions for "Partial" Summary Judgment at 68, *Hill v. Ford Motor Company*, No. 16 C 04179-2 (Sept. 22, 2017).

[147] *Id.*

[148] **Exhibit 32**, *Vehicle Size and Weight*, IIHS (July 2022), available at: https://www.iihs.org/topics/vehicle-size-and-weight#how-size-and-weight-affect-safety (last visited Oct. 7, 2022).

[149] **Exhibit 6**, Plaintiffs' Response to Ford Motor Company's Three Motions for "Partial" Summary Judgment at 2, *Hill v. Ford Motor Company*, No. 16 C 04179-2 (Sept. 22, 2017).

- 99 -

Ford Super Duty trucks.[150] The ERSP developed a roof that could withstand 55,000 lbs. of force.[151]

308.   Beginning in model year 2009, Ford put the stronger and safer roof developed by the ERSP in F-150 trucks.[152] The model year 2009 F-150 brochure boasts that the truck has a new "high-strength safety cage structure" and that this was the "safest F-150 yet."[153]

309.   With the ERSP roof, the F-150 had a SWR ratio of 4.72.[154] But the supposedly durable and robust Roof-Crush Risk vehicles had a SWR of just 1.1.[155]

310.   Rather than implementing the stronger and safer ERSP roofs, Ford concealed their existence and continued selling Super Duties with the Roof-Crush Risk for twelve years without warning anyone.

311.   In fact, Ford did not strengthen the roof of the Super Duty line until 2017—when new government regulations forced it to do so.[156]

---

[150] *Id.*

[151] *Id.*

[152] *Id.* at 3.

[153] *Id.* at 85–86.

[154] *Id.* at 34.

[155] *Id.*

[156] *Id.* at 33.

312.   It is beyond question that Ford knew the weak roofs in Roof-Crush Risk Vehicles were severely injuring and killing people because one of Ford's own ERSP engineers admitted that was the *exact* "problem" Ford was trying to "solve" by building stronger roofs.[157]

**F.     All class members could have been made aware of the Roof-Crush Risk at the point of sale.**

313.   Plaintiffs and all putative class members were necessarily exposed to Ford's omissions before purchasing the Roof-Crush Risk Vehicles because they each interacted with an authorized Ford dealer at the point of sale and/or they were repeatedly exposed to Ford's advertising and marketing. These dealers are authorized by Ford to distribute its advertising materials and could have disclosed the omitted information to each class member, but they failed to do so. As a district court affirmed in another consumer class action case against Ford, all class members in that case would have "been aware of a disclosure" from Ford about the defect at the point of sale because class members "interact[ed] with an authorized Ford dealer prior to purchase." *Daniel v. Ford Motor Co.*, 2016 WL 8077932, at *8 (E.D. Cal. Sept. 23, 2016). The same is true here.

---

[157] *Id.* at 32–33.

## VI.   TOLLING OF THE STATUTE OF LIMITATIONS

**A.   The Discovery Rule justifies tolling.**

314.   Ford ignored the Roof-Crush Risk, and Plaintiffs and class members had no way of knowing that they were sold vehicles with an unreasonable risk of paralysis, grave injury, or death in the event of a rollover accident. Plaintiffs likewise were unable to discover that this risk arose because Ford reduced the roof strength of the Roof-Crush Risk Vehicles in the pursuit of profits over safety. In fact, within the period of any applicable statutes of limitations, there were insufficient facts available to Plaintiffs and members of the proposed class that would have created suspicion of Ford's wrongdoing.

315.   Plaintiffs and putative class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Ford did not report information within its knowledge to federal and state authorities, its dealerships, or consumers, and that it purposefully used secrecy clauses in settlements with owners of Roof-Crush Risk Vehicles. Nor would a reasonable and diligent investigation have disclosed that Ford omitted information about the unreasonable risk of paralysis, grave injury, or death caused by the Roof-Crush Risk Vehicles, which was discovered by Plaintiffs only shortly before this action was filed. As discussed above, until $1.7 billion in punitive damages was awarded in the *Hill* case, there was insufficient information concerning the Roof-Crush

to put Plaintiffs on notice regarding its existence. Among other things, Ford was able to limit publicity of the Roof-Crush Risk by entering into "hush deals" with victims and preventing these cases from going to trial where they would be discussed in the media.[158] Plaintiffs also did not possess the aggregate data concerning roof collapses involving Roof-Crush Risk Vehicles or the technical data regarding Ford's design of the Roof-Crush Risk Vehicles.

316.   Within the period of any applicable statutes of limitation, Plaintiffs and members of the proposed Classes could not have discovered through the exercise of reasonable diligence that Ford was omitting the Roof-Crush Risk complained of herein. Indeed, Ford's concealment of the Roof-Crush Risk is ongoing, as evidenced by its failure to issue a recall for the Roof-Crush Risk vehicles.

317.   Thus, the Discovery Rule justifies tolling because Plaintiffs were unaware that Ford designed their vehicles with dangerously weak roofs and because Plaintiffs did not know—and could not have discovered—that Ford's design decisions caused the Roof-Crush Risk. Accordingly, all applicable statutes

---

[158] **Exhibit 35**, Hannah Albarazi, *Ford's $1.7B Trial Loss Puts Spotlight On Hush Deals, Ga. Law*, Law360 (Aug. 26, 2022), available at https://www.law360.com/articles/1523787/ford-s-1- 7b-trial-loss-puts-spotlight-on-hush-deals-ga-law ("Over the last two decades, I have had quite a few of these [lawsuits] that were resolved for amounts that were confidential at Ford's request").

of limitation have been tolled by operation of the Discovery Rule with respect to claims involving the Roof-Crush Risk Vehicles.

**B.    Estoppel justifies tolling.**

318.    Ford is and was under a continuous duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the Roof-Crush Risk Vehicles, including the vehicles' safety-related defects as alleged herein, and the inevitable repairs, costs, time, and monetary damages resulting from therefrom. Ford actively concealed the true character, quality, and nature of the Roof-Crush Risk Vehicles and has not disclosed the full nature of the Roof-Crush Risk.

319.    Ford knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the Roof-Crush Risk Vehicles.

320.    Ford knowingly decreased the strength and safety of the roof in the Roof-Crush Risk Vehicles in order to increase profits. Ford did this both before the first sale of a Roof-Crush Risk Vehicle and on an ongoing basis in the years following such first sale.

321.    Based on the foregoing, Ford is estopped from relying on any statutes of limitations in defense of this action.

- 104 -

## VII.   CLASS ALLEGATIONS

322.   Plaintiffs bring this action on behalf of themselves and as a class

action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of

Civil Procedure, on behalf of the following Nationwide Class and State Subclasses:

> **Nationwide Class**: All persons or entities who purchased or leased model year 1999–2016 Ford Super Duty vehicle, including the F-250, F-350, F-450, and F-550 (the "Roof-Crush Risk Vehicles").

> **Alabama Subclass**: All persons or entities who purchased or leased one or more of the Roof-Crush Risk Vehicles in the State of Alabama.

> **Arizona Subclass**: All persons or entities who purchased or leased one or more of the Roof-Crush Risk Vehicles in the State of Arizona.

> **Arkansas Subclass**: All persons or entities who purchased or leased one or more of the Roof-Crush Risk Vehicles in the State of Arkansas.

> **California Subclass**: All persons or entities who purchased or leased one or more of the Roof-Crush Risk Vehicles in the State of California.

> **Colorado Subclass**: All persons or entities who purchased or leased one or more of the Roof-Crush Risk Vehicles in the State of Colorado.

> **Connecticut Subclass**: All persons or entities who purchased or leased one or more of the Roof-Crush Risk Vehicles in the State of Connecticut.

> **Florida Subclass**: All persons or entities who purchased or leased one or more of the Roof-Crush Risk Vehicles in the State of Florida.

- 105 -

**Illinois Subclass**: All persons or entities who purchased or leased one or more of the Roof-Crush Risk Vehicles in the State of Illinois.

**Indiana Subclass**: All persons or entities who purchased or leased one or more of the Roof-Crush Risk Vehicles in the State of Indiana.

**Iowa Subclass**: All persons or entities who purchased or leased one or more of the Roof-Crush Risk Vehicles in the State of Iowa.

**Montana Subclass**: All persons or entities who purchased or leased one or more of the Roof-Crush Risk Vehicles in the State of Montana.

**New Jersey Subclass**: All persons or entities who purchased or leased one or more of the Roof-Crush Risk Vehicles in the State of New Jersey.

**New Mexico Subclass**: All persons or entities who purchased or leased one or more of the Roof-Crush Risk Vehicles in the State of New Mexico.

**North Carolina Subclass**: All persons or entities who purchased or leased one or more of the Roof-Crush Risk Vehicles in the State of North Carolina.

**Oklahoma Subclass**: All persons or entities who purchased or leased one or more of the Roof-Crush Risk Vehicles in the State of Oklahoma.

**Oregon Subclass**: All persons or entities who purchased or leased one or more of the Roof-Crush Risk Vehicles in the State of Oregon.

**South Carolina Subclass**: All persons or entities who purchased or leased one or more of the Roof-Crush Risk Vehicles in the State of South Carolina.

011115-11/2243027 V1

**Texas Subclass**: All persons or entities who purchased or leased one or more of the Roof-Crush Risk Vehicles in the State of Texas.

**Utah Subclass**: All persons or entities who purchased or leased one or more of the Roof-Crush Risk Vehicles in the State of Utah.

**Washington Subclass**: All persons or entities who purchased or leased one or more of the Roof-Crush Risk Vehicles in the State of Washington.

323. Excluded from the definitions of the Nationwide Class and state Subclasses are any personal injury or property damages claims resulting from accidents involving the Roof-Crush Risk Vehicles. Also excluded from the Nationwide Class and state Subclasses are Ford and its subsidiaries and affiliates; all persons who make a timely election to be excluded from this action; governmental entities; the Judge to whom this case is assigned and his/her immediate family; and Plaintiffs' Counsel. Plaintiffs reserve the right to revise the class definitions based upon information learned through discovery.

324. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

325. This action has been brought and may be properly maintained on behalf of the Nationwide Class and state Subclasses proposed herein under Federal Rule of Civil Procedure 23.

- 107 -

326.  **Numerosity**. Federal Rule of Civil Procedure 23(a)(1): The members of the Nationwide Class and state Subclasses are so numerous and geographically dispersed that individual joinder of all class members is impracticable. For purposes of this complaint, Plaintiffs allege that there are estimated to be at least 5.2 million Roof-Crush Risk Vehicles in the Nationwide Class.[159] The precise number of class members is unknown to Plaintiffs but may be ascertained from Ford's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and published notice.

327.  **Commonality and Predominance**: Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual class members, including, without limitation:

    a.    Whether Ford engaged in the conduct alleged herein;

    b.    Whether the Roof-Crush Risk creates an unreasonable risk of physical injury and death in the Roof-Crush Risk Vehicles;

    c.    When Ford first knew about the Roof-Crush Risk;

    d.    Whether Ford designed, manufactured, marketed, and distributed the Roof-Crush Risk Vehicles with component(s)

---

[159] *See* **Exhibit 24**, *Ford Trucks Highlighted in $1.7 Billion Verdict Weren't Subject to Tougher Safety Rules*, WSJ (Aug. 25, 2022), available at: https://www.wsj.com/articles/ford-trucks-in-1-7-billion-verdict-werent-subject-to-tougher-safety-rules-11661439150 (last visited Sept. 1, 2022).

that create an unreasonable risk of physical injury or death in the event of a rollover accident;

e.  Whether Ford's conduct renders it liable for breach of the implied warranty of merchantability;

f.  Whether Ford has been unjustly enriched at the expense of Plaintiffs and class members;

g.  Whether Plaintiffs and class members overpaid for their vehicles at the point of sale; and

h.  Whether Plaintiffs and class members are entitled to damages and other monetary relief and, if so, in what amount.

328.  **Typicality**: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other class members' claims because, among other things, all class members were comparably injured through Ford's wrongful conduct as described above.

329.  **Adequacy**: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate class representatives because their interests do not conflict with the interests of the other members of the classes they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The interests of the classes will be fairly and adequately protected by Plaintiffs and their Counsel.

330.  **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the

management of this class action. The damages or other financial detriment suffered by Plaintiffs and other class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for the members of the Nationwide Class and state Subclasses to individually seek redress for Ford's wrongful conduct. Even if Nationwide Class and state Subclass members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII.  CLAIMS

**A.     Nationwide Claims**

### COUNT I

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *et seq.*)

**(Alleged by Plaintiffs on behalf of the Nationwide Class or, alternatively, on behalf of each state-specific Subclass)**

331.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

332.   Plaintiffs bring this claim on behalf of the Nationwide Class or, alternatively, on behalf of each state-specific Subclass.

- 110 -

333.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

334.   The Roof-Crush Risk Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Plaintiffs and Nationwide Class members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

335.   Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

336.   15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

337.   Ford provided Plaintiffs and Nationwide Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Ford warranted that the Roof-Crush Risk Vehicles were fit for their ordinary purpose and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

- 111 -

338.   Ford breached its implied warranties, as described herein, and is therefore liable to Plaintiffs under 15 U.S.C. § 2310(d)(1). Without limitation, the Roof-Crush Risk Vehicles share a common defect in that they are all equipped with a defect in design and manufacturing of the roof system that makes the vehicles unsafe in the event of a rollover accident, causing an unreasonable risk of paralysis, grave injury and death to owners and lessees of the Roof-Crush Risk Vehicles. The Roof-Crush Risk rendered the Roof-Crush Risk Vehicles unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

339.   As discussed herein, Ford knew about the Roof-Crush Risk from its purposeful degradation of the strength of the roof systems in the Roof-Crush Risk Vehicles before launching the Roof-Crush Risk Vehicles. Ford omitted information about the Roof-Crush Risk and its consequences from Plaintiffs and class members, misrepresented the qualities of the Roof-Crush Risk Vehicles, and has failed to provide a fix for the Roof-Crush Risk.

340.   Any effort by Ford to limit the implied warranties in a manner that would exclude coverage of the Roof-Crush Risk Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

341.   Any limitations Ford might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between Ford

and Plaintiffs, because, at the time of purchase and lease, Plaintiffs had no other options for purchasing warranty coverage other than directly from Ford.

342.   Any limitations Ford might seek to impose on its warranties are substantively unconscionable. Ford knew that the Roof-Crush Risk Vehicles were unsafe and that the Roof-Crush Risk Vehicles could cause paralysis, grave injuries or death when used as intended long before Plaintiffs and class members knew or should have known. Ford failed to disclose this risk to Plaintiffs and class members. Thus, enforcement of the durational limitations on the warranties is harsh and would shock the conscience.

343.   Plaintiffs have had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between Ford and Plaintiffs. Nonetheless, privity is not required here because Plaintiffs are an intended third-party beneficiary of contracts between Ford and its dealers, and specifically, of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Roof-Crush Risk Vehicles and have no rights under the warranty agreements provided with the Roof-Crush Risk Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Roof-Crush Risk Vehicles are dangerous instrumentalities due to the aforementioned defect, as the Roof-Crush Risk

- 113 -

presents an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Roof-Crush Risk Vehicles.

344.   Under 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give Ford notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs under Rule 23 of the Federal Rules of Civil Procedure.

345.   Plaintiffs would suffer economic hardship if they returned their Roof-Crush Risk Vehicles but did not receive the return of all payments made by them. Because Ford will not acknowledge any revocation of acceptance and immediately return any payments made, Plaintiffs have not re-accepted their Roof-Crush Risk Vehicles by retaining them.

346.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed based on all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of all other Nationwide Class members, seek all damages permitted by law, including diminution in value of the Roof-Crush Risk Vehicles, in an amount to be proven at trial. In addition, under 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably

- 114 -

been incurred by Plaintiffs and Nationwide Class members in connection with the commencement and prosecution of this action.

347. Plaintiffs also seek the establishment of a Ford-funded program for Plaintiffs and Nationwide Class members to recover out-of-pocket costs incurred in attempting to rectify and mitigate the effects of the Roof-Crush Risk in their Roof-Crush Risk Vehicles.

**COUNT II**

**FRAUDULENT CONCEALMENT**
**(COMMON LAW)**

**(Alleged by Plaintiffs on behalf of the Nationwide Class or, alternatively, on behalf of each state-specific Subclass)**

348. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

349. Plaintiffs assert this claim on behalf of themselves and the Nationwide Class, or, in the alternative, on behalf of the state Subclasses.

350. A Nationwide Class is appropriate because the elements of a fraudulent concealment (or "fraud by concealment") claim are virtually identical in all states. In all states, Plaintiffs can prevail by showing that: (i) Ford had a duty to disclose material facts in connection with the sale or lease of the Roof-Crush Risk Vehicles; (ii) Ford either (a) knowingly made a false representation concerning material information in connection with the sale or lease of the Roof-Crush Risk

- 115 -

Vehicles; or (b) knowingly concealed material information in connection with the sale or lease of the Roof-Crush Risk Vehicles; or (c) knowingly failed to disclose material information in connection with the sale or lease of the Roof-Crush Risk Vehicles; and (iii) as a result of Ford's conduct, Plaintiffs suffered economic damages.

351.    Ford concealed and suppressed material facts concerning the serious safety risks in Plaintiffs' vehicles.

352.    Ford sold the Roof-Crush Risk Vehicles to Plaintiffs without disclosing the Roof-Crush Risk and concealed and suppressed the risk from regulators and consumers.

353.    Ford concealed and suppressed the Roof-Crush Risk with the intent to deceive Plaintiffs.

354.    Ford did so in order to falsely assure purchasers, lessees, and owners of the Roof-Crush Risk Vehicles that the vehicles they were purchasing or leasing were safe and reliable and would live up to the performance characteristics associated with the Ford brand, and then to avoid the cost and negative publicity of a recall. The concealed information was material to consumers, both because it concerned the quality, safety, and performance of the Roof-Crush Risk Vehicles and because the information would have significantly decreased the value and sales price of the vehicles.

355.   Ford had a duty to disclose the Roof-Crush Risk because it was known and only knowable by Ford; Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to, or reasonably discoverable by, Plaintiffs. Ford also had a duty to disclose because it made many affirmative representations about the safety, durability, and quality of the Roof-Crush Risk Vehicles, as set forth above; these representations were misleading, deceptive, and incomplete without the disclosure of the Roof-Crush Risk. Finally, once the Roof-Crush Risk Vehicles were on the road, Ford had a duty to monitor the Roof-Crush Risk Vehicles under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

356.   Ford concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt Ford's image and cost Ford money, and it did so at the expense of Plaintiffs and the Nationwide Class.

357.   On information and belief, Ford has still not made a full and adequate disclosure and continues to defraud Plaintiffs and the Nationwide Class and conceal material information regarding the Roof-Crush Risk.

