**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**


IN RE FORD SUPER DUTY                                    Case No. 2:22-cv-12079
ROOF-CRUSH LITIGATION                             Hon. Brandy R. McMillion


_____/

### <u>OPINION AND ORDER GRANTING IN PART,</u>
### <u>DENYING IN PART DEFENDANT'S MOTION TO DISMISS (ECF No. 29)</u>

Plaintiffs[1] filed this class action against Defendant Ford Motor Company

("Ford") in relation to Super Duty pick-up truck models spanning nearly two

decades.  Before the Court is Ford's Motion to Dismiss (ECF No. 29) the Second

Consolidated Class Action Complaint ("the Complaint" or "the SCC") (ECF No.

25).  The Court held a hearing on the Motion on September 26, 2024.  For the reasons

that follow, the Court **GRANTS IN PART** and **DENIES IN PART** Ford's Motion

to Dismiss (ECF No. 29).

**I.**

**A.    Background**

"Built Ford Tough."  This multi-state class action challenges that well-known

industry motto.  At issue are model year 1999 to 2016 Ford Super Duty pick-up

trucks.  SCC, ECF No. 25, PageID.2023.  Plaintiffs allege that these trucks were

---

[1] Given the number of plaintiffs, the Court will refer to them collectively as "Plaintiffs" but will, where necessary, refer to individual plaintiffs by name.

"designed with a roof that is instantly crushed in the event of a rollover accident," causing severe injuries and even death. *Id.* They term this the "roof crush risk." *Id.* Plaintiffs claim that Ford lobbied to weaken government standards for roof strength testing and subsequently weakened the roof structure on Super Duty model trucks so it could save money. *Id.* at PageID.2026-2028. They further claim Ford knew about the roof crush risk "well before" the 1999-2016 Super Duty trucks went to market and that Ford "did nothing" to warn owners and lessees of the risk. *Id.* at PageID.2028-2029, 2032.

Plaintiffs allege that the roof crush risk exposes them to "an unreasonable risk of paralysis, grave injury, and death if their vehicle is involved in a rollover accident." ECF No. 25, PageID.2029. According to Plaintiffs, Ford failed to disclose the roof crush risk to consumers before they purchased their vehicles. *Id.* And by omitting information about the roof crush risk, they say, Ford misrepresented the "safety, reliability, functionality, and quality" of the Super Duty trucks at issue. *Id.* at PageID.2029-2030. Plaintiffs further allege that Ford "omitted the consequences, including the serious safety hazards and monetary harm caused by the Roof-Crush Risk" should they get in an accident. *Id.* at 2030.

Plaintiffs also allege that they "sustained damage" because of the "concealment and/or suppression of the facts":

> In purchasing their Roof-Crush Risk Vehicles, Plaintiffs did not get the benefit of the bargain since the vehicle was worth less than it

2

would have been without the Roof-Crush Risk, and because they own vehicles that diminished in value as a result of Ford's concealment of, and failure to timely disclose and remedy, the Roof-Crush Risk.  Had Plaintiffs been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased them at all.

ECF No. 25, PageID.2140.

## B.    Procedural History

Plaintiff Steven Beck initially sued Ford individually and on behalf of proposed nationwide and statewide classes in early September 2022.  ECF No. 1.  By late September, he had amended his complaint to add three additional plaintiffs.  ECF No. 12.  In mid-October 2022, Beck's case was consolidated with another class action under the current case number.  ECF Nos. 13 and 14.  In late October 2022, Plaintiffs filed a Consolidated Class Action Complaint, adding several more plaintiffs and claims.  ECF No. 16.

In early April 2023, this case was reassigned from the Honorable Paul D. Borman to the Honorable F. Kay Behm.  In late March 2023, Judge Behm entered a stipulated order consolidating this case with two others then-recently filed.  ECF No. 23.  A month later, Plaintiffs filed the SCC.  ECF No. 25.  This is the operative complaint.  Ford moved to dismiss the SCC shortly after Plaintiffs filed it.  ECF No. 29.  That motion is fully briefed, including supplemental authority the parties provided to the Court after they completed briefing on the motion to dismiss.  ECF

3

Nos. 36, 37, 41, 48.  The Court held a hearing on Ford's motion to dismiss on September 26, 2024.

## II.

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests a complaint's legal sufficiency."  *Norman v. FCA US, LLC*, 696 F. Supp. 3d 359, 371 (E.D. Mich. 2023).  In reviewing a 12(b)(6) motion, the Court "accept[s] all of the complaint's factual allegations as true and determine[s] whether these facts sufficiently state a plausible claim for relief."  *Fouts v. Warren City Council*, 97 F.4th 459, 464 (6th Cir. 2024) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).  The Court "must construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations as true, and examine whether the complaint contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Norris v. Stanley*, 73 F.4th 431, 435 (6th Cir. 2023) (citations and internal quotation marks omitted).  Facial plausibility requires a plaintiff to "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

**III.**

**A.   Diminution in Value or Overpayment as Actionable Injury**

Ford first argues that Plaintiffs fail to allege an actionable injury because the roof crush risk has not manifested in their vehicles.  Plaintiffs counter that they have alleged injury by virtue of having overpaid for defective vehicles and brought to the Court's attention a recent Sixth Circuit case dealing with overpayment and Article III standing, *Speerly v. Gen. Motors, LLC*, ___ F.4th ___; 2024 WL 3964115 (6th Cir. 2024).  At the hearing on Ford's motion, Ford clarified that this particular argument doesn't relate to Article III standing but instead to whether Plaintiffs have satisfied injury requirements under state substantive law.  The Court finds that they generally have.

Plaintiffs argue they have stated cognizable injuries because they overpaid for allegedly defective vehicles and they point to *Speerly* for support.  There, the Sixth Circuit addressed whether overpaying for a defective product gives Article III standing.  It answered that question in the affirmative.  *Speerly*, ___ F.4th at ___; 2024 WL 3964115 at *6-7.

In *Speerly*, the 26-state spread of plaintiffs sought class certification of a suit against General Motors for alleged defects in vehicle transmissions.  *Speerly*, ___ F.4th at ___; 2024 WL 3964115 at *1-3.  The plaintiffs alleged that, on top of other issues, their transmissions caused their vehicles to "slip, buck, kick, jerk and harshly

engage . . . ." *Id.* at *1 (quotation marks omitted).  GM press releases indicated that one of the transmissions helped with "enhanced performance and efficiency" while the other offered improved fuel economy over similar transmissions.  *Id.*  But in 2019, GM's "quality organization" issued a bulletin for "shudder" issues with the transmissions.  *Id.*  Customers with the affected transmissions reported shaking vehicles, problems with shifting, "a lot of vibrations, sputtering, and rumbling while driving," and slow acceleration.  *Id.*  Some of the vehicles with the shudder issue also had other issues, like tire imbalance, that may have played a role in or caused the shudder.  *Id.*  And in others, as demonstrated by an expert report, though owners claimed to have experienced the shudder issue, not all of those vehicles "actually exhibited the issue" claimed by the owner.  *Id.*  Yet, in those cases, fixing the other issue didn't necessarily fix the shudder problem.  *Id.*

The plaintiffs sued under various state consumer protection and warranty statutes and eventually whittled down their proposed class from 30 to 26 states. *Speerly*, ___ F.4th at ___; 2024 WL 3964115 at *3.  GM filed a partially successful motion to dismiss and the parties engaged in "several rounds of stipulated dismissals of certain individual plaintiffs . . . ." *Id.* at *4.  The plaintiffs then moved to certify the class and appoint class representatives and counsel, which the district court granted. *Id.* at *4-5. Among its arguments against that motion, GM challenged the plaintiffs' standing. *Id.* at *5.