358.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Roof-Crush Risk Vehicles or would have paid less for their vehicles if they knew of the Roof-Crush Risk. Plaintiffs'

actions were justified. Ford was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

359.   Because of the concealment and/or suppression of the facts, Plaintiffs and other Nationwide Class members sustained damage. In purchasing their Roof-Crush Risk Vehicles, Plaintiffs did not get the benefit of the bargain since the vehicle was worth less than it would have been without the Roof-Crush Risk, and because they own vehicles that diminished in value as a result of Ford's concealment of, and failure to timely disclose and remedy, the Roof-Crush Risk. Had Plaintiffs been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased them at all.

360.   Accordingly, Ford is liable to Plaintiffs and the Nationwide Class for damages in an amount to be proven at trial.

361.   Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Nationwide Class members' rights and well-being in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## UNJUST ENRICHMENT
## (COMMON LAW)

### (Alleged by Plaintiffs on behalf of the Nationwide Class or, alternatively, on behalf of each state-specific Subclass)

362.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

363.   Plaintiffs assert this claim on behalf of themselves and the Nationwide Class, or, in the alternative, on behalf of the state Subclasses. A Nationwide Class is appropriate because the elements of unjust enrichment are uniform in all states.

364.   This claim is pleaded in the alternative to the contract-based claims brought on behalf of Plaintiffs and the Nationwide Class or, alternatively, on behalf of each state-specific subclass.

365.   Ford has received and retained a benefit from Plaintiffs and Nationwide Class members and inequity has resulted.

366.   Ford has benefitted from selling, leasing, and distributing the Roof-Crush Risk Vehicles for more than they were worth because of Ford's conduct described herein, at a profit, and Plaintiffs and putative class members have overpaid for the Roof-Crush Risk Vehicles.

367.   Thus, Plaintiffs and the Nationwide Class conferred a benefit on Ford.

368.   It is inequitable for Ford to retain these benefits.

369.   Plaintiffs and Nationwide Class members were not aware of the true facts about the Roof-Crush Risk Vehicles and did not benefit from Ford's conduct described herein.

370.   Ford knowingly accepted the benefits of its unjust conduct.

371.   As a result of Ford's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

**B.      State-Specific Claims**

    **1.      Alabama**

**COUNT IV**

**VIOLATION OF THE ALABAMA DECEPTIVE TRADE PRACTICES ACT**
**(73 P.S. § 201-1, *et seq.*)**

**(Alleged by Plaintiff Sager on behalf of the Alabama Subclass)**

372.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

373.   Plaintiff Sager (Plaintiff, for purposes of this count) brings this claim on behalf of himself and the Alabama Subclass.

374.   Plaintiff and the Alabama Subclass members are consumers within the meaning of ALA. CODE § 8-19-3(5).

375.   The Roof-Crush Risk Vehicles are "goods" within the meaning of ALA. CODE § 8-19-3(3).

- 120 -

376.   Ford was and is engaged in "trade or commerce" within the meaning of ALA. CODE § 8-19-3(8).

377.   The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including: "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." ALA. CODE § 8-19-5.

378.   Ford engaged in unlawful trade practices, including representing that the Roof-Crush Risk Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Roof-Crush Risk Vehicles are of a particular standard and quality when they are not; advertising the Roof-Crush Risk Vehicles with the intent not to sell them as advertised; and engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

379.   In purchasing or leasing the Roof-Crush Risk Vehicles, Plaintiff and the Alabama Subclass were deceived by Ford's failure to disclose the Roof-Crush Risk and misrepresentations about the Roof-Crush Risk Vehicles.

- 121 -

380.   Plaintiff and the Alabama Subclass members reasonably relied on Ford's material omissions and false misrepresentations. They had no way of knowing that Ford's representations were false and misleading. Plaintiff and the Alabama Subclass members did not, and could not, unravel Ford's deception on their own.

381.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, such as Plaintiff and the Alabama Subclass members.

382.   Ford knew or should have known that its conduct violated the Alabama DTPA.

383.   Ford's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of misleading a substantial portion of the purchasing public and imposed a serious safety risk on the public.

384.   Ford knew about the Roof-Crush Risk affecting the Roof-Crush Risk Vehicles owned or leased by Plaintiff and Alabama Subclass members based on (i) its own testing, studies and designs of the Roof-Crush Risk Vehicles; (ii) its own lobbying of regulatory authorities to minimize the regulation of roof strength in the Roof-Crush Risk Vehicles; (iii) its decision to put profits ahead of safety and purposefully weaken the roof structure in the Roof-Crush Risk Vehicles in order to

- 122 -

increase profits; (iv) its own pre-sale durability testing; and (v) Ford's own investigation of accidents involving in the Roof-Crush Risk Vehicles.

385. Ford owed Plaintiff and the Alabama Subclass a duty to disclose the true safety and reliability of the Roof-Crush Risk Vehicles because Ford:

     a.    Possessed exclusive knowledge about the Roof-Crush Risk;

     b.    Omitted the foregoing from Plaintiff and the Alabama Subclass;

     c.    Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Roof-Crush Risk Vehicles, while withholding material facts from Plaintiff and the Alabama Subclass that contradicted these representations; and/or

     d.    Had duties under the TREAD Act and related regulations to disclose and remedy the Roof-Crush Risk.

386. Ford had a duty to disclose the Roof-Crush Risk, because, having volunteered to provide information to Plaintiff and the Alabama Subclass, Ford had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiff relied on Ford's material omissions and representations that the Roof-Crush Risk Vehicles they were purchasing were safe and free from serious safety defects.

387. Plaintiff and the Alabama Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the omitted facts, in that they would not have purchased or leased the Roof-Crush Risk Vehicles manufactured by Ford, would have paid less, and

- 123 -

would have taken other affirmative steps considering the information omitted from them. Plaintiff and the Alabama Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public or Plaintiff and the Alabama Subclass.

388.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff and the Alabama Subclass. Had Plaintiff and the Alabama Subclass members known the truth about the Roof-Crush Risk they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiff and the Alabama Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Roof-Crush Risk Vehicles.

389.   Pursuant to ALA. CODE § 8-19-10, Plaintiff seek monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each Plaintiff.

390.   Plaintiff also seeks an order enjoining Ford's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under ALA. CODE § 8-19-1, *et seq.*

391.   On September 1, 2022, certain Plaintiffs sent a letter complying with ALA. CODE § 8-19-10(e). Because Ford failed to remedy its unlawful conduct within the requisite time period, Plaintiff seeks all damages and relief to which Plaintiff is entitled.

## 2.   Arizona

### COUNT V

### VIOLATIONS OF THE ARIZONA CONSUMER FRAUD ACT
### (Arizona Rev. Stat. § 44-1521, *et seq*.)

### (Alleged by Plaintiff Ellers on behalf of the Arizona Subclass)

392.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

393.   Plaintiff Ellers (Plaintiff, for purposes of this count) brings this claim on behalf of herself and the Arizona Subclass.

394.   Ford, Plaintiff, and the Arizona Subclass members are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), Ariz. Rev. Stat. § 44-1521(6).

395.   The Roof-Crush Risk Vehicles are "merchandise" within the meaning of ARIZ. REV. STAT. § 44-1521(5).

396.   Ford's actions, as set forth above, occurred in the conduct of trade or commerce.

- 125 -

397.    The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, … misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale … of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." ARIZ. REV. STAT. § 44-1522(A).

398.    Ford engaged in unlawful trade practices, including representing that the Roof-Crush Risk Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Roof-Crush Risk Vehicles are of a particular standard and quality when they are not; advertising the Roof-Crush Risk Vehicles with the intent not to sell them as advertised; and engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

399.    In purchasing or leasing the Roof-Crush Risk Vehicles, Plaintiff and the Arizona Subclass were deceived by Ford's failure to disclose the Roof-Crush Risk and misrepresentations about the Roof-Crush Risk Vehicles.

400.    Plaintiff and the Arizona Subclass members reasonably relied on Ford's material omissions and false misrepresentations. They had no way of knowing that Ford's representations were false and misleading. Plaintiff and the

- 126 -

Arizona Subclass members did not, and could not, unravel Ford's deception on their own.

401.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, such as Plaintiff and the Arizona Subclass members.

402.   Ford knew or should have known that its conduct violated the Arizona CFA.

403.   Ford's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of misleading a substantial portion of the purchasing public and imposed a serious safety risk on the public.

404.   Ford knew about the Roof-Crush Risk affecting the Roof-Crush Risk Vehicles owned or leased by Plaintiffs and Arizona Subclass members based on (i) its own testing, studies and designs of the Roof-Crush Risk Vehicles; (ii) its own lobbying of regulatory authorities to minimize the regulation of roof strength in the Roof-Crush Risk Vehicles; (iii) its decision to put profits ahead of safety and purposefully weaken the roof structure in the Roof-Crush Risk Vehicles in order to increase profits; (iv) its own pre-sale durability testing; and (v) Ford's own investigation of accidents involving in the Roof-Crush Risk Vehicles.

405.   Ford owed Plaintiff and the Arizona Subclass a duty to disclose the true safety and reliability of the Roof-Crush Risk Vehicles because Ford:

- 127 -

a.    Possessed exclusive knowledge about the Roof-Crush Risk;

b.    Omitted the foregoing from Plaintiff and the Arizona Subclass;

c.    Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Roof-Crush Risk Vehicles, while withholding material facts from Plaintiff and the Arizona Subclass that contradicted these representations; and/or

d.    Had duties under the TREAD Act and related regulations to disclose and remedy the Roof-Crush Risk.

406.   Ford had a duty to disclose the Roof-Crush Risk, because, having volunteered to provide information to Plaintiff and the Arizona Subclass, Ford had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiff relied on Ford's material omissions and representations that the Roof-Crush Risk Vehicles they were purchasing were safe and free from serious safety defects.

407.   Plaintiff and the Arizona Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the omitted facts, in that they would not have purchased or leased the Roof-Crush Risk Vehicles manufactured by Ford, would have paid less, and would have taken other affirmative steps considering the information omitted from them. Plaintiff and the Arizona Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public or Plaintiff and the Arizona Subclass.

408.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff and the Arizona Subclass. Had Plaintiff and the Arizona Subclass members known the truth about the Roof-Crush Risk they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiff and the Arizona Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Roof-Crush Risk Vehicles.

409.   Plaintiff seeks monetary relief against Ford in an amount to be determined at trial. Plaintiff also seeks punitive damages because Ford engaged in aggravated and outrageous conduct with an evil mind.

410.   Plaintiff also seeks an order enjoining Ford's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

**3.     Arkansas**

## COUNT VI

**VIOLATION OF THE DECEPTIVE TRADE PRACTICE ACT**
**(Ark. Code Ann. § 4-88-101, *et seq*.)**

**(Alleged by Plaintiff Stowers on behalf of the Arkansas Subclass)**

411.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

412.   Plaintiff Stowers (Plaintiff, for purposes of this count) brings this claim on behalf of himself and the Arkansas Subclass.

413.   Plaintiff and the Arkansas Subclass members are "persons" within the meaning of the Arkansas Deceptive Trade Practices Act ("Arkansas DTPA"), Ark. Code Ann. § 4-88-102(5).

414.   The Roof-Crush Risk Vehicles are "goods" within the meaning of Ark. Code Ann. § 4-88-102(4).

415.   Ford's actions, as set forth above, occurred in the conduct of trade or commerce.

416.   The Arkansas DTPA prohibits "[d]eceptive and unconscionable trade practices," which include, but are not limited to, a list of enumerated items, including "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]" Ark. Code Ann. § 4-88-107(a)(10). The Arkansas DTPA also prohibits the following when utilized in connection with the sale or advertisement of any goods: "(1) The act, use, or employment by any person of any deception, fraud, or false pretense; or (2) The concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission." Ark. Code Ann. § 4-88-108.

417.   Ford engaged in unlawful trade practices, including representing that the Roof-Crush Risk Vehicles have characteristics, uses, benefits, and qualities

- 130 -

which they do not have; representing that the Roof-Crush Risk Vehicles are of a

particular standard and quality when they are not; advertising the Roof-Crush Risk

Vehicles with the intent not to sell them as advertised; and engaging in other

fraudulent or deceptive conduct which creates a likelihood of confusion or of

misunderstanding.

418.   In purchasing or leasing the Roof-Crush Risk Vehicles, Plaintiff and

the Arkansas Subclass were deceived by Ford's failure to disclose the Roof-Crush

Risk and misrepresentations about the Roof-Crush Risk Vehicles.

419.   Plaintiff and the Arkansas Subclass members reasonably relied on

Ford's material omissions and false misrepresentations. They had no way of

knowing that Ford's representations were false and misleading. Plaintiff and the

Arkansas Subclass members did not, and could not, unravel Ford's deception on

their own.

420.   Ford's unfair or deceptive acts or practices were likely to and did in

fact deceive reasonable consumers, such as Plaintiff and the Arkansas Subclass

members.

421.   Ford knew or should have known that its conduct violated the

Arkansas DTPA.

422. Ford's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of misleading a substantial portion of the purchasing public and imposed a serious safety risk on the public.

423. Ford knew about the Roof-Crush Risk affecting the Roof-Crush Risk Vehicles owned or leased by Plaintiff and the Arkansas Subclass members based on (i) its own testing, studies and designs of the Roof-Crush Risk Vehicles; (ii) its own lobbying of regulatory authorities to minimize the regulation of roof strength in the Roof-Crush Risk Vehicles; (iii) its decision to put profits ahead of safety and purposefully weaken the roof structure in the Roof-Crush Risk Vehicles in order to increase profits; (iv) its own pre-sale durability testing; and (v) Ford's own investigation of accidents involving in the Roof-Crush Risk Vehicles.

424. Ford owed Plaintiff and the Arkansas Subclass a duty to disclose the true safety and reliability of the Roof-Crush Risk Vehicles because Ford:

    a.    Possessed exclusive knowledge about the Roof-Crush Risk;

    b.    Omitted the foregoing from Plaintiff and the Arkansas Subclass;

    c.    Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Roof-Crush Risk Vehicles, while withholding material facts from Plaintiff and the Arkansas Subclass that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the Roof-Crush Risk.

- 132 -

425.   Ford had a duty to disclose the Roof-Crush Risk, because, having volunteered to provide information to Plaintiff and the Arkansas Subclass, Ford had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiff relied on Ford's material omissions and representations that the Roof-Crush Risk Vehicles they were purchasing were safe and free from serious safety defects.

426.   Plaintiff and the Arkansas Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the omitted facts, in that they would not have purchased or leased the Roof-Crush Risk Vehicles manufactured by Ford, would have paid less, and would have taken other affirmative steps considering the information omitted from them. Plaintiff and the Arkansas Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public or Plaintiff and the Arkansas Subclass.

427.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff and the Arkansas Subclass. Had Plaintiff and the Arkansas Subclass members known the truth about the Roof-Crush Risk they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiff and the Arkansas Subclass also suffered ascertainable, monetary loss in the form of out-of-

- 133 -

pocket expenses, loss of use, and lost value related to the Roof-Crush Risk Vehicles.

428.    Plaintiff seeks monetary relief against Ford in an amount to be determined at trial. Plaintiff also seeks punitive damages because Ford acted wantonly in causing the injury or with such a conscious indifference to the consequences that malice may be inferred.

429.    Plaintiff also seeks an order enjoining Ford's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arkansas DTPA.

## COUNT VII

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER ARKANSAS LAW (Ark. Code Ann. § 4-2-314)

**(Alleged by Plaintiff Stowers on behalf of the Arkansas Subclass)**

430.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

431.    Plaintiff Stowers (Plaintiff, for purposes of this count) brings this claim on behalf of himself and the Arkansas Subclass.

432.    Ford is and was at all relevant times a merchant with respect to motor vehicles within the meaning of Ark. Code Ann. § 4-2-104(1).

- 134 -

433.   A warranty that the Roof-Crush Risk Vehicles were in merchantable condition is implied by law in the instant transactions under Ark. Code Ann. § 4-2-314.

434.   The Roof-Crush Risk Vehicles were not merchantable when sold or leased because they contain the Roof-Crush Risk and pose an unreasonable risk of paralysis, grave injury or death due to the Roof-Crush Risk as described herein. Without limitation, the Roof-Crush Risk Vehicles share a common defect in that they are all equipped with the Roof-Crush Risk that makes the vehicles susceptible to the roof crushing in a rollover accident, causing an unreasonable risk of paralysis, grave injury or death to lessees and owners of the Roof-Crush Risk Vehicles. This Roof-Crush Risk renders the Roof-Crush Risk Vehicles when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving when sold and leased, and at all times thereafter.

435.   Plaintiff and the Arkansas Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized dealers who sold or leased the Roof-Crush Risk Vehicles to Plaintiff and the Arkansas Subclass members.

436.   It was reasonable to expect that Plaintiff and the Arkansas Subclass members would use, consume, or be affected by the Roof-Crush Risk Vehicles.

- 135 -

437.   Ford was provided notice of these issues within a reasonable time of Plaintiff and the Arkansas Subclass members' knowledge of the non-conforming or defective nature of the Roof-Crush Risk Vehicles by the filing of this Complaint, consumer complaints to NHTSA regarding the Roof-Crush Risk that is the subject of this Complaint, and by the allegations contained in this and earlier Complaints.

438.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the Arkansas Subclass have been damaged in an amount to be determined at trial.

### 4.   California

**COUNT VIII**

**VIOLATION OF THE CALIFORNIA
CONSUMER LEGAL REMEDIES ACT
(Cal. Civ. Code § 1750, *et seq.*)**

**(Alleged by Plaintiffs Beck, Braden, John Schabinger, Edward Blaine
Schabinger, and Tellez on behalf of the California Subclass)**

439.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

440.   Plaintiffs Beck, Braden, John Schabinger, Edward Blaine Schabinger, and Tellez (Plaintiffs, for purposes of this count) bring this claim on behalf of themselves and the California Subclass.

441.   Ford is a person as defined in California Civil Code § 1761(c).

- 136 -

442.   Plaintiffs and California Subclass members are consumers as defined in California Civil Code § 1761(d).

443.   Ford engaged in unfair and deceptive acts in violation of the California Consumer Legal Remedies Act ("CLRA") through the practices described herein, and by omitting the Roof-Crush Risk and misrepresenting and misleading Plaintiffs and the California Subclass about the Roof-Crush Risk Vehicles, along with omitting the risks, costs, and monetary damage resulting from the Roof-Crush Risk. These acts and practices violate, at a minimum, the following sections of the CLRA: (a)(2) misrepresenting the source, sponsorship, approval, or certification of goods or services; (a)(5) representing that goods or services have sponsorships, characteristics, uses, benefits, or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection which they do not have; (a)(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and (a)(9) advertising goods and services with the intent not to sell them as advertised.

444.   Ford's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of misleading a substantial portion of the purchasing public and imposed a serious safety risk on the public.

445.   Ford knew or should have known that its conduct violated the CLRA.

- 137 -

446.   Ford knew about the Roof-Crush Risk affecting the Roof-Crush Risk Vehicles owned or leased by Plaintiffs and California Subclass members based on (i) its own testing, studies and designs of the Roof-Crush Risk Vehicles; (ii) its own lobbying of regulatory authorities to minimize the regulation of roof strength in the Roof-Crush Risk Vehicles; (iii) its decision to put profits ahead of safety and purposefully weaken the roof structure in the Roof-Crush Risk Vehicles in order to increase profits; (iv) its own pre-sale durability testing; and (v) Ford's own investigation of accidents involving in the Roof-Crush Risk Vehicles.