On appeal and relevant here, GM urged the Sixth Circuit to reverse the district court's certification of the 26 subclasses because most of the class members never had transmission issues in their own vehicles. *Speerly*, ___ F.4th at ___; 2024 WL 3964116 at *6. The district court had rejected that argument, noting that each named plaintiff gave testimony of experiencing at least one of the alleged defects. *Id.* Three primary reasons controlled the district court's positive standing determination: (1) the plaintiffs' evidence "supported a suggestion" that the defect was caused by a "common design failure" and could be "expected to afflict every class vehicle sold within its useful lifetime"; (2) recoupment for any loss by a plaintiff was "immaterial" to the district court's Rule 23 analysis; and (3) the appropriate time to address "claims of absent class members whose vehicles never have manifested any defect" was at summary judgment. *Id.* (quotation marks and citation omitted). Before the Sixth Circuit, the plaintiffs argued that the defects need not manifest for every class member for a class to have Article III standing. *Id.*

The Sixth Circuit agreed with the plaintiffs. *Speerly*, ___ F.4th at ___; 2024 WL 3964116 at *6-7. In doing so, it distinguished *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), and discussed an unpublished case of the Sixth Circuit that also discussed "whether diminished value suffices to establish standing," as well as cases from other circuits. *Id.* at *6. The court also noted that every named plaintiff in the case had "experienced the shudder, shift quality issues, or both" with the problematic

7

transmission. *Id.* at \*7. Thus, the Court held that "alleging overpaying for a defective product sufficiently provides the Plaintiffs with Article III standing." *Id.* It also agreed with the district court that summary judgment is the appropriate time to address claims of "absent class members whose vehicles" have never manifested a defect. *Id.*

For its part, Ford doesn't quarrel with *Speerly*. At the motion hearing, Ford argued *Speerly* is not relevant to this case because it is not raising an Article III standing argument. Though that may be the case, the injury analysis for that inquiry cannot be separated from the injury analysis relevant to substantive state law claims. So, if a plaintiff alleges enough facts to state an injury for purposes of Article III standing, those facts would, generally speaking, be sufficient to state a claim under state substantive law. Unless, of course, state substantive law prohibits a particular theory of recovery. And that is the case here, at least for one state. *See Wallis v. Ford Motor Co.*, 362 Ark. 317 (2005) (affirming dismissal of common-law fraud and deceptive trade practices claims under Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101 *et seq*.). The Court therefore dismisses Count II as to the Arkansas subclass and Count VI for failure to state a claim due to a lack of actionable injury.[2] The remaining claims based on an overpayment or diminution-in-value

---

[2] Even if Arkansas allowed a diminution-in-value theory, for reasons explained more fully below, the Court would still dismiss Count VI because of the class action bar in Arkansas's consumer protection statute.

theory may proceed.[3]  *See, e.g., White v. DaimlerChrysler Corp.*, 368 Ill. App. 3d 278, 287-88 (Ill. App. Ct. 2006) (recognizing diminution in value as a viable theory under Illinois's consumer protection statute).

**B.    Nationwide Claims[4]**

Ford next argues that Plaintiffs lack standing to raise claims under the laws of states where none of them bought their vehicles.  ECF No. 29, PageID.3291. Plaintiffs respond that resolution of this issue—whether Plaintiffs can represent absent class members from other states—is best done at the class-certification stage. ECF No. 36, PageID.3863-3866.  In the interim, another judge in this district decided *Norman v. FCA US, LLC*, 696 F. Supp. 3d 359 (E.D. Mich. 2023), which Ford brought to the Court's attention earlier this year.  ECF No. 41.  The Court agrees with the reasoning in *Norman*, 696 F. Supp. 3d at 372-375.

---

[3] The Court finds this appropriate where Ford has not identified any state besides Arkansas that prohibits relying on overpayment or diminution in value to state an injury.  Ford is not precluded from raising such an argument in the future, if appropriately supported.

[4] At the outset, the Court questions the viability of these "nationwide" claims because there is no nationwide body of common law that would sustain claims as to any plaintiff, anywhere.  *See In re Chrysler Pacifica Fire Recall Prods. Liab. Litig.*, 706 F. Supp. 3d 746, 760-62 (E.D. Mich. 2023) (describing in the context of multidistrict litigation issues with nationwide claims including the lack of "federal general common law" or "any common law that is universally accepted by the states, which would require court to "parse the elements" of each claim "under the common law of each state" to determine if complaint states a viable claim even if some elements "may overlap from state to state.").  Nonetheless, because Plaintiffs also plead the claims in the alternative on behalf of each state-specific Subclass, the Court will address them herein.  As detailed below, certain claims will be dismissed for the unrepresented states.

The judicial power extends only to "Cases" and "Controversies." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016) (citing U.S. Const. art. III, § 2, cl. 1).  And standing is "an essential and unchanging part of the case-or-controversy requirement of Article III."  *Horne v. Flores*, 557 U.S. 433, 445 (2009) (quotation marks and citation omitted).  The Supreme Court has articulated the "irreducible constitutional minimum" for establishing standing as requiring: (1) an injury in fact (2) that is fairly traceable to the defendant's actions, and (3) that a favorable judicial decision is likely to redress.  *Spokeo*, 578 U.S. at 330.  But as Judge Berg recognized in *Norman*, 696 F. Supp. 3d at 372-73, class actions are the exception "to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (internal quotation marks omitted).

*Norman* addressed whether a named plaintiff with standing to sue in one state could sue "on behalf of similarly-situated consumers in other states with laws generally prohibiting the conduct complained of[.]"  *Norman*, 696 F. Supp. 3d at 373.  After detailing decisions of courts in this district that differed on when to evaluate Article III standing—at the motion-to-dismiss or class-certification stages—the *Norman* court discussed the Sixth Circuit's decision in *Fox v. Saginaw Cnty.*, 67 F.4th 284 (6th Cir. 2023).  *Norman*, 696 F. Supp. 3d at 372-74.  Recognizing that although *Fox* didn't arise in the "auto-defect litigation" context, *Norman* found

10

that it did "provide[] important guidance on the relationship between Rule 23 and Article III standing." *Norman*, 696 F. Supp. 3d at 374.