447.   In the course of its business, Ford violated the CLRA and engaged in deceptive acts or practices with the marketing and sale or lease of the Roof-Crush Risk Vehicles because it misrepresented and omitted material facts concerning the Roof-Crush Risk Vehicles, specifically the existence of the Roof-Crush Risk, as alleged herein. Ford omitted the fact of the Roof-Crush Risk from Plaintiffs and the California Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Roof-Crush Risk Vehicles given the existence of the Roof-Crush Risk in them.

448.   Ford owed Plaintiffs and the California Subclass a duty to disclose the true safety and reliability of the Roof-Crush Risk Vehicles because Ford:

a.   Possessed exclusive knowledge about the Roof-Crush Risk;

b.   Omitted the foregoing from Plaintiffs and the California Subclass;

- 138 -

    c.    Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Roof-Crush Risk Vehicles, while withholding material facts from Plaintiffs and the California Subclass that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the Roof-Crush Risk.

449.   In failing to disclose the Roof-Crush Risk and associated safety risks and repair costs that result from it, Ford has misrepresented the Roof-Crush Risk Vehicles, omitted disclosure the Roof-Crush Risk, and breached its duty to disclose.

450.   The facts omitted and misrepresented by Ford to Plaintiffs and California Subclass members, as described herein, are material in that a reasonable consumer would have considered them important in deciding whether to purchase the Roof-Crush Risk Vehicles or to pay a lesser price. Had Plaintiffs and California Subclass members known about the nature of the Roof-Crush Risk Vehicles, they would not have purchased or leased the Roof-Crush Risk Vehicles or would have paid less for them.

451.   On or about September 1, 2022, Plaintiffs' undersigned counsel provided Ford written notice of their violations of the CLRA under California Civil Code § 1782(a) regarding the Roof-Crush Risk Vehicles.

452.   Plaintiffs and California Subclass members' injuries were proximately caused by Ford's deceptive business practices.

- 139 -

453.   Plaintiffs and California Subclass members seek all relief available under the CLRA, including equitable relief, damages, and attorneys' fees.

## COUNT IX

**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**(Cal. Bus. & Prof. Code § 17200)**

**(Alleged by Plaintiffs Beck, Braden, John Schabinger, Edward Blaine Schabinger, and Tellez on behalf of the California Subclass)**

454.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

455.   Plaintiffs Beck, Braden, John Schabinger, Edward Blaine Schabinger, and Tellez (Plaintiffs, for purposes of this count) bring this claim on behalf of themselves and the California Subclass.

456.   The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

457.   In the course of its business, Ford engaged in deceptive acts or practices with the marketing and sale or lease of the Roof-Crush Risk Vehicles because it misrepresented and omitted material facts concerning the Roof-Crush Risk Vehicles, specifically the existence of the Roof-Crush Risk, as alleged herein. Ford omitted the fact of the Roof-Crush Risk from Plaintiffs and California

- 140 -

Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Roof-Crush Risk Vehicles given the existence of the Roof-Crush Risk in them.

458.    Ford engaged in unfair competition and unfair, unlawful, or fraudulent business practices through the conduct, statements, and omissions described herein, and by omitting the Roof-Crush Risk in the Roof-Crush Risk Vehicles from Plaintiffs and California Subclass members, along with omitting the risks, costs, and monetary damage resulting from the Roof-Crush Risk. Ford should have disclosed this information because it was in a superior position to know the true facts related to the Roof-Crush Risk, and Plaintiffs and California Subclass members could not reasonably be expected to learn or discover the true facts related to the Roof-Crush Risk.

459.    The Roof-Crush Risk causes paralysis, grave injury or death in the Roof-Crush Risk Vehicles in the event of a rollover accident, and this constitutes a safety issue that triggered Ford's duty to disclose the safety issue to consumers.

460.    Ford's acts and practices misled and deceived Plaintiffs and are likely to deceive the public. In failing to disclose the Roof-Crush Risk and omitting other material facts from Plaintiffs and California Subclass members, Ford breached its duty to disclose these facts, violated the UCL, and caused injuries to Plaintiffs and California Subclass members. Ford's omissions and misrepresentations concerned

information that was material to Plaintiffs and California Subclass members, as it would have been to all reasonable consumers.

461.   The injuries suffered by Plaintiffs and California Subclass members are not greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiffs and California Subclass members could or should have reasonably avoided.

462.   Ford's acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750, *et seq.*, and California Commercial Code § 2313. Ford knew or should have known its conduct violated the UCL.

463.   Plaintiffs and California Subclass members have suffered an injury in fact, including the loss of money or property, because of Ford's unfair, unlawful, and deceptive practices.

464.   Plaintiffs seek to enjoin further unlawful, unfair, and fraudulent acts or practices by Ford, to obtain restitutionary disgorgement of all monies and revenues generated because of such practices, and all other relief allowed under California Business & Professions Code § 17200.

## COUNT X

### VIOLATIONS OF CALIFORNIA FALSE ADVERTISING LAW
### (Cal. Bus. & Prof. Code § 17500, *et seq.*)

### (Alleged by Plaintiffs Beck, Braden, John Schabinger, Edward Blaine Schabinger, and Tellez on behalf of the California Subclass)

465.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

466.   Plaintiffs Beck, Braden, John Schabinger, Edward Blaine Schabinger, and Tellez (Plaintiffs, for purposes of this count) bring this claim on behalf of themselves and the California Subclass.

467.   California Business & Professions Code § 17500 states: "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

468.   Ford caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements

- 143 -

that were untrue or misleading, and which were known, or through the exercise of reasonable care should have been known to Ford, to be untrue and misleading to consumers, including Plaintiffs and California Subclass members.

469.   Ford violated Section 17500 because its misrepresentations and omissions regarding the safety, reliability, and functionality of the Roof-Crush Risk Vehicles as described herein were material, untrue, and misleading, and likely to deceive a reasonable consumer.

470.   Plaintiffs and California Subclass members have suffered an injury in fact, including the loss of money or property, because of Ford's deceptive advertising. In purchasing or leasing their Roof-Crush Risk Vehicles, Plaintiffs and California Subclass members relied on Ford's misrepresentations and omissions regarding the safety, reliability, and functionality of the vehicles. Ford's representations and omissions were untrue because the Roof-Crush Risk Vehicles were sold or leased with the Roof-Crush Risk. Had Plaintiffs and California Subclass members known this, they would not have purchased or leased their Roof-Crush Risk Vehicles or paid as much for them. Accordingly, Plaintiffs and California Subclass members overpaid for their Roof-Crush Risk Vehicles and did not receive the benefit of their bargain.

471.   All the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Ford's business. Ford's wrongful conduct is part of a

- 144 -

pattern or generalized course of conduct that is still perpetuated and repeated, both in California and nationwide.

472.   Plaintiffs, individually and on behalf of the California Subclass members, requests this Court enter such orders or judgments as necessary to enjoin Ford from continuing its unlawful and deceptive advertising, to restore to Plaintiffs and California Subclass members any money Ford acquired by its deceptive advertising, including restitution and restitutionary disgorgement, and for such other relief permitted.

## COUNT XI

### VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER CALIFORNIA LAW (Cal. Civ. Code §§ 1791.1 & 1792)

### (Alleged by Plaintiffs Beck, Braden, John Schabinger, Edward Blaine Schabinger, and Tellez on behalf of the California Subclass)

473.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

474.   Plaintiffs Beck, Braden, John Schabinger, Edward Blaine Schabinger, and Tellez (Plaintiffs, for purposes of this count) bring this claim on behalf of themselves and the California Subclass.

475.   Plaintiffs and California Subclass members are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

476.  The Roof-Crush Risk Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

477.  Ford is the "manufacturer" of the Roof-Crush Risk Vehicles within the meaning of Cal. Civ. Code § 1791(j).

478.  Ford impliedly warranted to Plaintiffs and the California Subclass that the Roof-Crush Risk Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Roof-Crush Risk Vehicles do not have the quality that a buyer would reasonably expect and were therefore not merchantable.

479.  Cal. Civ. Code § 1791.1(a) states:

> "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:
>
> (1)  Pass without objection in the trade under the contract description.
>
> (2)  Are fit for the ordinary purposes for which such goods are used.
>
> (3)  Are adequately contained, packaged, and labeled.
>
> (4)  Conform to the promises or affirmations of fact made on the container or label.

480.  The Roof-Crush Risk Vehicles were not merchantable when sold or leased because they contain the Roof-Crush Risk and pose an unreasonable risk of paralysis, grave injury or death due to the Roof-Crush Risk as described herein.

- 146 -

Without limitation, the Roof-Crush Risk Vehicles share a common defect in that they are all equipped with the Roof-Crush Risk that makes the vehicles susceptible to the roof crushing in a rollover accident, causing an unreasonable risk of paralysis, grave injury or death to lessees and owners of the Roof-Crush Risk Vehicles. This Roof-Crush Risk renders the Roof-Crush Risk Vehicles when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving.

481.   Ford breached the implied warranty of merchantability by selling Roof-Crush Risk Vehicles containing a defect leading to grave risk of injury or death during ordinary operating conditions. This defect has deprived Plaintiffs and California Subclass members of the benefit of their bargain.

482.   Notice of breach is not required because Plaintiffs and California Subclass members did not purchase their automobiles directly from Ford. Nonetheless, Plaintiffs' counsel sent notification to Ford on or about September 1, 2022.

483.   Plaintiffs and California Subclass members were and are third-party beneficiaries to Ford's contracts with Ford-certified/authorized retailers who sold or leased the Roof-Crush Risk Vehicles to Plaintiffs and California Subclass members.

484.   As a direct and proximate result Ford's breach of the implied warranty of merchantability, Plaintiffs and California Subclass members received goods whose dangerous condition now renders them at least partially inoperable and substantially impairs their value. Plaintiffs and California Subclass members have been damaged as they overpaid for their vehicles, and now suffer the partial or complete loss of use of their Roof-Crush Risk Vehicles.

485.   Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs and California Subclass members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Roof-Crush Risk Vehicles, or the overpayment or diminution in value of their Roof-Crush Risk Vehicles.

486.   Under Cal. Civ. Code § 1794, Plaintiffs and California Subclass members are entitled to costs and attorneys' fees.

**5.   Colorado**

## COUNT XII

## VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT
### (Col. Rev. Stat. §§ 6-1-101, *et seq.*)

**(Alleged by Plaintiff Marshall on behalf of the Colorado Subclass)**

487.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

488.   Plaintiff Marshall (Plaintiff, for purposes of this count) brings this claim on behalf of himself and the Colorado Subclass.

- 148 -

489.   Plaintiff and the Colorado Subclass members are consumers for purposes of Col. Rev. Stat § 6-1-113(1)(a).

490.   Ford is a "person" under § 6-1-102(6) of the Colorado Consumer Protection Act ("Colorado CPA"), Col. Rev. Stat. § 6-1-101, *et seq.*

491.   Ford's actions, as set forth above, occurred in the conduct of trade or commerce.

492.   The Colorado CPA prohibits deceptive trade practices in the course of a person's business.

493.   Ford engaged in unlawful trade practices, including representing that the Roof-Crush Risk Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Roof-Crush Risk Vehicles are of a particular standard and quality when they are not; advertising the Roof-Crush Risk Vehicles with the intent not to sell them as advertised; and engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

494.   In purchasing or leasing the Roof-Crush Risk Vehicles, Plaintiff and the Colorado Subclass were deceived by Ford's failure to disclose the Roof-Crush Risk and misrepresentations about the Roof-Crush Risk Vehicles.

495.   Plaintiff and the Colorado Subclass members reasonably relied on Ford's material omissions and false misrepresentations. They had no way of

- 149 -

knowing that Ford's representations were false and misleading. Plaintiff and the Colorado Subclass members did not, and could not, unravel Ford's deception on their own.

496.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, such as Plaintiff and the Colorado Subclass members.

497.   Ford knew or should have known that its conduct violated the Colorado CPA.

498.   Ford's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of misleading a substantial portion of the purchasing public and imposed a serious safety risk on the public.

499.   Ford knew about the Roof-Crush Risk affecting the Roof-Crush Risk Vehicles owned or leased by Plaintiff and Colorado Subclass members based on (i) its own testing, studies and designs of the Roof-Crush Risk Vehicles; (ii) its own lobbying of regulatory authorities to minimize the regulation of roof strength in the Roof-Crush Risk Vehicles; (iii) its decision to put profits ahead of safety and purposefully weaken the roof structure in the Roof-Crush Risk Vehicles in order to increase profits; (iv) its own pre-sale durability testing; and (v) Ford's own investigation of accidents involving in the Roof-Crush Risk Vehicles.

500.   Ford owed Plaintiff and the Colorado Subclass a duty to disclose the

true safety and reliability of the Roof-Crush Risk Vehicles because Ford:

    a.    Possessed exclusive knowledge about the Roof-Crush Risk;

    b.    Omitted the foregoing from Plaintiff and the Colorado Subclass;

    c.    Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Roof-Crush Risk Vehicles, while withholding material facts from Plaintiff and the Colorado Subclass that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the Roof-Crush Risk.

501.   Ford had a duty to disclose the Roof-Crush Risk, because, having

volunteered to provide information to Plaintiff and the Colorado Subclass, Ford

had the duty to disclose not just the partial truth, but the entire truth. Further,

Plaintiff relied on Ford's material omissions and representations that the Roof-

Crush Risk Vehicles they were purchasing were safe and free from serious safety

defects.

502.   Plaintiff and the Colorado Subclass were unaware of the omitted

material facts referenced herein, and they would not have acted as they did if they

had known of the omitted facts, in that they would not have purchased or leased

the Roof-Crush Risk Vehicles manufactured by Ford, would have paid less, and

would have taken other affirmative steps considering the information omitted from

them. Plaintiff and the Colorado Subclass members' actions were justified. Ford

- 151 -

was in exclusive control of the material facts, and such facts were not generally known to the public or Plaintiff and the Colorado Subclass.

503.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff and the Colorado Subclass. Had Plaintiff and the Colorado Subclass members known the truth about the Roof-Crush Risk they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiff and the Colorado Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Roof-Crush Risk Vehicles.

504.   Pursuant to Colo. Rev. Stat. § 6-1-113, Plaintiff seeks monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for each Plaintiff.

505.   Plaintiff also seeks an order enjoining Ford's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Colorado CPA.

## COUNT XIII

## BREACH OF IMPLIED WARRANTY OF
## MERCHANTABILITY UNDER COLORADO LAW
## (Col. Rev. Stat. § 4-2-314)

**(Alleged by Plaintiff Marshall on behalf of the Colorado Subclass)**

506.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

507.   Plaintiff Marshall (Plaintiff, for purposes of this count) brings this claim on behalf of himself and the Colorado Subclass.

508.   Ford is and was at all relevant times a merchant with respect to motor vehicles.

509.   A warranty that the Roof-Crush Risk Vehicles were in merchantable condition is implied by law in the instant transactions, pursuant to Col. Rev. Stat. § 4-2-314.

510.   The Roof-Crush Risk Vehicles were not merchantable when sold or leased because they contain the Roof-Crush Risk and pose an unreasonable risk of paralysis, grave injury or death due to the Roof-Crush Risk as described herein. Without limitation, the Roof-Crush Risk Vehicles share a common defect in that they are all equipped with the Roof-Crush Risk that makes the vehicles susceptible to the roof crushing in a rollover accident, causing an unreasonable risk of paralysis, grave injury or death to lessees and owners of the Roof-Crush Risk

- 153 -

Vehicles. This Roof-Crush Risk renders the Roof-Crush Risk Vehicles when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving when sold and leased, and at all times thereafter.

511.   Plaintiff and the Colorado Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized dealers who sold or leased the Roof-Crush Risk Vehicles to Plaintiff and the Colorado Subclass members.

512.   It was reasonable to expect that Plaintiff and the Colorado Subclass members would use, consume, or be affected by the Roof-Crush Risk Vehicles.

513.   Ford was provided notice of these issues within a reasonable time of Plaintiff and the Colorado Subclass members' knowledge of the non-conforming or defective nature of the Roof-Crush Risk Vehicles by the filing of this Complaint, consumer complaints to NHTSA regarding the Roof-Crush Risk that is the subject of this Complaint, and by the allegations contained in this and earlier Complaints.

514.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the Colorado Subclass have been damaged in an amount to be determined at trial.

- 154 -

6.      **Connecticut**

## COUNT XIV

**VIOLATION OF CONNECTICUT UNLAWFUL TRADE PRACTICES ACT**
**(Conn. Gen. Stat. § 42-110a, *et seq.*)**

**(Alleged by Plaintiff Lawless on behalf of the Connecticut Subclass)**

515.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

516.   Plaintiff Lawless (Plaintiff, for purposes of this count) brings this claim on behalf of himself and the Connecticut Subclass.

517.   Ford is a "person" within the meaning of CONN. GEN. STAT. § 42-110a(3).

518.   Ford challenged acts occurred is in "trade" or "commerce" within the meaning of CONN. GEN. STAT. § 42-110a(4).

519.   The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." CONN. GEN. STAT. § 42-110b(a).

520.   Ford engaged in unlawful trade practices, including representing that the Roof-Crush Risk Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Roof-Crush Risk Vehicles are of a particular standard and quality when they are not; advertising the Roof-Crush Risk

- 155 -

Vehicles with the intent not to sell them as advertised; and engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

521.   In purchasing or leasing the Roof-Crush Risk Vehicles, Plaintiff and the Connecticut Subclass were deceived by Ford's failure to disclose the Roof-Crush Risk and misrepresentations about the Roof-Crush Risk Vehicles.

522.   Plaintiff and the Connecticut Subclass members reasonably relied on Ford's material omissions and false misrepresentations. They had no way of knowing that Ford's representations were false and misleading. Plaintiff and the Connecticut Subclass members did not, and could not, unravel Ford's deception on their own.

523.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, such as Plaintiff and the Connecticut Subclass members.

524.   Ford knew or should have known that its conduct violated the Connecticut UTPA.

525.   Ford's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of misleading a substantial portion of the purchasing public and imposed a serious safety risk on the public.

526.   Ford knew about the Roof-Crush Risk affecting the Roof-Crush Risk Vehicles owned or leased by Plaintiff and Connecticut Subclass members based on (i) its own testing, studies and designs of the Roof-Crush Risk Vehicles; (ii) its own lobbying of regulatory authorities to minimize the regulation of roof strength in the Roof-Crush Risk Vehicles; (iii) its decision to put profits ahead of safety and purposefully weaken the roof structure in the Roof-Crush Risk Vehicles in order to increase profits; (iv) its own pre-sale durability testing; and (v) Ford's own investigation of accidents involving in the Roof-Crush Risk Vehicles.