*Fox* involved a plaintiff who sued Gratiot County and its treasurer for a Takings Clause violation related to it retaining surplus funds when it sold his home after he failed to pay taxes. *Fox*, 67 F.4th at 290. Gratiot County and its treasurer were the only ones who harmed the plaintiff, however, a fact the plaintiff acknowledged. *Id.* at 290. Despite this, he named 26 other counties and the treasurers as defendants, then moved to certify a class to prosecute claims on behalf of similarly-situated delinquent taxpayers in those counties. *Id.* at 290-91. The district court certified the class, but the Sixth Circuit reversed. *Id.* at 300.

The *Fox* court rejected the idea that courts could delay a standing analysis until the parties filed a class-certification motion. *Fox*, 67 F.4th at 296. In doing so, it analyzed two cases the plaintiff had relied on: *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999). *See Fox*, 67 F.4th at 296-97. The context of those cases was, as Judge Berg put it, "critical" because they did not address a challenge to a named plaintiff's standing at the start of litigation but, rather, "concerned standing challenges that arose as a result of a district court's defective and overbroad class-certification decision." *Norman*, 696 F. Supp. 3d at 374 (citing *Fox*, 67 F.4th at 296). In that instance, the Sixth Circuit concluded, considering class certification before Article III standing made sense.

11

*Fox*¸ 67 F.4th at 296. But, the Sixth Circuit continued, because named plaintiffs are parties from the start, a court "must immediately concern itself with their standing because jurisdictional issues precede the merits." *Id.* at 297. Accordingly, the Sixth Circuit held that every named class representative "must allege an individual injury; they cannot piggyback off the injuries suffered by other, unidentified members of the class. And even when they have incurred an injury, they lack standing to seek class-wide relief that would go beyond remedying that injury." *Id.* at 296.

*Norman* held that, consistent with *Fox*, "the issue of standing must be addressed at the motion-to-dismiss stage rather than at the class-certification stage." *Norman*, 696 F. Supp. 3d at 375. It found that because the plaintiffs there could not "bring MMWA claims under the laws of states in which they have not been injured, they [could not] proceed on behalf of a 'Nationwide Class.'" *Id.*

Here, the named Plaintiffs do not allege injuries in states other than their own. Nor do they base their claims on the application of other states' laws. Accordingly, under *Norman*, Plaintiffs do not have standing to bring claims in the 30 unrepresented states. *See Norman*, 696 F. Supp. 3d at ; *see also Withrow v. FCA US LLC*, No. 19-13214, 2021 WL 2529847, at *5-11 (E.D. Mich. June 21, 2021) ("The proper jurisdictional question is whether the named plaintiffs have standing to pursue *each* and *every* claim of their complaint.") (emphasis in the original) (internal

citation omitted)).  The Court therefore **DISMISSES** Counts I, II, and III with respect to unrepresented states for lack of standing.

## C.    Consumer Protection, Fraud, and Unjust Enrichment

Ford argues several grounds for dismissal of Plaintiffs' consumer protection, fraud, and unjust enrichment claims.  The Court rejects some and accepts others.

### 1.    Rule 9(b) Specificity

Federal Rule of Civil Procedure 9(b) typically requires plaintiffs to articulate the "who, what, when, where, and how" of the alleged fraud.  *Greer v. Strange Honey Farm, LLC*, 114 F.4th 605, 614 (6th Cir. 2024) (quotation marks and citation omitted).  But for fraudulent omissions claims—like those here[5]—there is a less stringent (though still strict) standard.  *See In re Chevrolet Bolt EV Battery Litig.*, 633 F. Supp. 3d 921, 960-61 (E.D. Mich. 2022) (*In re Chevy Volt EV Battery*) ("Fraudulent concealment or omission claims are subject to a slightly more relaxed pleading burden; the claim can succeed without the same level of specificity required by a normal fraud claim.") (quotation marks and citation omitted).  Thus, in alleging the "who, what, when, where, and how" of the alleged omission, plaintiffs must plead: "what was omitted, who should have made the representation, the content of the omission, and what the defendant gained by the alleged fraud."  *Id.* (citing *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 256 (6th Cir. 2012)).

---

[5] Plaintiffs stated at the hearing on Ford's motion that its claims were omissions claims.

This less-stringent standard takes into consideration that "a plaintiff alleging an omission-based fraud will not be able to specify the time, place, and specific content of an omission as precisely as would a plaintiff in a false representation claim." *Beck v. FCA US LLC*, 273 F. Supp. 3d 735, 751 (E.D. Mich. 2017) (citation omitted).

In the context of class actions against auto manufacturers, plaintiffs must "state with particularity factual allegations supporting the assertion that [the manufacturer] knew about the safety implication of the [alleged defect]." *Smith v. Gen. Motors LLC*, 988 F.3d 873, 884 (6th Cir. 2021). But when it comes to the manufacturer's pre-sale knowledge, Rule 9(b)'s heightened standard doesn't "set the standard . . . ." *In re Chrysler Pacifica Fire Recall Prods. Liab. Litig.*, 706 F. Supp. 3d 746, 764 (E.D. Mich. 2023) (*In re Chrysler Pacifica Fire Recall*). The rule instead allows "general allegations about the defendant's knowledge to avoid a 12(b)(6) motion." *Smith*, 988 F.3d at 883 (citing Fed. R. Civ. P. 9(b)) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

General allegations raising the "mere possibility of fraud will not do; instead the complaint must provide the factual predicates necessary to convince [the court] that the underlying fraud in all likelihood occurred." *Greer*, 114 F.4th at 615 (cleaned up). Thus, plaintiffs may not "base claims of fraud on speculation and conclusory allegations." *Smith*, 988 F.3d at 885. This demonstrates the purpose of

Rule 9(b): "to prevent, not facilitate, casual allegations of fraud." *Id.* (quotation marks and citation omitted).

Here, Plaintiffs have met the standard—at this stage of the proceedings. Plaintiffs allege Ford failed to disclose the roof crush risk to consumers before they purchased their vehicles. ECF No. 25, PageID.2029. They further allege that Ford "also misrepresented the vehicles' safety, reliability, functionality, and quality" by omitting information about the roof crush risk. *Id.* at PageID.2029-2030. And, Plaintiffs allege, Ford also "omitted the consequences" if a class vehicle got into an accident—such as serious injuries to occupants and damage to the vehicle itself. *Id.* at PageID.2030. Thus, Plaintiffs allege Ford (the "who") should have disclosed the roof crush risk to consumers. *Id.* at PageID.2029-2030.