527.   Ford owed Plaintiff and the Connecticut Subclass a duty to disclose the true safety and reliability of the Roof-Crush Risk Vehicles because Ford:

a.   Possessed exclusive knowledge about the Roof-Crush Risk;

b.   Omitted the foregoing from Plaintiff and the Connecticut Subclass;

c.   Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Roof-Crush Risk Vehicles, while withholding material facts from Plaintiff and the Connecticut Subclass that contradicted these representations; and/or

d.   Had duties under the TREAD Act and related regulations to disclose and remedy the Roof-Crush Risk.

528.   Ford had a duty to disclose the Roof-Crush Risk, because, having volunteered to provide information to Plaintiff and the Connecticut Subclass, Ford had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiff relied on Ford's material omissions and representations that the Roof-

- 157 -

Crush Risk Vehicles they were purchasing were safe and free from serious safety defects.

529.   Plaintiff and the Connecticut Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the omitted facts, in that they would not have purchased or leased the Roof-Crush Risk Vehicles manufactured by Ford, would have paid less, and would have taken other affirmative steps considering the information omitted from them. Plaintiff and the Connecticut Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public or Plaintiff and the Connecticut Subclass.

530.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff and the Connecticut Subclass. Had Plaintiff and the Connecticut Subclass members known the truth about the Roof-Crush Risk they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiff and the Connecticut Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Roof-Crush Risk Vehicles.

- 158 -

531.   Plaintiff and the Connecticut Subclass are entitled to recover his actual damages, punitive damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g.

532.   Ford acted with a reckless indifference to another's rights or wanton or intentional violation to another's rights and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights and safety of others. Therefore, punitive damages are warranted.

**7.    Florida**

## COUNT XV

## VIOLATION OF THE FLORIDA DECEPTIVE
## AND UNFAIR TRADE PRACTICES ACT
### (Fla. Stat. § 501.201, *et. seq.*)

**(Alleged by Plaintiffs Holicz and Koblasz on behalf of the Florida Subclass)**

533.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

534.   Plaintiffs Holicz and Koblasz (Plaintiffs, for purposes of this count) bring this claim on behalf of themselves and the Florida Subclass.

535.   Plaintiffs and the Florida Subclass members are "consumers", as defined by § 501.203(7) of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

536.   All of the acts complained of herein were perpetrated by Ford in the course of trade or commerce as defined by § 501.203(8) of the FDUTPA.

- 159 -

537.    The sale of the Roof-Crush Risk Vehicles to Plaintiffs and other

Florida Subclass members was a "consumer transaction", as defined by § 1345.01

of the FDUTPA.

538.    Section 501.204(1) of the Florida Deceptive and Unfair Trade

Practices Act prohibits "[u]nfair methods of competition, unconscionable acts or

practices, and unfair or deceptive acts or practices in the conduct of any trade or

commerce…" Fla. Stat. § 501.204(1). Ford participated in unfair and deceptive

trade practices that violated the FDUTPA as described herein.

539.    Ford engaged in unlawful trade practices, including representing that

the Roof-Crush Risk Vehicles have characteristics, uses, benefits, and qualities

which they do not have; representing that the Roof-Crush Risk Vehicles are of a

particular standard and quality when they are not; advertising the Roof-Crush Risk

Vehicles with the intent not to sell them as advertised; and engaging in other

fraudulent or deceptive conduct which creates a likelihood of confusion or of

misunderstanding.

540.    In purchasing or leasing the Roof-Crush Risk Vehicles, Plaintiffs and

the Florida Subclass were deceived by Ford's failure to disclose the Roof-Crush

Risk and misrepresentations about the Roof-Crush Risk Vehicles.

541.    Plaintiffs and the Florida Subclass members reasonably relied on

Ford's material omissions and false misrepresentations. They had no way of

knowing that Ford's representations were false and misleading. Plaintiffs and the Florida Subclass members did not, and could not, unravel Ford's deception on their own.

542.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, such as Plaintiffs and the Florida Subclass members.

543.   Ford knew or should have known that its conduct violated the FDUTPA.

544.   Ford's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of misleading a substantial portion of the purchasing public and imposed a serious safety risk on the public.

545.   Ford knew about the Roof-Crush Risk affecting the Roof-Crush Risk Vehicles owned or leased by Plaintiffs and Florida Subclass members based on (i) its own testing, studies and designs of the Roof-Crush Risk Vehicles; (ii) its own lobbying of regulatory authorities to minimize the regulation of roof strength in the Roof-Crush Risk Vehicles; (ii) its decision to put profits ahead of safety and purposefully weaken the roof structure in the Roof-Crush Risk Vehicles in order to increase profits; (iii) its own pre-sale durability testing; and (iv) Ford's own investigation of accidents involving in the Roof-Crush Risk Vehicles.

546.   Ford owed Plaintiffs and the Florida Subclass a duty to disclose the true safety and reliability of the Roof-Crush Risk Vehicles because Ford:

      a.      Possessed exclusive knowledge about the Roof-Crush Risk;

      b.      Omitted the foregoing from Plaintiffs and the Florida Subclass;

      c.      Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Roof-Crush Risk Vehicles, while withholding material facts from Plaintiffs and the Florida Subclass that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the Roof-Crush Risk.

547.   Ford had a duty to disclose the Roof-Crush Risk, because, having volunteered to provide information to Plaintiffs and the Florida Subclass, Ford had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiffs relied on Ford's material omissions and representations that the Roof-Crush Risk Vehicles they were purchasing were safe and free from serious safety defects.

548.   Plaintiffs and the Florida Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the omitted facts, in that they would not have purchased or leased the Roof-Crush Risk Vehicles manufactured by Ford, would have paid less, and would have taken other affirmative steps considering the information omitted from them. Plaintiffs and the Florida Subclass members' actions were justified. Ford

- 162 -

was in exclusive control of the material facts, and such facts were not generally known to the public or Plaintiffs and the Florida Subclass.

549.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiffs and the Florida Subclass. Had Plaintiffs and the Florida Subclass members known the truth about the Roof-Crush Risk they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiffs and the Florida Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Roof-Crush Risk Vehicles.

550.   Plaintiffs and the Florida Subclass are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1), and any other just and appropriate relief.

## COUNT XVI

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER FLORIDA LAW
### (Fla. Stat. § 672.314)

**(Alleged by Plaintiffs Holicz and Koblasz on behalf of the Florida Subclass)**

551.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

552.   Plaintiffs Holicz and Koblasz (Plaintiffs, for purposes of this count) bring this claim on behalf of themselves and the Florida Subclass.

- 163 -

553.   Plaintiffs were at all relevant times a "buyer" as defined by § 672.103 of the Florida Uniform Commercial Code.

554.   Ford was at all relevant times a "merchant" as defined by § 672.104 of the Florida Uniform Commercial Code.

555.   The Roof-Crush Risk Vehicles are and were at all relevant times "goods", as defined by § 672.105 of the Florida Uniform Commercial Code.

556.   Under Florida law, an implied warranty of merchantability attaches to the Roof-Crush Risk Vehicles.

557.   The Roof-Crush Risk Vehicles were not merchantable when sold or leased because they contain the Roof-Crush Risk and pose an unreasonable risk of paralysis, grave injury or death due to the Roof-Crush Risk as described herein. Without limitation, the Roof-Crush Risk Vehicles share a common defect in that they are all equipped with the Roof-Crush Risk that makes the vehicles susceptible to the roof crushing in a rollover accident, causing an unreasonable risk of paralysis, grave injury or death to lessees and owners of the Roof-Crush Risk Vehicles. This Roof-Crush Risk renders the Roof-Crush Risk Vehicles when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving.

558.   Plaintiffs and the Florida Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized dealers who sold or

leased the Roof-Crush Risk Vehicles to Plaintiffs and the Florida Subclass members.

559.   It was reasonable to expect that Plaintiffs and the Florida Subclass members would use, consume, or be affected by the Roof-Crush Risk Vehicles.

560.   Ford was provided notice of these issues within a reasonable time of Plaintiffs and the Florida Subclass members' knowledge of the non-conforming or defective nature of the Roof-Crush Risk Vehicles by the filing of this Complaint, consumer complaints to NHTSA regarding the Roof-Crush Risk that is the subject of this Complaint, and by the allegations contained in this and earlier Complaints.

561.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs and the Florida Subclass have been damaged in an amount to be determined at trial.

**8.    Illinois**

**COUNT XVII**

**VIOLATION OF ILLINOIS CONSUMER FRAUD AND
DECEPTIVE BUSINESS PRACTICES ACT
(815 ILCS 505/1, *et seq*. and 720 ILCS 295/1a)**

**(Alleged by Plaintiffs Brock and Scott on behalf of the Illinois Subclass)**

562.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

563.   Plaintiffs Brock and Scott (Plaintiffs, for purposes of this count) bring this claim on behalf of themselves and the Illinois Subclass.

- 165 -

564.   Ford is a "person" as that term is defined in 815 ILCS 505/1(c).

565.   Plaintiffs and the Illinois Subclass are "consumers" as that term is defined in 815 ILCS 505/1(e).

566.   Ford's actions, as set forth above, occurred in the conduct of trade or commerce.

567.   The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including, but not limited to, the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

568.   Ford engaged in unlawful trade practices, including representing that the Roof-Crush Risk Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Roof-Crush Risk Vehicles are of a particular standard and quality when they are not; advertising the Roof-Crush Risk Vehicles with the intent not to sell them as advertised; and engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

- 166 -

569.   In purchasing or leasing the Roof-Crush Risk Vehicles, Plaintiffs and the Illinois Subclass were deceived by Ford's failure to disclose the Roof-Crush Risk and misrepresentations about the Roof-Crush Risk Vehicles.

570.   Plaintiff and the Illinois Subclass members reasonably relied on Ford's material omissions and false misrepresentations. They had no way of knowing that Ford's representations were false and misleading. Plaintiffs and the Illinois Subclass members did not, and could not, unravel Ford's deception on their own.

571.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, such as Plaintiffs and the Illinois Subclass members.

572.   Ford knew or should have known that its conduct violated the Illinois CFA.

573.   Ford's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of misleading a substantial portion of the purchasing public and imposed a serious safety risk on the public.

574.   Ford knew about the Roof-Crush Risk affecting the Roof-Crush Risk Vehicles owned or leased by Plaintiffs and the Illinois Subclass members based on (i) its own testing, studies and designs of the Roof-Crush Risk Vehicles; (ii) its own lobbying of regulatory authorities to minimize the regulation of roof strength

- 167 -

in the Roof-Crush Risk Vehicles; (iii) its decision to put profits ahead of safety and purposefully weaken the roof structure in the Roof-Crush Risk Vehicles in order to increase profits; (iv) its own pre-sale durability testing; and (v) Ford's own investigation of accidents involving in the Roof-Crush Risk Vehicles.

575.   Ford owed Plaintiffs and the Illinois Subclass a duty to disclose the true safety and reliability of the Roof-Crush Risk Vehicles because Ford:

   a.   Possessed exclusive knowledge about the Roof-Crush Risk;

   b.   Omitted the foregoing from Plaintiffs and the Illinois Subclass;

   c.   Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Roof-Crush Risk Vehicles, while withholding material facts from Plaintiffs and the Illinois Subclass that contradicted these representations; and/or

   d.   Had duties under the TREAD Act and related regulations to disclose and remedy the Roof-Crush Risk.

576.   Ford had a duty to disclose the Roof-Crush Risk, because, having volunteered to provide information to Plaintiffs and the Illinois Subclass, Ford had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiffs relied on Ford's material omissions and representations that the Roof-Crush Risk Vehicles they were purchasing were safe and free from serious safety defects.

577.   Plaintiffs and the Illinois Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the omitted facts, in that they would not have purchased or leased

011115-11/2243027 V1

the Roof-Crush Risk Vehicles manufactured by Ford, would have paid less, and would have taken other affirmative steps considering the information omitted from them. Plaintiffs and the Illinois Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public or Plaintiffs and the Illinois Subclass.

578.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiffs and the Illinois Subclass. Had Plaintiffs and the Illinois Subclass members known the truth about the Roof-Crush Risk they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiffs and the Illinois Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Roof-Crush Risk Vehicles.

579.   Pursuant to 815 ILCS 505/10a(a), Plaintiffs seek monetary relief against Ford in the amount of actual damages, as well as punitive damages because Ford acted with fraud and/or malice and/or was grossly negligent.

580.   Plaintiffs also seeks an order enjoining Ford's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1, *et seq*.

## COUNT XVIII

### BREACH OF IMPLIED WARRANTY OF
### MERCHANTABILITY UNDER ILLINOIS LAW
### (810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212)

**(Alleged by Plaintiffs Brock and Scott on behalf of the Illinois Subclass)**

581.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

582.    Plaintiffs Brock and Scott (Plaintiffs, for purposes of this count) bring this claim on behalf of themselves and the Illinois Subclass.

583.    Ford is and was at all relevant times a merchant with respect to motor vehicles under 810 ILL. COMP. STAT. §§ 5/2-104(1) and 5/2A-103(3), and "sellers" of motor vehicles under § 5/2-103(1)(d).

584.    The Roof-Crush Risk Vehicles are and were at all relevant times "goods" within the meaning of 810 ILL. COMP. STAT. §§ 5/2-105(1) and 5/2A-103(1)(h).

585.    A warranty that the Roof-Crush Risk Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 810 Ill. Comp. Stat. §§ 28-2-314 and 28-12-212.

586.    The Roof-Crush Risk Vehicles were not merchantable when sold or leased because they contain the Roof-Crush Risk and pose an unreasonable risk of paralysis, grave injury or death due to the Roof-Crush Risk as described herein.

- 170 -

Without limitation, the Roof-Crush Risk Vehicles share a common defect in that they are all equipped with the Roof-Crush Risk that makes the vehicles susceptible to the roof crushing in a rollover accident, causing an unreasonable risk of paralysis, grave injury or death to lessees and owners of the Roof-Crush Risk Vehicles. This Roof-Crush Risk renders the Roof-Crush Risk Vehicles when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving when sold and leased, and at all times thereafter.

587.   Plaintiffs and the Illinois Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized dealers who sold or leased the Roof-Crush Risk Vehicles to Plaintiffs and the Illinois Subclass members.

588.   It was reasonable to expect Plaintiffs and the Illinois Subclass members would use, consume, or be affected by the Roof-Crush Risk Vehicles.

589.   Ford was provided notice of these issues within a reasonable time of Plaintiffs and the Illinois Subclass members' knowledge of the non-conforming or defective nature of the Roof-Crush Risk Vehicles by the filing of this Complaint, consumer complaints to NHTSA regarding the Roof-Crush Risk that is the subject of this Complaint, and by the allegations contained in this and earlier Complaints.

590.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs and the Illinois Subclass have been damaged in an amount to be determined at trial.

### 9.   Indiana

## COUNT XIX

## VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT
(Ind. Code § 24-5-0.5-3)

### (Alleged by Plaintiff Powell on behalf of the Indiana Subclass)

591.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

592.   Plaintiff Powell (Plaintiff, for purposes of this count) brings this claim on behalf of himself and the Indiana Subclass.

593.   Ford is a "person" within the meaning of Ind. Code § 24-5-0.5-2(2) and a "supplier" within the meaning of Ind. Code § 24-5-.05-2(a)(3).

594.   Plaintiff's purchase of Roof-Crush Risk Vehicles are "consumer transactions" within the meaning of Ind. Code § 24-5-.05-2(a)(1).

595.   Ford's actions, as set forth above, occurred in the conduct of trade or commerce.

596.   Indiana's Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a person from engaging in a "deceptive trade practice," which includes representing: "(1) That such subject of a consumer transaction has sponsorship,

- 172 -

approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; … (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have; … (b) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false."

597.   Ford engaged in unlawful trade practices, including representing that the Roof-Crush Risk Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Roof-Crush Risk Vehicles are of a particular standard and quality when they are not; advertising the Roof-Crush Risk Vehicles with the intent not to sell them as advertised; and engaging in other

- 173 -

fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

598. In purchasing or leasing the Roof-Crush Risk Vehicles, Plaintiff and the Indiana Subclass were deceived by Ford's failure to disclose the Roof-Crush Risk and misrepresentations about the Roof-Crush Risk Vehicles.

599. Plaintiff and the Indiana Subclass members reasonably relied on Ford's material omissions and false misrepresentations. They had no way of knowing that Ford's representations were false and misleading. Plaintiff and the Indiana Subclass members did not, and could not, unravel Ford's deception on their own.

600. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, such as Plaintiff and the Indiana Subclass members.

601. Ford knew or should have known that its conduct violated the Indiana DCSA.

602. Ford's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of misleading a substantial portion of the purchasing public and imposed a serious safety risk on the public.

603. Ford knew about the Roof-Crush Risk affecting the Roof-Crush Risk Vehicles owned or leased by Plaintiff and the Indiana Subclass members based on

- 174 -

(i) its own testing, studies and designs of the Roof-Crush Risk Vehicles; (ii) its own lobbying of regulatory authorities to minimize the regulation of roof strength in the Roof-Crush Risk Vehicles; (iii) its decision to put profits ahead of safety and purposefully weaken the roof structure in the Roof-Crush Risk Vehicles in order to increase profits; (iv) its own pre-sale durability testing; and (v) Ford's own investigation of accidents involving in the Roof-Crush Risk Vehicles.

604. Ford owed Plaintiff and the Indiana Subclass a duty to disclose the true safety and reliability of the Roof-Crush Risk Vehicles because Ford:

    a.    Possessed exclusive knowledge about the Roof-Crush Risk;

    b.    Omitted the foregoing from Plaintiff and the Indiana Subclass;

    c.    Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Roof-Crush Risk Vehicles, while withholding material facts from Plaintiff and the Indiana Subclass that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the Roof-Crush Risk.

605. Ford had a duty to disclose the Roof-Crush Risk, because, having volunteered to provide information to Plaintiff and the Indiana Subclass, Ford had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiff relied on Ford's material omissions and representations that the Roof-Crush Risk Vehicles they were purchasing were safe and free from serious safety defects.

011115-11/2243027 V1

606.   Plaintiff and the Indiana Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the omitted facts, in that they would not have purchased or leased the Roof-Crush Risk Vehicles manufactured by Ford, would have paid less, and would have taken other affirmative steps considering the information omitted from them. Plaintiff and the Indiana Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public or Plaintiff and the Indiana Subclass.

607.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff and the Indiana Subclass. Had Plaintiff and the Indiana Subclass members known the truth about the Roof-Crush Risk they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiff and the Indiana Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Roof-Crush Risk Vehicles.

608.   Pursuant to Ind. Code § 24-5-0.5-4, Plaintiff seeks monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff, including treble damages up to $1,000 for Ford's willfully deceptive acts.

- 176 -

Plaintiff also seeks punitive damages based on the outrageousness and recklessness of Ford's conduct and Ford's high net worth.

609.   On September 1, 2022, certain Plaintiffs sent a letter complying with Ind. Code § 24-5-0.5-5(a). Because Ford failed to remedy its unlawful conduct within the requisite time period, Plaintiff seeks all damages and relief to which Plaintiffs are entitled.