Plaintiffs also allege that Ford knew of the roof crush risk before it sold the class vehicles yet did "nothing to promptly warn owners and lessees." ECF No. 25, PageID.2029. In fact, Plaintiffs allege, Ford knew of the roof crush risk "well before" the class vehicles "went to market." *Id.* at PageID.2028. They include allegations detailing Ford's history of testing roof strength throughout the 60's (ECF No. 25, PageID.2098-2101); claiming that Ford and other auto industry companies lobbied the National Highway Transportation Safety Administration to "weaken[] roof strength testing procedures" (ECF No. 25, PageID.2026, 2097-2098, 2112); indicating Ford did not perform roof strength tests before vehicles were sold (ECF

15

No. 25, PageID.2094); describing its establishment of a team of engineers in 2004 specifically tasked with strengthening the roof strength of its pick-up trucks, which created a roof capable of withstanding 55,000 pounds of force yet Ford "concealed" its existence and "continued selling Super Duties with the Roof-Crush Risk for [12] years without warning anyone" (ECF No. 25, PageID.2121); referencing a statement from one of the engineers who "admitted" that the roof crush risk was the exact "'problem'" Ford was trying to "'solve'" by building stronger roofs; (ECF No. 25, PageID.2123); and test data allegedly showing changes in roof structure design (ECF No. 25, PageID.2094-2096).[6]

All these facts—taken together,  as true—satisfy Plaintiffs' general pleading burden for knowledge.[7] *See Smith*, 988 F.3d at 883 (citing Fed. R. Civ. P. 9(b)).  This satisfies the "what."  *See Norman*, 696 F. Supp. 3d at 382 ("a 'what' (a failure to disclose the . . . defect prior to sale despite knowing about it."); *id.* ("Usually,

---

[6] The Court acknowledges that the court in *Norman* cited cases indicating pre-production testing is not persuasive by itself.  *Norman*, 696 F. Supp. 3d at 382-83.  Here, however, the Court considers more than just the allegations related to pre-production testing.

[7] Although a background of industry awareness does not, by itself, suffice to establish knowledge of a specific defect in the class vehicles, it "aid[s] in nudging their allegations of knowledge from the realm of the possible into the realm of the plausible."  *In re Chrysler Pacifica Fire Recall*, 706 F. Supp. 3d at 765; *see also In re Chevy Bolt EV Battery*, 633 F. Supp. 3d at 956 (observing that general industry knowledge of lithium-ion batteries' fire risks alone may not establish knowledge of a defect, it does "make[ ] Plaintiffs' knowledge allegations somewhat more plausible").  Alone, a history of testing in the industry related to roof strength isn't enough to establish Ford's knowledge of the roof crush risk, but like the courts in *In re Chrysler Pacifica Fire Recall* and *In re Chevy Bolt EV Battery*, the Court finds these allegations make Plaintiffs' knowledge allegations more plausible.

16

Plaintiffs in these large-scale auto-defect cases overcome Rule 9(b) challenges by alleging that an auto-manufacturer knew of a uniformly defective *component*.") (emphasis added; citations omitted).

Second, Plaintiffs allege Ford could have and should have disclosed the roof crush risk to consumers, prior to purchase, at the point of sale because "they each interacted with an authorized Ford dealer at the point of sale and/or they were repeatedly exposed to Ford's advertising and marketing."   ECF No. 25, PageID.2123.  Thus, Plaintiffs have alleged sufficient facts satisfying the "when" and "where."  *See Kiriacopoulos v. Gen. Motors LLC*, No. 22-cv-10785, 2023 WL 2789622, at *6 (E.D. Mich. Apr. 5, 2023) ("[S]tatements trumpeting a vehicle's safety can cross the line from puffery to actionable misrepresentation when paired with plausible allegations that manufacturers had actual knowledge of a genuine safety risk.").

Finally, Plaintiffs allege what Ford received by concealing the roof crush risk: Plaintiffs would not have paid higher prices for their trucks had they known they were "not safe and durable," ECF No. 25, PageID.2085-2086, and, in fact, either would have paid less for their vehicles or not purchased them at all, *see* ECF No. 25, PageID.2034-2072.  That's the "how."  *See Norman*, 696 F. Supp. 3d at 382. Accordingly, the Court finds that Plaintiffs' allegations sufficiently establish the "who, what, when, where, and how" of their fraud-by-omission claims.

17

## 2.      Duty to Disclose

The Court's inquiry does not end with the "who, what, when, where, and how" analysis, however.   That's because plaintiffs raising fraud-by-omission claims generally "must also plead a duty to disclose." *Norman*, 696 F. Supp. 3d at 382 (citation omitted).  Here, the Court finds Plaintiffs have adequately alleged Ford had a duty to disclose the defect with respect to each Plaintiff.

Plaintiffs conceded at oral argument that their claims focus on Ford's omissions about the roof crush defect.  They allege that Ford essentially concealed the defect from consumers but that it had a duty to disclose.  Ford, citing caselaw from various states, says Plaintiffs haven't pleaded enough facts giving rise to a duty to disclose.  In *In re Chrysler Pacifica Fire Recall Prods. Liab. Litig.*, 706 F. Supp. 3d at 769-72, (decided after this motion was fully briefed), another judge in this district found that most of the states at issue here—Alabama, Arizona, California, Colorado, Connecticut, Florida, Illinois, Indiana, Iowa, New Jersey, North Carolina, Oregon, South Carolina, Texas, and Washington—recognize certain circumstances giving rise to a duty to disclose.  Those include when the manufacturer: "has superior knowledge of the problem" or "the defect implicates product safety"; "has superior and exclusive knowledge of the problem compared with buyers"; and "makes

18

'partial disclosures' that are rendered false or misleading by the absence of additional material details." *Id.*[8]

Montana, New Mexico, Oklahoma, and Utah recognize a duty to disclose in similar circumstances. *See Bertelsen v. Citimortgage, Inc.*, No. 16-2, 2016 WL 3282189, at *11 (D. Mont. June 14, 2016) (citing *Morrow v. Bank of Am., N.A.*, 375 Mont. 38, 324 P.3d 1167, 1184 (Mont. 2014));[9] *Salmeron v. Highlands Ford Sales, Inc.*, 271 F. Supp. 2d 1314, 1319 (D. N.M. 2003);[10] *Hampton v. Gen. Motors, LLC*, 631 F. Supp. 3d 1041, 1049 (E.D. Okla. 2022);[11] *Mitchell v. Wells Fargo Bank*, 355 F. Supp. 3d 1136, 1161-62 (D. Utah 2018).[12]

---

[8] Plaintiffs also mentioned *Daniel v. Ford Motor Co.*, 11-02890, 2016 WL 8077932 (E.D. Cal. Sept. 23, 2016) ("A duty to disclose also exists when one party actively conceals material facts from another.").

[9] "A duty to provide an accurate, full disclosure arises (1) when a person speaks, to ensure the person does not say anything misleading to another, or (2) when one has specialized knowledge of material facts to which the other party does not have access. Thus, a duty arises where one party has misled another in some way." *Bertelsen*, 2016 WL 3282189, at *11 (citing *Morrow*, 324 P.3d at 1184).