**COUNT XX**

**BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER INDIANA LAW
(Ind. Code § 26-1-2-314)**

**(Alleged by Plaintiff Powell on behalf of the Indiana Subclass)**

610.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

611.   Plaintiff Powell (Plaintiff, for purposes of this count) brings this claim on behalf of himself and the Indiana Subclass.

612.   Ford is and was at all relevant times a merchant with respect to motor vehicles within the meaning of Ind. Code § 26-1-2-104(1).

613.   A warranty that the Roof-Crush Risk Vehicles were in merchantable condition is implied by law in the instant transactions under Ind. Code § 26-1-2-314.

614.   The Roof-Crush Risk Vehicles were not merchantable when sold or leased because they contain the Roof-Crush Risk and pose an unreasonable risk of paralysis, grave injury or death due to the Roof-Crush Risk as described herein. Without limitation, the Roof-Crush Risk Vehicles share a common defect in that they are all equipped with the Roof-Crush Risk that makes the vehicles susceptible to the roof crushing in a rollover accident, causing an unreasonable risk of paralysis, grave injury or death to lessees and owners of the Roof-Crush Risk Vehicles. This Roof-Crush Risk renders the Roof-Crush Risk Vehicles when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving when sold and leased, and at all times thereafter.

615.   Plaintiff and the Indiana Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized dealers who sold or leased the Roof-Crush Risk Vehicles to Plaintiff and the Indiana Subclass members.

616.   It was reasonable to expect that Plaintiff and the Indiana Subclass members would use, consume, or be affected by the Roof-Crush Risk Vehicles.

617.   Ford was provided notice of these issues within a reasonable time of Plaintiff and the Indiana Subclass members' knowledge of the non-conforming or defective nature of the Roof-Crush Risk Vehicles by the filing of this Complaint,

consumer complaints to NHTSA regarding the Roof-Crush Risk that is the subject of this Complaint, and by the  allegations contained in this and earlier Complaints.

618.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the Indiana Subclass have been damaged in an amount to be determined at trial.

### 10.    Iowa

**COUNT XXI**

**CONSUMER FRAUDS ACTS IN VIOLATION OF IOWA LAW
(IOWA CODE § 714H.1 *ET SEQ.*)**

**(Alleged by Plaintiffs Katch and Stutler Jr. on behalf of the Iowa Subclass)**

619.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

620.   Plaintiffs Katch and Stutler Jr. (Plaintiffs, for purposes of this count) bring this claim on behalf of themselves and the Iowa Subclass.

621.   Ford is a "person" under Iowa Code § 714H.2(7).

622.   Plaintiffs and the Iowa Subclass are "consumers" as that term is defined in Iowa Code § 714H.2(3).

623.   Ford's actions, as set forth above, occurred in the conduct of trade or commerce.

624.   The Iowa Private Right of Action for Consumer Frauds Act ("Iowa CFA") prohibits any "practice or act the person knows or reasonably should know

- 179 -

is an unfair practice, deception, fraud, false pretense, or false promise, or the

misrepresentation, concealment, suppression, or omission of a material fact, with

the intent that others rely upon the unfair practice, deception, fraud, false pretense,

false promise, misrepresentation, concealment, suppression, or omission in

connection with the advertisement, sale, or lease of consumer merchandise." Iowa

Code § 714H.3.

625. Ford engaged in unlawful trade practices, including representing that

the Roof-Crush Risk Vehicles have characteristics, uses, benefits, and qualities

which they do not have; representing that the Roof-Crush Risk Vehicles are of a

particular standard and quality when they are not; advertising the Roof-Crush Risk

Vehicles with the intent not to sell them as advertised; and engaging in other

fraudulent or deceptive conduct which creates a likelihood of confusion or of

misunderstanding.

626. In purchasing or leasing the Roof-Crush Risk Vehicles, Plaintiffs and

the Iowa Subclass were deceived by Ford's failure to disclose the Roof-Crush Risk

and misrepresentations about the Roof-Crush Risk Vehicles.

627. Plaintiffs and the Iowa Subclass members reasonably relied on Ford's

material omissions and false misrepresentations. They had no way of knowing that

Ford's representations were false and misleading. Plaintiffs and the Iowa Subclass

members did not, and could not, unravel Ford's deception on their own.

628.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, such as Plaintiffs and the Iowa Subclass members.

629.   Ford knew or should have known that its conduct violated the Iowa CFA.

630.   Ford's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of misleading a substantial portion of the purchasing public and imposed a serious safety risk on the public.

631.   Ford knew about the Roof-Crush Risk affecting the Roof-Crush Risk Vehicles owned or leased by Plaintiffs and the Iowa Subclass members based on (i) its own testing, studies and designs of the Roof-Crush Risk Vehicles; (ii) its own lobbying of regulatory authorities to minimize the regulation of roof strength in the Roof-Crush Risk Vehicles; (iii) its decision to put profits ahead of safety and purposefully weaken the roof structure in the Roof-Crush Risk Vehicles in order to increase profits; (iv) its own pre-sale durability testing; and (v) Ford's own investigation of accidents involving in the Roof-Crush Risk Vehicles.

632.   Ford owed Plaintiffs and the Iowa Subclass a duty to disclose the true safety and reliability of the Roof-Crush Risk Vehicles because Ford:

      a.     Possessed exclusive knowledge about the Roof-Crush Risk;

      b.     Omitted the foregoing from Plaintiffs and the Iowa Subclass;

- 181 -

      c.     Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Roof-Crush Risk Vehicles, while withholding material facts from Plaintiffs and the Iowa Subclass that contradicted these representations; and/or

      d.     Had duties under the TREAD Act and related regulations to disclose and remedy the Roof-Crush Risk.

633.   Ford had a duty to disclose the Roof-Crush Risk, because, having volunteered to provide information to Plaintiffs and the Iowa Subclass, Ford had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiffs relied on Ford's material omissions and representations that the Roof-Crush Risk Vehicles they were purchasing were safe and free from serious safety defects.

634.   Plaintiffs and the Iowa Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the omitted facts, in that they would not have purchased or leased the Roof-Crush Risk Vehicles manufactured by Ford, would have paid less, and would have taken other affirmative steps considering the information omitted from them. Plaintiffs and the Iowa Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public or Plaintiffs and the Iowa Subclass.

635.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiffs and the Iowa Subclass. Had Plaintiffs and the Iowa Subclass members known the

truth about the Roof-Crush Risk they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiffs and the Iowa Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Roof-Crush Risk Vehicles.

636.   Pursuant to Iowa Code § 714H.5, Plaintiffs seeks monetary relief against Ford in the amount of actual damages, as well as punitive damages because Ford acted with fraud and/or malice and/or was grossly negligent.

637.   Plaintiffs also seek an order enjoining Ford's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under Iowa Code § 714H.1, *et seq*.

**11.    Montana**

## COUNT XXII

### VIOLATION OF MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT OF 1973
#### (Mont. Code Ann. § 30-14-101, *et seq.*)

**(Alleged by Plaintiff Porter on behalf of the Montana Subclass)**

638.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

639.   Plaintiff Porter (Plaintiff, for purposes of this count) brings this claim on behalf of himself and the Montana Subclass.

640.   Ford and Plaintiff are "persons" within the meaning of MONT. CODE ANN. § 30-14-102(6).

- 183 -

641.    Plaintiff and the Montana Subclass are "consumer[s]" under Mont. Code Ann. § 30-14-102(1).

642.    The sale or lease of the Roof-Crush Risk Vehicles to Plaintiff and the Montana Subclass occurred within "trade and commerce" within the meaning of MONT. CODE ANN. § 30-14-102(8), and Ford committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

643.    The Montana Unfair Trade Practices and Consumer Protection Act ("Montana CPA") makes unlawful any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mont. Code Ann. § 30-14-103.

644.    Ford engaged in unlawful trade practices, including representing that the Roof-Crush Risk Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Roof-Crush Risk Vehicles are of a particular standard and quality when they are not; advertising the Roof-Crush Risk Vehicles with the intent not to sell them as advertised; and engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

645.    In purchasing or leasing the Roof-Crush Risk Vehicles, Plaintiff and the Montana Subclass were deceived by Ford's failure to disclose the Roof-Crush Risk and misrepresentations about the Roof-Crush Risk Vehicles.

- 184 -

646.   Plaintiff and the Montana Subclass members reasonably relied on Ford's material omissions and false misrepresentations. They had no way of knowing that Ford's representations were false and misleading. Plaintiff and the Montana Subclass members did not, and could not, unravel Ford's deception on their own.

647.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, such as Plaintiff and the Montana Subclass members.

648.   Ford knew or should have known that its conduct violated the Montana CPA.

649.   Ford's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of misleading a substantial portion of the purchasing public and imposed a serious safety risk on the public.

650.   Ford knew about the Roof-Crush Risk affecting the Roof-Crush Risk Vehicles owned or leased by Plaintiff and Montana Subclass members based on (i) its own testing, studies and designs of the Roof-Crush Risk Vehicles; (ii) its own lobbying of regulatory authorities to minimize the regulation of roof strength in the Roof-Crush Risk Vehicles; (iii) its decision to put profits ahead of safety and purposefully weaken the roof structure in the Roof-Crush Risk Vehicles in order to

- 185 -

increase profits; (iv) its own pre-sale durability testing; and (v) Ford's own

investigation of accidents involving in the Roof-Crush Risk Vehicles.

651. Ford owed Plaintiff and the Montana Subclass a duty to disclose the

true safety and reliability of the Roof-Crush Risk Vehicles because Ford:

     a.    Possessed exclusive knowledge about the Roof-Crush Risk;

     b.    Omitted the foregoing from Plaintiff and the Montana Subclass;

     c.    Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Roof-Crush Risk Vehicles, while withholding material facts from Plaintiff and the Montana Subclass that contradicted these representations; and/or

     d.    Had duties under the TREAD Act and related regulations to disclose and remedy the Roof-Crush Risk.

652. Ford had a duty to disclose the Roof-Crush Risk, because, having

volunteered to provide information to Plaintiff and the Montana Subclass, Ford had

the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiff

relied on Ford's material omissions and representations that the Roof-Crush Risk

Vehicles they were purchasing were safe and free from serious safety defects.

653. Plaintiff and the Montana Subclass were unaware of the omitted

material facts referenced herein, and they would not have acted as they did if they

had known of the omitted facts, in that they would not have purchased or leased

the Roof-Crush Risk Vehicles manufactured by Ford, would have paid less, and

would have taken other affirmative steps considering the information omitted from

them. Plaintiff and the Montana Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public or Plaintiff and the Montana Subclass.

654.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff and the Montana Subclass. Had Plaintiff and the Montana Subclass members known the truth about the Roof-Crush Risk they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiff and the Montana Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Roof-Crush Risk Vehicles.

655.   Plaintiff seeks from Ford actual damages or $500, whichever is greater, discretionary treble damages, reasonable attorneys' fees, an order enjoining Ford's unfair, unlawful, and/or deceptive practices, and any other relief the Court considers necessary or proper, under Mont. Code Ann. § 30-14-133.

## COUNT XXIII

## BREACH OF IMPLIED WARRANTY OF
## MERCHANTABILITY UNDER MONTANA LAW
(Mont. Code § 30-2-314)

**(Alleged by Plaintiff Porter on behalf of the Montana Subclass)**

656.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

657.   Plaintiff Porter (Plaintiff, for purposes of this count) brings this claim on behalf of himself and the Montana Subclass.

658.   Ford is and was at all relevant times a merchant with respect to motor vehicles under Mont. Code § 30-2-314.

659.   A warranty that the Roof-Crush Risk Vehicles were in merchantable condition is implied by law in the instant transactions, pursuant to Mont. Code § 30-2-314.

660.   The Roof-Crush Risk Vehicles were not merchantable when sold or leased because they contain the Roof-Crush Risk and pose an unreasonable risk of paralysis, grave injury or death due to the Roof-Crush Risk as described herein. Without limitation, the Roof-Crush Risk Vehicles share a common defect in that they are all equipped with the Roof-Crush Risk that makes the vehicles susceptible to the roof crushing in a rollover accident, causing an unreasonable risk of paralysis, grave injury or death to lessees and owners of the Roof-Crush Risk

- 188 -

Vehicles. This Roof-Crush Risk renders the Roof-Crush Risk Vehicles when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving when sold and leased, and at all times thereafter.

661.   Plaintiff and the Montana Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized dealers who sold or leased the Roof-Crush Risk Vehicles to Plaintiff and the Montana Subclass members.

662.   It was reasonable to expect that Plaintiff and the Montana Subclass members would use, consume, or be affected by the Roof-Crush Risk Vehicles.

663.   Ford was provided notice of these issues within a reasonable time of Plaintiff and the Montana Subclass members' knowledge of the non-conforming or defective nature of the Roof-Crush Risk Vehicles by the filing of this Complaint, consumer complaints to NHTSA regarding the Roof-Crush Risk that is the subject of this Complaint, and by the allegations contained in this and earlier Complaints.

664.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the Montana Subclass have been damaged in an amount to be determined at trial.

- 189 -

12.     **New Jersey**

## COUNT XXIV

**VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT**
**(N.J.S.A. § 56:8-1, *et seq.*)**

**(Alleged by Plaintiff Willard on behalf of the New Jersey Subclass)**

665.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

666.   Plaintiff Willard (Plaintiff, for purposes of this count) brings this claim on behalf of himself and the New Jersey Subclass.

667.   Plaintiff and the New Jersey Subclass members are "persons" under the New Jersey Consumer Fraud Act ("New Jersey CFA").

668.   All of the acts complained of herein were perpetrated by Ford in the course of trade or commerce within the meaning of the New Jersey CFA.

669.   The New Jersey CFA makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J. STAT. ANN. § 56:8-2.

670.    Ford engaged in unlawful trade practices, including representing that the Roof-Crush Risk Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Roof-Crush Risk Vehicles are of a particular standard and quality when they are not; advertising the Roof-Crush Risk Vehicles with the intent not to sell them as advertised; and engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

671.    In purchasing or leasing the Roof-Crush Risk Vehicles, Plaintiff and the New Jersey Subclass were deceived by Ford's failure to disclose the Roof-Crush Risk and misrepresentations about the Roof-Crush Risk Vehicles.

672.    Plaintiff and the New Jersey Subclass members reasonably relied on Ford's material omissions and false misrepresentations. They had no way of knowing that Ford's representations were false and misleading. Plaintiff and the New Jersey Subclass members did not, and could not, unravel Ford's deception on their own.

673.    Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, such as Plaintiff and the New Jersey Subclass members.

674.    Ford knew or should have known that its conduct violated the New Jersey CFA.

675.    Ford's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of misleading a substantial portion of the purchasing public and imposed a serious safety risk on the public.

676.    Ford knew about the Roof-Crush Risk affecting the Roof-Crush Risk Vehicles owned or leased by Plaintiff and New Jersey Subclass members based on (i) its own testing, studies and designs of the Roof-Crush Risk Vehicles; (ii) its own lobbying of regulatory authorities to minimize the regulation of roof strength in the Roof-Crush Risk Vehicles; (ii) its decision to put profits ahead of safety and purposefully weaken the roof structure in the Roof-Crush Risk Vehicles in order to increase profits; (iii) its own pre-sale durability testing; and (iv) Ford's own investigation of accidents involving in the Roof-Crush Risk Vehicles.

677.    Ford owed Plaintiff and the New Jersey Subclass a duty to disclose the true safety and reliability of the Roof-Crush Risk Vehicles because Ford:

   a.    Possessed exclusive knowledge about the Roof-Crush Risk;

   b.    Omitted the foregoing from Plaintiff and the New Jersey Subclass;

   c.    Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Roof-Crush Risk Vehicles, while withholding material facts from Plaintiff and the New Jersey Subclass that contradicted these representations; and/or

   d.    Had duties under the TREAD Act and related regulations to disclose and remedy the Roof-Crush Risk.

678.   Ford had a duty to disclose the Roof-Crush Risk, because, having volunteered to provide information to Plaintiff and the New Jersey Subclass, Ford had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiff relied on Ford's material omissions and representations that the Roof-Crush Risk Vehicles they were purchasing were safe and free from serious safety defects.

679.   Plaintiff and the New Jersey Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the omitted facts, in that they would not have purchased or leased the Roof-Crush Risk Vehicles manufactured by Ford, would have paid less, and would have taken other affirmative steps considering the information omitted from them. Plaintiff and the New Jersey Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public or Plaintiff and the New Jersey Subclass.

680.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff and the New Jersey Subclass. Had Plaintiff and the New Jersey Subclass members known the truth about the Roof-Crush Risk they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiff and the New Jersey Subclass also suffered ascertainable, monetary loss in the form of out-

- 193 -

of-pocket expenses, loss of use, and lost value related to the Roof-Crush Risk
Vehicles.

681.   Plaintiff and the New Jersey Subclass are entitled to recover legal
and/or equitable relief, including an order enjoining Defendants' unlawful conduct,
treble damages, costs, and reasonable attorneys' fees pursuant to N.J. STAT. ANN.
§ 56:8-19, and any other just and appropriate relief.

## COUNT XXV

## BREACH OF IMPLIED WARRANTY OF
## MERCHANTABILITY UNDER NEW JERSEY LAW

**(Alleged by Plaintiff Willard on behalf of the New Jersey Subclass)**

682.   Plaintiffs reallege and incorporate by reference all paragraphs as
though fully set forth herein.

683.   Plaintiff Willard (Plaintiff, for purposes of this count) brings this
claim on behalf of himself and the New Jersey Subclass.

684.   Ford is a "merchant" with respect to motor vehicles.

685.   Under New Jersey law, an implied warranty of merchantability
attaches to the Roof-Crush Risk Vehicles.

686.   The Roof-Crush Risk Vehicles were not merchantable when sold or
leased because they contain the Roof-Crush Risk and pose an unreasonable risk of
paralysis, grave injury or death due to the Roof-Crush Risk as described herein.
Without limitation, the Roof-Crush Risk Vehicles share a common defect in that

- 194 -

they are all equipped with the Roof-Crush Risk that makes the vehicles susceptible to the roof crushing in a rollover accident, causing an unreasonable risk of paralysis, grave injury or death to lessees and owners of the Roof-Crush Risk Vehicles. This Roof-Crush Risk renders the Roof-Crush Risk Vehicles when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving.

687.   Plaintiff and the New Jersey Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized dealers who sold or leased the Roof-Crush Risk Vehicles to Plaintiff and the New Jersey Subclass members.

688.   It was reasonable to expect that Plaintiff and the New Jersey Subclass members would use, consume, or be affected by the Roof-Crush Risk Vehicles.

689.   Ford was provided notice of these issues within a reasonable time of Plaintiff and the New Jersey Subclass members' knowledge of the non-conforming or defective nature of the Roof-Crush Risk Vehicles by the filing of this Complaint, consumer complaints to NHTSA regarding the Roof-Crush Risk that is the subject of this Complaint, and by the allegations contained in this and earlier Complaints.

690.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the New Jersey Subclass have been damaged in an amount to be determined at trial.