[10] The court noted the existence of a duty to disclose if one party has knowledge that the other party to a "contemplated transaction is acting under a mistaken belief," has superior knowledge "not within the reach of the other party or could not have been discovered by the exercise of reasonable diligence," or reveals "some information on a subject," which requires the party to then "reveal all known materials facts." *Salmeron*, 271 F. Supp. 2d at 1319 (quotation marks and citation omitted).

[11] "The duty to disclose arises where a party conveys only partial information in a misleading manner." *Hampton*, 631 F. Supp. 3d at 1049 (citations omitted); *see id.* ("One conveying a false impression by the disclosure of some facts and the concealment of others is guilty of fraud even though his statement is true as far as it goes, since concealment is in effect a false representations that what is disclosed is the whole truth." *Id.* (quotation marks and citations omitted).

[12] "[W]here fraud on the basis of nondisclosure is asserted," "whether a duty to speak exists is determinable by reference to all the circumstances of the case and by comparing the facts not disclosed with the object and end in view by the contracting parties. . . . [A] duty of disclosure

Thus, each state at issue has some form of duty to disclose applicable here. The Court finds the allegations here sufficient to establish that Ford had a duty to disclose the defect at issue. [13]

With respect to the availability of information about the defect, Ford brought to the Court's attention a 9th Circuit memorandum opinion, *Landers v. Ford Motor Co.*, No. 23-55552, 2024 WL 489169 (9th Cir. Feb. 8, 2024). Ford says this indirectly gives credence to the idea that Plaintiffs couldn't have known about the defect until the verdict in *Hill*. The Court appreciates the candor. Relevant here, *Landers* noted that in California "it is not the law . . . that 'public awareness of a problem through media coverage alone creates constructive suspicion for purposes of discovery.'" *Id.* at *2 (quoting *Unruh-Haxton v. Regents of Univ. of Cali*, 76 Cal. Rptr. 3d 146, 163 (Cal. Ct. App. 2008)). "This is because '[t]he statute of limitations does not begin to run when some members of the public have a suspicion of wrongdoing, but only once the plaintiffs *has* a suspicion of wrongdoing." *Id.* (quoting *Unruh-Haxton*, 76 Cal. Rptr 3d at 163).

---

may exist when the circumstances are such that the failure to disclose something would violate a standard requiring conformity to what the ordinary ethical person would have disclosed." *Mitchell*, 355 F. Supp. 3d at 1162 (quoting *First Sec. Bank of Utah N.A. v. Banberry Dev. Corp.*, 786 P.2d 1326, 1328, 1331 (Utah 1990)) (internal quotation marks omitted).

[13] The Court notes that several Plaintiffs purchased their vehicles from third or private parties. The duty to disclose relates to Ford, and the Court finds that fact has been sufficiently alleged, which at this stage of the litigation is sufficient. However, as the case proceeds and to the extent their claims remain in the case, the Court notes that Duenes (Utah), Willard (New Jersey), Thomas (North Carolina), Scott (Illinois), and Ellers (Arizona) may be subject to a different analysis based on who they purchased their vehicles from.

Though a memorandum opinion, unpublished, and outside our Circuit, the Court finds *Landers* persuasive with respect to the information that was available to Plaintiffs about the alleged defect. Additionally, Ford requests that the Court take judicial notice of the Federal Register, as it must under 44 U.S.C. § 1507. Acknowledging that publication in the Federal Register serves as constructive notice to Plaintiffs on some items, *see Roudnahal v. Ridge*, 310 F. Supp. 2d 884, 892 (N.D. Ohio 2003), questions remain related to the publicly-available information on the roof crush risk, and whether and when Plaintiffs knew or should have known of these risks and their claims. And while it may give credence to Plaintiffs' position at the motion-to-dismiss stage, the Court also recognizes that publicity about the alleged defect might be relevant at the summary-judgment stage because it may bear on when they had notice or information sufficient to "put a reasonable person on inquiry." *Yumul v. Smart Balance, Inc.*, 733 F. Supp. 2d 1134, 1143 (C.D. Cali. 2010) (citations omitted).

### 3.   Statutes of Limitations

Ford argues most of Plaintiffs' fraud-based claims are time-barred because the facts they "rely on to show the alleged fraud were publicly available when they bought their vehicles," and, for the same reason, there is no reason to toll the limitations period. The Court disagrees.

21

It is well established that "the statute of limitations is an affirmative defense, and a plaintiff generally need not plead the lack of affirmative defenses to state a valid claim." *In re Chrysler Pacifica Fire Recall*, 706 F. Supp. 3d at 773 (quoting *Francis v. GM LLC*, 504 F. Supp. 3d 659, 691 (E.D. Mich. 2020), and *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012)).   Plus, "adjudication of a limitations defense at the pleading stage is particularly inappropriate" when, like here, "factual issues relating to concealment of the defect by the defendant potentially could impact whether it is estopped from asserting the limitations defense, or whether other exceptions to the defense could apply." *Francis*, 504 F. Supp. 3d at 691 (citing *In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-02744, 2018 WL 4352702, at *7 (E.D. Mich. Sept. 12, 2018)).

### 4.    Economic Loss Doctrine

#### a.    Arizona

Ford first argues the Court should dismiss Count V of the SCC because Arizona's economic loss rule bars it.   The Court declines to do so at this time. Arizona law requires each case to "be examined to determine whether the facts preponderate in favor of the application of tort law or commercial exclusively or a combination of the two." *In re Chevy Bolt EV Battery*, 633 F. Supp. 3d at 966; *Estate of Pilgrim v. Gen. Motors LLC*, 596 F. Supp. 3d 808, 829 (E.D. Mich. 2022). Because of the "fact-intensive nature of this test," the Court declines to dismiss

Count V at this stage of the proceedings.  *In re Chevy Bolt EV Battery*, 633 F. Supp. 3d at 966.  Ford may re-raise this issue at a later stage of this litigation, if appropriate.

### b.    Arkansas

The Court analyzed this issue under Section III.A., and simply reiterates that it agrees with Ford that Arkansas law does not allow fraud claims based on a diminution-in-value theory.  As indicated there, Count VI is dismissed.

### c.    California

Ford says that California's economic loss doctrine bars fraud-based omissions claims like Plaintiffs' that simply restate contractual obligations.  Plaintiffs point to *Dhital v. Nissan N. Am., Inc.*, 84 Cal. App. 5th 828, 843 (Cal. Ct. App. 2022), which held that the economic loss doctrine does not bar a claim for fraudulent inducement by concealment.  Ford retorts that *Dhital* is currently pending before the California Supreme Court and, therefore, has "no precedential force."   ECF No. 37, PageID.3929.  The applicable California court rule, Cal. Rule of Court 8.1115(e)(1), says published opinions of a Court of Appeal that are pending review by the California Supreme Court have "no binding or precedential effect . . . ."  The Court finds it appropriate to defer a ruling on the applicability of the economic loss doctrine as to Plaintiffs' California fraud-based claim until a decision is rendered on *Dhital*. The Court therefore denies this portion of Ford's Motion, but it may re-raise the issue in future briefing once the California Supreme Court acts on *Dhital*.