13.    **New Mexico**

## COUNT XXVI

## VIOLATION OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT
### (N.M. Stat. Ann. §§ 57-12-1, *et seq.*)

### (Alleged by Plaintiffs Michael and Gail Gneckow
### on behalf of the New Mexico Subclass)

691.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

692.    Plaintiffs Michael and Gail Gneckow (Plaintiffs, for purposes of this count) bring this claim on behalf of themselves and the New Mexico Subclass.

693.    Ford, Plaintiffs, and the New Mexico Subclass members are "persons" under the New Mexico Unfair Trade Practices Act ("New Mexico UTPA"), N.M. Stat. Ann. § 57-12-2.

694.    Ford's actions, as set forth above, occurred in the conduct of trade or commerce as defined under N.M. Stat. Ann. § 57-12-2.

695.    The New Mexico UTPA makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services … by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to "failing to state a material fact if doing so deceives or tends to deceive." N.M. Stat. Ann. § 57-12-2(D). Ford's acts and omissions described herein

- 196 -

constitute unfair or deceptive acts or practices under N.M. Stat. Ann. § 57-12-2(D). In addition, Ford's actions constitute unconscionable actions under N.M. Stat. Ann. § 57-12-2(E), since they took advantage of the lack of knowledge, ability, experience, and capacity of Plaintiffs to a grossly unfair degree.

696.   Ford engaged in unlawful trade practices, including representing that the Roof-Crush Risk Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Roof-Crush Risk Vehicles are of a particular standard and quality when they are not; advertising the Roof-Crush Risk Vehicles with the intent not to sell them as advertised; and engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

697.   In purchasing or leasing the Roof-Crush Risk Vehicles, Plaintiffs and the New Mexico Subclass were deceived by Ford's failure to disclose the Roof-Crush Risk and misrepresentations about the Roof-Crush Risk Vehicles.

698.   Plaintiffs and the New Mexico Subclass members reasonably relied on Ford's material omissions and false misrepresentations. They had no way of knowing that Ford's representations were false and misleading. Plaintiffs and the New Mexico Subclass members did not, and could not, unravel Ford's deception on their own.

699.    Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, such as Plaintiffs and the New Mexico Subclass members.

700.    Ford knew or should have known that its conduct violated the New Mexico UTPA.

701.    Ford's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of misleading a substantial portion of the purchasing public and imposed a serious safety risk on the public.

702.    Ford knew about the Roof-Crush Risk affecting the Roof-Crush Risk Vehicles owned or leased by Plaintiffs and the New Mexico Subclass members based on (i) its own testing, studies and designs of the Roof-Crush Risk Vehicles; (ii) its own lobbying of regulatory authorities to minimize the regulation of roof strength in the Roof-Crush Risk Vehicles; (iii) its decision to put profits ahead of safety and purposefully weaken the roof structure in the Roof-Crush Risk Vehicles in order to increase profits; (iv) its own pre-sale durability testing; and (v) Ford's own investigation of accidents involving in the Roof-Crush Risk Vehicles.

703.    Ford owed Plaintiffs and the New Mexico Subclass a duty to disclose the true safety and reliability of the Roof-Crush Risk Vehicles because Ford:

> a.    Possessed exclusive knowledge about the Roof-Crush Risk;
>
> b.    Omitted the foregoing from Plaintiffs and the New Mexico Subclass;

- 198 -

c.   Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Roof-Crush Risk Vehicles, while withholding material facts from Plaintiffs and the New Mexico Subclass that contradicted these representations; and/or

d.   Had duties under the TREAD Act and related regulations to disclose and remedy the Roof-Crush Risk.

704.   Ford had a duty to disclose the Roof-Crush Risk, because, having volunteered to provide information to Plaintiffs and the New Mexico Subclass, Ford had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiffs relied on Ford's material omissions and representations that the Roof-Crush Risk Vehicles they were purchasing were safe and free from serious safety defects.

705.   Plaintiffs and the New Mexico Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the omitted facts, in that they would not have purchased or leased the Roof-Crush Risk Vehicles manufactured by Ford, would have paid less, and would have taken other affirmative steps considering the information omitted from them. Plaintiffs and the New Mexico Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public or Plaintiffs and the New Mexico Subclass.

706.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiffs

- 199 -

and the New Mexico Subclass. Had Plaintiffs and the New Mexico Subclass

members known the truth about the Roof-Crush Risk they would not have

purchased or leased the vehicles or would have paid significantly less for them.

Plaintiffs and the New Mexico Subclass also suffered ascertainable, monetary loss

in the form of out-of-pocket expenses, loss of use, and lost value related to the

Roof-Crush Risk Vehicles.

707.   Because Ford's unconscionable, willful conduct caused actual harm to

Plaintiffs, Plaintiffs seek recovery of actual damages or $100, whichever is greater,

discretionary treble damages, punitive damages, and reasonable attorneys' fees and

costs, as well as all other proper and just relief available under N.M. Stat. Ann.

§ 57-12-10.

**14.    North Carolina**

## COUNT XXVII

**VIOLATION OF THE NORTH CAROLINA UNFAIR AND
DECEIVE TRADE PRACTICES ACT
(N.C. GEN. STAT. § 75-1.1, *et seq.*)**

**(Alleged by Plaintiffs Anderson, Taylor, and Thomas on behalf of the North
Carolina Subclass)**

708.   Plaintiffs reallege and incorporate by reference all paragraphs as

though fully set forth herein.

709.   Plaintiffs Anderson, Taylor, and Thomas (Plaintiffs, for purposes of this count) bring this claim on behalf of themselves and the North Carolina Subclass.

710.   Ford engaged in "commerce" within the meaning of the North Carolina Unfair and Deceptive Acts and Practices Act ("North Carolina UDTPA"), N.C. GEN. STAT. § 75-1.1(b).

711.   The North Carolina UDTPA broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. GEN. STAT. § 75-1.1(a). Ford willfully committed unfair or deceptive acts or practices in violation of North Carolina UDTPA.

712.   Ford participated in misleading, false, or deceptive acts that violated the North Carolina UDTPA as described below and alleged throughout the Complaint. By failing to disclose the Roof-Crush Risk, by concealing the Roof-Crush Risk, by marketing the Roof-Crush Risk Vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Roof-Crush Risk Vehicles. Ford systematically misrepresented, concealed,

- 201 -

suppressed, or omitted material facts relating to the Roof-Crush Risk Vehicles and the Roof-Crush Risk in the course of its business.

713.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, and/or suppression or omission, in connection with the sale of the Roof-Crush Risk Vehicles.

714.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

715.   Ford knew that the Roof-Crush Risk Vehicles suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

716.   Ford knew or should have known that its conduct violated the North Carolina UDTPA.

717.   Plaintiffs and members of the North Carolina Subclass reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Roof-Crush Risk Vehicles and in the purchase of the Roof-Crush Risk Vehicles.

718.   Had Plaintiffs and the North Carolina Subclass Members known that the Roof-Crush Risk Vehicles would exhibit the Roof-Crush Risk, they would not have purchased or leased the Roof-Crush Risk Vehicles, or would have paid less for them. Plaintiffs and members of the North Carolina Subclass did not receive the benefit of their bargain as a result of Ford's misconduct.

719.   Ford owed Plaintiffs and the North Carolina Subclass members a duty to disclose the truth about the Roof-Crush Risk because Ford: (a) possessed exclusive knowledge of the design of the Roof-Crush Risk Vehicles and the Roof-Crush Risk; (b) intentionally concealed the foregoing from Plaintiffs and the North Carolina Subclass Members; and/or (c) made incomplete representations regarding the quality and durability of the Roof-Crush Risk Vehicles, while purposefully withholding material facts from Plaintiffs and members of the North Carolina Subclass that contradicted these representations.

720.   Due to Ford's specific and superior knowledge that the roofs in the Roof-Crush Risk Vehicles are prone to collapse during a rollover accident due to the Roof-Crush Risk, its false representations regarding the increased durability of the Roof-Crush Risk Vehicles, and reliance by Plaintiffs and members of the North Carolina Subclass on these material representations, Ford had a duty to disclose to Plaintiffs and North Carolina Subclass members that the Roof-Crush Risk Vehicle roofs are prone to collapse, that Roof-Crush Risk Vehicles do not have the

- 203 -

expected durability, reliability, and/or safety over other vehicles or of their

predecessor roofs, that collapse of the Roof-Crush Risk Vehicle roofs during an

accident carries an unreasonable risk of paralysis, grave injury, or death, and that

Plaintiffs and the North Carolina Subclass members would be required to bear the

cost of the damage to their Roof-Crush Risk Vehicles if they survived such an

accident at all. Having volunteered to provide information to Plaintiffs and

members of the North Carolina Subclass, Ford had the duty to disclose not just the

partial truth, but the entire truth. These omitted and concealed facts were material

because they directly impact the value of the Roof-Crush Risk Vehicles purchased

or leased by Plaintiffs and the North Carolina Subclass members. Longevity,

durability, performance, and safety are material concerns to Ford truck consumers.

Ford represented to Plaintiffs and members of the North Carolina Subclass that

they were purchasing or leasing vehicles that were durable, reliable, safe, efficient,

of high quality, and containing roofs of advanced and superior characteristics and

technology as alleged throughout this Complaint, when in fact that is not the case

due to the Roof-Crush Risk.

721.   Plaintiffs and members of the North Carolina Subclass suffered injury

in fact to a legally protected interest. As a result of Ford's conduct, Plaintiffs and

members of the North Carolina Subclass were harmed and suffered actual damages

in the form of the diminished value of their vehicles.

722.    As a result of Ford's conduct, Plaintiffs and members of the North Carolina Subclass were harmed and suffered actual damages as a result of Ford's misrepresentations and omissions with regard to their Roof-Crush Risk Vehicles' roofs because they purchased vehicles which do not perform as advertised.

723.    As a direct and proximate result of Ford's unfair or deceptive acts or practices, Plaintiffs and members of the North Carolina Subclass suffered and will continue to suffer injury in fact and/or actual damages.

724.    Defendant's violations present a continuing risk to Plaintiffs and members of the North Carolina Subclass as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

725.    Plaintiffs and members of the North Carolina Subclass seek an order for treble their actual damages, an order enjoining Ford's unlawful acts, court costs, attorneys' fees, and any other just and proper relief available under the North Carolina Act, N.C. GEN. STAT. § 75-16.

## COUNT XXVIII

### BREACH OF IMPLIED WARRANTY OF
### MERCHANTABILITY UNDER NORTH CAROLINA LAW

**(Alleged by Plaintiffs Anderson, Taylor, and Thomas on behalf of the North Carolina Subclass)**

726.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

727.    Plaintiffs Anderson, Taylor, and Thomas (Plaintiff, for purposes of this count) bring this claim on behalf of himself and the North Carolina Subclass.

728.    Ford is and was at all relevant times a merchant with respect to motor vehicles under N.C. GEN. STAT. § 25-2-104(1) and a seller of motor vehicles under § 25-2-103(1)(d). With respect to leases, Ford is and was at all relevant times a lessor of motor vehicles under N.C. GEN. STAT. § 25-2A-103(1)(p). The Roof-Crush Risk Vehicles are and were at all relevant times goods within the meaning of N.C. GEN. STAT. § 25-2-105(1) and N.C.G.S.A. § 25-2A-103(1)(h).

729.    Defendant impliedly warranted that the Roof-Crush Risk Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used.

730.    The Roof-Crush Risk Vehicles were not merchantable when sold or leased because they contain the Roof-Crush Risk and pose an unreasonable risk of paralysis, grave injury or death due to the Roof-Crush Risk as described herein.

- 206 -

Without limitation, the Roof-Crush Risk Vehicles share a common defect in that they are all equipped with the Roof-Crush Risk that makes the vehicles susceptible to the roof crushing in a rollover accident, causing an unreasonable risk of paralysis, grave injury or death to lessees and owners of the Roof-Crush Risk Vehicles. This Roof-Crush Risk renders the Roof-Crush Risk Vehicles when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving.

731.   Plaintiffs and members of the North Carolina Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized dealers who sold or leased the Roof-Crush Risk Vehicles to Plaintiffs and members of the North Carolina Subclass.

732.   It was reasonable to expect that Plaintiffs and members of the North Carolina Subclass would use, consume, or be affected by the Roof-Crush Risk Vehicles.

733.   Notice of breach is not required because Plaintiffs and members of the North Carolina Subclass did not purchase their automobiles directly from Ford. Nonetheless, Plaintiffs' counsel sent notification to Ford on or about September 1, 2022. Defendant was provided further notice of the Roof-Crush Risk by numerous personal injury lawsuits and through its own testing. Affording Defendant a reasonable opportunity to cure its breach of implied warranties would be

- 207 -

unnecessary and futile here because Defendant has known of and concealed the Roof-Crush Risk and, on information and belief, has refused to rectify the Roof-Crush Risk, free of charge, within a reasonable time.

734.    As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiffs and members of the North Carolina Subclass have been damaged in an amount to be proven at trial.

**15.    Oklahoma**

## COUNT XXIX

### VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT (OKLA. STAT. TIT. 15, § 751, *et seq.*)

**(Alleged by Plaintiff Griffit on behalf of the Oklahoma Subclass)**

735.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

736.    Plaintiff Griffit (Plaintiff, for purposes of this count) brings this claim on behalf of himself and the Oklahoma Subclass.

737.    Plaintiff and the Oklahoma Subclass members are "persons" under the Oklahoma Consumer Protection Act ("Oklahoma CPA"), Okla. Stat. tit. 15, § 752.

738.    Ford is a "person," "corporation," or "association" within the meaning of Okla. Stat. tit. 15 § 15-751(1).

- 208 -

739.   The sale or lease of the Roof-Crush Risk Vehicles to Plaintiff and the Oklahoma Class Subclass was a "consumer transaction" within the meaning of Okla. Stat. tit. 15, § 752.

740.   Ford's actions, as set forth above, occurred in the conduct of trade or commerce.

741.   The Oklahoma Consumer Protection Act ("Oklahoma CPA") declares unlawful, *inter alia*, the following acts or practices when committed in the course of business: (1) "mak[ing] a false or misleading representation, knowingly or with reason to know, as to the characteristics, . . . uses, [or] benefits, of the subject of a consumer transaction;" (2) making a false representation, "knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style or model, if it is of another;" (3) "[a]dvertis[ing], knowingly or with reason to know, the subject of a consumer transaction with intent not to sell it as advertised;" and (4) otherwise committing "an unfair or deceptive trade practice." Okla. Stat. tit. 15, § 753.

742.   Ford engaged in unlawful trade practices, including representing that the Roof-Crush Risk Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Roof-Crush Risk Vehicles are of a particular standard and quality when they are not; advertising the Roof-Crush Risk Vehicles with the intent not to sell them as advertised; and engaging in other

- 209 -

fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

743.   In purchasing or leasing the Roof-Crush Risk Vehicles, Plaintiff and the Oklahoma Subclass were deceived by Ford's failure to disclose the Roof-Crush Risk and misrepresentations about the Roof-Crush Risk Vehicles.

744.   Plaintiff and the Oklahoma Subclass members reasonably relied on Ford's material omissions and false misrepresentations. They had no way of knowing that Ford's representations were false and misleading. Plaintiff and the Oklahoma Subclass members did not, and could not, unravel Ford's deception on their own.

745.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, such as Plaintiff and the Oklahoma Subclass members.

746.   Ford knew or should have known that its conduct violated the Oklahoma CPA.

747.   Ford's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of misleading a substantial portion of the purchasing public and imposed a serious safety risk on the public.

748.   Ford knew about the Roof-Crush Risk affecting the Roof-Crush Risk Vehicles owned or leased by Plaintiff and the Oklahoma Subclass members based

- 210 -

on (i) its own testing, studies and designs of the Roof-Crush Risk Vehicles; (ii) its own lobbying of regulatory authorities to minimize the regulation of roof strength in the Roof-Crush Risk Vehicles; (iii) its decision to put profits ahead of safety and purposefully weaken the roof structure in the Roof-Crush Risk Vehicles in order to increase profits; (iv) its own pre-sale durability testing; and (v) Ford's own investigation of accidents involving in the Roof-Crush Risk Vehicles.

749.   Ford owed Plaintiff and the Oklahoma Subclass a duty to disclose the true safety and reliability of the Roof-Crush Risk Vehicles because Ford:

      a.    Possessed exclusive knowledge about the Roof-Crush Risk;

      b.    Omitted the foregoing from Plaintiff and the Oklahoma Subclass;

      c.    Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Roof-Crush Risk Vehicles, while withholding material facts from Plaintiff and the Oklahoma Subclass that contradicted these representations; and/or

      d.    Had duties under the TREAD Act and related regulations to disclose and remedy the Roof-Crush Risk.

750.   Ford had a duty to disclose the Roof-Crush Risk, because, having volunteered to provide information to Plaintiff and the Oklahoma Subclass, Ford had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiff relied on Ford's material omissions and representations that the Roof-Crush Risk Vehicles they were purchasing were safe and free from serious safety defects.

- 211 -

751.   Plaintiff and the Oklahoma Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the omitted facts, in that they would not have purchased or leased the Roof-Crush Risk Vehicles manufactured by Ford, would have paid less, and would have taken other affirmative steps considering the information omitted from them. Plaintiff and the Oklahoma Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public or Plaintiff and the Oklahoma Subclass.

752.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff and the Oklahoma Subclass. Had Plaintiff and the Oklahoma Subclass members known the truth about the Roof-Crush Risk they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiff and the Oklahoma Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Roof-Crush Risk Vehicles.

753.   Because Ford's unconscionable conduct caused injury to Oklahoma Subclass members, Plaintiffs and the Oklahoma Subclass seek recovery of actual damages, discretionary penalties up to $2,000 per violation, punitive damages, and reasonable attorneys' fees, under Okla. Stat. tit. 15, § 761.1.

- 212 -

754.   Plaintiff and Oklahoma Subclass members further seek an order enjoining Ford's unfair and/or deceptive acts or practices, and any other just and proper relief available under the Oklahoma CPA.

## COUNT XXX

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (OKLA. STAT. ANN. § 12A-2-314)

### (Alleged by Plaintiff Griffit and the Oklahoma Subclass)

755.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

756.   Plaintiff Griffit (Plaintiff, for purposes of this count) brings this claim on behalf of himself and the Oklahoma Subclass.

757.   Ford is and was at all relevant times a merchant with respect to motor vehicles within the meaning of the Okla. Stat. Ann. § 12A-2-314.

758.   Under Okla. Stat. Ann. § 12A-2-314, a warranty that the Roof-Crush Risk Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles from Ford.

759.   The Roof-Crush Risk Vehicles were not merchantable when sold or leased because they contain the Roof-Crush Risk and pose an unreasonable risk of paralysis, grave injury, or death due to the Roof-Crush Risk as described herein. Without limitation, the Roof-Crush Risk Vehicles share a common defect in that they are all equipped with the Roof-Crush Risk that makes the vehicles susceptible

- 213 -

to the roof crushing in a rollover accident, causing an unreasonable risk of paralysis, grave injury or death to lessees and owners of the Roof-Crush Risk Vehicles. This Roof-Crush Risk renders the Roof-Crush Risk Vehicles when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving when sold and leased, and at all times thereafter.