#### d. Florida

Florida's economic loss rule bars fraudulent concealment claims. *See In re Takata Airbag Prod. Liab. Litig.*, 193 F. Supp. 3d 1324, 1338-39 (S.D. Fla. 2016). Though *Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1297 (E.D. Mich. 2021), found otherwise, *Chapman* based its decision on the plaintiff having cited *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos.*, 110 So.3d 399, 404 (Fla. 2013). *See Chapman*, 531 F. Supp. 3d at 1297 (citing record where the plaintiff cited cases indicating that certain states, including Florida, recognized a fraud exception to the economic loss doctrine); Case No. 19-cv-12333, Response to Motion to Dismiss, ECF No. 53, PageID.5987 n.20 (citing *Tiara*). And in *Leon v. Continental AG*, 301 F. Supp. 3d 1203, 1224-25 (S.D. Fla. 2017), cited by Ford here, the district court there found that the Florida Supreme Court had not intended a fraudulent inducement exception to the economic loss rule in the products liability arena. On that basis, the *Leon* court dismissed two of the plaintiffs' fraudulent concealment claims that "request[ed] diminished value damages despite alleging no specific property damage or personal injury . . . ." *Id.* That's just like here. Accordingly, the Court finds that the economic loss doctrine bars Plaintiffs' Florida deceptive and unfair trade practices claim. Count XV is therefore dismissed.

24

### e.     Indiana

The Court declines to apply the economic loss doctrine to Plaintiffs' Indiana consumer protection claim.  *See In re Chrysler Pacifica Fire Recall*, 706 F. Supp. 3d 746, 767-68 (E.D. Mich. 2023) ("Indiana courts reject the application of the economic loss rule to claims sounding in fraud.").

### f.     New Jersey

Ford also asks the Court to find that New Jersey's economic loss doctrine bars Count XIV.  In *In re FCA US LLC Monostable Electronic Gearshift Litig.*, 355 F. Supp. 3d 582, 592 (E.D. Mich. 2018) (*In re FCA Gearshift*), another judge in this district found that New Jersey has an exception to the economic loss rule for claims of fraud and misrepresentation.  S*ee also Estate of Pilgrim*, 596 F. Supp. 3d at 829. The Court agrees with the reasoning there.  Accordingly, the Court declines to dismiss Count XIV under the economic loss doctrine.

### g.     North Carolina

Finally, the Court finds it inappropriate to dismiss Plaintiffs' North Carolina consumer protection claim based on the economic loss doctrine.  *See Francis*, 504 F. Supp. 3d at 686-88; *In re FCA Gearshift*, 355 F. Supp. 3d at 592; *see also In re Chrysler Pacifica Fire Recall*, 706 F. Supp. 3d at 765-67 (summarizing discussion from *Francis* related to economic loss doctrine, including that in North Carolina "the economic loss doctrine has not been extended beyond embracing specific causes of

action that are not analogous to fraudulent omission, or relevant exceptions have been recognized for fraud in the nature of an inducement to enter into a contract (i.e., deceptively to persuade a customer to buy or overpay for a defective car), or in cases where the information withheld concerns a safety-related defect.").

### 5.      Class Actions Prohibited by Consumer Protection Statutes

Ford argues that consumer protection laws in Arkansas, Iowa, and South Carolina prohibit class actions. The Court agrees with respect to Arkansas and South Carolina but not Iowa.

In *Shady Grove v. Allstate*, the Supreme Court grappled with how to handle conflicts between state statutes and the federal rule governing class actions, Fed. R. Civ. P. 23. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010); *see In re FCA Gearshift*, 355 F. Supp. 3d at 599-600 (summarizing *Shady Grove*). Our district treats Justice Stevens's *Shady Grove* opinion as controlling, like many others. *See Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1301 (E.D. Mich. 2021). And here, that requires the Court "to ask: is the state law substantive (in which case it will control) or procedural (in which case Fed. R. Civ. P. 23 can supersede)?" *Id.*

As with the *Chapman* court, this Court finds persuasive Judge Roberts's discussion of *Shady Grove* in *Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772, 798-99 (E.D. Mich. 2019). Judge Roberts found "that the bar on class actions in

26

state consumer protection statutes like these is best understood as a substantive policy choice: these states do not want consumer protection claims to be maintained as part of class actions." *Chapman*, 531 F. Supp. 3d at 1301 (citing *Matanky*, 370 F. Supp. 3d at 798-99, and summarizing it).  And those states made this choice "not simply because of procedural convenience, but for reasons relating to the substantive nature of class action lawsuits." *Id.* (citing *Matanky*, 370 F. Supp. 3d at 798-99).

Arkansas's consumer protection bars class actions unless there are allegations of violation of a specific Arkansas constitutional provision: "A private class action under this subsection is prohibited unless the claim is being asserted for a violation of Arkansas Constitution, Amendment 89."  Ark. Code Ann. § 4-88-113(f)(1)(B).  South Carolina's consumer protection statute has a similar but more restrictive bar:

> Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by Section 39-5-20 may bring an action individually, *but not in a representative capacity*, to recover actual damages.

S.C. Code § 39-5-140(a) (emphasis added).

Relevant here, *Chapman* used this reasoning to dismiss the plaintiffs' consumer protection claim under South Carolina law.  *See Chapman*, 531 F. Supp. 3d at 1301.  The Court agrees it is appropriate to do the same here for not just South Carolina but also Arkansas.  *See id.*; *In re Ford Motor Co. F-150 & Ranger Truck Fuel Economy Marketing & Sales Practices Litig.*, No. 19-02901, 2022 WL 551221,

at \*19 n.3 (E.D. Mich. Fed. 23, 2022) (dismissing South Carolina consumer protection claims under class-action bar statute and finding that the plaintiffs' consumer protection claim brought under Arkansas law would have been subject to dismissal by this statutory bar were it not dismissed for lack of standing).[14]  Counts VI and XXXIII are therefore dismissed.

Iowa's statute is different.  Whereas Arkansas and South Carolina bar claims completely (with one exception in Arkansas's law), Iowa's provision allows class actions but only with permission of the state attorney general:

> A class action lawsuit alleging a violation of this chapter shall not be filed with a court unless it has been approved by the attorney general. The attorney general shall approve the filing of a class action lawsuit alleging a violation of this chapter unless the attorney general determines that the lawsuit is frivolous. This section shall not affect the requirements of any other law or of the Iowa rules of civil procedure relating to class action lawsuits.

Iowa Code § 714H.7.