760.   Plaintiff and the Oklahoma Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized dealers who sold or leased the Roof-Crush Risk Vehicles to Plaintiff and the Oklahoma Subclass members.

761.   It was reasonable to expect Plaintiff and the Oklahoma Subclass members would use, consume, or be affected by the Roof-Crush Risk Vehicles.

762.   Ford was provided notice of these issues within a reasonable time of Plaintiff and the Oklahoma Subclass members' knowledge of the non-conforming or defective nature of the Roof-Crush Risk Vehicles by the filing of this Complaint, consumer complaints to NHTSA regarding the Roof-Crush Risk that is the subject of this Complaint, and by the allegations contained in this and earlier Complaints.

763.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the Oklahoma Subclass have been damaged in an amount to be determined at trial.

- 214 -

16.   **Oregon**

## COUNT XXXI

**VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT**
**(Or. Rev. Stat. §§ 646.605, *et seq.*)**

**(Alleged by Plaintiffs Rains and Robbins on behalf of the Oregon Subclass)**

764.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

765.   Plaintiffs Rains and Robbins (Plaintiffs, for purposes of this count) bring this claim on behalf of themselves and the Oregon Subclass.

766.   Ford is a person within the meaning of Or. Rev. Stat. § 646.605(4).

767.   The Roof-Crush Risk Vehicles are "goods" obtained primarily for personal, family, or household purposes within the meaning of Or. Rev. Stat. § 646.605(6).

768.   Ford's actions, as set forth above, occurred in the conduct of trade or commerce.

769.   The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits a person from, in the course of the person's business, doing any of the following: "(e) Represent[ing] that … goods … have … characteristics … uses, benefits, … or qualities that they do not have; (g) Represent[ing] that … goods … are of a particular standard [or] quality … if they are of another; (i) Advertis[ing] … goods or services with intent not to provide them as advertised;" and "(u) engag[ing] in

- 215 -

any other unfair or deceptive conduct in trade or commerce." Or. Rev. Stat. § 646.608(1).

770. Ford engaged in unlawful trade practices, including representing that the Roof-Crush Risk Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Roof-Crush Risk Vehicles are of a particular standard and quality when they are not; advertising the Roof-Crush Risk Vehicles with the intent not to sell them as advertised; and engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

771. In purchasing or leasing the Roof-Crush Risk Vehicles, Plaintiffs and the Oregon Subclass were deceived by Ford's failure to disclose the Roof-Crush Risk and misrepresentations about the Roof-Crush Risk Vehicles.

772. Plaintiffs and the Oregon Subclass members reasonably relied on Ford's material omissions and false misrepresentations. They had no way of knowing that Ford's representations were false and misleading. Plaintiffs and the Oregon Subclass members did not, and could not, unravel Ford's deception on their own.

773. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, such as Plaintiffs and the Oregon Subclass members.

- 216 -

774.   Ford knew or should have known that its conduct violated the Oregon UTPA.

775.   Ford's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of misleading a substantial portion of the purchasing public and imposed a serious safety risk on the public.

776.   Ford knew about the Roof-Crush Risk affecting the Roof-Crush Risk Vehicles owned or leased by Plaintiffs and the Oregon Subclass members based on (i) its own testing, studies and designs of the Roof-Crush Risk Vehicles; (ii) its own lobbying of regulatory authorities to minimize the regulation of roof strength in the Roof-Crush Risk Vehicles; (iii) its decision to put profits ahead of safety and purposefully weaken the roof structure in the Roof-Crush Risk Vehicles in order to increase profits; (iv) its own pre-sale durability testing; and (v) Ford's own investigation of accidents involving in the Roof-Crush Risk Vehicles.

777.   Ford owed Plaintiffs and the Oregon Subclass a duty to disclose the true safety and reliability of the Roof-Crush Risk Vehicles because Ford:

a.   Possessed exclusive knowledge about the Roof-Crush Risk;

b.   Omitted the foregoing from Plaintiffs and the Oregon Subclass;

c.   Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Roof-Crush Risk Vehicles, while withholding material facts from Plaintiffs and the Oregon Subclass that contradicted these representations; and/or

- 217 -

      d.     Had duties under the TREAD Act and related regulations to disclose and remedy the Roof-Crush Risk.

778.   Ford had a duty to disclose the Roof-Crush Risk, because, having volunteered to provide information to Plaintiffs and the Oregon Subclass, Ford had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiffs relied on Ford's material omissions and representations that the Roof-Crush Risk Vehicles they were purchasing were safe and free from serious safety defects.

779.   Plaintiffs and the Oregon Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the omitted facts, in that they would not have purchased or leased the Roof-Crush Risk Vehicles manufactured by Ford, would have paid less, and would have taken other affirmative steps considering the information omitted from them. Plaintiffs and the Oregon Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public or Plaintiffs and the Oregon Subclass.

780.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiffs and the Oregon Subclass. Had Plaintiffs and the Oregon Subclass members known the truth about the Roof-Crush Risk they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiffs and the Oregon

Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Roof-Crush Risk Vehicles.

781.   Plaintiffs and the Oregon Subclass are entitled to recover the greater of actual damages or $200 pursuant to Or. Rev. Stat. § 646.638(1). Plaintiffs and the Oregon Subclass are also entitled to punitive damages because Ford engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

**COUNT XXXII**

**BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER OREGON LAW
(Or. Rev. Stat. § 72.3140)**

**(Alleged by Plaintiffs Rains and Robbins on behalf of the Oregon Subclass)**

782.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

783.   Plaintiffs Rains and Robbins (Plaintiffs, for purposes of this count) bring this claim on behalf of themselves and the Oregon Subclass.

784.   Ford is and was at all relevant times a merchant with respect to motor vehicles.

785.   A warranty that the Roof-Crush Risk Vehicles were in merchantable condition is implied by law in the instant transactions.

- 219 -

786.   The Roof-Crush Risk Vehicles were not merchantable when sold or leased because they contain the Roof-Crush Risk and pose an unreasonable risk of paralysis, grave injury or death due to the Roof-Crush Risk as described herein. Without limitation, the Roof-Crush Risk Vehicles share a common defect in that they are all equipped with the Roof-Crush Risk that makes the vehicles susceptible to the roof crushing in a rollover accident, causing an unreasonable risk of paralysis, grave injury or death to lessees and owners of the Roof-Crush Risk Vehicles. This Roof-Crush Risk renders the Roof-Crush Risk Vehicles when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving when sold and leased, and at all times thereafter.

787.   Plaintiffs and the Oregon Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized dealers who sold or leased the Roof-Crush Risk Vehicles to Plaintiffs and the Oregon Subclass members.

788.   It was reasonable to expect Plaintiffs and the Oregon Subclass members would use, consume, or be affected by the Roof-Crush Risk Vehicles.

789.   Ford was provided notice of these issues within a reasonable time of Plaintiffs and the Oregon Subclass members' knowledge of the non-conforming or defective nature of the Roof-Crush Risk Vehicles by the filing of this Complaint,

- 220 -

consumer complaints to NHTSA regarding the Roof-Crush Risk that is the subject of this Complaint, and by the allegations contained in this and earlier Complaints.

790.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs and the Oregon Subclass have been damaged in an amount to be determined at trial.

### 17.   South Carolina

## COUNT XXXIII

### VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT
### (S.C. Code Ann. § 39-5-10, *et seq*.)

### (Alleged by Plaintiff Everett Sylvester Wilson III on behalf of the South Carolina Subclass)

791.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

792.   Plaintiff Everett Sylvester Wilson III (Plaintiff, for purposes of this count) brings this claim on behalf of himself and the South Carolina Subclass.

793.   Ford is a "person" under S.C. Code Ann. § 39-5-10.

794.   The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code Ann. § § 39-5-20(a). Ford's conduct and acts were offensive to public policy or immoral, unethical, or oppressive, thus unfair; indeed, to manufacture, distribute, and promote the Roof-Crush Risk Vehicles with a Roof-

- 221 -

Crush Risk known to cause grave injury or death is surely detrimental to the public at large. Ford's unfair or deceptive acts or practices were prohibited by the South Carolina UTPA.

795.   Ford participated in unfair or deceptive trade practices that violated the South Carolina UTPA as described below and alleged throughout the Complaint. By failing to disclose the Roof-Crush Risk, by concealing the Roof-Crush Risk, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Roof-Crush Risk Vehicles. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Roof-Crush Risk Vehicles and the Roof-Crush Risk in the course of its business.

796.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression, and/or omission, in connection with the sale of the Roof-Crush Risk Vehicles.

797.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

798.   Ford knew that the Roof-Crush Risk Vehicles and their roofs suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

799.   Ford knew or should have known that its conduct violated the South Carolina UTPA.

800.   Plaintiff and members of the South Carolina Subclass reasonably and justifiably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Roof-Crush Risk Vehicles and in the purchase or lease of the Roof-Crush Risk Vehicles.

801.   Had Plaintiff and members of the South Carolina Subclass known that the Class Vehicles would exhibit the Roof-Crush Risk, they would not have purchased or leased the Roof-Crush Risk Vehicles, or would have paid less for them. Plaintiff and members of the South Carolina Subclass did not receive the benefit of their bargain as a result of Ford's misconduct.

802.   Ford owed Plaintiff and members of the South Carolina Subclass a duty to disclose the truth about the Roof-Crush Risk because Ford: (a) possessed exclusive knowledge of the design of the Roof-Crush Risk Vehicles and the Roof-

Crush Risk; (b) intentionally concealed the foregoing from Plaintiff and members of the South Carolina Subclass; and/or (c) made incomplete representations regarding the quality and durability of the Roof-Crush Risk Vehicles, while purposefully withholding material facts from Plaintiff and members of the South Carolina Subclass that contradicted these representations.

803.   Due to Ford's specific and superior knowledge that the roofs in the Roof-Crush Risk Vehicles are prone to collapse due to the Roof-Crush Risk, its false representations regarding the increased durability of the Roof-Crush Risk Vehicles, and reliance by Plaintiff and members of the South Carolina Subclass on these material representations, Ford had a duty to disclose to Plaintiff and members of the South Carolina Subclass that the Roof-Crush Risk Vehicle roofs are prone to collapse, that Roof-Crush Risk Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor roofs, that collapse of the Roof-Crush Risk Vehicle roofs during an accident carries an unreasonable risk of paralysis, grave injury, or death, and that Plaintiff and members of the South Carolina Subclass would be required to bear the cost of the damage to their Roof-Crush Risk Vehicles if they survived such an accident at all. Having volunteered to provide information to Plaintiff and members of the South Carolina Subclass, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly

impact the value of the Roof-Crush Risk Vehicles purchased or leased by Plaintiff and members of the South Carolina Subclass. Longevity, durability, performance, and safety are material concerns to Ford truck consumers. Ford represented to Plaintiff and members of the South Carolina Subclass that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing roofs of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact that is not the case due to the Roof-Crush Risk.

804.   Plaintiff and members of the South Carolina Subclass suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Plaintiff and members of the South Carolina Subclass were harmed and suffered actual damages in the form of the diminished value of their vehicles.

805.   As a result of Ford's conduct, Plaintiff and members of the South Carolina Subclass were harmed and suffered actual damages as a result of Ford's misrepresentations and omissions with regard to their Roof-Crush Risk Vehicles' roofs because they purchased vehicles which do not perform as advertised.

806.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Plaintiff and members of the South Carolina Subclass suffered and will continue to suffer injury in fact and/or actual damages.

- 225 -

807.   Ford's violations present a continuing risk to Plaintiff and members of the South Carolina Subclass as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest. Specifically: (1) the number of consumers affected by Ford's deceptive practices are estimated to be in the thousands nationwide; (2) Ford has significantly high sophistication and bargaining power with respect to the manufacture and sale of the Roof-Crush Risk Vehicles to Plaintiff and members of the South Carolina Subclass; and (3) so long as the Roof-Crush Risk Vehicles continue to be sold and distributed with the Roof-Crush Risk, the likelihood of continued impact on other consumers is significant.

808.   Pursuant to S.C. Code Ann. § 39-5-140(a), Plaintiff and members of the South Carolina Subclass seek monetary relief against Defendant to recover for economic losses, reasonable attorney's fees and costs. Because Defendant's actions were willful and knowing, Plaintiff's damages should be trebled.

809.   Plaintiff and members of the South Carolina Subclass further allege that Defendant's malicious and deliberate conduct warrants an assessment of punitive damages because Defendant carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiff and members of the South Carolina Subclass to cruel and unjust hardship as a result.

## COUNT XXXIV

### BREACH OF IMPLIED WARRANTY OF
### MERCHANTABILITY UNDER SOUTH CAROLINA LAW
### (S.C. Code Ann. §§ 36-2-314 and 36-2A-212, *et seq.*)

### (Alleged by Plaintiff Everett Sylvester Wilson III
### on behalf of the South Carolina Subclass)

810. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

811. Plaintiff Everett Sylvester Wilson III (Plaintiff, for purposes of this count) brings this claim on behalf of himself and the South Carolina Subclass.

812. Ford is and was at all relevant times a merchant with respect to motor vehicles under S.C. Code Ann. §§ 36-2-104(1) and 36-2A-103(1)(t) and a seller of motor vehicles under § 36-2-103(1)(d).

813. Defendant impliedly warranted that the Roof-Crush Risk Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used.

814. The Roof-Crush Risk Vehicles were not merchantable when sold or leased because they contain the Roof-Crush Risk and pose an unreasonable risk of paralysis, grave injury, or death due to the Roof-Crush Risk as described herein. Without limitation, the Roof-Crush Risk Vehicles share a common defect in that they are all equipped with the Roof-Crush Risk that makes the vehicles susceptible to the roof crushing in a rollover accident, causing an unreasonable risk of

- 227 -

paralysis, grave injury, or death to lessees and owners of the Roof-Crush Risk

Vehicles. This Roof-Crush Risk renders the Roof-Crush Risk Vehicles when sold

or leased and at all times thereafter, unmerchantable and unfit for their ordinary use

of driving.

815.   Plaintiff and members of the South Carolina Subclass were and are

third-party beneficiaries of Ford's contracts with Ford-certified/authorized dealers

who sold or leased the Roof-Crush Risk Vehicles to Plaintiffs and Texas Subclass

members.

816.   It was reasonable to expect that Plaintiff and the South Carolina

Subclass members would use, consume, or be affected by the Roof-Crush Risk

Vehicles.

817.   Notice of breach is not required because Plaintiff and members of the

South Carolina Subclass did not purchase their automobiles directly from Ford.

Nonetheless, Plaintiffs' counsel sent notification to Ford on or about September 1,

2022. Defendant was provided further notice of the Roof-Crush Risk by numerous

personal injury lawsuits and through its own testing. Affording Defendant a

reasonable opportunity to cure its breach of implied warranties would be

unnecessary and futile here because Defendant has known of and concealed the

Roof-Crush Risk and, on information and belief, has refused to rectify the Roof-

Crush Risk, free of charge, within a reasonable time.

818.   As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiff and members of the South Carolina Subclass have been damaged in an amount to be proven at trial.

**18.   Texas**

**COUNT XXXV**

**VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT**
**(Tex. Bus. & Com. Code Ann. § 17.41, *et seq.*)**

**(Alleged by Plaintiffs Brenda L. Rhodes and Stephen T. Rhodes**
**on behalf of the Texas Subclass)**

819.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

820.   Plaintiffs Brenda L. Rhodes and Stephen T. Rhodes (Plaintiffs, for purposes of this count) bring this claim on behalf of themselves and the Texas Subclass.

821.   Plaintiffs and the Texas Subclass are individuals, partnerships and corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets). *See* Tex. Bus. & Com. Code Ann. § 17.41.

822.   The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice

- 229 -

which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree," Tex. Bus. & Com. Code Ann. § 17.45(5); Tex. Bus. & Com. Code Ann. § 17.50(a)(3).

823.   Defendant has committed false, misleading, unconscionable, and deceptive acts or practices in the conduct of trade or commerce.

824.   Defendant also violated the Texas DTPA by: (1) representing that the Roof-Crush Risk Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that they are of a particular standard, quality, and grade when they are not; (3) advertising them with the intent not to sell them as advertised; and (4) failing to disclose information concerning them with the intent to induce consumers to purchase them.

825.   In the course of its business, Defendant failed to disclose and actively concealed the dangers and risks posed by the Roof-Crush Risk Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

826.   Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Roof-Crush Risk Vehicles.

827.    As alleged above, Defendant has known of the Roof-Crush Risk since at least 2000, including through lawsuits and internal testing. Prior to manufacturing the Roof-Crush Risk Vehicles, Defendant knew or should have known of the Roof-Crush Risk, because Ford's own testing and safety guidelines indicated that the Roof-Crush Risk Vehicles' roofs were unable to support the weight of the vehicle in a rollover accident, exposing the passengers to significant risk of catastrophic injury or death.

828.    By failing to disclose and by actively concealing the Roof-Crush Risk in the Roof-Crush Risk Vehicles by marketing them as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that values safety, Defendant engaged in unfair or deceptive business practices in violation of the Texas DTPA.

829.    Defendant deliberately withheld the information about the propensity of the Roof-Crush Risk Vehicles' roofs to crush in the event of a rollover in order to ensure that consumers would purchase the Roof-Crush Risk Vehicles.

830.    In the course of Defendant's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the Roof-Crush Risk discussed above.

831.   Defendant compounded the deception by repeatedly asserting that the Roof-Crush Risk Vehicles were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

832.   Defendant's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Texas Subclass, about the true safety and reliability of Roof-Crush Risk Vehicles, the quality of Defendant's brands, and the true value of the Roof-Crush Risk Vehicles.

833.   Defendant intentionally and knowingly misrepresented material facts regarding the Roof-Crush Risk Vehicles with an intent to mislead Plaintiffs and the Texas Subclass.

834.   Defendant knew or should have known that its conduct violated the Texas DTPA.

835.   As alleged above, Defendant made material statements about the safety and reliability of the Roof-Crush Risk Vehicles that were either false or misleading. Defendant's representations, omissions, statements, and commentary have included selling and marketing the Roof-Crush Risk Vehicles as safe and reliable, despite their knowledge of the Roof-Crush Risk or their failure to reasonably investigate it.

- 232 -

836.   To protect its profits and to avoid remediation costs and a public relations nightmare, Defendant concealed the dangers and risks posed by the Roof-Crush Risk Vehicles and their tragic consequences, and allowed unsuspecting purchasers to continue to buy the Roof-Crush Risk Vehicles, and allowed them to continue driving highly dangerous vehicles.

837.   Defendant owed Plaintiffs and the Texas Subclass a duty to disclose the true safety and reliability of the Roof-Crush Risk Vehicles because Defendant:

a.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.   Intentionally concealed the foregoing from Plaintiffs and the Texas Subclass; and/or

c.   Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs and the Texas Subclass that contradicted these representations.