The court's decision in *In re FCA Gearshift* is persuasive in this regard.  355 F. Supp. 3d at 600.  There, the court found, and this Court agrees, that the Iowa statute "does not prohibit class actions at all . . . ."  *Id.*  It instead "merely requires a certification by the state's attorney general that the claims are not frivolous."   *Id.*  Thus, the Iowa statute doesn't "alter[] the rules of decision by which the court will

---

[14] The Court notes that Chief Judge Cox also dismissed consumer protection claims under Alabama and Montana law for the same reason.  While the parties don't raise that issue here, the Court notes that both of those states are at issue in this litigation, and a similar dismissal would be appropriate if properly before the Court.

adjudicate those rights," which would render it substantive. *Stein v. Regions Morgan Keegan Select High Income Fund, Inc.*, 821 F.3d 780, 794 (6th Cir. 2016) (quotation marks and citations omitted). It instead simply regulates "the manner and means by which the litigants' rights are enforced," which the Court finds to be procedural. *Id.* Therefore, the Court denies Ford's request to dismiss Count XXI on this basis.

### 6. Unjust Enrichment

Ford asserts that Plaintiffs failed to state a claim for unjust enrichment. The Court disagrees.

"The typical elements of a cause of action for unjust enrichment are: (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant accepted and retained the benefit; and (3) it would be unjust for the defendant not to pay the plaintiff the value of the benefit." *Francis*, 504 F. Supp. 3d at 693 (brackets, quotation marks, and citation omitted).

Ford first argues Plaintiffs' unjust enrichment claims, which are grounded in fraud, do not satisfy Rule 9(b) and fail for the reasons it articulated with respect to Plaintiffs' fraud-based claims. But because the Court found that Plaintiffs alleged sufficient facts to state their fraud-by-omission claims, the Court rejects this argument.

Ford next argues that it did not retain a benefit from Plaintiffs' alleged overpayment. The Court disagrees. Plaintiffs adequately pleaded that Ford received

29

a benefit in the form of Plaintiffs (and others like them) having paid the higher price tag on the Super Duty trucks.[15]  ECF No. 25, PageID.2141-2142; *see Francis*, 504 F. Supp. 3d at 693.  They also adequately pleaded that Ford knew it received the benefit.  ECF No. 25, PageID.2142; *see Francis*, 504 F. Supp. 3d at 693.  And Plaintiffs adequately pleaded that it would be unfair for Ford to retain the benefit "because of its wrongful concealment of the defective [roof] design, which all of the plaintiffs alleged would have led them to reconsider the purchase of their car, or to have paid less for it[.]" *Francis*, 504 F. Supp. 3d at 693; ECF No. 25, PageID.2141-2142; *see, e.g., id.* at PageID.2035 ("Had Plaintiff been aware of the concealed risks that existed in the Roof-Crush Risk Vehicles, Plaintiff would have paid less for his vehicle or would not have purchased it at all.").

## D.     Breach of Implied Warranty of Merchantability

Ford raises six separate arguments about Plaintiffs' claims for breach of the implied warranty of merchantability.  The Court need only address three: timeliness, whether the trucks are fit for their ordinary purpose, and the Magnuson-Moss Warranty Act.

---

[15] Ford argues that Plaintiffs "who did not even buy their vehicle directly from a Ford dealership certainly state no unjust enrichment claim."  ECF No. 29, PageID.3315.  The court in *In re FCA Gearshift*, 280 F. Supp. 3d at 1008-09, rejected this argument, explaining: "[T]he courts dismiss such claims only where the plaintiffs fail to allege facts showing that they have bestowed some sort of benefit upon the defendant that the defendant ought not keep in equity and good conscience."  (quotation marks and citation omitted).  *See Francis*, 504 F. Supp. 3d at 693-94 (quoting *In re FCA Gearshift* and other cases rejecting this argument).  The Court rejects it here, too.

**1.     Timeliness**

Ford first argues that Plaintiffs' implied warranty claims are outside the applicable statutes of limitations and are therefore time barred.  Plaintiffs do not dispute that their claims are outside the statutes of limitations; they instead urge the Court to apply the discovery rule or equitably toll the statutes of limitations.  The Court agrees that equitable tolling is appropriate here.

Ford argues equitable tolling does not apply here for two reasons: (1) it "made no misrepresentations or omissions regarding the strength of the Super Duty roof structure" (the Court has already addressed this portion, *see* Section III.C.1); and (2) "the information from which Plaintiffs infer defect was, and has been, part of the public record for decades."  ECF No. 29, PageID.3296.  Plaintiffs respond that because of Ford's omissions, they did not discover or know of the roof crush risk until shortly before they filed their complaint, so that's when their claim accrued. ECF No. 36, PageID.3866-3869.

The Court finds it improper to dismiss the implied warranty claims on statute-of-limitations grounds.  Doing so is inappropriate "when there are disputed factual questions relating to the accrual date."  *Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*, 839 F.3d 458, 464 (6th Cir. 2016); *see Droesser v. Ford Motor Co.*, No. 19-cv-12365, 2023 WL 2746792, at *23 (E.D. Mich. Mar. 31, 2023).  "Examples of such disputed factual questions include claims that the defendant fraudulently

31

concealed facts, thereby preventing the plaintiff from learning of its injury, and complex issues about whether information in the plaintiff's possession sufficed to alert it of the claim." *Am. Premier Underwriters*, 839 F.3d at 464 (internal citations omitted). Disputed facts remain related to the limitation periods of the claims, so dismissal on this ground is improper.[16]

### 2. Fit for Ordinary Purpose

Beyond its timeliness argument, Ford also contends that Plaintiffs' implied warranty claims fail because Plaintiffs have failed to allege that their trucks aren't merchantable, i.e., they are not fit for their ordinary and intended purpose. The Court agrees, so all of Plaintiffs' implied-warranty claims are dismissed.

To be merchantable "in the usual sense," the law "requires more than that [the vehicle] simply move from point to point under its own power. Ordinary car buyers reasonably expect, and the law allows that they should expect, cars not only to provide transportation, but also do so in a reasonably safe and reliable manner." *Francis*, 504 F. Supp. 3d at 675. Thus, "an automobile is merchantable or fit for its intended purposely only where it is able reliably to operate in a 'safe condition' or to provide 'safe transportation.'" *Id.* at 676.

---

[16] The Court acknowledges the caveat in *Am. Premier Underwriters*: "[W]here one can determine from the face of the complaint that the statute of limitations has run, dismissal is appropriate." 839 F.3d at 464 (citation omitted). In that instance, resolution of the issue is a question of law, not of fact, so a court can resolve the issue at the motion-to-dismiss stage. *Id.* Here, however, the complaint alleges facts indicating Plaintiffs did not have knowledge of their claims until just before they filed suit. The Court finds that enough to avoid dismissal on this ground.