838.   Because Defendant fraudulently concealed the Roof-Crush Risk in Roof-Crush Risk Vehicles, resulting in a raft of negative publicity once the Roof-Crush Risk finally began to be disclosed, the value of the Roof-Crush Risk Vehicles has diminished. In light of the stigma attached to Roof-Crush Risk Vehicles by Defendant's conduct, they are now worth less than they otherwise would be.

- 233 -

839.   Defendant's failure to disclose and active concealment of the dangers and risks posed by the Roof Defect in the Roof-Crush Risk Vehicles were material to Plaintiffs and the Texas Subclass.

840.   Plaintiffs and the Texas Subclass suffered ascertainable loss caused by Defendant's misrepresentations and their failure to disclose material information. Had they been aware of the Roof-Crush Risk that existed in the Roof-Crush Risk Vehicles and Defendant's disregard for safety, Plaintiffs and the Texas Subclass either would not have paid as much for their vehicles or would not have purchased them at all. Plaintiffs and the Texas Subclass did not receive the benefit of their bargain as a result of Defendant's misconduct.

841.   Defendant's violations present a continuing risk to Plaintiffs, the Texas Subclass, and the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

842.   As a direct and proximate result of Defendant's violations of the Texas DTPA, Plaintiffs and the Texas Subclass have suffered injury-in-fact and/or actual damage.

843.   Pursuant to Tex. Bus. & Com. Code Ann. § 17.50(a)(l) and (b), Plaintiffs and the Texas Subclass seek monetary relief against Defendants measured as actual damages in an amount to be determined at trial, treble damages

- 234 -

for Defendant's knowing violations of the Texas DTPA, and any other just and proper relief available under the Texas DTPA.

844.   For Plaintiffs and the Texas Subclass members who wish to rescind their purchases, they are entitled under Tex. Bus. & Com. Code Ann. § 17.50(b)(4) to rescission and other relief necessary to restore any money or property that was acquired from them based on violations of the Texas DTPA.

845.   Plaintiffs and the Texas Subclass also seek court costs and attorneys' fees under § 17.50(d) of the Texas DTPA.

846.   In accordance with Tex. Bus. & Com. Code Ann. § 17.505(a), Plaintiffs' counsel, on behalf of Plaintiffs and the Texas Subclass, served Defendant with notices of their alleged violations of the Texas DTPA relating to the Roof-Crush Risk Vehicles purchased by Plaintiffs and the Texas Subclass, and demanded that Defendant correct or agree to correct the actions described therein.

847.   Plaintiffs seek compensatory and monetary damages to which Plaintiffs and the Texas Subclass are entitled.

## COUNT XXXVI

## BREACH OF IMPLIED WARRANTY OF
## MERCHANTABILITY UNDER TEXAS LAW

### (Alleged by Plaintiffs Brenda L. Rhodes and Stephen T. Rhodes
### on behalf of the Texas Subclass)

848.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

849.   Plaintiffs Brenda L. Rhodes and Stephen T. Rhodes (Plaintiffs, for purposes of this count) bring this claim on behalf of themselves and the Texas Subclass.

850.   Ford is and was at all relevant times a merchant with respect to motor vehicles within the meaning of Tex. Bus. & Com. Code Ann.§ 2.104.

851.   Defendant impliedly warranted that the Roof-Crush Risk Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used.

852.   The Roof-Crush Risk Vehicles were not merchantable when sold or leased because they contain the Roof-Crush Risk and pose an unreasonable risk of paralysis, grave injury or death due to the Roof-Crush Risk as described herein. Without limitation, the Roof-Crush Risk Vehicles share a common defect in that they are all equipped with the Roof-Crush Risk that makes the vehicles susceptible to the roof crushing in a rollover accident, causing an unreasonable risk of

- 236 -

paralysis, grave injury or death to lessees and owners of the Roof-Crush Risk Vehicles. This Roof-Crush Risk renders the Roof-Crush Risk Vehicles when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving.

853.   Plaintiffs and Texas Subclass members were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized dealers who sold or leased the Roof-Crush Risk Vehicles to Plaintiffs and Texas Subclass members.

854.   It was reasonable to expect that Plaintiffs and the Texas Subclass members would use, consume, or be affected by the Roof-Crush Risk Vehicles.

855.   Ford was provided notice of these issues within a reasonable time of Plaintiffs and the Texas Subclass members' knowledge of the non-conforming or defective nature of the Roof-Crush Risk Vehicles by the filing of this Complaint, consumer complaints to NHTSA regarding the Roof-Crush Risk that is the subject of this Complaint, and by the allegations contained in this and earlier Complaints.

856.   As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiffs and members of the Texas Subclass have been damaged in an amount to be determined at trial.

19.    **Utah**

## COUNT XXXVII

## VIOLATION OF THE UTAH CONSUMER SALES PRACTICES ACT
### (Utah Code Ann. § 13-11-1, *et seq.*)

### (Alleged by Plaintiff Duenes on behalf of the Utah Subclass)

857.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

858.   Plaintiff Duenes (Plaintiff, for purposes of this count) brings this claim on behalf of himself and the Utah Subclass.

859.   Ford is a "supplier" under the Utah Consumer Sales Practices Act ("Utah CSPA"), Utah Code Ann. § 13-11-3.

860.   Plaintiff and the Utah Subclass are "persons" under Utah Code Ann. § 13-11-3.

861.   The sale of the Roof-Crush Risk Vehicles to Plaintiff was a "consumer transaction" within the meaning of Utah Code Ann. § 13-11-3.

862.   Ford's actions, as set forth above, occurred in the conduct of trade or commerce.

863.   The Utah CSPA makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction" under Utah Code Ann. § 13-11-4. Specifically, "a supplier commits a deceptive act or practice if the supplier knowingly or intentionally: (a) indicates that the subject of a consumer transaction

- 238 -

has sponsorship, approval, performance characteristics, accessories, uses, or

benefits, if it has not" or "(b) indicates that the subject of a consumer transaction is

of a particular standard, quality, grade, style, or model, if it is not." Utah Code

Ann. § 13-11-4. "An unconscionable act or practice by a supplier in connection

with a consumer transaction" also violates the Utah CSPA. Utah Code Ann. § 13-

11-5.

864.   Ford engaged in unlawful trade practices, including representing that

the Roof-Crush Risk Vehicles have characteristics, uses, benefits, and qualities

which they do not have; representing that the Roof-Crush Risk Vehicles are of a

particular standard and quality when they are not; advertising the Roof-Crush Risk

Vehicles with the intent not to sell them as advertised; and engaging in other

fraudulent or deceptive conduct which creates a likelihood of confusion or of

misunderstanding.

865.   In purchasing or leasing the Roof-Crush Risk Vehicles, Plaintiff and

the Utah Subclass were deceived by Ford's failure to disclose the Roof-Crush Risk

and misrepresentations about the Roof-Crush Risk Vehicles.

866.   Plaintiff and the Utah Subclass members reasonably relied on Ford's

material omissions and false misrepresentations. They had no way of knowing that

Ford's representations were false and misleading. Plaintiff and the Utah Subclass

members did not, and could not, unravel Ford's deception on their own.

867.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, such as Plaintiff and the Utah Subclass members.

868.   Ford knew or should have known that its conduct violated the Utah CSPA.

869.   Ford's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of misleading a substantial portion of the purchasing public and imposed a serious safety risk on the public.

870.   Ford knew about the Roof-Crush Risk affecting the Roof-Crush Risk Vehicles owned or leased by Plaintiff and the Utah Subclass members based on (i) its own testing, studies and designs of the Roof-Crush Risk Vehicles; (ii) its own lobbying of regulatory authorities to minimize the regulation of roof strength in the Roof-Crush Risk Vehicles; (iii) its decision to put profits ahead of safety and purposefully weaken the roof structure in the Roof-Crush Risk Vehicles in order to increase profits; (iv) its own pre-sale durability testing; and (v) Ford's own investigation of accidents involving in the Roof-Crush Risk Vehicles.

871.   Ford owed Plaintiff and the Utah Subclass a duty to disclose the true safety and reliability of the Roof-Crush Risk Vehicles because Ford:

     a.    Possessed exclusive knowledge about the Roof-Crush Risk;

     b.    Omitted the foregoing from Plaintiff and the Utah Subclass;

- 240 -

c. Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Roof-Crush Risk Vehicles, while withholding material facts from Plaintiff and the Utah Subclass that contradicted these representations; and/or

d. Had duties under the TREAD Act and related regulations to disclose and remedy the Roof-Crush Risk.

872. Ford had a duty to disclose the Roof-Crush Risk, because, having volunteered to provide information to Plaintiff and the Utah Subclass, Ford had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiff relied on Ford's material omissions and representations that the Roof-Crush Risk Vehicles they were purchasing were safe and free from serious safety defects.

873. Plaintiff and the Utah Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the omitted facts, in that they would not have purchased or leased the Roof-Crush Risk Vehicles manufactured by Ford, would have paid less, and would have taken other affirmative steps considering the information omitted from them. Plaintiff and the Utah Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public or Plaintiff and the Utah Subclass.

874. Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff and the Utah Subclass. Had Plaintiff and the Utah Subclass members known the

- 241 -

truth about the Roof-Crush Risk they would not have purchased or leased the

vehicles or would have paid significantly less for them. Plaintiff and the Utah

Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket

expenses, loss of use, and lost value related to the Roof-Crush Risk Vehicles.

875.   Pursuant to Utah Code Ann. § 13-11-4, Plaintiff and the Utah

Subclass seek monetary relief against Ford measured as the greater of (a) actual

damages in an amount to be determined at trial and (b) statutory damages in the

amount of $2,000 for each Plaintiff, reasonable attorneys' fees, and any other just

and proper relief available under the Utah CSPA.

### COUNT XXXVIII

### BREACH OF IMPLIED WARRANTY OF
### MERCHANTABILITY UNDER UTAH LAW
### (Utah Code Ann. § 70A-2-314)

### (Alleged by Plaintiff Duenes and the Utah Subclass)

876.   Plaintiffs reallege and incorporate by reference all paragraphs as

though fully set forth herein.

877.   Plaintiff Duenes (Plaintiff, for purposes of this count) brings this

claim on behalf of himself and the Utah Subclass.

878.   Ford is and was at all relevant times a merchant with respect to motor

vehicles.

879.   A warranty that the Roof-Crush Risk Vehicles were in merchantable condition is implied by law in the instant transactions.

880.   The Roof-Crush Risk Vehicles were not merchantable when sold or leased because they contain the Roof-Crush Risk and pose an unreasonable risk of paralysis, grave injury or death due to the Roof-Crush Risk as described herein. Without limitation, the Roof-Crush Risk Vehicles share a common defect in that they are all equipped with the Roof-Crush Risk that makes the vehicles susceptible to the roof crushing in a rollover accident, causing an unreasonable risk of paralysis, grave injury or death to lessees and owners of the Roof-Crush Risk Vehicles. This Roof-Crush Risk renders the Roof-Crush Risk Vehicles when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving when sold and leased, and at all times thereafter.

881.   Plaintiff and the Utah Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized dealers who sold or leased the Roof-Crush Risk Vehicles to Plaintiff and the Utah Subclass members.

882.   It was reasonable to expect Plaintiff and the Utah Subclass members would use, consume, or be affected by the Roof-Crush Risk Vehicles.

883.   Ford was provided notice of these issues within a reasonable time of Plaintiff and the Utah Subclass members' knowledge of the non-conforming or defective nature of the Roof-Crush Risk Vehicles by the filing of this Complaint,

- 243 -

consumer complaints to NHTSA regarding the Roof-Crush Risk that is the subject of this Complaint, and by the  allegations contained in this and earlier Complaints.

884.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the Utah Subclass have been damaged in an amount to be determined at trial.

### 20.   Washington

### COUNT XXXIX

### VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT
### (Wash. Rev. Code Ann. §§ 19.86.010, *et seq.*)

### (Alleged by Plaintiffs Bright and Gosser on behalf of the Washington Subclass)

885.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

886.   Plaintiffs Bright and Gosser (Plaintiffs, for purposes of this count) bring this claim on behalf of themselves and the Washington Subclass.

887.   All of the acts complained of herein were perpetrated by Ford in the course of trade or commerce within the meaning of Wash. Rev. Code. Wash. Ann. § 19.96.010.

888.   The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code. Wash. Ann. § 19.96.010.

- 244 -

889.   Ford engaged in unlawful trade practices, including representing that the Roof-Crush Risk Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Roof-Crush Risk Vehicles are of a particular standard and quality when they are not; advertising the Roof-Crush Risk Vehicles with the intent not to sell them as advertised; and engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

890.   In purchasing or leasing the Roof-Crush Risk Vehicles, Plaintiffs and the Washington Subclass were deceived by Ford's failure to disclose the Roof-Crush Risk and misrepresentations about the Roof-Crush Risk Vehicles.

891.   Plaintiffs and the Washington Subclass members reasonably relied on Ford's material omissions and false misrepresentations. They had no way of knowing that Ford's representations were false and misleading. Plaintiffs and the Washington Subclass members did not, and could not, unravel Ford's deception on their own.

892.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, such as Plaintiffs and the Washington Subclass members.

893.   Ford knew or should have known that its conduct violated the Washington CPA.

894.   Ford's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of misleading a substantial portion of the purchasing public and imposed a serious safety risk on the public.

895.   Ford knew about the Roof-Crush Risk affecting the Roof-Crush Risk Vehicles owned or leased by Plaintiffs and Washington Subclass members based on (i) its own testing, studies and designs of the Roof-Crush Risk Vehicles; (ii) its own lobbying of regulatory authorities to minimize the regulation of roof strength in the Roof-Crush Risk Vehicles; (iii) its decision to put profits ahead of safety and purposefully weaken the roof structure in the Roof-Crush Risk Vehicles in order to increase profits; (iv) its own pre-sale durability testing; and (v) Ford's own investigation of accidents involving in the Roof-Crush Risk Vehicles.

896.   Ford owed Plaintiffs and the Washington Subclass a duty to disclose the true safety and reliability of the Roof-Crush Risk Vehicles because Ford:

    a.    Possessed exclusive knowledge about the Roof-Crush Risk;

    b.    Omitted the foregoing from Plaintiffs and the Washington Subclass;

    c.    Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Roof-Crush Risk Vehicles, while withholding material facts from Plaintiffs and the Washington Subclass that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the Roof-Crush Risk.

- 246 -

897.   Ford had a duty to disclose the Roof-Crush Risk, because, having

volunteered to provide information to Plaintiffs and the Washington Subclass, Ford

had the duty to disclose not just the partial truth, but the entire truth. Further,

Plaintiffs relied on Ford's material omissions and representations that the Roof-

Crush Risk Vehicles they were purchasing were safe and free from serious safety

defects.

898.   Plaintiffs and the Washington Subclass were unaware of the omitted

material facts referenced herein, and they would not have acted as they did if they

had known of the omitted facts, in that they would not have purchased or leased

the Roof-Crush Risk Vehicles manufactured by Ford, would have paid less, and

would have taken other affirmative steps considering the information omitted from

them. Plaintiffs and the Washington Subclass members' actions were justified.

Ford was in exclusive control of the material facts, and such facts were not

generally known to the public or Plaintiffs and the Washington Subclass.

899.   Ford's deceptive acts and practices alleged herein directly and

proximately caused actual damages and an ascertainable monetary loss to Plaintiffs

and the Washington Subclass. Had Plaintiffs and the Washington Subclass

members known the truth about the Roof-Crush Risk they would not have

purchased or leased the vehicles or would have paid significantly less for them.

Plaintiffs and the Washington Subclass also suffered ascertainable, monetary loss

in the form of out-of-pocket expenses, loss of use, and lost value related to the Roof-Crush Risk Vehicles.

900.   Ford is liable to Plaintiffs and the Washington Subclass for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under Rev. Code. Wash. Ann. § 19.86.090.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class and state Subclasses, respectfully requests that the Court enter judgment in their favor and against Ford, as follows:

A.     Certification of the proposed Nationwide Class and state Subclasses, including appointment of Plaintiffs' counsel as Class Counsel;

B.     Restitution, including at the election of Nationwide Class and state Subclass members, recovery of the purchase price of their Roof-Crush Risk Vehicles, or the overpayment for their vehicles;

C.     Damages, costs, and disgorgement in an amount to be determined at trial;

D.     An order requiring Ford to pay both pre- and post-judgment interest on any amounts awarded;

E.     An award of costs and attorneys' fees; and

- 248 -

F.      Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: April 27, 2023                Respectfully Submitted,

                                     /s/ *Steve W. Berman*
                                     Steve W. Berman
                                     Thomas E. Loeser
                                     Shelby Smith
                                     **HAGENS BERMAN SOBOL SHAPIRO LLP**
                                     1301 Second Avenue, Suite 2000
                                     Seattle, WA 98101
                                     Telephone: (206) 623-7292
                                     Facsimile: (206) 623-0594
                                     steve@hbsslaw.com
                                     toml@hbsslaw.com
                                     shelby@hbsslaw.com

                                     E. Powell Miller (P39487)
                                     Sharon S. Almonrode (P33938)
                                     Dennis A. Lienhardt (P81118)
                                     **THE MILLER LAW FIRM PC**
                                     950 W. University Drive, Suite 300
                                     Rochester, MI 48307
                                     Telephone: (248) 841-2200
                                     epm@millerlawpc.com
                                     ssa@millerlawpc.com
                                     dal@millerlawpc.com

Joseph H. Meltzer
Melissa L. Yeates
Tyler S. Graden
Jordan E. Jacobson
**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
jmeltzer@ktmc.com
myeates@ktmc.com
tgraden@ktmc.com
jjacobson@ktmc.com

Matthew J. Preusch
**KELLER ROHRBACK L.L.P.**
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel: (805) 456-1496
Fax: (805) 456-1497
mpreusch@kellerrohrback.com

Gretchen Freeman Cappio
Ryan McDevitt
Adele Daniel
Emma Wright
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel: (206) 623-1900
Fax: (206) 623-3384
gcappio@kellerrohrback.com
rmcdevitt@kellerrohrback.com
adaniel@kellerrohrback.com
ewright@kellerrohrback.com

- 250 -

Elizabeth A. Fegan
**FEGAN SCOTT LLC**
150 S. Wacker Dr., 24th Floor
Chicago, IL 606606
Tel: (312) 741-1019
Fax: (312) 264-0100
beth@feganscott.com

Jonathan D. Lindenfeld
**FEGAN SCOTT LLC**
140 Broadway, 46th Floor
New York, NY 10005
Tel: (332) 216-2101
Fax: (312) 264-0100
jonathan@feganscott.com

J. Barton Goplerud
**SHINDLER, ANDERSON, GOPLERUD
& WEESE PC**
5015 Grand Ridge Drive, Suite 100
West Des Moines, IA 50265
Tel: (515) 223-4567
goplerud@sagwlaw.com

*Attorneys for Plaintiffs and the Proposed
Classes*

- 251 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 27, 2023, the foregoing document was electronically filed using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

*/s/ Steve W. Berman*
Steve W. Berman

011115-11/2243027 V1