Plaintiffs say *Francis* supports their allegations of "concern" with the safety of driving their vehicles.  In *Francis*, the court noted the various reports of "dangerous incidents" involving transmission issues and found that those reports "support[ed] the concerns stated by all of the individual plaintiffs that *similar gearing issues experienced in their own vehicles* have caused them to be worried for their safety while driving the cars."  *Francis*, 504 F. Supp. 3d at 676 (emphasis added).  The court found that those facts—personal experience of the issue by each plaintiff—supported "an inference that the class vehicles were not fit for the intended purpose of providing safe and reliable transportation on public roadways."  *Id.*

But in *Beck v. FCA US LLC*, 273 F. Supp. 3d 735, 762 (E.D. Mich. 2017), another court in this district found dismissal of the plaintiff's implied warranty claims appropriate when the plaintiff still owned the class vehicle and did not include any allegations that he had "actually stopped driving his vehicle."  *See Lyman v. Ford Motor Co.*, No. 21-cv-10024, 2022 WL 856393, *8 (E.D. Mich. Mar. 22, 2022) (relying on *Beck* in rejecting class implied warranty claims where the plaintiffs failed to allege that the defect prevented ability to drive vehicle); *Weidman v. Ford Motor Co.*, No. 18-cv-12719, 2020 WL 674348, *5 (E.D. Mich. Feb. 11, 2020) (relying on *Beck* to dismiss implied warranty claims where new plaintiffs failed to allege they could not use their vehicles and collecting cases across the country finding the same); *see also Sulligan v. Ford Motor Co.*, No. 22-cv-11668, 2023 WL 5180330, at *9

33

(E.D. Mich. Aug. 11, 2023) (allowing claims to proceed where certain plaintiffs alleged they "actually experienced a vehicle shutdown while operating the vehicle on roads" but dismissing claims where there were no allegations that the vehicles "were not reasonably safe for them to operate" and those plaintiffs simply "express[ed] 'concern' over driving the vehicles" and had "feelings of the vehicles being 'unsafe.'"); *Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 588 (7th Cir. 2001) (affirming dismissal of Illinois implied warranty claim where the plaintiff claimed the vehicle was "dangerous to drive" yet "his actions belie[d]" the allegation because he continued driving the vehicle); *Sheris v. Nissan N. Am. Inc.*, 2008 WL 2354908, at *6 (D.N.J. June 3, 2008) ("The weight of authority, from courts across the country, indicates that plaintiffs may not recover for breach of the implied warranty of merchantability . . . where plaintiffs have driven their cars without problems for years.").

Here, the Court is persuaded by *Beck* and those other cases applying it. Each of the 24 named Plaintiffs who bring a claim of implied warranty of merchantability allege that they are "concerned" about driving the class vehicles because they "feel it is no longer safe for fear of what could happen if the vehicle were to be involved in a rollover accident." *See, e.g.,* ECF No. 25, PageID.2038 (Plaintiff Stowers – Arkansas). Unlike the plaintiffs in *Francis*, no Plaintiff here has alleged having experienced an issue with the roof of their vehicle, save one (Rains). *See Francis*,

34

504 F. Supp. 3d at 676. But more importantly, none allege that they have stopped using their respective Ford pick-up trucks. *See Beck*, 273 F. Supp. 3d at 762. Not even Plaintiff Rains—whose son actually experienced a rollover in Rains's F-250 Super Duty, the roof of which was "completely crushed." ECF No. 25, PageID.2063. Indeed, Rains bought *a second* Super Duty truck *after* his son's accident. ECF No. 25, PageID.2062-2063. Plaintiffs' allegations, taken as true, also demonstrate that their vehicles "operate in a 'safe condition'" and "provide 'safe transportation'" (again, save Rains' *first* Super Duty truck). *Francis*, 504 F. Supp. 3d at 675. Because Plaintiffs have no allegations stating they have stopped using their vehicles, they do not state a plausible claim that their trucks are unfit for their ordinary purpose. Accordingly, Plaintiffs' claims for breach of the implied warranty of merchantability are dismissed.

The Court **DISMISSES** Counts VII, XI, XIII, XVI, XVIII, XX, XXIII, XXV, XXVIII, XXX, XXXII, XXXIV, XXXVI, and XXXVIII.

### 3. Magnuson-Moss Warranty Act

Because Plaintiffs' Magnuson-Moss Warranty Act claims derive from their implied-warranty claims, Count I is dismissed as to all named Plaintiffs. *See In re FCA Gearshift*, 280 F. Supp. 3d 975, 1017 (E.D. Mich. 2017) ("Claims under the Magnuson-Moss Warranty Act stand or fall with express and implied warranty

35

claims under state law.") (cleaned up); *Gant v. Ford Motor Co.*, 517 F. Supp. 3d 707, 718 (E.D. Mich. 2021) (citing *Monostable*, 280 F. Supp. 3d at 1017).

**IV.**

At this stage of the litigation, the Court accepts the facts as alleged to be true. Based on that premise, Plaintiffs have alleged sufficient facts to assert several of their claims. The Court notes that discovery may prove otherwise; but currently, Plaintiffs present enough to survive Ford's Motion.

Accordingly, for the reasons explained above, Defendants' Motion to Dismiss (ECF No. 29) is **GRANTED IN PART** as follows:

- The statewide-class breach of implied warranty claims of all Plaintiffs (Counts VII, XI, XIII, XVI, XVIII, XX, XXIII, XXV, XXVIII, XXX, XXXII, XXXIV, XXXVI, and XXXVIII) are **DISMISSED**;

- The nationwide-class Magnuson-Moss Warranty Act claim (Count I) is **DISMISSED** in full;

- The nationwide-class Fraudulent Concealment claim (Count II) is **PARTIALLY DISMISSED**, with respect to the 30 unrepresented states and Arkansas only;

- The nationwide-class Unjust Enrichment claim (Count III) is **PARTIALLY DISMISSED**, with respect to the 30 unrepresented states only;

- The Consumer Protection claims in Count VI, XV, and XXXIII are **DISMISSED**.

The Motion to Dismiss is **DENIED** with respect to the following claims, which will proceed:

- The nationwide-class Fraudulent Concealment and Unjust Enrichment claims (Counts II and III) with respect to the 19 remaining represented states;

- The remaining Consumer Protection claims (Counts IV, V, VIII, IX, X, XII, XIV, XVII, XIX, XXI, XXII, XXIV, XXVI, XXVII, XXIX, XXXI, XXXV, XXXVII, and XXXIX).

**IT IS HEREBY ORDERED** that Counts I, VI, VII, XI, XIII, XV, XVI, XVIII, XX, XXIII, XXV, XXVIII, XXX, XXXII, XXXIII, XXXIV, XXXVI, and XXXVIII are **DISMISSED**.  **IT IS FURTHER ORDERED** that Count II is **PARTIALLY DISMISSED** with respect to the 30 unrepresented states and Arkansas only, and Count III is **PARTIALLY DISMISSED** with respect to the 30 unrepresented states only.

      **IT IS SO ORDERED.**

Dated: September 30, 2024                  s/Brandy R. McMillion
                                                   BRANDY R. MCMILLION
                                                   United States District Judge